IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

DEBRA BLAKE, GLORIA JOHNSON,
JOHN LOGAN, individuals, on behalf of
themselves and all others similarly situated,

              Plaintiffs,

         v.

CITY OF GRANTS PASS,

           Defendant.

Case No. 1:18-cv-01823-CL

OPINION AND ORDER

_____

CLARKE, Magistrate Judge.

      This case involves a certified class of homeless individuals residing in and around Grants

Pass, Oregon. The class members allege that the City of Grants Pass has a web of ordinances,

customs, and practices that, in combination, punish people based on their status of being

involuntarily homeless. This case comes before the Court on cross-motions for summary

judgment. The Court has also considered amicus briefs submitted by League of Oregon Cities

and the National Law Center on Homelessness and Poverty. For the reasons below, Plaintiffs'

Motion for Summary Judgment (Dkt. No. 62) is GRANTED in part and DENIED in part, and

Defendant's Motion for Summary Judgment (Dkt. No. 80) is DENIED.[1]

## STANDARD OF REVIEW

Summary judgment shall be granted when the record shows that there is no genuine

dispute as to any material facts and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving

party has the initial burden of showing that no genuine issue of material fact exists. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

2001) (en banc). The court cannot weigh the evidence or determine the truth but may only

determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796,

800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to

the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at

250. Conclusory allegations unsupported by factual material are insufficient to defeat a motion

for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the

opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts

which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether

a party has met its burden, the court views the evidence in the light most favorable to the non-

moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

---

[1] The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

## BACKGROUND

This case is about respecting the dignity of homeless individuals and the City of Grants Pass' ability to protect the safety and welfare of its citizens. Unsheltered homelessness is an ever-growing crisis nationwide, and the overwhelming majority of homeless individuals are not living that way by choice. According to the United States Department of Housing and Urban Development ("HUD"), there were an estimated 533,000 homeless individuals in the United States in 2018; more than a third of whom were "unsheltered homeless," meaning, individuals "whose primary nighttime location [wa]s a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, . . . or camping ground."[2] HUD's figures are obtained using what is known as a "point-in-time" or "PIT" count, which, as its name suggests, is arrived at by counting the number of people in a city or county who are homeless on a particular night.[3] HUD requires local homelessness assistance and prevention networks to conduct a PIT count each year as a condition of federal funding. A 2001 administrative study found that the true size of a homeless population may be anywhere between 2.5 to 10 times larger than what can be estimated by a PIT count.[4] As the Ninth Circuit recognized in *Martin v. City of Boise*, there are many reasons for this undercount:

> It is widely recognized that a one-night point in time count will undercount the homeless population, as many homeless individuals may have access to temporary housing on a given night, and as weather conditions may affect the number of available volunteers and the number of homeless people staying at shelters or accessing services on the night of the count.

---

[2] National Law Center on Homelessness & Poverty, *Housing Not Handcuffs 2019: Ending the Criminalization of Homelessness in U.S. Cities* 28 n. 15 (2019), http://nlchp.org/wpcontent/uploads/2019/12/HOUSING-NOT-HANDCUFFS-2019-FINAL.pdf [hereinafter *Housing Not Handcuffs*].
[3] *Id.* at 28.
[4] *Id.*

920 F.3d 584, 604 (9th Cir.), *cert. denied sub nom. City of Boise, Idaho v. Martin*, 140 S. Ct. 674, (2019).

To combat the homeless crisis, many local governments have created ordinances—such as the ones challenged by Plaintiffs in this case—that ban "camping" or similar activities in all or parts of a city. These ordinances are often referred to as "quality of life laws."[5] Enforcing quality of life laws is an expensive endeavor nationwide. For example, the City of Los Angeles spends $50 million annually policing criminal and civil quality of life laws.[6] By contrast, the City of Los Angeles spends only $13 million on providing housing and services to the country's largest homeless population.[7] Likewise, a Seattle University study found that the cost to the City of Seattle for enforcing just one of its six quality of life laws was $2.3 million over five years.[8]

The City of Grants Pass, Oregon, the city involved in this case, had a population of 23,000 people according to the 2000 census, and it is now estimated to have more than 38,000 people.[9] The development of affordable housing in Grants Pass has not kept up with the population growth. City Manager Aaron Cubic confirmed in his deposition that Grants Pass has a vacancy rate of 1% and that "essentially means that there's no vacancy." Edward Johnson Decl., Ex. 1, Cubic Depo. at p. 49, lines 1-10 (Dkt. #63-1). Kelly Wessels, the Chief Operating Officer of the Community Action Agency that serves Grants Pass testified that "Grants Pass'

---

[5] *See* Joshua Howard et al., *At What Cost: The Minimum Cost of Criminalizing Homelessness in Seattle and Spokane,* HOMELESS RIGHTS ADVOCACY PROJECT 10 (2015), https://digitalcommons.law.seattleu.edu/hrap/10.

[6] Gale Holland, *L.A. Spends $100 Million a Year on Homelessness, City Report Finds*, LOS ANGELES TIMES, Apr. 16, 2015, https://www.latimes.com/local/lanow/la-me-ln-homeless-caoreport-20150416-story.html.

[7] *Housing Not Handcuffs*, *supra* note 2, at 71.

[8] *See* Joshua Howard et al., *At What Cost: The Minimum Cost of Criminalizing Homelessness in Seattle and Spokane,* HOMELESS RIGHTS ADVOCACY PROJECT iii (2015), https://digitalcommons.law.seattleu.edu/hrap/10.

[9] http://worldpopulationreview.com/us-cities/grants-passor-population/.

stock of affordable housing has dwindled to almost zero.  Landlords routinely require an

applicant to have an income that is three times the monthly rent.  Rental units that cost less than

$1,000/month are virtually unheard of in Grants Pass." Kelly Wessels Decl. ¶ 7 (Dkt. #42).

A point-in-time count of homeless individuals was conducted by the United Community

Action Network ("UCAN") on January 30, 2019, in Grants Pass.  UCAN counted 602 homeless

individuals in Grants Pass. Wessels Decl. ¶ 6 (Dkt. #42).  Another 1,045 individuals were

counted as "precariously housed," meaning that they were sleeping at the home of somebody

else, or "couch surfing." *Id.*

In March 2013, the Grants Pass City Council hosted a Community Roundtable,

hereinafter referred to as the "2013 Roundtable Meeting," to "identify solutions to current

vagrancy problems."  Wessels Decl. ¶ 8, Ex. 1 (minutes of public roundtable) (Dkt #65).

Minutes from this meeting show that the City Council President stated, "the point is to make it

uncomfortable enough for them in our city so they [referring to homeless individuals] will want

to move on down the road." Wessels Decl., Ex. 1 at 2 (Dkt. #65-1).  At the end of the meeting, a

list of "actions to move forward on" was created.  These action items included (i) ways to

increase police presence downtown; (ii) create an exclusion zone and possibly have a blanket

trespassing regulation; (iii) specific amount of misdemeanors leading to prosecution; (iv) not

feeding in parks or other specific areas in the city; (v) posting "zero tolerance" signs stating

certain ordinances will be strictly enforced; (vi) look into the possibility of creating a "do not

serve" or "most unwanted" list; (vii) pass out the trespassing letters and get word out to have

them signed; and (viii) provide assistance in constructing safe areas at agencies to protect

volunteers from aggressive behavior. *Id.* at 13.  City Manager Aaron Cubic confirmed that the

action items from the 2013 Roundtable Meeting were copied into the City's strategic plans in the

form of an objective to "address the vagrancy issue" starting with the 2013-14 Grants Pass

Strategic Plan up to the current 2019 Grants Pass Strategic Plan.  Edward Johnson Decl., Ex. 1,

Cubic Depo. at p. 29 lines 11-16; p. 46 line 20 to p. 48 line 10. (Dkt. #63-1).  The City Manager

also confirmed that one of the action items related to this objective was the "targeted

enforcement of illegal camping."  *Id.* at p. 36 line 16 to p. 37 line 5.

There are no homeless shelters in Grants Pass that qualify as "shelters" under the criteria

provided by HUD.  The housing option cited by the City that most resembles a shelter is the

Gospel Rescue Mission ("GRM"), which operates transitional housing programs in Grants Pass.

GRM Director of Resident Services, Brian Bouteller, testified that GRM offers 30-day

transitional housing in two facilities: one facility is for women and children with capacity for 60

people and the other for men with 78 spaces.  Edward Johnson Decl., Ex. 2, Bouteller Depo. p.

18 lines 10-15 (Dkt. #63-2).  There is no program for men with children or unaccompanied

minors.  *Id.* at Bouteller Depo. p. 19, lines 5-8.  Homeless individuals in these programs are

required to work six-hour days, six days a week in exchange for a bunk for 30 days.  *Id.* at

Bouteller Depo. p. 48 line 23-p. 51 line 5.  During this 30-day period, people are not permitted to

look for outside work.  *Id.* at Bouteller Depo. at p. 51 line 25-p. 52 line 4.  It is mandatory that

GRM residents attend a traditional Christian Chapel twice a day and go to a Christian Church

that follows the Nicene and Apostle's Creed every week.  *Id.* at Bouteller Depo. at p. 33 line 10-

p. 35 line 3.  Before a person is considered for admission at GRM, they must agree to comply

with a lengthy list of rules.  For example, if you have serious or chronic medical or mental health

issues that prevent you from participating in daily GRM life, you may not be able to stay at the

GRM; you are to remain nicotine free during your stay at GRM; all intimate relationships other

than legal/biblical marriage, regardless of gender, either on or off Mission property are strictly

forbidden. Edward Johnson Decl., Ex 3 (Dkt. #63-3). GRM has avoided seeking government funding so that it can maintain these restrictive rules. Johnson Decl., Ex 2, Bouteller Depo. p. 15 lines 15-23 (Dkt. #63-2).

The class of involuntarily homeless people living in and around Grants Pass, Oregon was certified by this Court on August 7, 2019. (Dkt. #47). The class is defined as all involuntarily homeless individuals living in Grants Pass, Oregon, including homeless individuals who sometimes sleep outside city limits to avoid harassment and punishment by Defendant City of Grants Pass as addressed in this lawsuit. The class representatives allege that each of their situations fall under the definition of homelessness adopted by HUD. 24 C.F.R § 582.5 (2012). HUD's definition encompasses a variety of living situations, including youth homelessness, *id.* § 582.5(3); individuals fleeing domestic violence, *id.* § 582.5(4); individuals "living in a supervised publicly or privately operated shelter designed to provide temporary living arrangements," *id.* § 582.5(1)(ii); and individuals whose primary nighttime residence "is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, abandoned building, bus or train station, or camping ground, *id.* § 582.5(1)(i).

Class representatives allege that their situations are just three representations of modern homelessness in the United States. Class representative, Debra Blake, lost her job and housing approximately ten years ago and has been involuntarily homeless in Grants Pass ever since. Blake Decl. ¶ 3 (Dkt. #90). At the time of class certification, Ms. Blake was living in temporary transitional housing, but her ninety-day stay expired and she has returned to sleeping outside. As recently as September 11, 2019, Ms. Blake was cited for illegal camping and "prohibited conduct" in Riverside Park in Grants Pass because she was laying in the park in a sleeping bag at 7:30 a.m. *Id.* ¶ 7. Ms. Blake was convicted and fined $590. Later that same morning, the same

officer wrote Ms. Blake a citation for "criminal trespass on City property" with an associated fine of $295. *Id.* Ms. Blake was also issued a park exclusion on September 11, 2019. *Id.* ¶ 8. Ms. Blake filed an appeal and the exclusion was lifted without explanation after she had already been excluded from all Grants Pass parks for two weeks. *Id.* Currently, Ms. Blake owes the City over $5,000 in unpaid fines related to enforcement of the ordinances at issue while living outside in Grants Pass. Class representative, John Logan, has been intermittently homeless in Grants Pass for the last ten years. Mr. Logan currently sleeps in his truck at a rest stop north of Grants Pass because he fears being awakened and ticketed if he sleeps in his truck within the City. Logan Decl. ¶ 2 (Dkt. #67). Mr. Logan is a licensed home care provider and his clients have allowed him to sleep on a mattress in a room they use for storage approximately four to five nights a week. *Id.* ¶ 3. However, that job ended in October or November 2019. *Id.* Class representative, Gloria Johnson, has been living out of her van since at least before this litigation began. Johnson Decl. ¶ 2 (Dkt. #91). Ms. Johnson has parked her van to sleep outside of town on both BLM land and county roads. She claims that she has been asked to move along several times. *Id.* ¶¶ 3-5. While their exact circumstances and stories may vary, the three class representatives all share the need to conduct the life sustaining activities of resting, sleeping, and seeking shelter from the elements while living in Grants Pass without a permanent home.

Through their appointed class representatives, Plaintiffs move for summary judgment on each of their claims. Plaintiffs allege that the City of Grants Pass, through a combination of ordinances, customs, and policies, has unconstitutionally punished them for conducting life-sustaining activities and criminalized their existence as homeless individuals. Plaintiffs seek an order from this Court declaring that the City's enforcement of Grants Pass Municipal Codes ("GPMC") 5.61.020 (the "anti-sleeping ordinance"); GPMC 5.61.030 and GPMC 6.46.090 (the "anti-camping ordinances"), GPMC 6.46.350 (the "park exclusion ordinance") and criminal trespass laws stemming from violations of those ordinances are unconstitutional as applied to the

plaintiff class. Plaintiffs also seek an injunction prohibiting the City from enforcing those ordinances and related criminal trespass laws against the plaintiff class unless and until members of the class have the opportunity to obtain shelter within the City. The exact language of the ordinances at issue are as follows:

### 5.61.010 Definitions
A. "To Camp" means to set up or to remain in or at a campsite.
B. "Campsite" means any place where bedding, sleeping bag, or other material used for bedding purposes, or any stove or fire is placed, established, or maintained for the purpose of maintaining a temporary place to live, whether or not such place incorporates the use of any tent, lean-to, shack, or any other structure, or any vehicle or part thereof.

### 5.61.020 Sleeping on Sidewalks, Streets, Alleys, or Within Doorways Prohibited
A. No person may sleep on public sidewalks, streets, or alleyways at any time as a matter of individual and public safety.
B. No person may sleep in any pedestrian or vehicular entrance to public or private property abutting a public sidewalk.
C. In addition to any other remedy provided by law, any person found in violation of this section may be immediately removed from the premises.

### 5.61.030 Camping Prohibited
No person may occupy a campsite in or upon any sidewalk, street, alley, lane, public right of way, park, bench, or any other publicly-owned property or under any bridge or viaduct, unless (i) otherwise specifically authorized by this Code, (ii) by a formal declaration of the City Manager in emergency circumstances, or (iii) upon Council resolution, the Council may exempt a special event from the prohibitions of this section, if the Council finds such exemption to be in the public interest and consistent with Council goals and notices and in accordance with conditions imposed by the Parks and Community Services Director. Any conditions imposed will include a condition requiring that the applicant provide evidence of adequate insurance coverage and agree to indemnify the City for any liability, damage or expense incurred by the City as a result of activities of the applicant. Any findings by the Counsel shall specify the exact dates and location covered by the exemption.

**6.46.090 Camping in Parks**
A. It is unlawful for any person to camp, as defined in GPMC Title 5, within the boundaries of the City parks.
B. Overnight parking of vehicles shall be unlawful. For the purposes of this section, anyone who parks or leaves a vehicle parked for two consecutive hours or who remains within one of the parks as herein defined for purposes of camping as defined in this section for two consecutive hours, without permission from the City Council, between the hours of midnight and 6:00am shall be considered in violation of this Chapter.

**6.46.350 Temporary Exclusion from City Park Properties**
An individual may be issued a written exclusion order by a police officer of the Public Safety Department barring said individual from all City Park properties for a period of 30 days, if within a one-year period the individual:
A. Is issued 2 or more citations for violating regulations related to City Park properties, or
B. Is issued one or more citations for violating any state law(s) while on City Park property.

Plaintiffs also challenge the appeal process for park exclusions as violating their

procedural due process rights. The language detailing the appeal procedures are found in GPMC

6.46.355:

**6.46.355 Appeal and Hearing**
If the individual who is issued a written exclusion order files a written objection to the exclusion with the City Manager within 2 business days, the matter shall be placed on the City Council's agenda not earlier than 2 days after receiving the objection. The objection may be heard by the Council at its discretion at a regular meeting, at a Council workshop, or at a special meeting. The exclusion order shall remain in effect pending the hearing and decision of the Council. At the hearing the staff shall provide the Council with information regarding the exclusion order and the individual shall be allowed to present relevant evidence. The staff shall have the burden of proof by a preponderance of evidence.

The two camping ordinances carry a mandatory fine of $295. The fine for illegal

sleeping is $75. GPMC 1.36.010. When unpaid, the fines increase to $537.60 and $160

respectively due to "collection fees." Johnson Decl., Ex. 9 at 5-6 (Dkt. #63-9). Plaintiffs were

provided 615 citations and 541 incident reports issued pursuant to three of these ordinances:

GPMC 5.61.020 (the anti-sleeping ordinance), GPMC 5.61.030 (the anti-camping ordinance),

GPMC 6.46.090 (the anti-camping in parks ordinance). Inessa Wurscher Decl. ¶¶ 4-5 (Dkt.

#64). Of the 615 tickets, 313 were for illegal sleeping, 129 were for illegal camping in the parks

and 182 were for illegal camping. *Id.* ¶ 5 (some citations were for more than one offense). The

number of citations rose from 24 tickets in 2012 to 228 tickets in 2014, a significant increase

following the 2013 Roundtable Meeting. *Id.*

## DISCUSSION

I.    **Grants Pass' policy and practice of punishing homelessness violates the Cruel and Unusual Punishment Clause of the Eighth Amendment.**

      a.  *Martin v. Boise* **is controlling precedent.**

The United States Constitution prohibits punishing people for engaging in unavoidable

human acts, such as sleeping or resting outside when they have no access to shelter. *Martin v.*

*Boise*, 920 F.3d 584 (9th Cir. 2019) *cert. denied* 2019 U.S. LEXIS 7571 (Dec. 16, 2019). In

*Martin*, the Ninth Circuit held that "so long as there is a greater number of homeless individuals

in [a city] than the number of available beds [in shelters]," a city cannot punish homeless

individuals for "involuntarily sitting, lying, and sleeping in public." *Id.* at 617. That is, as long

as there are no emergency shelter beds available to homeless individuals, "the government

cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the

false premise they had a choice in the matter." *Id.* (quoting *Jones v. City of Los Angeles*, 444

F.3d 1118, 1138 (9th Cir. 2006), *vacated on other grounds*, 505 F.3d 1006 (9th Cir. 2007)).

*Martin* is binding precedent on this Court. In *Martin*, six plaintiffs who were or had

recently been homeless residents of Boise, Idaho challenged two city ordinances that punished

homeless people for sleeping or camping in public spaces. The Boise "camping ordinance"

prohibited and punished the "use of 'any streets, sidewalks, parks, or public places as a camping

place at any time.'" *Id.* at 603. Camping was defined as "the use of public property as a temporary or permanent place of dwelling, lodging, or residence." *Id.* at 603-604. The Boise "disorderly conduct ordinance" prohibited "occupying, lodging, or sleeping in any building, structure, or public place, whether public or private . . . without the permission of the owner or person entitled to possession or in control thereof." *Id.* at 604.

In this case, Grants Pass' two anti-camping ordinances prohibit "occupying a campsite" on "any publicly-owned property" in the City of Grants Pass. GPMC 5.61.030; GPMC 6.46.090. "Campsite" is defined as "any place where bedding, sleeping bag, or other material used for bedding purposes . . . is placed . . . for the purpose of maintaining a temporary place to live." GPMC 5.61.010(B). The camping ordinances apply to all public spaces in Grants Pass at all times, including parks. The camping ordinances also prohibit anyone from sleeping in their cars for two consecutive hours within any Grants Pass park parking lot between the hours of midnight and 6:00 a.m. GPMC 6.46.090(B). The anti-sleeping ordinance prohibits sleeping "on public sidewalks, streets, or alleyways at any time . . . ." GPMC 5.61.020. Additionally, "[n]o person may sleep in any pedestrian or vehicular entrance to public or private property abutting a public sidewalk." *Id.* These ordinances, in combination, prohibit individuals from sleeping in any public space in Grants Pass while using any type of item that falls into the category of "bedding" or is used as "bedding."

Grants Pass takes the position that *Martin* simply confirms that a city cannot criminalize the unavoidable act of sleeping outside when there are not enough shelter beds available. Grants Pass argues that the City amended its anti-camping ordinances to remove the word "sleeping" after *Martin*. On January 2, 2019, the City amended GPMC 6.46.090 by removing the word "sleeping" so that the act of "sleeping" was to be distinguished from the prohibited conduct of

"camping" under the City's Camping in the Parks Ordinance. Aaron Hisel Decl. ¶¶ 12, 13, Exs. 11, 12 (Dkt. #81) . The City's intent for making this change "was to make it clear that those without shelter *could* engage in the involuntary acts of sleeping or resting in the City's parks but would still be prohibited from the voluntary conduct of maintaining a 'campsite' in the parks as a 'place to live.'" Defendant's Motion at 35 (Dkt. #80) (emphasis in original). The Court appreciates the City's attempt to comply with *Martin*. However, Grants Pass ignores the basic life sustaining need to keep warm and dry while sleeping in order to survive the elements. Under the Grants Pass ordnances, if a homeless person sleeps on public property with so much as a flattened cardboard box to separate himself from the wet cold ground, he risks being punished under the anti-camping ordinance. Grants Pass cannot credibly argue that its ordinances allow sleeping in public without punishment when, in reality, the only way for homeless people to legally sleep on public property within the City is if they lay on the ground with only the clothing on their backs and without their items near them. That cannot be what *Martin* had in mind. Maintaining a practice where the City allows a person to "sleep" on public property, but punishes him as a "camper" if he so much as uses a bundled up item of clothing as a pillow, is cruel and unusual punishment. Therefore, this Court finds that it is not enough under the Eight Amendment to simply allow sleeping in public spaces; the Eight Amendment also prohibits a City from punishing homeless people for taking necessary minimal measures to keep themselves warm and dry while sleeping when there are no alternative forms of shelter available.

As was the case in *Martin,* Grants Pass has far more homeless people than "practically available" shelter beds. In *Martin,* the Ninth Circuit's math reflected 867 homeless individuals in Ada County Idaho (an unknown number in Boise) while Boise had 354 emergency shelter beds and 92 overflow mats. *Martin* 920 F.3d at 604, 606. On January 30, 2019, the Point in

Time Count[10] in Grants Pass counted 1,673 unduplicated individuals, 602 of whom were

"homeless" and the rest of whom were "precariously housed or doubled up." Wessels Decl. ¶¶

5-6 (Dkt. #42). The mathematical ratio in the record as it currently stands is 602 homeless

people (with another 1,071 on the verge of homelessness) in Grants Pass and, on the other side of

the ledger, zero emergency shelter beds. The numbers here are clear, overwhelming, and

decisive.

The Gospel Rescue Mission ("GRM") is the only entity in Grants Pass that offers any

sort of temporary program for some class members year-round. However, GRM cannot be

included in the mathematical ratio of homeless people to shelter beds because GRM has lost its

designation as a HUD certified emergency shelter. Wessels Decl. ¶ 12 (Dkt. #29). GRM is also

considerably less accessible than even the shelters in *Martin* because it does not offer temporary

emergency shelter and has substantial religious requirements and other restrictive rules. GRM

does not offer "emergency shelter," only a "30-day Residential Program." Bouteller Depo. p. 27

lines 11-18. This program offers extended stays and is more akin to a transitional housing

program than a homeless shelter. Bouteller Depo. p. 18 lines 10-15; Wessels Decl. ¶ 12 (Dkt.

#29). Additionally, there are several strict rules for residents of GRM, including remaining

nicotine free while on or off the premises and mandatory attendance to Christian church and

other church affiliated activities. Even without these rules, GRM's 138 beds would not be nearly

enough to accommodate the at least 602 homeless individuals in Grants Pass.

Grants Pass argues that Plaintiffs have alternative "realistically available" shelter outside

the City on federal BLM land, Josephine County land, or state rest stops. This remarkable

---

[10] The Ninth Circuit in *Martin* also used PIT Counts to determine the number of homeless people in the area and commented that PIT Counts typically undercount the homeless population in a community because of difficulty in locating people, weather and volunteer issues. *Martin* at 604.

argument not only fails under *Martin*, but it also sheds light on the City's attitude towards its homeless citizens. Essentially, Grants Pass argues that it should be permitted to continue to punish its homeless population because Plaintiffs have the option to just leave the City. The City's suggestion that because it is geographically smaller than Boise or other cities, it should be allowed to drive its homeless population onto "nearby" federal, state, or Josephine County land, is not supported by *Martin*. Additionally, the record does not support the suggestion that homeless people are welcome to live without interruption by law enforcement at these locations. BLM land is available for recreational camping, not as a space for emergency shelter. Fed. Reg. Vol. 70, No. 159 (Aug. 18, 2005). The campsites cost money. Aaron Hisel Decl., Ex. 1 at 52 (Dkt. #81-1). Living, establishing occupancy, or using this land for "residential purposes" is specifically prohibited, and there are limits on how long a person can stay. Fed. Reg. Vol. 70, No. 159; *See also* Gloria Johnson Decl. ¶¶ 3-5; Blake Decl. ¶ 15. Homeless people who attempt to live on BLM land are subject to trespass prosecution under 43 C.F.R. 2808.10, fined $330, and summoned to this Court. Likewise, Josephine County does not welcome non-recreational camping in its parks. The County issued a letter from its Parks Director on November 12, 2019, stating that "County Parks are not a good alternative for nonrecreational campers – individuals or families who need a place to sleep, due to not having a permenant [sic] residents [sic]." Wessels Decl., Ex. 1 (Dkt. #89-1). This letter urges homeless services providers not to pay for campsites for homeless individuals in County Parks. Wessels Decl. ¶ 8 (Dkt. #89). Similarly, camping, setting up a tent, or remaining in a rest stop for more than 12 hours in a 24-hour period are explicitly prohibited. OAR 734-030-0010(18).

Finally, the City lists three services offered within Grants Pass that similarly do not change the equation under *Martin*. In February 2020, the Umpqua Community Action Network

(UCAN) opened a warming center that may hold up to 40 individuals on nights when the temperature is either below 30 degrees or below 32 degrees with snow. Wessels Decl. ¶ 9 (Dkt. #89). From the record, it appears 131 different people have stayed at the warming center since it opened. *Id.* ¶¶ 9-11. As of the filing of Plaintiffs' Reply Brief, the center had been open sixteen nights and reached capacity on every night except the first night it opened, when it had 32 occupants. *Id.* ¶ 11. While the opening of a warming shelter is positive for the City, this emergency warming facility is not a shelter for the purposes of the *Martin* analysis because the facility does not have beds and is not available consistently throughout the year. *Id.* ¶ 9. Even if the warming center did count as a shelter under HUD, the capacity of the warming center is not large enough to accommodate the amount of homeless people in Grants Pass.

The City also referenced a "sobering center" where intoxicated individuals may be temporarily held and a youth shelter. Response Br. at 13 (Dkt. #80). The sobering center is not a shelter. It allows for temporary placement for "highly intoxicated" individuals while they sober up, and for individuals who are creating a nuisance but "do not warrant a trip to jail." Aaron Hisel Decl., Ex. 1 at 33 (Dkt #81-1). Plaintiffs claim that the sobering center has no beds and consists of a chair with restraints and 12 locked rooms with toilets where people can sober up for several hours. Edward Johnson Decl., Ex. 2 (Dkt. #92-2). Hearts with a Mission Youth Shelter runs an 18-bed facility where minors aged 10-17 may stay for 72 hours, unless they have parental consent to stay longer. Edward Johnson Decl. ¶ 4 (Dkt. #92). This shelter does not have enough beds to serve the number of homeless individuals in Grants Pass and is not "practically available" to class members in this case because it is reserved for minors. The record is undisputed that Grants Pass has far more homeless individuals than it has practically available shelter beds.

This case cannot be distinguished from the holding in *Martin*. The alternative shelters suggested by the City do not change the equation set out in *Martin*. Because Grants Pass lacks adequate shelter for its homeless population, its practice of punishing people who have no access to shelter for the act of sleeping or resting outside while having a blanket or other bedding to stay warm and dry constitutes cruel and unusual punishment in violation of the Eighth Amendment.

### b. The Eighth Amendment prohibits cruel and unusual punishment whether the punishment is designated as civil or criminal.

Grants Pass argues that the Eighth Amendment analysis does not apply to the ordinances at issue in this case because they are designated as violations and, therefore, not criminal matters. To support this assertion, Grants Pass quotes the Oregon Court of Appeals, which found "[a] violation is not a crime." *State v. Dahl*, 185 Or App 149, 152-56 (2002) (analyzing Oregon's statutory distinctions between crimes and civil offenses and holding, among other things, that the Fifth Amendment does not apply to violations precisely because they are not crimes). However, the label of crime or violation is not dispositive where the Eighth Amendment is concerned. The focus, for Eighth Amendment purposes, is the punishment associated with the crime, violation, or civil penalty. Even though Grants Pass labels the ordinances as violations, offenders of these violations are still subject to punishment. As the United States Supreme Court has held,

> The purpose of the Eighth Amendment . . . was to limit the government's power to punish. *See Browning-Ferris*, 492 U.S. at 266-267, 275. The Cruel and Unusual Punishments Clause is self-evidently concerned with punishment. 'The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law.' *United States v. Halper*, 490 U.S. 435, 447-448, (1989).

*Austin v. United States,* 509 U.S. 602, 609-610 (1993).

Unlike the Fifth Amendment's Self-Incrimination Clause, the Eighth Amendment's prohibition on punishing an involuntary act or condition applies to punishment beyond "criminal" cases. Again, the Supreme Court made clear,

[The United States] further suggests that the Eighth Amendment cannot apply to a civil proceeding unless that proceeding is so punitive that it must be considered criminal [citations omitted]. We disagree. Some provisions of the Bill of Rights are expressly limited to criminal cases. The Fifth Amendment's Self-Incrimination Clause, for example, provides: "No person...shall be compelled in any criminal case to be a witness against himself." The protections provided by the Sixth Amendment are explicitly confined to "criminal prosecutions." [Citation omitted]. The text of the Eighth Amendment includes no similar limitation. Nor does the history of the Eighth Amendment require such a limitation...

*Austin,* 509 U.S. at 608.

The Supreme Court further opined that provisions of civil forfeiture were punitive because "a civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Id.* at 610 (emphasis in original). Ultimately, the Supreme Court held that civil forfeiture constitutes "payments to a sovereign as punishment for some offense, and, as such, is subject to the limitations of the Eighth Amendment excessive fines clause." *Id.* at 622.

The Court's reasoning and holding in *Austin* has been affirmed by subsequent decisions. Most recently, in *Timbs v. Indiana*, the Supreme Court declined to overrule *Austin*: "We thus decline the State's invitation to reconsider our unanimous judgment in *Austin* that civil *in rem* forfeitures are fines for purposes of the Eighth Amendment when they are at least partially punitive." *Timbs v. Indiana*, 139 S. Ct. 682, 690 (2019).

Violations of the Boise ordinances analyzed in *Martin* were misdemeanors, 920 F.3d at 603, so the Ninth Circuit at times used the word "criminal" in its analysis. However, a careful reading of *Martin* shows that this language was not a limitation on when the Eighth Amendment's prohibition on cruel and unusual punishment applies. The Ninth Circuit stated the broad question that it was addressing was "[D]oes the Cruel and Unusual Punishments Clause of

the Eighth Amendment preclude the enforcement of a statute prohibiting sleeping outside against homeless individuals with no access to alternative shelter?" *Id.* at 615. The Ninth Circuit held that it does, quoting *Jones*, "the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Id.* at 616. It is the punishment of a person's unavoidable status that violates the constitution, not whether that punishment is designated civil or criminal. *See id.* The main difference between Grants Pass' punishment scheme and that of Boise's in *Martin* is that Grants Pass first issues fines for violations and then either issues a trespass order or excludes persons from all parks before a person is charged with misdemeanor criminal trespass. This makes no difference for Eight Amendment purposes because the result, in Boise and Grants Pass, is identical: involuntarily homeless people are punished for engaging in the unavoidable acts of sleeping or resting in a public place when they have nowhere else to go.

Additionally, as the Supreme Court noted, "whether a particular statutorily defined penalty is civil or criminal is a matter of statutory construction." *United States v. Ward*, 448 U.S. 242, 248 (1980). In Oregon, violations are defined as criminal actions and are prosecuted in criminal proceedings. ORS 131.005(6)-(7). The Grants Pass Municipal Code uses the language and procedures of criminal law, discussing those "guilty" of code violations. GPMC 1.36.010(A). The violations are prosecuted in the Josephine County Circuit Court by the Josephine County District Attorney's office. ORS 153.076(6). As in a criminal trial, a defendant may not be compelled to testify and the same pretrial discovery that applies in misdemeanor and felony cases applies. ORS 153.076(3)-(4). The judgment from a camping violation in Grants Pass reads, "[t]he court finds the defendant GUILTY of the charges

designated CONVICTED in the section below."  Edward Johnson Decl., Ex. 9 at 3-4 (Dkt. #63-9).

Moreover, even if *Martin* and the Eighth Amendment were limited to "criminal" punishments, which they are not, Grants Pass' enforcement scheme involves criminal punishment.  Violations for sleeping and "camping" are an element of future Criminal Trespass II arrests and initiate the criminal process in two common circumstances: (1) after a person is "trespassed" from an area for "camping" and either does not leave or returns, or (2) after an officer excludes a person from a park for prohibited camping.  In either situation, if that person does not move along or returns to the location, they are subject to arrest and prosecution for Criminal Trespass II.  The criminal process is initiated with the original citation and that citation is an element of the subsequent criminal trespass charge once the person is trespassed or excluded under threat of arrest for criminal trespassing.

Therefore, Grants Pass' enforcement scheme is subject to Eighth Amendment analysis. Under such analysis, the ordinances at issue and their enforcement, as applied to plaintiff class members, violate the Cruel and Unusual Punishment Clause of the Eighth Amendment.

## II.    Grants Pass' policy and practice of enforcing the ordinances at issue violates the Excessive Fines Clause of the Eight Amendment.

Grants Pass' enforcement of the ordinances at issue also violates the Excessive Fines Clause of the Eighth Amendment.  The Supreme Court has found that the phrase "nor excessive fines imposed," in the Eighth Amendment "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *Timbs v. Indiana,* 139 S.Ct. 682, 687 (2019) *citing United States v. Bajakajian,* 524 U.S. 321, 327-328, (1998).  There is a two-step inquiry in analyzing an excessive fines claim: (1) is the fine punitive, and if so, (2) is it excessive? *Bajakajian*, 524 U.S. at 334.

To determine when a fine is punitive, courts look to whether the fine is tied to punishment and prohibited conduct. *Bajakajian*, 524 U.S. at 328; *Austin*, 509 U.S. at 619-22; *See also U.S. v. Mackby*, 339 F.3d 1013 (9th Cir. 2003) (assuming a statutory fine under the False Claims Act imposed after a finding of liability in a civil trial was punitive). It does not matter if the fine imposed is characterized as criminal or civil, the salient inquiry is whether the fine at least partially serves the traditional punitive functions of retribution and deterrence. *Austin*, 509 U.S. at 610. For example, in *Wright v. Riveland*, the Ninth Circuit held that a 5% deduction for the Crime Victim's Compensation Fund was punitive because there was no relationship between the deduction and the harm the defendant caused. *Wright v. Riveland*, 219 F.3d 905, 915 (9th Cir. 2000); *see also Dept. of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 778 (1994) (observing the similarities between civil and criminal punishment, the court held "Criminal fines, civil penalties, civil forfeitures, and taxes all share certain features: They generate government revenues, impose fiscal burdens on individuals, and deter certain behavior."). The Supreme Court has held that all civil penalties have some deterrent effect. *U.S. v Hudson*, 522 U.S. 93, 102 (1997).

In this case, the Court finds that the fines imposed for violating the ordinances at issue are punitive. According to the record, the two camping ordinances carry a mandatory fine of $295. The fine for illegal sleeping is $75. When unpaid, the fines increase to $537.60 and $160 respectively because of additional "collection fees." Johnson Decl., Ex. 9 at 5-6 (Dkt. #63-9). Officers have the discretion to issue warnings prior to issuing a citation, but once a citation is issued, officers have no discretion over the amount of the fine, which is "autofilled" into all camping citations. Johnson Decl., Ex. 6, Burge Depo. at 20, lines 15-21 (Dkt. #63-6); Ex. 4, Hamilton Depo at p. 84 line 23 to p. 85 line 5 (Dkt. #63-4). Based on the record and minutes

from the 2013 Roundtable Meeting, these statutory fines serve no remedial purpose and were intended to deter homeless individuals from residing in Grants Pass. Moreover, the ordinances themselves describe these fines as punishment. Compare GPMC 1.36.010(c) ("MAXIMUM FINE: except in cases where a different punishment is prescribed by any provision of this Code...") with GPMC 1.36.010(e) (allowing for restitution to any person, or business, including the city, who has been damaged by the defendant's conduct).

Because the fines are punitive, the inquiry turns to whether the fines are excessive. The Supreme Court held that a fine violates the excessiveness standard of the Eighth Amendment if the amount of the fine is "grossly disproportionate to the gravity of the offense." *Bajakajian,* 524 U.S. at 324, 334 ("The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."); *see also Wright v. Riveland,* 219 F.3d 905, 916 (9th Cir. 2000) (following *Bajakajian*). In applying this standard, courts have looked to a non-exhaustive list of several factors, including the nature of the offense, whether the violation was related to other illegal activity, and other penalties that may be imposed.[11] *See generally U.S. v. Mackby*, 339 F.3d 1013 (9th Cir. 2003).

Here, the decisive consideration is that Plaintiffs are being punished for engaging in the unavoidable, biological, life-sustaining acts of sleeping and resting while also trying to stay warm and dry. Plaintiffs do not have enough money to obtain shelter, so they likely cannot pay these fines. When the fines remain unpaid, the additional collection fees are applied and the fines still remain unpaid, subjecting plaintiffs to collection efforts, the threat of driver license

---

[11] The Supreme Court has left open the question of whether the ability to pay the fine would be relevant to the excessiveness inquiry. *Bajakajian* at 340, n.15; see also *Timbs* at 688 *quoting* 4 W. Blackstone, Commentaries on the Laws of England 372 (1769) "[N]o man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear . . . ."

suspensions (Johnson Decl., Ex. 9 at 3-4 (Dkt. #63-9)), and damaged credit that makes it even

more difficult for them to find housing, exacerbating the homeless problem in Grants Pass

(Wessels Dec. ¶11 (Dkt #65)). As the Supreme Court recognized in the cruel and unusual

punishment context, "even one day in prison would be cruel and unusual punishment for the

'crime' of having a common cold." *Robinson v. California*, 370 U.S. 660, 667 (1962). So too

here. Fining a homeless person in Grants Pass who must sleep outside beneath a blanket because

they cannot find shelter $295 ($537.60 after collection fees are inevitably assessed) is grossly

disproportionate to the "gravity of the offense." Any fine is excessive if it is imposed on the

basis of status and not conduct. For Plaintiffs, the conduct for which they face punishment is

inseparable from their status as homeless individuals, and therefore, beyond what the City may

constitutionally punish. The fines associated with violating the ordinances at issue, as applied to

Plaintiffs, are unconstitutionally excessive.

Having found that the ordinances violate the Cruel and Unusual Punishment Clause as

well as the Excessive Fines Clause of the Eight Amendment, the Court declines to decide

whether the ordinances are also unconstitutionally vague.

III.    **The appeal process for park exclusions in Grants Pass violates procedural due process rights.**

a.    **Plaintiffs' claim that park exclusions violate procedural due process was adequately pled and standing has been established.**

Grants Pass does not challenge the merits of plaintiffs' procedural due process claim

regarding the City's park exclusion ordinance in its response to Plaintiffs' motion for summary

judgment. Instead, Grants Pass argues that this claim was not properly pled in the operative

complaint. The Court disagrees. This claim seems to be the sole reason for the Third Amended

Complaint filed on November 13, 2019. (Dkt. #50). The only changes from the Second

Amended Complaint were to add the allegation at paragraph 87 that, "Plaintiffs have been

excluded from Grants Pass parks without due process of law" and to specifically add "GPMC 6.46.350 (the park exclusion ordinance)" to the injunctive and declaratory relief sought in this case. Third Amended Complaint ¶ 87, Prayer ¶¶ 3-4 (Dkt. #50). Although the City correctly points out that GPMC 6.46.355 (the ordinance that explains the appeal procedure) is missing from the operative complaint, Plaintiffs made clear that they were challenging park exclusions under the Procedural Due Process Clause. The City did not object to the amendment or ask that it be clarified or made more specific. Therefore, the claim was pled, and the City was on notice.

Second, Grants Pass argues that if the claim was pled, it should be dismissed because Plaintiffs have not alleged or sufficiently established standing. The City argues, "plaintiffs do not even attempt to produce a plaintiff or rely upon any individual's standing." Response at 51 (Dkt. #80). The Court disagrees. The record shows that of the 59 park exclusions produced to Plaintiffs by the City, all were issued to homeless individuals and 42 were issued for illegal camping. Pltf.s' Motion at 22 (Dkt. #62); Inessa Wurscher Decl. ¶ 7 (Dkt. #64). Class representative Debra Blake was issued an exclusion on September 11, 2019, after she was found sleeping in a City Park, and a copy of that exclusion order has been provided in the record. Johnson Decl., Ex. 9 at 7 (Dkt. #63-9). Debra Blake filed a written objection to her September 11, 2019 banishment from all parks. The ban was "lifted" without explanation on September 25, 2019, after half of the exclusion period had expired. Blake Decl. ¶ 8 (Dkt. #90). Additionally, class member Dolores Nevin was excluded from all parks after being found sleeping in Riverside Park on December 31, 2019. Wurscher Decl., Ex. 1 at 33-35 (Dkt. #64-1). Moreover, Plaintiffs provided evidence that a park exclusion goes into effect immediately and is not stayed when appealed. Johnson Decl., Ex. 5, McGinnis Depo p. 28 line 23 to p. 29 line 5 (Dkt. #63-5); Ex. 4,

Hamilton Depo. at p.117 lines 11-14 (Dkt. #63-4). Therefore, Plaintiffs have standing to seek prospective declaratory and injunctive relief regarding the park exclusion appeal process.

Finally, Grants Pass argues in a footnote that if the claim was pled and plaintiffs do have standing, the claim is "moot" because the current practice of the Grants Pass Department of Public Safety is to not issue park exclusions until City Council "has made appropriate revisions." Response at 51, n.8 (Dkt. #80). Evidence presented by Grants Pass to show this policy change consists of a sworn declaration from Jim Hamilton, the Deputy Chief for the City of Grants Pass Department of Public Safety, in which he declares, "The current practice is that there are no park exclusions being issued by anyone in the Grants Pass Department of Public Safety by way of written Order from me. Unless and until a revised version of the park exclusion ordinance is adopted by the City council and the related forms revised, they will not be issued." Hamilton Decl. ¶ 3 (Dkt. #83). The written order issued to the department was not attached as an exhibit. However, even if it was, policy changes not reflected in a change to statutes or ordinances does not render a claim moot. *Rosebrock,* 745 F.3d at 971-72. The doctrine of voluntary cessation has been interpreted to apply generally in cases in which an injunction is sought. "Such cases do not become moot 'merely because the [defendant's] conduct immediately complained of has terminated, if there is a possibility of a recurrence which would be within the terms of a proper decree.'" *Armster v. U.S. District Court for the Central District of California,* 806 F.2d 1347, 1357 (9th Cir. 1986) (quoting P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 110 (2d ed. 1973)). This is particularly true, whereas here, the "new policy. . . could be easily abandoned or altered in the future." *Bell,* 709 F.3d at 901. If a municipal defendant could moot out claims simply by announcing in its cross-motion for summary judgment that it has decided not to enforce the offending ordinance,

the doctrine of voluntary cessation would be rendered meaningless. Plaintiffs pled this claim,

have standing to assert it, and Grants Pass cannot moot this claim by asserting that it has

temporarily stopped issuing park exclusions.

### b. Plaintiffs are entitled to summary judgment on this claim.

Under Grants Pass' enforcement scheme, police officers may issue a written exclusion

order barring an individual "from all city park properties for a period of 30 days, if within a one-

year period the individual is issued two or more citations for violating regulations related to city

park properties, or is issued one or more citations for violating any state law(s) while on city park

property." GPMC 6.46.350. A park exclusion goes into effect immediately upon being issued

and is not stayed while a person appeals. Johnson Decl., Ex. 5, McGinnis Depo p. 28 line 23 to

p. 29 line 5 (Dkt. #63-5); Ex. 4, Hamilton Depo. at p.117 lines 11-14 (Dkt. #63-4); GPMC

6.46.355. The appeal period is "within two business days" and the method of appeal is by

"written objection" to the City Manager, at which point the objection will be placed on the City

Council's agenda. GPMC 6.46.355.

Sixteen years ago, this Court found a substantially identical appeal process in Portland's

park exclusion ordinance to violate procedural due process rights.

> The risk of erroneous deprivation is compounded by PCC 20.12.265's deficient
> appeal procedures and lack of a pre-deprivation hearing. An exclusion takes effect
> immediately upon issuance and is not stayed pending appeal. Thus, a person
> excluded from a park is subject to arrest for reentry as soon as she receives the
> exclusion notice. An appeal may be filed within five days, but the individual
> continues to be excluded from the parks. Thus, even if the exclusion is ultimately
> found to be invalid, the individual has been kept from the public park(s) for at least
> a significant portion of the thirty days.

*Yeakle v. City of Portland,* 322 F. Supp. 2d 1119, 1130 (D. Or. 2004). For the same reasons,

Grants Pass' park exclusion ordinance is also unconstitutional and violates the procedural

protections of the due process clause.

The *Yeakle* court applied the three-part balancing test from *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976) to Portland's functionally identical park exclusion appeal process. The court found that excluded individuals have a strong liberty interest in avoiding unjust exclusion because of the importance of public parks as a "treasured and unmatched resource" for members of the public. 322 F. Supp 2d at 1129. In this case, that interest is even greater for Plaintiffs because several parks in Grants Pass contain benches, tables and restrooms that homeless individuals may use for basic activities of daily life when they have no alternative place to dwell. The court also found that "the risk of erroneous deprivation under the present procedure is considerable" given the lack of pre-deprivation process and the lack of "any evidentiary standard." *Id.* at 1130. The same is true here. There is no requirement in the ordinance that the Grants Pass police officer have enough evidence or reasonable suspicion of the excludable conduct to issue an exclusion or make an arrest. The officer need not witness the violation or have any other reliable information that a violation occurred under the language of the ordinance. Further, just like in *Yeakle,* "a person is subject to arrest for reentry as soon as she receives the exclusion notice" and "even if the exclusion is ultimately found to be invalid, the individual has been kept from the public parks for at least a significant portion of the thirty days." *Id.* The *Yeakle* Court concluded that "a pre-deprivation hearing or other procedural safeguard would not unduly burden the government" and "there would be no additional burden on the City if the park exclusions were simply stayed in the event that an individual filed an appeal." *Id.* at 1131. For the same reasons, the procedures for appealing park exclusions in Grants Pass violate Plaintiffs' procedural due process rights.

IV.    **Plaintiffs are denied summary judgment on their Equal Protection Claim.**

The Equal Protection Clause guarantees that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982). Plaintiffs allege selective enforcement of the ordinances at issue. As such, they "must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose." *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007). Further, because the class seeks to enjoin enforcement, they must demonstrate that the selective enforcement "is part of a 'policy, plan, or a pervasive pattern.'" *Id.* at 1153 (quoting *Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1993)).

Plaintiffs did not carry their burden of demonstrating that the City's ordinances were selectively enforced and that enforcement was motivated by a discriminatory purpose under the summary judgment standard. The evidence relied on by Plaintiffs to prove this claim are the minutes from the 2013 Roundtable Meeting and deposition testimony from two Grants Pass police officers. The City disputes this evidence as proof of selective enforcement. The City argues that deposition testimony from two knowledgeable police officers that they "could not remember" enforcing these ordinances against a non-homeless individual is not enough for the Court to conclude that these ordinances were selectively enforced as a matter of law. The Court agrees. Moreover, the City provided its Department of Public Safety Policy Manual, which specifically includes instructions to officers to not discriminate against homeless individuals. *See* Hamilton Decl., Ex. 1 (Dkt. #83-1). Therefore, facts surrounding the issues of whether the City's enforcement scheme had a discriminatory effect and whether the police were motivated by a discriminatory purpose are in dispute. As a result, Plaintiff's are denied summary judgment on their equal protection claim.

**V.    Plaintiff's are denied summary judgment on their Substantive Due Process Claim.**

The substantive due process clause of the Fourteenth Amendment forbids the government from depriving a person of life, liberty, or property when the government acts with deliberate indifference or reckless disregard for that person's fundamental rights. *Tennison v. City & County of S.F.*, 570 F.3d 1078, 1089 (9th Cir. 2009); *Porter v. Osborn*, 546 F.3d 1131, 1137-39 (9th Cir. 2008). A plaintiff establishes a substantive due process violation by showing the defendant deprived him of his life, liberty, or property and engaged in "conscience shocking behavior." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006). An official's conduct may shock the conscience where the official acts with deliberate indifference or reckless disregard for the plaintiff's rights in situations where the official had the opportunity to deliberate. *Tennison*, 570 F.3d at 1089; *Porter*, 546 F.3d at 1137-39.

Plaintiffs argue they have a protected liberty interest in being present in public spaces in Grants Pass. Plaintiffs cite *Morales*, which found "it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage,' or the right to move 'to whatsoever place one's own inclination may direct' identified in Blackstone's Commentaries." 27 U.S. at 53-54 (citing *Williams v. Fears*, 179 U.S. 270, 274 (1900); *Papachristou v. Jacksonville*, 405 U.S. 156, 164 (1972); *Kent v. Dulles*, 357 U.S. 116, 126 (1958); 1 W. Blackstone, Commentaries on the Laws of England 130 (1765)). At least three Courts of Appeals have followed *Morales* and acknowledged a liberty interest to remain in a place open to the public. See *Vincent v. City of Sulphur*, 805 F.3d 543, 548 (5th Cir. 2015) ("Supreme Court decisions amply support the proposition that there is a general right to go to or remain on public property for lawful purposes . . . ."); *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) ("Plaintiffs have a

constitutionally protected liberty interest to be in parks or on other city lands of their choosing that are open to the public generally."); *Kennedy v. City of Cincinnati,* 595 F.3d 327, 336 (6th Cir. 2010) ("[I]t is clear that Kennedy had a liberty interest 'to remain in a public place of his choice' and that defendants interfered with this interest.").

However, even if this Court were to find that Plaintiffs have a liberty interest to remain in City parks or other City lands that are open to the public generally, Plaintiffs have not provided this Court with controlling authority to convince the Court that Plaintiffs have a liberty interest to sleep or camp in a public place. Moreover, Plaintiffs have not carried their burden of showing that the City engaged in "conscience shocking behavior" under the summary judgment standard. This Court's holding that the enforcement of Grants Pass' ordinances violate the Eight Amendment does not automatically translate to a finding that Grants Pass officials acted with deliberate indifference or reckless disregard for Plaintiffs' fundamental rights. Whether Grants Pass' conduct shocks the conscience is a question of material fact. Therefore, Plaintiffs are denied summary judgment on their substantive due process claim.

## VI.   Conclusion

The holding in this case does not say that Grants Pass must allow homeless camps to be set up at all times in public parks. Just like in *Martin,* this holding in no way dictates to a local government that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the street at any time and at any place. *See Martin*, 920 F.3d 584, 617. Nor does this holding "cover individuals who do have access to adequate temporary shelter, whether they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it." *Id.* at n. 8. The City may implement time and place restrictions for when homeless individuals may use their belongings to keep warm and dry and when they must have their belonging packed up. The City may also implement an anti-camping ordinance that is more

Page 30 of 35 OPINION AND ORDER

specific than the one in place now. For example, the City may ban the use of tents in public parks without going so far as to ban people from using any bedding type materials to keep warm and dry while they sleep. The City may also consider limiting the amount of bedding type materials allowed per individual in public places. Moreover, this holding does not limit Grants Pass' ability to enforce laws that actually further public health and safety, such as laws restricting littering, public urination or defecation, obstruction of roadways, possession or distribution of illicit substances, harassment, or violence. Grants Pass would retain a large toolbox for regulating public space without violating the Eight Amendment.

There is no doubt that homelessness is a serious public health concern. Homeless individuals have higher rates of chronic physical and mental health conditions, increased rates of mortality, and related diseases and co-occurring disorders.[12] With the lack of access to the most basic of human needs, including running water, toilets, and trash disposal, infectious diseases—like COVID-19—can spread quickly. Uprooting homeless individuals, without providing them with basic sanitation and waste disposal needs, does nothing more than shift a public health crisis from one location to another, potentially endangering the health of the public in both locations. This concern is particularly acute during the current COVID-19 pandemic. As the U.S. Centers for Disease Control and Prevention (the "CDC") explained in its *Interim Guidance for Responding to Coronavirus Disease 2019 (COVID-19) among People Experiencing Unsheltered Homelessness*: Unless individual housing units are available, do not clear encampments during community spread of COVID-19.

The Court encourages Grants Pass to work with local homeless services experts and mental health professionals to develop training programs that cover techniques and tools for

---

[12] *Housing Not Handcuffs*, *supra* note 2 at 68.

interacting with homeless individuals and for deescalating mental health crises.  For example, the City of Eugene, Oregon has used the services from an organization called CAHOOTS ("Crisis Assistance Helping Out on the Streets") to provide free "immediate stabilization in cases of urgent medical need or psychological crisis, assessment, information referral, advocacy [and] (in some cases) transportation to the next step in treatment" to the people of Eugene, Oregon.[13]  As *The Wall Street Journal* noted, Gary Marshall, a 64-year-old who previously lived on the streets of Eugene, said the police approach was "name, serial number and up against the van."  In contrast, when he was having one of his frequent panic attacks, CAHOOTS counselors would bring the him inside and talk him down, he said.[14]

Such trainings have also been proven to be effective in Miami-Dade County, Florida.  Specifically, "providing mental health de-escalation training to [its] police officers and 911 dispatchers enabled [the county] to divert more than 10,000 people to services or safely stabilizing situations without arrest."[15]  The number of people in jail, in turn, fell by nearly 49%, which allowed the county to close an entire jail facility, thereby saving nearly $12 million a year.[16]

The City of Medford, Oregon, has also developed new strategies for addressing the homeless crisis in its community.  The City of Medford worked with Rogue Retreat, a nonprofit group, to open Hope Village in November 2017.[17]  Hope Village is the first tiny homes

---

[13] CAHOOTS, https://whitebirdclinic.org/cahoots/ (last visited Mar. 26, 2020); Mobile Crisis Services in Eugene and Springfield, *White Bird Clinic CAHOOTS*, https://whitebirdclinic.org/wp-content/uploads/2019/04/11x8.5_trifold_brochure_cahoots.pdf.

[14] Zusha Elinson, *When Mental-Health Experts, Not Police, Are the First Responders,* THE WALL STREET JOURNAL (Nov. 24, 2018), https://www.wsj.com/articles/when-mental-healthexperts-not-police-are-the-first-responders-1543071600.

[15] *Housing Not Handcuffs, supra* note 2 at 98.

[16] *Id.*

[17] Rogue Retreat, *Hope Village*, https://www.rogueretreat.com/housing-programs/hope-village/ (last visited Jul. 17, 2020).

community in Southern Oregon that provides short term transitional shelter and case management for individuals and families to help move from homelessness into long term housing.[18] The idea of Hope Village was created in 2013, when Rogue Retreat, St. Vincent DePaul, and the Jackson County Homeless Taskforce began researching and visiting other villages in Oregon to find creative ways to serve the homeless in Jackson County.[19] Hope Village started with 14 units, each 8 feet by 10 feet, plus a communal kitchen, laundry and shower facilities. Hope Village began operating under a one-year agreement with the city, and in less than a year, the Medford City Council approved doubling the size of the village and signed a new, two-year agreement with Rogue Retreat.[20] Medford city officials didn't create the project, didn't build the units, and doesn't operate the village. However, city leaders supported the concept from the beginning, offering a city-owned property for the village.[21] When neighboring businesses and other property owners objected to that location, the City of Medford continued to offer support and encouragement, culminating in a new location.[22] Hope Village now sits on property owned by the City of Medford and another property leased by Rogue Retreat.[23] Residents of Hope Village are required to attend case management meetings, counseling sessions, and work on permanent ways to stay off of the streets. Rogue Retreat says the average

---

[18] *Id.*

[19] *Id.*

[20] Mail Tribune Editorial Board, *Medford can be proud of Hope Village*, THE MAIL TRIBUNE (Aug. 4, 2019), https://mailtribune.com/opinion/editorials/medford-can-be-proud-of-hope-village.
[21] *Id.*

[22] *Id.*; *see also* April Ehrlich, *Law Enforcement Officials Argue Rural Homeless Services Worsen Problem*, NPR (Jan. 21, 2020), https://www.npr.org/2020/01/21/797497926/law-enforcement-officials-argue-rural-homeless-services-worsen-problem ("Hope Village in Oregon faced some pushback in its early stages a few years ago. Some people feared that it would increase crime and generate litter. But resident Buckshot Cunningham says those fears proved to be wrong. 'Look at this place,' he says, motioning to the neat row of cottages. 'It's clean; it's beautiful. And it stays that way seven days a week, all year round. It's pretty simple.'").
[23] Mail Tribune Editorial Board, *Medford can be proud of Hope Village*, THE MAIL TRIBUNE (Aug. 4, 2019), https://mailtribune.com/opinion/editorials/medford-can-be-proud-of-hope-village.

stay at Hope Village is around four months, and the program has a 62 percent success rate. According to Rogue Retreat, this means 6 out of 10 people in the program successfully move away from homelessness.[24]

As the League of Oregon Cities noted in its amicus brief, "Oregon's cities are obligated to provide safe and livable communities for all residents." Cities Br. at 2 (Dkt. #87). Laws that punish people because they are unhoused and have no other place to go undermine cities' ability to fulfill this obligation. Indeed, enforcement of such "quality of life laws" do nothing to cure the homeless crisis in this country. Arresting the homeless is almost never an adequate solution because, apart from the constitutional impediments, it is expensive, not rehabilitating, often a waste of limited public resources, and does nothing to serve those homeless individuals who suffer from mental illness and substance abuse addiction.

Quality of life laws erode the little trust that remains between homeless individuals and law enforcement officials. This erosion of trust not only increases the risk of confrontations between law enforcement and homeless individuals, but it also makes it less likely that homeless individuals will cooperate with law enforcement.[25] Moreover, quality of life laws, even civil citations, contribute to a cycle of incarceration and recidivism. Indeed, civil citations requiring appearance in court can lead to warrants for failure to appear when homeless people, who lack a physical address or phone number, do not receive notice of relevant hearings and wind up incarcerated as a result.[26] Moreover, unpaid civil citations can impact a person's credit history and be a direct bar to housing access in competitive rental markets where credit history is a factor

---

[24] Madison LaBerge, *New tiny home village in Grants Pass for homeless population*, FOX 26 (June 10, 2020), https://fox26medford.com/new-tiny-home-village-in-grants-pass-for-homeless-population/
[25] *Housing Not Handcuffs*, *supra* note 2 at 65.
[26] *Id.* at 52.

in tenant selection. In this way, civil penalties can prevent homeless people from accessing the very housing that they need to move from outdoor public spaces to indoor private ones.

There are many options available to Grants Pass to prevent the erection of encampments that cause public health and safety concerns without violating the Eight Amendment. The Court reminds governing bodies of the importance of empathy and thinking outside the box. We must try harder to protect our most vulnerable citizens. Let us not forget that homeless individuals are citizens just as much as those fortunate enough to have a secure living space.

## ORDER

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Dkt. No. 62) is GRANTED in part and DENIED in part, and Defendant's Motion for Summary Judgment (Dkt. No. 80) is DENIED.

IT IS SO ORDERED and DATED this 22nd day of July, 2020.


/s/ Mark D. Clarke
MARK D. CLARKE
United States Magistrate Judge