**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GLORIA JOHNSON; JOHN LOGAN, individuals, on behalf of themselves and all others similarly situated, | Nos.   20-35752<br>20-35881 |
| *Plaintiffs-Appellees*, | D.C. No.   1:18-cv-01823-CL |
| v. | |
| CITY OF GRANTS PASS, | ORDER AND AMENDED OPINION |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the District of Oregon
Mark D. Clarke, Magistrate Judge, Presiding

Argued and Submitted December 6, 2021
San Francisco, California

Filed September 28, 2022
Amended July 5, 2023

Before:  Ronald M. Gould and Daniel P. Collins, Circuit
Judges, and Roslyn O. Silver,[*] District Judge.

---

[*] The Honorable Roslyn O. Silver, United States District Judge for the District of Arizona, sitting by designation.

Order;
Opinion By Judge Silver;
Dissent by Judge Collins;
Statement by Judges Silver and Gould;
Statement by Judge O'Scannlain;
Statement by Judge Graber;
Dissent by Judge M. Smith;
Dissent by Judge Collins;
Dissent by Judge Bress

## SUMMARY[**]

### Civil Rights / Homelessness

The panel issued an order amending the opinion and dissent filed September 28, 2002, and reported at 50 F.4th 787; filed an amended opinion and dissent concurrently with its order; and denied a petition for rehearing en banc after a request for a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration, in an action challenging City of Grants Pass ordinances which, among other things, preclude homeless persons from using a blanket, pillow, or cardboard box for protection from the elements while sleeping within City limits.

In the amended opinion, the panel affirmed in part and vacated in part the district court's summary judgment and

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

permanent injunction in favor of plaintiffs; affirmed certification pursuant to Fed. R. Civ. P. 23(b)(2), of a class of "involuntary homeless" persons; and remanded.

The five municipal ordinances, described as an "anti-sleeping" ordinance, two "anti-camping" ordinances, a "park exclusion" ordinance, and a "park exclusion appeals" ordinance, result in civil fines up to several hundred dollars per violation.  Persons found to violate ordinances multiple times could be barred from all City property.  If a homeless person is found on City property after receiving an exclusion order, they are subject to criminal prosecution for trespass.

The panel stated that this court's decision in *Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018), which held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter" served as the backdrop for this entire litigation. Pursuant to *Martin*, it is an Eight Amendment violation to criminally punish involuntarily homeless persons for sleeping in public if there are no other public areas or appropriate shelters where those individuals can sleep.

The panel first rejected the City's argument that the district court lacked jurisdiction because plaintiffs' claims were moot or because plaintiffs failed to identify any relief that was within a federal court's power to redress. The panel held that there was abundant evidence in the record establishing that homeless persons were injured by the City's enforcement actions in the past and it was undisputed that enforcements have continued. The panel further held that the relief sought by plaintiffs, enjoining enforcement of a few municipal ordinances aimed at involuntary homeless

persons, was redressable within the limits of Article III.  The death of class representative Debra Blake while the matter was on appeal did not moot the class's claims as to all challenged ordinances except possibly the anti-sleeping ordinance.  The panel vacated the summary judgment as to that ordinance and remanded to allow the district court the opportunity to substitute a class representative in Blake's stead.  The remaining class representatives had standing to challenge the park exclusion, criminal trespass and anti-camping ordinances.

The panel held that, based on the record in this case, the district court did not err by finding plaintiffs satisfied the requirements of Fed. R. Civ. P. 23(a) such that a class could be certified under Rule 23(b)(2).  Although the City appeared to suggest that *Martin*'s need for an individualized inquiry of each alleged involuntary homeless person's access to shelter defeated numerosity, commonality and typicality, the panel held that nothing in *Martin* precluded class actions.  The panel held that the district court did not abuse its discretion in concluding the numerosity requirement was met; that plaintiffs' claims presented at least one question and answer common to the class; and that the class representatives' claims and defenses were typical of the class in that they were homeless persons who claimed that the City could not enforce the challenged ordinances against them when they have no shelter.

Addressing the merits, the panel affirmed the district court's ruling that the City of Grants Pass could not, consistent with the Eighth Amendment, enforce its anti-camping ordinances against homeless persons for the mere act of sleeping outside with rudimentary protection from the elements, or for sleeping in their car at night, when there was no other place in the City for them to go.  The panel held that

*Martin* applied to civil citations where, as here, the civil and criminal punishments were closely intertwined.

There was no need to resolve whether the fines imposed under the anti-sleeping and anti-camping ordinances violated the Eighth Amendment's prohibition on excessive fines because the permanent injunction would result in no class member being fined for engaging in such protected activity. Finally, the panel held that it was unnecessary to decide whether plaintiffs properly pled their procedural due process challenge to the park exclusion appeals ordinance because subsequent to the district court's order, the City amended the ordinance.

The panel directed the district court on remand to narrow its injunction to enjoin only those portions of the anti-camping ordinances that prohibited conduct protected by *Martin* and this opinion. In particular, the district court should narrow its injunction to the anti-camping ordinances and enjoin enforcement of those ordinances only against involuntarily homeless persons for engaging in conduct necessary to protect themselves from the elements when there was no shelter space available.

Dissenting, Judge Collins stated that *Martin* seriously misconstrued the Eighth Amendment and the Supreme Court's caselaw construing it, but even assuming that *Martin* remains good law, today's decision—which both misreads and greatly expands *Martin*'s holding—is egregiously wrong. Although the majority's phrasing pays lip service to the fact that the persons at issue must be "involuntarily homeless," the majority also explicitly rejects the City's contention that the holding of *Martin* can only be applied after an individualized inquiry of each alleged involuntary homeless person's access to shelter. The net result, for class

certification purposes, is that any issue of individualized involuntariness is set aside and *Martin* is thereby reduced to a simplistic formula to be resolved on a classwide basis— into whether the number of homeless persons in the jurisdiction exceeds the number of available shelter beds. The majority's analysis fails because *Martin* does not allow the individualized inquiry into involuntariness to be set aside in this way. Further, the majority opinion combines its gross misreading of *Martin,* which requires an individualized inquiry*,* with a flagrant disregard of settled class-certification principles pertaining to commonality under Fed. R. Civ. P. 23(a) and the requirements of Fed. R. Civ. P. 23(b). The end result of this amalgamation of error is that the majority validates the core aspects of the district court's injunction in this case, which effectively requires the City of Grants Pass to allow all but one of its public parks to be used as homeless encampments.

In a joint statement regarding the denial of rehearing, District Judge Silver and Judge Gould wrote that Judge O'Scannlain's statement regarding the denial of rehearing and the dissent from Judge M. Smith significantly exaggerate the holding in *Johnson v. Grants Pass*. *Grants Pass*, relying on *Martin*, holds only that governments cannot criminalize the act of sleeping with the use of rudimentary protections from the elements in some public places when a person has nowhere else to sleep. It does not establish an unrestrained right for involuntarily homeless persons to sleep anywhere they choose. Nor does it require jurisdictions to cede all public spaces to involuntarily homeless persons. Judges Silver and Gould also explained that class certification was proper, that the commonality requirement was met, that the majority applied existing Supreme Court and Ninth Circuit authority to the record

presented by the parties, and that Judge O'Scannlain greatly overstated the extent to which *Martin* and *Grants Pass* fall on one side of an existing circuit split.

Respecting the denial of rehearing en banc, Judge O'Scannlain, joined by Judges Wallace, Callahan, Bea, Ikuta, Bennett, R. Nelson, Bade, Collins, Lee, Bress, Forrest, Bumatay, and VanDyke, and with whom Judge M. Smith joins as to all parts except Part II-A, states that with this decision, this Circuit's jurisprudence now effectively guarantees a personal federal constitutional 'right' for individuals to camp or to sleep on sidewalks and in parks, playgrounds, and other public places in defiance of traditional health, safety, and welfare laws—a dubious holding premised on a fanciful interpretation of the Eighth Amendment. Judge O'Scannlain writes that the *Boise* panel made no effort to ground its decision in the text, history, or tradition of the Eighth Amendment. Unfortunately, the problems created by *Boise* have now been visited upon the City of Grants Pass by the panel majority here, which has expanded *Boise*'s faulty holding to affirm an injunction effectively requiring the City to resign all but one of its public parks to be used as homeless encampments. This Circuit is the first and only federal circuit to have divined such a strange and sweeping mandate from the Cruel and Unusual Punishments Clause. The jurisprudence in this case is egregiously flawed and deeply damaging—at war with constitutional text, history, tradition, and Supreme Court precedent. And it conflicts with other circuits on a question of exceptional importance—paralyzing local communities from addressing the pressing issue of homelessness, and seizing policymaking authority that the federal system of government leaves to the democratic process.

Respecting the denial of rehearing en banc, Judge Graber agreed with the basic legal premise that the Eighth Amendment protects against criminal prosecution of the involuntary act of sleeping but stated that the injunctive relief in this case goes too far. The extension of *Martin* to classwide relief, enjoining civil statutes that may eventually lead to criminal violations but have never resulted in criminal convictions for any named plaintiff, is a step too far from the individualized inquiries inherent both in the Eighth Amendment context and in the context of injunctive relief. Even assuming that classwide injunctive relief were available against a prosecution for criminal trespass, the Eighth Amendment does not prohibit all civil remedies that could, in theory, lead to such a prosecution. In this way, *Johnson* unjustifiably expands the reach of the Eighth Amendment.

Dissenting from the denial of rehearing en banc, Judge M. Smith, joined by Judges Bennett, Bumatay, and VanDyke, and with whom Judges Ikuta, R. Nelson, Bade, Collins and Bress join as to Parts I and II, stated that *Martin* cannot be squared with the Supreme Court's Eighth Amendment precedent; that the amendment to the original opinion is not accompanied by any downstream changes to the majority's application of its rule to the facts or its ultimate conclusion; and that by wholly collapsing the merits into the class definition, the majority opinion certifies an impermissible "fail safe" class. Local governments are hard-pressed to find any way to regulate the adverse health and safety effects of homeless encampments without running afoul of this court's case law—or, at a minimum, being saddled with litigation costs. Judge M. Smith states that *Martin*, particularly now that it has been supercharged by *Grants Pass*, has proven to be a runaway train that has

derailed and done substantial collateral damage to the governmental units in which it has been applied and those living therein. These cases use a misreading of Supreme Court precedent to require unelected federal judges—often on the basis of sloppy, mixed preliminary-injunction records—to act more like homelessness policy czars than as Article III judges applying a discernible rule of law.

Dissenting from the denial of rehearing en banc, Judge Collins states that the panel majority's joint statement regarding the denial of rehearing confirms and illustrates the layers of self-contradiction that underlie its opinion in this case, and that the panel majority is wrong to suggest that a newly enacted Oregon statute regulating the application of local ordinances to homeless individuals provides another reason to not rehear this case en banc.

Dissenting from the denial of rehearing en banc, Judge Bress, joined by Judges Callahan, M. Smith, Ikuta, Bennett, R. Nelson, Miller, Bade, Lee, Forrest, Bumatay and VanDyke, states that with no mooring in the text of the Constitution, our history and traditions, or the precedent of the Supreme Court, the court has taken our national founding document and used it to enact judge-made rules governing who can sit and sleep where, rules whose ill effects are felt not merely by the States, and not merely by our cities, but block by block, building by building, doorway by doorway. Local leaders—and the people who elect them—must be allowed the latitude to address on the ground the distinctly local features of the present crisis of homelessness and lack of affordable housing. Not every challenge we face is constitutional in character. Not every problem in our country has a legal answer that judges can provide. This is one of those situations.

## COUNSEL

Aaron P. Hisel (argued), Capitol Legal Services, Salem, Oregon; Gerald L. Warren, Law Office of Gerald L. Warren, Salem, Oregon; Daniel R. Adler, Samuel Eckman, Theane Evangelis, Patrick J. Fuster, and Bradley J. Hamburger, Gibson Dunn & Crutcher LLP, Los Angeles, California; for Defendant-Appellant.

Edward Johnson (argued) and Walter Fonseca, Oregon Law Center, Portland, Oregon; Elise M. Baranouski and Kelsi B. Corkran, Georgetown University Law Center Institute for Constitutional Advocacy and Protection, Washington, D.C.; Benjamin A. Gifford, Georgetown University, Brooklyn, New York; for Plaintiffs-Appellees.

Eric S. Tars, National Homelessness Law Center, Washington, D.C., for Amicus Curiae University of Miami School of Law Human Rights Clinic, Homelessness Law Center, and the Shift.

Ruthanne M. Deutsch, Deutsch Hunt PLLC, Washington, D.C., for Amicus Curiae Fines and Fees Justice Center.

John He, Leslie Bailey, and Brian Hardingham, Public Justice, Oakland, California; John Thomas H. Do, ACLU Foundation of Northern California, San Francisco, California; Kelly K. Simon, ACLU Foundation of Oregon, Portland, Oregon; William R. Maurer, Institute for Justice, Seattle, Washington; for Amici Curiae ACLU of Northern California, ACLU of Southern California, ACLU of Oregon Institute for Justice, National Center for Law and Economic Justice, and Rutherford Institute.

Nicolle Jacoby, Dechert LLP, New York, New York; Tharuni A. Jayaraman and Eric Auslander, Dechert LLP, Washington, D.C.; for Amici Curiae National Homelessness Law Center, The Homeless Rights Advocacy Project at the Korematsu Center for Law and Equality at Seattle University School of Law, and the National Coalition for the Homeless.

Jennifer B. Henning, California State Association of Counties, Sacramento, California, for Amici Curiae California State Association of Counties and League of California Cities.

Brandon M. Rain, Assistant City Attorney; Ann Davison, Seattle City Attorney; Seattle City Attorney's Office; Seattle, Washington; for Amicus Curiae City of Seattle.

Eric S. Boorstin, Horvitz & Levy LLP, Burbank, California; Jeremy B. Rosen, Horvitz & Levy, San Francisco, California; for Amicus Curiae Los Angeles Area Chamber of Commerce.

Anit K. Jindal and Hannah K. Hoffman, Markowitz Herbold PC, Portland, Oregon, for Amici Curiae League of Oregon Cities, City of Portland, Association of Idaho Cities, International Municipal Lawyers Association, Special Districts Association of Oregon, League of Arizona Cities and Towns, and Washington State Association of Municipal Attorneys.

Jeffrey C. Briggs, Briggs Law Office, Thousand Oaks, California, for Amici Curiae LA Alliance for Human Rights, Historic Core Business Improvement District Property Owners Association, Central City East Association of Los

Angeles, and Hollywood Media District Property Owners Association.

---

**ORDER**

The Opinion filed September 28, 2022, and reported at 50 F.4th 787, is hereby amended. The amended opinion will be filed concurrently with this order.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35. Judge Watford did not participate in the deliberations or vote in this case.

Future petitions for rehearing or rehearing en banc will not be entertained in this case.

The petition for rehearing en banc is **DENIED**.

## OPINION

SILVER, District Judge:

The City of Grants Pass in southern Oregon has a population of approximately 38,000.  At least fifty, and perhaps as many as 600, homeless persons live in the City.[1] And the number of homeless persons outnumber the available shelter beds.  In other words, homeless persons have nowhere to shelter and sleep in the City other than on the streets or in parks.  Nonetheless, City ordinances preclude homeless persons from using a blanket, a pillow, or a cardboard box for protection from the elements while sleeping within the City's limits.  The ordinances result in civil fines up to several hundred dollars per violation and persons found to violate ordinances multiple times can be barred from all City property.  And if a homeless person is found on City property after receiving an exclusion order, they are subject to criminal prosecution for trespass.

In September 2018, a three-judge panel issued *Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018), holding "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." *Id.* at 1048.  Approximately six weeks after the initial *Martin* panel opinion, three homeless individuals filed a putative class action complaint against the City arguing a number of City ordinances were unconstitutional.  The district court certified a class of "involuntarily homeless"

---

[1] During this litigation the parties have used different phrases when referring to this population.  For simplicity, we use "homeless persons" throughout this opinion.

persons and later granted partial summary judgment in favor of the class.**²** After the plaintiffs voluntarily dismissed some claims not resolved at summary judgment, the district court issued a permanent injunction prohibiting enforcement against the class members of some City ordinances, at certain times, in certain places. The City now appeals, arguing this case is moot, the class should not have been certified, the claims fail on the merits, and Plaintiffs did not adequately plead one of their theories. On the material aspects of this case, the district court was right.**³**

---

² Persons are involuntarily homeless if they do not "have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free." *See Martin*, 920 F.3d at 617 n.8. However, someone who has the financial means to obtain shelter, or someone who is staying in an emergency shelter is not involuntarily homeless. *See id.* at 617 n.8. Contrary to the City's argument, this definition of involuntary homelessness is not the same as the definition of "homeless" found in regulations for the Department of Housing and Urban Development, 24 C.F.R. § 582.5, or the McKinney-Vento Act, 42 U.S.C. § 11434a(2), the federal law regarding the right of homeless children to a public education. For example, the McKinney-Vento Act includes as "homeless children and youths" persons who may not qualify as involuntarily homeless under *Martin*, such as children and youths "living in emergency or transitional shelters." 42 U.S.C. § 11434a(2). Though the district court noted in part that Plaintiffs met the definition of homelessness set forth in 24 C.F.R. § 582.5, the district court also relied on the specific definition of unsheltered homeless persons set forth in the Department of Housing and Urban Development's regulations regarding point-in-time counts: "persons who are living in a place not designed or ordinarily used as a regular sleeping accommodation for humans must be counted as unsheltered homeless persons." 24 C.F.R. § 578.7(c)(2)(i).

³ Our dissenting colleague's strong disagreement with the majority largely arises from his disapproval of *Martin*. *See, e.g.*, Dissent 56 ("Even assuming *Martin* remains good law . . ."); Dissent 90 (". . . and the gravity of *Martin*'s errors."); Dissent 92 (claiming, without evidence,

**I.**

This case involves challenges to five provisions of the Grants Pass Municipal Code ("GPMC"). The provisions can be described as an "anti-sleeping" ordinance, two "anti-camping" ordinances, a "park exclusion" ordinance, and a "park exclusion appeals" ordinance. When the district court entered judgment, the various ordinances consisted of the following.

First, the anti-sleeping ordinance stated, in full

> Sleeping on Sidewalks, Streets, Alleys, or Within Doorways Prohibited
>
> A. No person may sleep on public sidewalks, streets, or alleyways at any time as a matter of individual and public safety.
>
> B. No person may sleep in any pedestrian or vehicular entrance to public or private property abutting a public sidewalk.
>
> C. In addition to any other remedy provided by law, any person found in violation of this section may be immediately removed from the premises.

GPMC 5.61.020. A violation of this ordinance resulted in a presumptive $75 fine. If unpaid, that fine escalated to $160. If a violator pled guilty, the fines could be reduced by a state

---

that "it is hard to deny that *Martin* has 'generate[d] dire practical consequences") (modification in original and citation omitted). But *Martin* is controlling law in the Ninth Circuit, to which we are required to adhere.

circuit court judge to \$35 for a first offense and \$50 for a second offense. GPMC 1.36.010(K).

Next, the general anti-camping ordinance prohibited persons from occupying a "campsite" on all public property, such as parks, benches, or rights of way. GPMC 5.61.030. The term "campsite" was defined as

> any place where bedding, sleeping bag, or other material used for bedding purposes, or any stove or fire is placed, established, or maintained for the purpose of maintaining a temporary place to live, whether or not such place incorporates the use of any tent, lean-to, shack, or any other structure, or any vehicle or part thereof.

GPMC 5.61.010.   A second overlapping anti-camping ordinance prohibited camping in public parks, including "[o]vernight parking" of any vehicle. GPMC 6.46.090. A homeless individual would violate this parking prohibition if she parked or left "a vehicle parked for two consecutive hours [in a City park] . . . between the hours of midnight and 6:00 a.m." *Id.* Violations of either anti-camping ordinance resulted in a fine of \$295. If unpaid, the fine escalated to \$537.60. However, if a violator pled guilty, the fine could be reduced to \$180 for a first offense and \$225 for a second offense. GPMC 1.36.010(J).

Finally, the "park exclusion" ordinance allowed a police officer to bar an individual from all city parks for 30 days if, within one year, the individual was issued two or more citations for violating park regulations. GPMC 6.46.350(A). Pursuant to the "park exclusion appeals" ordinance, exclusion orders could be appealed to the City Council.

GPMC 6.46.355.    If an individual received a "park exclusion" order, but subsequently was found in a city park, that individual would be prosecuted for criminal trespass.

Since at least 2013, City leaders have viewed homeless persons as cause for substantial concern.  That year the City Council convened a Community Roundtable ("Roundtable") "to identify solutions to current vagrancy problems." Participants discussed the possibility of "driving repeat offenders out of town and leaving them there."  The City's Public Safety Director noted police officers had bought homeless persons bus tickets out of town, only to have the person returned to the City from the location where they were sent.  A city councilor made clear the City's goal should be "to make it uncomfortable enough for [homeless persons] in our city so they will want to move on down the road."  The planned actions resulting from the Roundtable included increased enforcement of City ordinances, including the anti-camping ordinances.

The year following the Roundtable saw a significant increase in enforcement of the City's anti-sleeping and anti-camping ordinances.  From 2013 through 2018, the City issued a steady stream of tickets under the ordinances.[4]  On September 4, 2018, a three-judge panel issued its opinion in

---

[4] The City issued the following number of tickets under the anti-sleeping and anti-camping ordinances:

> 2013: 74 total tickets
> 2014: 228 total tickets
> 2015: 80 total tickets
> 2016: 47 total tickets
> 2017: 99 total tickets
> 2018: 46 total tickets

*Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018). **⁵** That case served as the backdrop for this entire litigation.

In *Martin*, six homeless or recently homeless individuals sued the city of Boise, Idaho, seeking relief from criminal prosecution under two city ordinances related to public camping. *Martin*, 920 F.3d at 603-04. As relevant here, *Martin* held the Cruel and Unusual Punishment Clause of the "Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." *Id.* at 616. *Martin* made clear, however, that a city is not required to "provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Id.* at 617 (quoting *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007)) (omission in original).

---

⁵ Following the opinion, the City of Boise petitioned for rehearing en banc. On April 1, 2019, an amended panel opinion was issued and the petition for rehearing was denied. Judge M. Smith, joined by five other judges, dissented from the denial of rehearing en banc. He argued the three-judge panel had, among other errors, misinterpreted the Supreme Court precedents regarding the criminalization of involuntary conduct. *Martin*, 920 F.3d at 591-92 (M. Smith, J., dissenting from denial of rehearing en banc). Judge Bennett, joined by four judges, also dissented from the denial of rehearing en banc. Judge Bennett argued the three-judge panel's opinion was inconsistent with the original public meaning of the Cruel and Unusual Punishment Clause. *Id.* at 599 (Bennett, J., dissenting from denial of rehearing en banc). The merits of those dissents do not alter the binding nature of the amended *Martin* panel opinion. Unless otherwise indicated, all citations to *Martin* throughout the remainder of this opinion are to the amended panel opinion.

Pursuant to *Martin*, it is an Eighth Amendment violation to criminally punish involuntarily homeless persons for sleeping in public if there are no other public areas or appropriate shelters where those individuals can sleep. *Id.* at 617 n.8 ("Naturally, our holding does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it."). When assessing the number of shelter spaces, *Martin* held shelters with a "mandatory religious focus" could not be counted as available due to potential violations of the First Amendment's Establishment Clause. *Id.* at 609-10 (citing *Inouye v. Kemna*, 504 F.3d 705, 712-13 (9th Cir. 2007)).

In October 2018, approximately six weeks after the *Martin* opinion, Debra Blake filed her putative class action complaint against the City. The complaint alleged enforcement of the City's anti-sleeping and anti-camping ordinances violated the Cruel and Unusual Punishment Clause of the Eighth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment. The complaint was amended to include additional named plaintiffs and to allege a claim that the fines imposed under the ordinances violated the Excessive Fines Clause of the Eighth Amendment. On January 2, 2019, a few months after the initial complaint was filed, and before Plaintiffs filed their class certification motion, the City amended its anti-camping ordinance in an attempt to come into compliance with *Martin*. Prior to this change, the anti-camping ordinance was worded such that "'sleeping' in parks . . . automatically constitut[ed] 'camping.'" According to the City, "in direct response to *Martin v. Boise*, the City amended [the anti-camping

ordinance] to make it clear that the act of 'sleeping' was to be distinguished from the prohibited conduct of 'camping.'" The City meant to "make it clear that those without shelter *could* engage in the involuntary acts of sleeping or resting in the City's parks." Shortly after the City removed "sleeping" from the "camping" definition, Plaintiffs moved to certify a class. Plaintiffs requested certification of a class defined as

> All involuntarily homeless individuals living in Grants Pass, Oregon, including homeless individuals who sometimes sleep outside city limits to avoid harassment and punishment by [the City] as addressed in this lawsuit.

Plaintiffs' class certification motion was accompanied by a declaration from the Chief Operating Officer and Director of Housing and Homeless Services for United Community Action Network ("UCAN"), a non-profit organization that serves homeless people in Josephine County, the county where the City is located.[6] UCAN had recently conducted a "point-in-time count of homeless individuals in Josephine County."[7]   Based on that count, the Chief Operating

---

[6] The Department of Housing and Urban Development regulations impose obligations on the "continuum of care," which is defined as "the group composed of representatives of relevant organizations . . . that are organized to plan for and provide, as necessary, a system of outreach, engagement, and assessment . . . to address the various needs of homeless persons and persons at risk of homelessness for a specific geographic area." 24 C.F.R. § 576.2.

[7] As the "continuum of care" in the City, UCAN was required to conduct point-in-time counts ("PIT counts") of homeless persons within that geographic area. 24 C.F.R. § 578.7(c)(2). PIT counts measure the number of sheltered and unsheltered homeless individuals on a single night. 24 C.F.R. § 578.7(c)(2). The *Martin* court relied on PIT counts

Officer's declaration stated "[h]undreds of [homeless] people live in Grants Pass," and "almost all of the homeless people in Grants Pass are involuntarily homeless. There is simply no place in Grants Pass for them to find affordable housing or shelter. They are not choosing to live on the street or in the woods."

The City opposed class certification, arguing Plaintiffs had not provided sufficient evidence to meet any of the requirements for certifying a class. The district court disagreed and certified the class proposed by Plaintiffs. The parties proceeded with discovery and filed cross-motions for summary judgment.

At the time the parties filed their summary judgment motions, there were only four locations in the City that temporarily housed homeless persons, which proved inadequate. One location was run by the Gospel Rescue Mission, an explicitly religious organization devoted to helping the poor. The Gospel Rescue Mission operated a facility for single men without children, and another facility for women, including women with children. These two facilities required residents to work at the mission six hours a day, six days a week in exchange for a bunk for 30 days. Residents were required to attend an approved place of worship each Sunday and that place of worship had to espouse "traditional Christian teachings such as the Apostles Creed." Disabled persons with chronic medical or mental

---

conducted by local non-profits to determine the number of homeless people in the jurisdiction. *See Martin*, 920 F.3d at 604. Courts and experts note that PIT counts routinely undercount homeless persons, but they appear to be the best available source of data on homelessness. *See, e.g.*, *id.*

health issues that prevented them from complying with the Mission's rules were prohibited.**[8]**

In addition to the Gospel Rescue Mission, the City itself operated a "sobering center" where law enforcement could transport intoxicated or impaired persons. That facility consisted of twelve locked rooms with toilets where intoxicated individuals could sober up. The rooms did not have beds. The City also provided financial support to the Hearts with a Mission Youth Shelter, an 18-bed facility where unaccompanied minors aged 10 to 17 could stay for up to 72 hours, and could stay even longer if they had parental consent.

Finally, on nights when the temperature was below 30 degrees (or below 32 degrees with snow), UCAN operated a "warming center" capable of holding up to 40 individuals. That center did not provide beds. The center reached capacity on every night it operated except the first night it opened, February 3, 2020. Between February 3 and March 19, 2020, the warming center was open for 16 nights. The center did not open at all during the winter of 2020-2021.

Presented with evidence of the number of homeless persons and the shelter spaces available, the district court concluded "[t]he record is undisputed that Grants Pass has far more homeless individuals than it has practically available shelter beds." The court then held that, based on the unavailability of shelter beds, the City's enforcement of its anti-camping and anti-sleeping ordinances violated the

---

[8] Multiple class members submitted uncontested declarations to the district court stating they did not stay at the Gospel Rescue Mission because they suffer from disqualifying disabilities and/or were unwilling to attend church.

Cruel and Unusual Punishment Clause.  The fact that *Martin* involved criminal violations while the present case involved initial civil violations that matured into criminal violations made "no difference for Eight Amendment purposes."  Next, the court held the system of fines violated the Eighth Amendment's Excessive Fines Clause.[9]  Finally, the court held the appeals process for park exclusions violated procedural due process under the Due Process Clause of the Fourteenth Amendment.

In reaching its decision the district court was careful to point out that, consistent with *Martin*, the scope of its decision was limited.  The court's order made clear that the City was not required to provide shelter for homeless persons and the City could still limit camping or sleeping at certain times and in certain places.  The district court also noted the City may still "ban the use of tents in public parks," "limi[t] the amount of bedding type materials allowed per individual," and pursue other options "to prevent the

---

[9] Part of the City's argument on this issue was that the fines are not mandatory because state court judges retain discretion not to impose fines.  This is inconsistent with the text of the ordinances and not supported by the record.  The provision of the municipal code defining penalties for ordinance violations clarifies that the fines are mandatory. It provides, the fines "*shall* be \$295" and "*shall* be \$75."  GPMC 1.36.010(J)-(K) (emphasis added).  Conversely, it is only discretionary to reduce fines because the relevant ordinance provides that, "[u]pon a plea of guilty . . . the penalty *may* be reduced" to the amount listed for a first or second offense.  *Id.* (emphasis added).  After a second citation, there is no authority within the municipal code that permits judges to reduce fines, and there is no evidence in the record demonstrating circuit court judges have reduced fines except pursuant to GPMC 1.36.010.

erection of encampments that cause public health and safety concerns."**10**

Approximately one month after the summary judgment order, the district court issued a judgment which included a permanent injunction that provided a complicated mix of relief. First, the district court declared the ordinance regarding the appeals of park exclusions failed to provide "adequate procedural due process," but that ordinance was not permanently enjoined. Instead, the district court enjoined only the enforcement of the underlying park exclusion ordinance. Next, the district court declared enforcement of the anti-sleeping and anti-camping ordinances against class members "violates the Eighth Amendment prohibition against cruel and unusual punishment" and "violates the Eighth Amendment prohibition against excessive fines." Without explanation, however, the district court did not enjoin those ordinances in their entirety. Rather, the district court entered no injunctive relief regarding the anti-sleeping ordinance. But the district court permanently enjoined enforcement of the anti-camping ordinances, as well as an ordinance regarding "criminal trespassing on city property related to parks," in all City parks at night except for one park where the parties agreed the injunction need not apply.**11** The district court also permanently enjoined enforcement of the anti-camping ordinances during daytime hours unless an initial warning was given "at least 24 hours before enforcement."

---

[10] The district court denied summary judgment on other claims brought by Plaintiffs. Those claims were subsequently voluntarily dismissed.

[11] The City ordinance regarding "criminal trespass" was never at issue in the litigation until the permanent injunction. Plaintiffs explain it was included in the injunction "[b]y agreement of the parties."

Accordingly, under the permanent injunction, the anti-camping ordinances may be enforced under some circumstances during the day, but never at night.

The City appealed and sought initial en banc review to clarify the scope of *Martin*.  The petition for initial hearing en banc was denied.

## II.

The core issue involving enforcement of the anti-camping ordinances is governed in large part by *Martin*. While there are some differences between *Martin* and the present case, the City has not identified a persuasive way to differentiate its anti-camping ordinances from the questioned ordinances in *Martin*.  Therefore, the district court's ruling that the Cruel and Unusual Punishment Clause bars enforcement of the anti-camping ordinances will be mostly affirmed.  We need not address the potential excessiveness of the fines issue or whether Plaintiffs adequately pled their due process challenge.

Our analysis proceeds in five parts.  First, we reject the City's argument that the district court lacked jurisdiction.[12] Second, we find no abuse of discretion in the district court's certification of a class of involuntarily homeless persons. Third, we agree with the district court that at least portions of the anti-camping ordinance violate the Cruel and Unusual Punishment clause under *Martin*.  Fourth, we conclude there is no need to resolve whether the fines violate the Excessive

---

[12] However, we vacate summary judgment and remand as to the anti-sleeping ordinance to afford the district court the opportunity to substitute a class representative in place of Debra Blake, who passed away while this matter was on appeal.

Fines clause. Fifth, we hold it is unnecessary to decide Plaintiffs' procedural due process claim.

## A.

Standing and mootness are questions of law that we review de novo. *Hartman v. Summers*, 120 F.3d 157, 159 (9th Cir. 1997); *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003). "Federal courts must determine that they have jurisdiction before proceeding to the merits," and plaintiffs must demonstrate standing as a necessary component of jurisdiction. *Lance v. Coffman*, 549 U.S. 437, 439 (2007). To have Article III standing, a plaintiff must show (1) a concrete and particularized injury, (2) caused by the challenged conduct, (3) that is likely redressable by a favorable judicial decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). For purposes of injunctive relief, "[a]bstract injury is not enough"—the plaintiff must have sustained or be in immediate danger "of sustaining some direct injury as the result of the challenged" law. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (quotation marks and citation omitted).

The City's appellate briefing makes two standing arguments. First, the City argues Plaintiffs' claims are now moot because Plaintiffs no longer face a risk of injury based on the City's changed behavior after *Martin*. Second, the City argues Plaintiffs have not identified any relief that is within a federal court's power to redress. Both arguments are without merit.

A claim becomes moot, and no longer justiciable in federal court, if it has been remedied independent of the court. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013). There is abundant evidence in the record establishing homeless persons were injured by the City's

enforcement actions in the past.  The City argues, however, that it made changes after *Martin* such that there is no longer a threat of future injury.  The problem for the City is that voluntary cessation of challenged practices rarely suffices to moot a case and, in any event, there is evidence the challenged practices have continued after *Martin*.

"It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"  *Friends of the Earth*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).  This is so "because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."  *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012).  Thus, the City "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth*, 528 U.S. at 190. Instead of the City making it "absolutely clear" it has stopped enforcement activities, the record shows ongoing enforcement.

The parties diverge substantially on how to characterize the degree of enforcement after *Martin* was issued in September 2018.  The City argued in its briefing and at oral argument that it has largely complied with *Martin*, noting the 2019 amendment to an anti-camping ordinance, that citations were issued "sparingly" in 2019, and in particular it says it issued only two citations during the late evening and early morning since *Martin*.  The City supports its petition with a declaration from a City police officer stating "[i]t is the regular practice of every officer I know of on this department to enforce these Ordinances sparingly and in recognition of the different circumstances we encounter."

As for Plaintiffs, they offered evidence showing enforcement continued after *Martin* such that class members received citations and exclusion orders for camping or sleeping and were prosecuted for criminal trespass between the point the lawsuit was filed and the close of discovery.

Although the record does show the rate of enforcement of the various ordinances decreased since *Martin*, even accepting the City's position the evidence is undisputed that enforcement continued.[13] It is plainly inaccurate for the City to claim all enforcement ceased. The ongoing enforcement activities establish the City did not meet its "formidable burden" of showing the challenged activities will not recur. *Friends of the Earth*, 528 U.S. at 190. The City's mootness argument fails.[14]

---

[13] The City also argues "there was no evidence that anyone was ever cited for the simple act of sleeping in a City park" after *Martin*. But the citation issued to Dolores Nevin in late December 2019 pursuant to the City's "criminal trespass" ordinance included a narrative explaining, "[d]uring an area check of Riverside Park, Dolores Nevin was found *sleeping* during closed hours. Nevin, who has been warned in the past, was issued a citation for Trespass on City Property." (emphasis added). And on September 11, 2019, Grants Pass Police Officer Jason McGinnis issued citations to Debra Blake and Carla Thomas for being in Riverside Park at approximately 7:30 a.m. with sleeping bags and belongings spread around themselves. The citation given to Debra Blake, a named plaintiff, identified the offense as "Criminal Trespass on City Property." Debra Blake was later convicted of that offense and fined. Other individuals cited for camping in a city park in 2019 include class members: Gail Laine, William Stroh, Dawn Schmidt, Cristina Trejo, Kellie Parker, Colleen Bannon, Amanda Sirnio, and Michael and Louana Ellis.

[14] Mootness was also considered during the *Martin* litigation. *See Bell v. City of Boise*, 709 F.3d 890, 898, 900-01 (9th Cir. 2013). The City of Boise argued that a combination of an amended definition of "camping"

The City's other jurisdictional argument is that Plaintiffs' claims are not redressable.  According to the City, any possible relief intrudes inappropriately upon matters of policy best left to executive and legislative discretion.  We disagree.  Consistent with *Martin*, the district court granted limited relief enjoining enforcement of a few municipal ordinances at certain times, in certain places, against certain persons.  None of the cases cited by the City credibly support its argument that the district court injunction overstepped the judiciary's limited authority under the Constitution.  Contrary to the City's position, enjoining enforcement of a few municipal ordinances aimed at involuntarily homeless persons cannot credibly be compared to an injunction seeking to require the federal government to "phase out fossil fuel emissions and draw down excess atmospheric CO2."  *Juliana v. United States*, 947 F.3d 1159, 1164-65 (9th Cir. 2020).   The relief sought by Plaintiffs was redressable within the limits of Article III.  *See Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (holding a plaintiff's burden to demonstrate redressability is "relatively modest") (citation omitted).

---

in the ordinance and a "Special Order," prohibiting police officers from enforcing the ordinances when a person is on public property and there is no available overnight shelter, mooted the case.  *Id.* at 894-95.  We rejected the argument that the change to the definition of "camping" rendered the case moot because "[m]ere clarification of the Camping Ordinance does not address the central concerns of the Plaintiffs' Eighth Amendment claims"—that the ordinance "effectively criminalized their status as homeless individuals."  *Id.* at 898 n.12.  And we held the adoption of a "Special Order" did not moot the case because the Special Order was not a legislative enactment, and as such it "could be easily abandoned or altered in the future."  *Id.* at 901.

Finally, we raise *sua sponte* the possibility that the death of class representative Debra Blake while this matter was on the appeal has jurisdictional significance. *Cf. Fort Bend Cty. v. Davis*, 139 S.Ct. 1843, 1849 (2019) (holding courts must raise issues of subject matter jurisdiction *sua sponte*). We hold Blake's death does not moot the class's claims as to all challenged ordinances except possibly the anti-sleeping ordinance. As to that ordinance, we remand to allow the district court the opportunity to substitute a class representative in Blake's stead.

With respect to the park exclusion, criminal trespass, and anti-camping ordinances, the surviving class representatives, Gloria Johnson[15] and John Logan,[16] have standing in their

---

[15] The dissent suggests Gloria Johnson does not have standing to challenge the park exclusion and criminal trespass ordinances. Dissent 71-72. The dissent concedes, however, Johnson has standing to challenge the anti-camping ordinances, GPMC 5.61.030, 6.46.090. But the dissent does not provide a meaningful explanation why it draws this distinction between the ordinances that work in concert. It is true Johnson has not received a park exclusion order and has not been charged with criminal trespass in the second degree. However, there is little doubt that her continued camping in parks would lead to a park exclusion order and, eventually, criminal trespass charges. Johnson is positioned to bring a pre-enforcement challenge against the park exclusion and criminal trespass ordinances, because they will be used against her given the undisputed fact that she remains involuntarily homeless in Grants Pass. She established a credible threat of future enforcement under the anti-camping ordinances which creates a credible threat of future enforcement under the park exclusion and criminal trespass ordinances.

[16] The dissent claims John Logan has not established standing. Dissent 69-71. During the course of this case, Logan submitted two declarations. At the class certification stage, his declaration stated he "lived out of [his] truck on the streets in Grants Pass for about 4 years." During that time, he was "awakened by City of Grants Pass police officer and told that I cannot sleep in my truck anywhere in the city and ordered to move

own right.    Although they live in their cars, they risk
enforcement under all the same ordinances as Blake and the
class (with the exception of the anti-sleeping ordinance,
GPMC 5.61.020, which cannot be violated by sleeping in a
car) and have standing in their own right as to all ordinances
except GPMC 5.61.020.

---

on." To avoid those encounters, Logan "usually sleep[s] in [his] truck
just outside the Grants Pass city limits." However, Logan stated "[i]f
there was some place in the city where [he] could legally sleep in [his]
truck, [he] would because it would save valuable gas money and avoid .
. . having to constantly move." Logan also explained he has "met dozens,
if not hundreds, of homeless people in Grants Pass" over the years who
had been ticketed, fined, arrested, and criminally prosecuted "for living
outside." At summary judgment, Logan submitted a declaration stating
he is "currently involuntarily homeless in Grants Pass and sleeping in
[his] truck at night at a rest stop North of Grants Pass." He stated he
"cannot sleep in the City of Grants Pass for fear that [he] will be
awakened, ticketed, fined, moved along, trespassed and charged with
Criminal Trespass." The dissent reads this evidence as indicating Logan
failed to "provide[] any facts to establish" that he is likely to be issued a
citation under the challenged ordinances. Dissent 70. We do not agree.
The undisputed facts establish Logan is involuntarily homeless. When
he slept in Grants Pass, he was awoken by police officers and ordered to
move. His personal knowledge was that involuntarily homeless
individuals in Grants Pass often are cited under the challenged
ordinances and Grants Pass continues to enforce the challenged
ordinances. And, but for the challenged ordinances, Logan would sleep
in the city. Therefore, as the district court found, it is sufficiently likely
Logan would be issued a citation that Logan's standing is established.
That is especially true given the Supreme Court's instruction that a
plaintiff need not wait for "an actual arrest, prosecution, or other
enforcement action" before "challenging [a] law." *Susan B. Anthony List
v. Driehaus*, 573 U.S. 149, 158 (2014). Finally, even if Logan had not
demonstrated standing, the dissent's analysis regarding Logan is
irrelevant because this case could proceed solely based on the standing
established by Gloria Johnson and the class. *See Bates v. United Parcel
Serv., Inc.*, 511 F.3d at 985 (9th Cir. 2007) (en banc).

With respect to the anti-sleeping ordinance, the law is less clear. Debra Blake is the only class representative who had standing in her own right to challenge the anti-sleeping ordinance. Under cases such as *Sosna v. Iowa*, 419 U.S. 393, 401 (1975), and *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747 (1976), a class representative may pursue the live claims of a properly certified class—without the need to remand for substitution of a new representative[17]—even after his own claims become moot, provided that several requirements are met.[18] *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 987-88 (9th Cir. 2007) (en banc). If Debra Blake's challenge to the anti-sleeping ordinance became moot before she passed away, she could have continued to pursue the challenge on behalf of the class under the doctrine of *Sosna*. But we have not found any case applying *Sosna* and *Franks* to a situation such as this, in

---

[17] *See Sosna*, 419 U.S. at 403 ("[W]e believe that the test of Rule 23(a) is met."); *id.* at 416-17 (White, J., dissenting) ("It is claimed that the certified class supplies the necessary adverse parties for a continuing case or controversy . . . The Court cites no authority for this retrospective decision as to the adequacy of representation which seems to focus on the competence of counsel rather than a party plaintiff who is a representative member of the class. At the very least, the case should be remanded to the District Court.").

[18] The class must be properly certified, *see Franks*, 424 U.S. at 755-56, or the representative must be appealing denial of class certification. *See United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980). The class representative must be a member of the class with standing to sue at the time certification is granted or denied. *See Sosna*, 419 U.S. at 403. The unnamed class members must still have a live interest in the matter throughout the duration of the litigation. *See Franks*, 424 U.S. at 755. And the court must be satisfied that the named representative will adequately pursue the interests of the class even though their own interest has expired. *See Sosna*, 419 U.S. at 403.

which the death of a representative causes a class to be unrepresented as to part (but not all) of a claim. The parties did not brief this issue and no precedent indicates whether this raises a jurisdictional question, which would deprive us of authority to review the merits of the anti-sleeping ordinance challenge, or a matter of Federal Rule of Civil Procedure 23, which might not.

Because Plaintiffs have not moved to substitute a class representative pursuant to Federal Rule of Appellate Procedure 43(a) or identified a representative who could be substituted, because no party has addressed this question in briefing, and because we are not certain of our jurisdiction to consider the challenge to the anti-sleeping ordinance, we think it appropriate to vacate summary judgment as to the anti-sleeping ordinance and remand to determine whether a substitute representative is available as to that challenge alone. *See Cobell v. Jewell*, 802 F.3d 12, 23-24 (D.C. Cir. 2015) (discussing substitution of a party during appeal). Substitution of a class representative may significantly aid in the resolution of the issues in this case. Remand will not cause significant delay because, as we explain below, remand is otherwise required so that the injunction can be modified. In the absence of briefing or precedent regarding this question, we do not decide whether this limitation is jurisdictional or whether it arises from operation of Rule 23.

We therefore hold the surviving class representatives at a minimum have standing to challenge every ordinance except the anti-sleeping ordinance. As to the anti-sleeping ordinance, we vacate summary judgment and remand for the district court to consider in the first instance whether an adequate class representative, such as class member Dolores Nevin, exists who may be substituted.

**B.**

The City's next argument is the district court erred in certifying the class. We "review a district court's order granting class certification for abuse of discretion, but give the district court 'noticeably more deference when reviewing a grant of class certification than when reviewing a denial.'" *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1275 (9th Cir. 2019) (internal citation omitted) (quoting *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1115 (9th Cir. 2017)). Factual findings underlying class certification are reviewed for clear error. *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014).

A member of a class may sue as a representative party if the member satisfies Federal Rule of Civil Procedure 23(a)'s four prerequisites: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). Assessing these requirements involves "rigorous analysis" of the evidence. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

If the initial requirements of Rule 23(a) are met, a putative class representative must also show the class falls into one of three categories under Rule 23(b). Plaintiffs brought this suit under Rule 23(b)(2), seeking injunctive or declaratory relief based on the City having "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The district court found the Rule 23(a) requirements satisfied and certified a class under Rule 23(b)(2). The City's arguments against this class certification are obscure.

It appears the City's argument is that class certification was an abuse of discretion because the holding of *Martin* can only be applied after an individualized inquiry of each alleged involuntarily homeless person's access to shelter.[19] The City appears to suggest the need for individualized inquiry defeats numerosity, commonality, and typicality. While we acknowledge the *Martin* litigation was not a class action, nothing in that decision precluded class actions.[20] And based on the record in this case, the district court did not err by finding Plaintiffs satisfied the requirements of Rule 23 such that a class could be certified.

To satisfy the numerosity requirement a proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). For purposes of this requirement, "'impracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964) (quotation omitted). There is no specific number of class members required. *See Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). However, proposed

---

[19] There is no reason to believe the putative class members are voluntarily homeless. To the contrary, at least 13 class members submitted declarations to the district court indicating that they are involuntarily homeless.

[20] Other courts have certified similar classes. *See e.g.*, *Lehr v. City of Sacramento*, 259 F.R.D. 479 (E.D. Cal. 2009) (addressing numerosity, commonality, and typicality for homeless persons in Sacramento); *Joyce v. City & Cty. of S.F.*, 1994 WL 443464 (N.D. Cal. Aug. 4, 1994), *dismissed as moot*, 87 F.3d 1320 (9th Cir. 1996) (finding typicality despite some differences among homeless class members); *Pottinger v. City of Miami*, 720 F.Supp. 955, 960 (S.D. Fla. 1989) (certifying a class of homeless persons).

classes of less than fifteen are too small while classes of more than sixty are sufficiently large.   *Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051-52 (9th Cir. 2003).

When the district court certified the class on August 7, 2019, it found there were at least 600 homeless persons in the City based on the 2018 and 2019 PIT counts conducted by UCAN.  The City does not identify how this finding was clearly erroneous.  In fact, the City affirmatively indicated to Plaintiffs prior to the class certification order that the number of homeless persons residing in Grants Pass for the past 7 years was "unknown."   Further, the only guidance offered by the City regarding a specific number of class members came long after the class was certified.  A City police officer claimed in a declaration that he was "aware of less than fifty individuals total who do not have access to any shelter" in the City.   The officer admitted, however, it "would be extremely difficult to accurately estimate the population of people who are homeless in Grants Pass regardless of the definition used."

The officer's guess of "less than fifty" homeless persons is inconsistent with the general understanding that PIT counts routinely undercount homeless persons.  *See Martin*, 920 F.3d at 604 ("It is widely recognized that a one-night point in time count will undercount the homeless population.") (internal quotation marks omitted).  But even accepting the officer's assessment that there were approximately fifty homeless persons in the City, the numerosity requirement is satisfied.  Joining approximately fifty persons might be impracticable and especially so under the facts here because homeless persons obviously lack a fixed address and likely have no reliable means of

communications.**21**  At the very least, the district court did
not abuse its discretion in concluding the numerosity
requirement was met.

A class satisfies Rule 23's commonality requirement if
there is at least one question of fact or law common to the
class. *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544
(9th Cir. 2013).  The Supreme Court has said the word
"question" in Rule 23(a)(2) is a misnomer: "What matters to
class certification . . . is not the raising of common
'questions'—even in droves—but rather, the capacity of a
class-wide proceeding to generate common *answers* apt to

---

[21] Moreover, there is a well-documented correlation between physical
and mental illness and homelessness.  *See, e.g.*, Sara K. Rankin,
*Punishing Homelessness*, 22 N. CRIM. L. REV. 99, 105 (2019)
("Psychiatric disorders affect at least 30 to 40 percent of all people
experiencing homelessness."); Stefan Gutwinski et al., *The prevalence
of mental disorders among homeless people in high-income countries:
An updated systematic review and meta-regression analysis*, 18(8) PLOS
MED. 1, 14 (Aug. 23, 2021), ("Our third main finding was high
prevalence rates for treatable mental illnesses, with 1 in 8 homeless
individuals having either major depression (12.6%) or schizophrenia
spectrum disorders (12.4%).  This represents a high rate of schizophrenia
spectrum disorders among homeless people, and a very large excess
compared to the 12-month prevalence in the general population, which
for schizophrenia is estimated around 0.7% in high-income countries.");
Greg A. Greenberg & Robert A. Rosenheck, *Jail Incarceration,
Homelessness, and Mental Health: A National Study*, 59 PSYCHIATRIC
SERVS. 170, 170 (2008) ("Homeless individuals may also be more likely
to have health conditions . . . Severe mental illness is also more prevalent
among homeless people than in the general population."); CTR. FOR
DISEASE CONTROL & PREVENTION, HOMELESSNESS AS A PUBLIC
HEALTH LAW ISSUE: SELECTED RESOURCES (Mar. 2, 2017)
("Homelessness is closely connected to declines in physical and mental
health; homeless persons experience high rates of health problems such
as HIV infection, alcohol and drug abuse, mental illness, tuberculosis,
and other conditions.").

drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)) (emphasis and omission in original)).  "[C]lass members' claims [must] 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'" *Mazza*, 666 F.3d at 588 (quoting *Wal-Mart*, 564 U.S. at 350).

As correctly identified by the district court, Plaintiffs' claims present at least one question and answer common to the class: "whether [the City's] custom, pattern, and practice of enforcing anti-camping ordinances, anti-sleeping ordinances, and criminal trespass laws . . . against involuntarily homeless individuals violates the Eighth Amendment of the Constitution."   An answer on this question resolved a crucial aspect of the claims shared by all class members.

The City argues the commonality requirement was not met because some class members might have alternative options for housing, or might have the means to acquire their own shelter.[22]   But this argument misunderstands the class

---

[22] The dissent adapts the City's argument that enforcement of the anti-camping ordinances depends on individual circumstances and is therefore not capable of resolution on a common basis. Dissent 77-79. That misunderstands how the present class was structured. The dissent attempts to reframe the common question as a very general inquiry. It appears the dissent interprets the question whether an Eighth Amendment violation must be determined by an individualized inquiry as whether each individual is "involuntarily homeless." To assess that, a court would have to conduct an individualized inquiry and determine if an individual was "involuntarily homeless."   But that is not the common question in this case. Rather, the question is whether the City's enforcement of the anti-camping ordinances against all involuntarily homeless individuals violates the Eighth Amendment. This question is

definition.  Pursuant to the class definition, the class includes only *involuntarily* homeless persons.[23]  Individuals who have shelter or the means to acquire their own shelter simply

---

capable of common resolution on a prospective class-wide basis, as the record establishes.

[23] The dissent argues this created a prohibited "fail safe" class.  That is erroneous.  As noted in a recent en banc decision, "a 'fail safe' class . . . is defined to include only those individuals who were injured by the allegedly unlawful conduct."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (en banc).  Such classes are prohibited "because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment."  *Id.  See also Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016) (noting a fail safe class "is one that is defined so narrowly as to preclude[ ] membership unless the liability of the defendant is established").  No such class is present here.  The class was defined, in relevant part, as "[a]ll involuntarily homeless individuals living in Grants Pass."  Membership in that class has no connection to the success of the underlying claims.  Put differently, the class would have consisted of exactly the same population whether Grants Pass won or lost on the merits.  The obvious illustration of this is the class population would not change if a court determined the anti-camping ordinance violated the Eighth Amendment while the anti-sleeping ordinance did not. In that situation, class members would not be "defined out of the class." *Olean*, 31 F.4th at 669 n.14 (citation omitted). Rather, class members would be "bound by the judgment" regarding the anti-sleeping ordinance. *Id.* In any event, the dissent's concerns regarding individualized determinations are best made when the City attempts to enforce its ordinances.  *Cf. McArdle v. City of Ocala*, 519 F.Supp.3d 1045, 1052 (M.D. Fla. 2021) (requiring that officers inquire into the availability of shelter space before an arrest could be made for violation of the City's "open lodging" ordinance).  If it is determined at the enforcement stage that a homeless individual has access to shelter, then they do not benefit from the injunction and may be cited or prosecuted under the anti-camping ordinances.  Moreover, as we noted above, several classes of homeless individuals have been certified in the past. *See supra* note 20.

are never class members.[24]  Because we find there existed at
least one question of law or fact common to the class, the
district court did not abuse its discretion in concluding
commonality was satisfied.

Typicality asks whether "the claims or defenses of the
representative parties are typical" of the class. Fed. R. Civ.
P. 23(a)(3). Typicality is a "permissive standard[]." *Staton
v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citation
omitted). It "refers to the nature of the claim or defense of
the class representative, and not to the specific facts from
which it arose or the relief sought." *Parsons*, 754 F.3d at
685 (citation omitted).

The class representatives' claims and defenses are
typical of the class in that they are homeless persons who
claim that the City cannot enforce the challenged ordinances
against them when they have no shelter. The defenses that
apply to class representatives and class members are
identical.   The claims of class representatives and class
members are similar, except that some class representatives
live in vehicles while other class members may live on
streets or in parks, not vehicles.  This does not defeat
typicality.  The class representatives with vehicles may
violate the challenged ordinances in a different manner than
some class members—*i.e.*, by sleeping in their vehicle,
rather than on the ground.  But they challenge the same
ordinances under the same constitutional provisions as other

---

[24] We do not, as the dissent contends, "suggest[ ] that the class definition
requires only an involuntary lack of access to regular or permanent
shelter to qualify as 'involuntarily homeless.'" Dissent 84. It is unclear
where the dissent finds this in the opinion.  To be clear: A person with
access to temporary shelter is not involuntarily homeless unless and until
they no longer have access to shelter.

class members.   *Cf.   Staton*, 327 F.3d at 957
("[R]epresentative claims are 'typical' if they are reasonably
coextensive with those of absent class members; they need
not be substantially identical.") (citation omitted).   The
district court did not abuse its discretion in finding the
typicality requirement met.

The City does not present any other arguments regarding
class certification, such as the propriety of certifying the
class as an injunctive class under Rule 23(b)(2).   We do not
make arguments for parties and the arguments raised by the
City regarding class certification fail.

## C.

Having rejected the City's jurisdictional arguments, as
well as its arguments regarding class certification, the merits
can be addressed.   The City's merits arguments regarding the
Cruel and Unusual Punishment Clause take two forms.   First,
the City argues its system of imposing civil fines cannot be
challenged as violating the Cruel and Unusual Clause
because that clause provides protection only in criminal
proceedings, after an individual has been convicted.   That is
incorrect.   Second, the City argues *Martin* does not protect
homeless persons from being cited under the City's amended
anti-camping ordinance which prohibits use of any bedding
or similar protection from the elements.   The City appears to
have conceded it cannot cite homeless persons merely for
sleeping in public but the City maintains it is entitled to cite
individuals for the use of rudimentary bedding supplies, such
as a blanket, pillow, or sleeping bag "for bedding purposes."
*See* GPMC 5.61.010(B).   Again, the City is incorrect.   Here,
we focus exclusively on the anti-camping ordinances.

According to the City, citing individuals under the anti-
camping ordinances cannot violate the Cruel and Unusual

Punishment Clause because citations under the ordinances are civil and civil citations are "categorically not 'punishment' under the Eight Amendment."[25]   The City explains "the simple act of issuing a civil citation with a court date [has never] been found to be unconstitutional 'punishment' under the Eighth Amendment."   While not entirely clear, the City appears to be arguing the Cruel and Unusual Punishment Clause provides no protection from citations categorized as "civil" by a governmental authority.[26]

---

[25] This position is in significant tension with the City's actions taken immediately after *Martin* was issued. As noted earlier, the City amended its anti-camping ordinance "in direct response to *Martin v. Boise*" to allow for "the act of 'sleeping'" in City parks. If the City believed *Martin* has no impact on civil ordinances, it is unclear why the City believed a curative "response" to *Martin* was necessary.

[26] The primary support for this contention is *Ingraham v. Wright*, 430 U.S. 651 (1977). In *Ingraham*, the Supreme Court addressed whether the Cruel and Unusual Punishment Clause was implicated by corporal punishment in public schools. The Court stated the Cruel and Unusual Punishment Clause limits "the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such." *Id.* at 667. The Court interpreted the challenge to corporal punishment as, in effect, asserting arguments under only the first or second limitation.   That is, the challenge was whether "the paddling of schoolchildren" was a permissible amount or type of punishment. *Id.* at 668. The *Ingraham* decision involved no analysis or discussion of the third limitation, *i.e.* the "substantive limits on what can be made criminal." *Id.* at 667. Thus, it was in the context of evaluating the amount or type of punishment that *Ingraham* stated "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Id.* at 671 n.40. When, as here, plaintiffs are raising challenges to the "substantive limits on what can be

Plaintiffs' focus on civil citations does involve an extra step from the normal Cruel and Unusual Clause analysis and the analysis of *Martin*. Usually, claims under the Cruel and Unusual Clause involve straightforward criminal charges. For example, the situation in *Martin* involved homeless persons allegedly violating criminal ordinances and the opinion identified its analysis as focusing on the "criminal" nature of the charges over ten times. 920 F.3d at 617. Here, the City has adopted a slightly more circuitous approach than simply establishing violation of its ordinances as criminal offenses. Instead, the City issues civil citations under the ordinances. If an individual violates the ordinances twice, she can be issued a park exclusion order. And if the individual is found in a park after issuance of the park exclusion order, she is cited for criminal trespass. *See* O.R.S. 164.245 (criminal trespass in the second degree). Multiple City police officers explained in their depositions this sequence was the standard protocol. The holding in *Martin* cannot be so easily evaded.

*Martin* held the Cruel and Unusual Punishment clause "prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." 920 F.3d at 616. A local government cannot avoid this ruling by issuing civil citations that, later, become criminal offenses. A recent decision by the en banc Fourth Circuit illustrates how the

---

made criminal," *Ingraham* does not prohibit a challenge before a criminal conviction. *See Martin*, 920 F.3d at 614 ("*Ingraham* did not hold that a plaintiff challenging the state's power to criminalize a particular status or conduct in the first instance, as the plaintiffs in this case do, must first be convicted.").

Cruel and Unusual Punishment Clause looks to the eventual criminal penalty, even if there are preliminary civil steps.

The disputes in *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019) (en banc) arose from a Virginia law which allowed a state court to issue a civil order identifying an individual as a "habitual drunkard." *Id.* at 268. Once labeled a "habitual drunkard," the individual was "subject to incarceration for the mere possession of or attempt to possess alcohol, or for being drunk in public." *Id.* at 269. A group of homeless alcoholics filed suit claiming, among other theories, the "habitual drunkard" scheme violated the Cruel and Unusual Punishment Clause. In the plaintiffs' view, the scheme resulted in criminal prosecutions based on their "status," *i.e.* alcoholism. *See id.* at 281.

Using reasoning very similar to that in *Martin*, the Fourth Circuit found the statutory scheme unconstitutional because it provided punishment based on the plaintiffs' status. Of particular relevance here, the Fourth Circuit reasoned the fact that Virginia's "scheme operate[d] in two steps" did not change the analysis. *Id.* 283. Issuing a civil order first, followed by a criminal charge, was a "two-pronged statutory scheme" potentially "less direct" than straightforwardly criminalizing the status of alcohol addiction. *Id.* But the scheme remained unconstitutional because it "effectively criminalize[d] an illness." *Id.* The fact that Virginia "civilly brands alcoholics as 'habitual drunkards' before prosecuting them for involuntary manifestations of their illness does nothing to cure the unconstitutionality of this statutory scheme." *Id.*

The same reasoning applies here. The anti-camping ordinances prohibit Plaintiffs from engaging in activity they cannot avoid. The civil citations issued for behavior

Plaintiffs cannot avoid are then followed by a civil park exclusion order and, eventually, prosecutions for criminal trespass. Imposing a few extra steps before criminalizing the very acts *Martin* explicitly says cannot be criminalized does not cure the anti-camping ordinances' Eighth Amendment infirmity.

The City offers a second way to evade the holding in *Martin*. According to the City, it revised its anti-camping ordinances to allow homeless persons to sleep in City parks. However, the City's argument regarding the revised anti-camping ordinance is an illusion. The amended ordinance continues to prohibit homeless persons from using "bedding, sleeping bag, or other material used for bedding purposes," or using stoves, lighting fires, or erecting structures of any kind. GPMC 5.61.010. The City claims homeless persons are free to sleep in City parks, but only without items necessary to facilitate sleeping outdoors.[27]

The discrepancy between sleeping without bedding materials, which is permitted under the anti-camping ordinances, and sleeping with bedding, which is not, is intended to distinguish the anti-camping ordinances from *Martin* and the two Supreme Court precedents underlying *Martin*, *Robinson v. California*, 370 U.S. 660 (1962) and

---

[27] The Grants Pass ordinance does not specifically define "bedding" but courts give the words of a statute or ordinance their "ordinary, contemporary, common meaning" absent an indication to the contrary from the legislature. *See Williams v. Taylor*, 529 U.S. 420, 431 (2000) (citation omitted). The Oxford English Dictionary defines "bedding" as "[a] collective term for the articles which compose a bed." OXFORD ENGLISH DICTIONARY. And "bed" is defined as "a place for sleeping." MERRIAM-WEBSTER COLLEGIATE DICTIONARY 108 (11th ed.). The City's effort to dissociate the use of bedding from the act of sleeping or protection from the elements is nonsensical.

*Powell v. Texas*, 392 U.S. 514 (1968).  Under those cases, a person may not be prosecuted for conduct that is involuntary or the product of a "status."  *See Martin*, 920 F.3d at 617 (citation omitted).  The City accordingly argues that sleeping is involuntary conduct for a homeless person, but that homeless persons can choose to sleep without bedding materials and therefore can be prosecuted for sleeping *with* bedding.

In its order granting summary judgment, the district court correctly concluded the anti-camping ordinances violated the Cruel and Unusual Punishment Clause to the extent they prohibited homeless persons from "taking necessary minimal measures to keep themselves warm and dry while sleeping when there are no alternative forms of shelter available."  The only plausible reading of *Martin* is that it applies to the act of "sleeping" in public, including articles necessary to facilitate sleep.  In fact, *Martin* expressed concern regarding a citation given to a woman who had been found sleeping on the ground, wrapped in blankets.  920 F.3d at 618.  *Martin* noted that citation as an example of the anti-camping ordinance being "enforced against homeless individuals who take even the most rudimentary precautions to protect themselves from the elements."  *Id.*  *Martin* deemed such enforcement unconstitutional.  *Id.*  It follows that the City cannot enforce its anti-camping ordinances to the extent they prohibit "the most rudimentary precautions" a homeless person might take against the elements.[28]  The City's position that it is

---

[28] Grants Pass is cold in the winter.  The evidence in the record establishes that homeless persons in Grants Pass have struggled against frostbite.  Faced with spending every minute of the day and night outdoors, the choice to use rudimentary protection of bedding to protect

entitled to enforce a complete prohibition on "bedding, sleeping bag, or other material used for bedding purposes" is incorrect.

The dissent claims we have misread *Martin* by "completely disregard[ing] the *Powell* opinions on which *Martin* relied, which make unmistakably clear that an individualized showing of involuntariness is required." Dissent 82. The dissent concedes that pursuant to *Martin*, the City cannot impose criminal penalties on involuntarily homeless individuals for sitting, sleeping, or lying outside on public property. Dissent 62. Thus, our purported "complete disregard[ ]" for *Martin* is not regarding the central holding that local governments may not criminalize involuntary conduct. Rather, the dissent believes, based on its interpretation of the Supreme Court opinions underlying *Martin*, that the Eighth Amendment provides only "a case-specific affirmative defense" that can never be litigated on a class basis. Dissent 59. To reach this counterintuitive conclusion, the dissent reads limitations into *Robinson*, *Powell*, and *Martin* that are nonexistent.

In *Robinson*, the Supreme Court struck down, under the Eighth Amendment, a California law that made "it a criminal offense for a person to 'be addicted to the use of narcotics.'" *Robinson*, 370 U.S. at 666. The law was unconstitutional, the Court explained, because it rendered the defendant "continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State." *Id.*

Six years later, in *Powell*, the Court divided 4-1-4 over whether Texas violated the Eighth Amendment under

---

against snow, frost, or rain is not volitional; it is a life-preserving imperative.

*Robinson* by prosecuting an alcoholic for public drunkenness. In a plurality opinion, Justice Marshall upheld the conviction of Leroy Powell on the ground that he was not punished on the basis of his status as an alcoholic, but rather for the *actus reus* of being drunk in public. *Powell*, 392 U.S. at 535. Four justices dissented, in an opinion by Justice Fortas, on the ground that the findings made by the trial judge—that Powell was a chronic alcoholic who could not resist the impulse to drink—compelled the conclusion that Powell's prosecution violated the Eighth Amendment because Powell could not avoid breaking the law. *Id.* at 569-70 (Fortas, J., dissenting). Justice White concurred in the judgment. He stressed, "[i]f it cannot be a crime to have an irresistible compulsion to use narcotics, I do not see how it can constitutionally be a crime to yield to such a compulsion." *Id.* at 549 (White, J., concurring). However, the reason for Justice White's concurrence was that he felt *Powell* failed to prove his status as an alcoholic compelled him to violate the law by appearing in public. *Id.* at 553 (White, J., concurring).

Pursuant to *Marks v. United States*, 430 U.S. 188 (1977), the narrowest position which gained the support of five justices is treated as the holding of the Court. In identifying that position, *Martin* held: "five Justices [in *Powell*] gleaned from *Robinson* the principle that 'that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being.'" *Martin*, 920 F.3d at 616 (quoting *Jones*, 443 F.3d at 1135). *Martin* did not—as the dissent alleges—hold that *Powell*'s "controlling opinion was Justice White's concurrence." Dissent 60. *See id.*, 920 F.3d at 616-17. It would have violated the rule of *Marks* to adopt portions of Justice White's concurrence that did not

receive the support of five justices. The dissent claims
Justice White's concurrence requires that the individual
claiming a status must prove the status compels the
individual to violate the law—here, that each homeless
individual must prove their status as an involuntarily
homeless person to avoid prosecution.**[29]** Dissent 59-63. The

---

[29] The dissent's attempt to create a governing holding out of Justice
White's concurrence is erroneous. By citing a word or two out of context
in the *Powell* dissenting opinion (*e.g.*, "constitutional defense") our
dissenting colleague argues both Justice White and the dissenting
justices in *Powell* agreed any person subject to prosecution has, at most,
"a case-specific affirmative 'defense.'" Dissent 59-60, 77. We disagree.
Though status was litigated as a defense in the context of Leroy Powell's
prosecution, no opinion in *Powell* held status may be raised only as a
defense. The *Powell* plurality noted trial court evidence that Leroy
Powell was an alcoholic, but that opinion contains no indication "status"
may only be invoked as "a case-specific affirmative 'defense.'" As for
Justice White, the opening paragraph of his concurrence indicates he was
primarily concerned not with how a status must be invoked but with the
fact that certain statuses should be beyond the reach of the criminal law:

> If it cannot be a crime to have an irresistible
> compulsion to use narcotics, I do not see how it can
> constitutionally be a crime to yield to such a
> compulsion. Punishing an addict for using drugs
> convicts for addiction under a different name.
> Distinguishing between the two crimes is like
> forbidding criminal conviction for being sick with flu
> or epilepsy but permitting punishment for running a
> fever or having a convulsion. Unless Robinson is to be
> abandoned, the use of narcotics by an addict must be
> beyond the reach of the criminal law. Similarly, the
> chronic alcoholic with an irresistible urge to consume
> alcohol should not be punishable for drinking or for
> being drunk.

*Powell*, 392 U.S. at 548-49 (White, J., concurring) (internal citation
omitted). Finally, neither the remainder of Justice White's concurrence

dissent claims this renders class action litigation inappropriate. But no opinion in either *Powell* or *Martin* discussed the propriety of litigating the constitutionality of such criminal statutes by way of a class action.[30]

The law that the dissent purports to unearth in Justice White's concurrence is not the "narrowest ground" which received the support of five justices. *No* opinion in *Powell* or *Martin* supports the dissent's assertion that *Powell* offers exclusively an "affirmative 'defense'" that cannot be litigated in a class action.[31] Dissent 59, 77. Although the

---

nor the dissenting opinion explicitly indicates one's status may only be invoked as a defense. Rather, Justice White and the dissenters simply agreed that, if Powell's status made his public intoxication involuntary, he could not be prosecuted. There is no conceivable way to interpret *Martin* as adopting our dissenting colleague's position that one's status must be invoked as a defense. But even assuming the burden must be placed on the party wishing to invoke a status, the class representatives established there is no genuine dispute of material fact they have the relevant status of being involuntarily homeless.

[30] Federal courts have certified classes of homeless plaintiffs in the past, *see supra* note 20, which counsels against the City's and the dissent's position that such classes are impermissible under Rule 23.

[31] As noted above, *Martin* did not hold homeless persons bear the burden of demonstrating they are involuntarily homeless. *See supra* note 29. Because the record plainly demonstrates Plaintiffs are involuntarily homeless, there similarly is no reason for us to determine what showing would be required. We note, however, that some district courts have addressed circumstances in which the question of burden was somewhat relevant. *See, e.g.*, *McArdle*, 519 F.Supp.3d at 1052 (requiring, based in part on *Martin*, that officers inquire into the availability of shelter space before making an arrest for violation of the City's "open lodging" ordinance); *Butcher v. City of Marysville*, 2019 WL 918203, at *7 (E.D. Cal. Feb. 25, 2019) (holding plaintiffs failed to make the "threshold showing" of pleading that there was no shelter capacity and that they had no other housing at the time of enforcement).

dissent might prefer that these principles find support in the controlling law, they do not.  We thus do not misread *Martin* by failing to apply the principles found solely in Justice White's concurrence.   Rather, we adhere to the narrow holding of *Martin* adopting the narrowest ground shared by five justices in *Powell*: a person cannot be prosecuted for involuntary conduct if it is an unavoidable consequence of one's status.

In addition to erecting an absolute bar to class litigation of this sort, the dissent would also impose artificial limitations on claims brought pursuant to *Martin*.   The dissent concedes Gloria Johnson has standing to bring individual challenges to most of the City's ordinances.  But the dissent then speculates that Gloria Johnson may, in fact, not be involuntarily homeless in the City.  The dissent would insist that Gloria Johnson, for example, leave the City to camp illegally on federal or state lands, provide the court an accounting of her finances and employment history, and indicate with specificity where she lived before she lost her job and her home.  Dissent 85-88.  There, of course, exists no law or rule requiring a homeless person to do any of these things.  Gloria Johnson has adequately demonstrated that there is no available shelter in Grants Pass and that she is involuntarily homeless.

The undisputed evidence establishes Gloria Johnson is involuntarily homeless and there is undisputed evidence showing many other individuals in similar situations.  It is undisputed that there are at least around 50 involuntarily homeless persons in Grants Pass, and PIT counts, which *Martin* relied on to establish the number of homeless persons in Boise, revealed more than 600.  *See Martin*, 920 F.3d at 604.  It is undisputed that there is no secular shelter space available to adults.  Many class members, including the class

representatives, have sworn they are homeless and the City has not contested those declarations. The dissent claims this showing is not enough, implying that Plaintiffs must meet an extremely high standard to show they are involuntarily homeless. Even viewed in the light most favorable to the City, there is no dispute of material fact that the City is home to many involuntarily homeless individuals, including the class representatives. In fact, neither the City nor the dissent has demonstrated there is even one *voluntarily* homeless individual living in the City.[32]  In light of the undisputed facts in the record underlying the district court's summary judgment ruling that show Plaintiffs are involuntarily homeless, and the complete absence of evidence that Plaintiffs are voluntarily homeless, we agree with the district court that Plaintiffs such as Gloria Johnson are not voluntarily homeless and that the anti-camping ordinances are unconstitutional as applied to them unless there is some place, such as shelter, they can lawfully sleep.[33]

---

[32] The dissent claims we have "shifted the burden to the City to establish the voluntariness of the behavior targeted by the ordinances." Dissent 87 n.13 (emphasis omitted). To the contrary, as we have explained, we do not decide who would bear such a burden because undisputed evidence demonstrates Plaintiffs are involuntarily homeless. Rather, without deciding who would bear such a burden if involuntariness were subject to serious dispute, we note Plaintiffs have demonstrated involuntariness and there is no evidence in the record showing any class member has adequate alternative shelter.

[33] Following *Martin*, several district courts have held that the government may evict or punish sleeping in public in some locations, provided there are other lawful places within the jurisdiction for involuntarily homeless individuals to sleep. *See, e.g.*, *Shipp v. Schaaf*, 379 F.Supp.3d 1033, 1037 (N.D. Cal. 2019) ("However, even assuming (as Plaintiffs do) that [eviction from a homeless encampment by citation or arrest] might occur, remaining at a particular encampment on public

Our holding that the City's interpretation of the anti-camping ordinances is counter to *Martin* is not to be interpreted to hold that the anti-camping ordinances were properly enjoined in their entirety. Beyond prohibiting bedding, the ordinances also prohibit the use of stoves or fires, as well as the erection of any structures. The record has not established the fire, stove, and structure prohibitions deprive homeless persons of sleep or "the most rudimentary precautions" against the elements.[34] Moreover, the record does not explain the City's interest in these prohibitions.[35]

_____

property is not conduct protected by *Martin*, especially where the closure is temporary in nature."); *Aitken v. City of Aberdeen*, 393 F.Supp.3d 1075, 1082 (W.D. Wash. 2019) ("*Martin* does not limit the City's ability to evict homeless individuals from particular public places."); *Gomes v. Cty. of Kauai*, 481 F.Supp.3d 1104, 1109 (D. Haw. 2020) (holding the County of Kauai could prohibit sleeping in a public park because it had not prohibited sleeping on other public lands); *Miralle v. City of Oakland*, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018) (holding the City could clear out a specific homeless encampment because "*Martin* does not establish a constitutional right to occupy public property indefinitely at Plaintiffs' option"); *Le Van Hung v. Schaaf*, 2019 WL 1779584, at *5 (N.D. Cal. Apr. 23, 2019) (holding *Martin* does not "create a right for homeless residents to occupy indefinitely any public space of their choosing"). Because the City has not established any realistically available place within the jurisdiction for involuntarily homeless individuals to sleep we need not decide whether alternate outdoor space would be sufficient under *Martin*. The district court may consider this issue on remand, if it is germane to do so.

[34] The dissent claims we establish "the right to use (at least) a tent." Dissent 89 n.15. This assertion is obviously false. The district court's holding that the City may still "ban the use of tents in public parks" remains undisturbed by our opinion.

[35] The dissent asserts, "it is hard to deny that *Martin* has 'generate[d] dire practical consequences for the hundreds of local governments within our jurisdiction, and for the millions of people that reside therein.'" Dissent 92 (quoting *Martin*, 920 F.3d at 594 (M. Smith, J., dissenting from denial

Consistent with *Martin*, these prohibitions may or may not be permissible.   On remand, the district court will be required to craft a narrower injunction recognizing Plaintiffs' limited right to protection against the elements, as well as limitations when a shelter bed is available.[36]

### D.

The district court concluded the fines imposed under the anti-sleeping and anti-camping ordinances violated the Eighth Amendment's prohibition on excessive fines.   A central portion of the district court's analysis regarding these fines was that they were based on conduct "beyond what the City may constitutionally punish."   With this in mind, the district court noted "[a]ny fine [would be] excessive" for the conduct at issue.

The City presents no meaningful argument on appeal regarding the excessive fines issue.   As for Plaintiffs, they argue the fines at issue were properly deemed excessive because they were imposed for "engaging in involuntary, unavoidable life sustaining acts."   The permanent injunction will result in no class member being fined for engaging in such protected activity.   Because no fines will be imposed

---

of rehearing en banc)) (modification in original).   There are no facts in the record to establish that *Martin* has generated "dire" consequences for the City.   Our review of this case is governed only by the evidence contained in the record.

[36] The district court enjoined the park exclusion ordinance in its entirety. The parties do not address this in their appellate briefing but, on remand, the district court should consider narrowing this portion as well because the park exclusion ordinance presumably may be enforced against Plaintiffs who engage in prohibited activity unrelated to their status as homeless persons.

for protected activity, there is no need for us to address whether hypothetical fines would be excessive.

**E.**

The final issue is whether Plaintiffs properly pled their challenge to the park exclusion appeals ordinance. GPMC 6.46.355. That ordinance provided a mechanism whereby an individual who received an exclusion order could appeal to the City Council. Subsequent to the district court's order, the City amended its park exclusion appeals ordinance. Therefore, the district court's determination the previous ordinance violated Plaintiffs' procedural due process rights has no prospective relevance. Because of this, we need not decide if Plaintiffs adequately pled their challenge to the previous ordinance.

**III.**

We affirm the district court's ruling that the City of Grants Pass cannot, consistent with the Eighth Amendment, enforce its anti-camping ordinances against homeless persons for the mere act of sleeping outside with rudimentary protection from the elements, or for sleeping in their car at night, when there is no other place in the City for them to go. On remand, however, the district court must narrow its injunction to enjoin only those portions of the anti-camping ordinances that prohibit conduct protected by *Martin* and this opinion. In particular, the district court should narrow its injunction to the anti-camping ordinances and enjoin enforcement of those ordinances only against involuntarily homeless person for engaging in conduct necessary to protect themselves from the elements when there is no shelter space available. Finally, the district court on remand should consider whether there is an adequate representative who may be substituted for Debra Blake.

We are careful to note that, as in *Martin*, our decision is narrow.  As in *Martin*, we hold simply that it is "unconstitutional to [punish] simply sleeping *somewhere* in public if one has nowhere else to do so."  *Martin*, 920 F.3d at 590 (Berzon, J., concurring in denial of rehearing en banc).  Our decision reaches beyond *Martin* slightly.  We hold, where *Martin* did not, that class certification is not categorically impermissible in cases such as this, that "sleeping" in the context of *Martin* includes sleeping with rudimentary forms of protection from the elements, and that *Martin* applies to civil citations where, as here, the civil and criminal punishments are closely intertwined.  Our decision does not address a regime of purely civil infractions, nor does it prohibit the City from attempting other solutions to the homelessness issue.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

COLLINS, Circuit Judge, dissenting:

In *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), we held that "the Eighth Amendment's prohibition on cruel and unusual punishment bars a city from prosecuting people criminally for sleeping outside on public property when those people have no home or other shelter to go to." *Id*. at 603.  Even assuming that *Martin* remains good law, today's decision—which both misreads and greatly expands *Martin*'s holding—is egregiously wrong.  To make things worse, the majority opinion then combines its gross misreading of *Martin* with a flagrant disregard of settled

class-certification principles.       The end result of this
amalgamation of error is that the majority validates the core
aspects of the district court's extraordinary injunction in this
case, which effectively requires the City of Grants Pass to
allow all but one of its public parks to be used as homeless
encampments.[1]   I respectfully dissent.

# I

Because our opinion in *Martin* frames the issues here, I
begin with a detailed overview of that decision before
turning to the facts of the case before us.

## A

In *Martin*, six individuals sued the City of Boise, Idaho,
under 42 U.S.C. § 1983, alleging that the City had violated
their Eighth Amendment rights in enforcing two ordinances
that respectively barred, *inter alia*, (1) camping in public
spaces and (2) sleeping in public places without permission.
920 F.3d at 603–04, 606.    All six plaintiffs had been
convicted of violating at least one of the ordinances, *id*. at
606, but we held that claims for retrospective relief based on
those convictions were barred by the doctrine of *Heck v.
Humphrey*, 512 U.S. 477 (1994).   *See Martin*, 920 F.3d at
611–12 (noting that, under *Heck*, a § 1983 action may not be
maintained if success in the suit would necessarily show the
invalidity of the plaintiff's criminal conviction, unless that
conviction has already been set aside or invalidated).   What
remained, after application of the *Heck* bar, were the claims

---

[1] The majority's decision is all the more troubling because, in truth, the
foundation on which it is built is deeply flawed: *Martin* seriously
misconstrued the Eighth Amendment and the Supreme Court's caselaw
construing it.   *See infra* at 90–92.   But I am bound by *Martin*, and—
unlike the majority—I faithfully apply it here.

for retrospective relief asserted by two plaintiffs (Robert Martin and Pamela Hawkes) in connection with citations they had received that did *not* result in convictions, and the claims for prospective injunctive and declaratory relief asserted by Martin and one additional plaintiff (Robert Anderson). *Id*. at 604, 610, 613–15; *see also id*. at 618–20 (Owens, J., dissenting in part) (dissenting from the majority's holding that the prospective relief claims survived *Heck*).    On the merits of those three plaintiffs' Eighth Amendment claims, the *Martin* panel held that the district court had erred in granting summary judgment for the City. *Id*. at 615–18.

Although the text of the Eighth Amendment's Cruel and Unusual Punishments Clause states only that "cruel and unusual *punishments*" shall not be "inflicted," U.S. CONST., amend. VIII (emphasis added), the *Martin* panel nonetheless held that the Clause "places substantive limits" on the government's ability to *criminalize* "sitting, sleeping, or lying outside on public property," 920 F.3d at 615–16.  In reaching this conclusion, the *Martin* panel placed dispositive reliance on the Supreme Court's decisions in *Robinson v. California*, 370 U.S. 660 (1962), and *Powell v. Texas*, 392 U.S. 514 (1968).    I therefore briefly review those two decisions before returning to *Martin*.

*Robinson* held that a California law that made "it a criminal offense for a person to 'be addicted to the use of narcotics,'" 370 U.S. at 660 (quoting CAL. HEALTH & SAFETY CODE § 11721 (1957 ed.)), and that did so "even though [the person] has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment," *id*. at 667.  The California statute, the Court emphasized, made the "'*status*' of narcotic

addiction a criminal offense," regardless of whether the defendant had "ever *used or possessed* any narcotics within the State" or had "been guilty of any antisocial *behavior* there." *Id*. at 666 (emphasis added).

In *Powell*, a fractured Supreme Court rejected Powell's challenge to his conviction, under a Texas statute, for being "found in a state of intoxication in any public place." 392 U.S. at 517 (quoting TEX. PENAL CODE art. 477 (1952)). A four-Justice plurality distinguished *Robinson* on the ground that, because Powell "was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion," Texas had "not sought to punish a mere status, as California did in *Robinson*." *Id*. at 532 (plurality). The plurality held that *Robinson* did not address, much less establish, that "certain *conduct* cannot constitutionally be punished because it is, in some sense, 'involuntary' or 'occasioned by a compulsion.'" *Id*. at 533 (emphasis added).

Justice White concurred in the judgment on the narrower ground that Powell had failed to establish the "prerequisites to the possible invocation of the Eighth Amendment," which would have required him to "satisfactorily show[] that it was not feasible for him to have made arrangements to prevent his being in public when drunk and that his extreme drunkenness sufficiently deprived him of his faculties on the occasion in issue." *Id*. at 552 (White, J., concurring). And because, in Justice White's view, the Eighth Amendment at most provided a case-specific affirmative "defense" to application of the statute, *id*. at 552 n.4, he agreed that the Texas statute was "constitutional insofar as it authorizes a police officer to *arrest* any seriously intoxicated person when he is encountered in a public place," *id*. at 554 n.5 (emphasis added). Emphasizing that Powell himself "did not show that *his* conviction offended the Constitution" and

that Powell had "made no showing that *he* was unable to stay off the streets on the night in question," Justice White concurred in the majority's affirmance of Powell's conviction. *Id.* at 554 (emphasis added).

The four dissenting Justices in *Powell* agreed that the Texas statute "differ[ed] from that in *Robinson*" inasmuch as it "covers more than a mere status." 392 U.S. at 567 (Fortas, J., dissenting). There was, as the dissenters noted, "no challenge here to the validity of public intoxication statutes in general or to the Texas public intoxication statute in particular." *Id*. at 558. Indeed, the dissenters agreed that, in the ordinary case "when the State proves such [public] presence in a state of intoxication, this will be sufficient for conviction, and the punishment prescribed by the State may, of course, be validly imposed." *Id*. at 569. Instead, the dissenters concluded that the application of the statute to Powell was unconstitutional "*on the occasion in question*" in light of the Texas trial court's findings about Powell's inability to control his condition. *Id*. at 568 n.31 (emphasis added). Those findings concerning Powell's "constitutional defense," the dissenters concluded, established that Powell "was powerless to avoid drinking" and "that, once intoxicated, he could not prevent himself from appearing in public places." *Id*. at 558, 568; *see also id*. at 525 (plurality) (describing the elements of the "constitutional defense" that Powell sought to have the Court recognize).

While acknowledging that the plurality in *Powell* had "interpret[ed] *Robinson* as precluding only the criminalization of 'status,' not of 'involuntary' conduct," the *Martin* panel held that the controlling opinion was Justice White's concurrence. 920 F.3d at 616. As I have noted, Justice White concluded that the Texas statute against public drunkenness could constitutionally be applied, even to an

alcoholic, if the defendant failed to "satisfactorily show[]
that it was not feasible for him to have made arrangements
to prevent his being in public when drunk and that his
extreme drunkenness sufficiently deprived him of his
faculties on the occasion in issue." *Powell*, 392 U.S. at 552
(White, J., concurring).[2]  Under *Marks v. United States*, 430
U.S. 188 (1977), this narrower reasoning given by Justice
White for joining the *Powell* majority's judgment *upholding*
the conviction constitutes the Court's holding in that case.
*See id*. at 193 ("When a fragmented Court decides a case and
no single rationale explaining the result enjoys the assent of
five Justices, 'the holding of the Court may be viewed as that
position taken by those Members who concurred in the
judgments on the narrowest grounds.'" (citation omitted));
*see also United States v. Moore*, 486 F.2d 1139, 1151 (D.C.
Cir. 1973) (en banc) (Wilkey, J., concurring) (concluding
that the judgment in *Powell* rested on the overlap in the
views of "four members of the Court" who held that
Powell's acts of public drunkenness "were punishable
without question" and the view of Justice White that
Powell's acts "were punishable so long as the acts had not
been proved to be the product of an established irresistible
compulsion").

The *Martin* panel quoted dicta in Justice White's
concurrence suggesting that, if the defendant could make the
requisite "showing"  that  "resisting  drunkenness  is

---

[2] Justice White, however, did not resolve the further question of whether,
if such a showing *had* been made, the Eighth Amendment would have
been violated.  He stated that the Eighth Amendment "*might* bar
conviction" in such circumstances, but he found it "unnecessary" to
decide whether that "novel construction of that Amendment" was
ultimately correct.  392 U.S. at 552–53 & n.4 (emphasis added).

impossible and that avoiding public places when intoxicated is also impossible," then the Texas statute "[a]s applied" to such persons might violate "the Eighth Amendment." 920 F.3d at 616 (quoting *Powell*, 392 U.S. at 551 (White, J., concurring)). These dicta, *Martin* noted, overlapped with similar statements in the dissenting opinion in *Powell*, and from those two opinions, the *Martin* panel derived the proposition that "five Justices" had endorsed the view that "the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Id*. (citation omitted). Applying that principle, *Martin* held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." *Id*. Because "human beings are biologically compelled to rest, whether by sitting, lying, or sleeping," *Martin* held that prohibitions on such activities in public cannot be applied to those who simply have "no option of sleeping indoors." *Id*. at 617.

The *Martin* panel emphasized that its "holding is a narrow one." *Id*. *Martin* recognized that, if there are sufficient available shelter beds for all homeless persons within a jurisdiction, then of course there can be no Eighth Amendment impediment to enforcing laws against sleeping and camping in public, because those persons engaging in such activities cannot be said to have "no option of sleeping indoors." *Id*. But "so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters, the jurisdiction cannot prosecute homeless individuals for *involuntarily* sitting, lying, and sleeping in public." *Id*. (simplified) (emphasis added). Consistent with Justice White's concurrence, the *Martin*

panel emphasized that, in determining whether the defendant was being punished for conduct that was "involuntary and inseparable from status," *id*. (citation omitted), the specific individual circumstances of the defendant must be considered.   Thus, *Martin* explained, the panel's "holding does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it." *Id*. at 617 n.8.  But *Martin* held that, where it is shown that homeless persons "do not have a single place where they can lawfully be," an ordinance against sleeping or camping in public, "as applied to them, effectively punish[es] them for something for which they may not be convicted under the Eighth Amendment." *Id*. at 617 (simplified).   Concluding that the remaining plaintiffs had "demonstrated a genuine issue of material fact" as to their lack of any access to indoor shelter, *Martin* reversed the district court's grant of summary judgment to the City.  *Id*. at 617 n.9; *see also id*. at 617–18.

**B**

With that backdrop in place, I turn to the specific facts of this case.

In the operative Third Amended Complaint, named Plaintiffs Debra Blake, Gloria Johnson, and John Logan sought to represent a putative class of "all involuntarily homeless people living in Grants Pass, Oregon" in pursuing a variety of claims under 42 U.S.C. § 1983 against the City of Grants Pass.  In particular, they asserted that the following three sections of the Grants Pass Municipal Code ("GPMC"), which generally prohibited sleeping and camping in public, violated the Eighth Amendment's Cruel

and Unusual Punishments Clause and its Excessive Fines Clause:

### 5.61.020 Sleeping on Sidewalks, Streets, Alleys, or Within Doorways Prohibited

A. No person may sleep on public sidewalks, streets, or alleyways at any time as a matter of individual and public safety.

B. No person may sleep in any pedestrian or vehicular entrance to public or private property abutting a public sidewalk.

C. In addition to any other remedy provided by law, any person found in violation of this section may be immediately removed from the premises.

### 5.61.030 Camping Prohibited

No person may occupy a campsite in or upon any sidewalk, street, alley, lane, public right of way, park, bench, or any other publicly-owned property or under any bridge or viaduct, [subject to specified exceptions].[3]

### 6.46.090 Camping in Parks

A. It is unlawful for any person to camp, as defined in GPMC Title 5, within the boundaries of the City parks.

B. Overnight parking of vehicles shall be unlawful. For the purposes of this section,

---

[3] The definition of "campsite" for purposes of GPMC 5.61.030 includes using a "vehicle" as a temporary place to live. *See* GPMC 5.61.010(B).

> anyone who parks or leaves a vehicle parked
> for two consecutive hours or who remains
> within one of the parks as herein defined for
> purposes of camping as defined in this
> section for two consecutive hours, without
> permission from the City Council, between
> the hours of midnight and 6:00 a.m. shall be
> considered in violation of this Chapter.

Plaintiffs' complaint also challenged the following "park exclusion" ordinance as a violation of their "Eighth and Fourteenth Amendment rights":

### 6.46.350 Temporary Exclusion from City Park Properties

An individual may be issued a written exclusion order by a police officer of the Public Safety Department barring said individual from all City Park properties for a period of 30 days, if within a one-year period the individual:

A. Is issued 2 or more citations for violating regulations related to City park properties, or

B. Is issued one or more citations for violating any state law(s) while on City park property.[4]

---

[4] This latter ordinance was amended in September 2020 to read as follows:

An individual may be issued a written exclusion order by a police officer of the Public Safety Department barring said

In an August 2019 order, the district court certified a class seeking declaratory and injunctive relief with respect to Plaintiffs' Eighth Amendment claims, pursuant to Federal Rule of Civil Procedure 23(b)(2).[5]  As defined in the court's order, the class consists of "[a]ll involuntarily homeless individuals living in Grants Pass, Oregon, including homeless individuals who sometimes sleep outside city limits to avoid harassment and punishment by Defendant as addressed in this lawsuit."

After the parties filed cross-motions for summary judgment, the district court in July 2020 granted Plaintiffs' motion in relevant part and denied the City's motion. The district court held that, under *Martin*, the City's enforcement of the above-described ordinances violated the Cruel and Unusual Punishments Clause.   The court further held that, for similar reasons, the ordinances imposed excessive fines

---

individual from a City park for a period of 30 days, if within a one-year period the individual:

A. Is issued two or more citations in the same City park for violating regulations related to City park properties, or

B. Is issued one or more citations for violating any state law(s) while on City park property.

The foregoing exclusion order shall only apply to the particular City park in which the offending conduct under 6.46.350(A) or 6.46.350(B) occurred.

[5] At the time that the district court certified the class, the operative complaint was the Second Amended Complaint.  That complaint was materially comparable to the Third Amended Complaint, with the exception that it did not mention the park-exclusion ordinance or seek injunctive relief with respect to it.

in violation of the Eighth Amendment's Excessive Fines Clause.

After Plaintiffs voluntarily dismissed those claims as to which summary judgment had been denied to both sides, the district court entered final judgment declaring that the City's enforcement of the anti-camping and anti-sleeping ordinances (GPMC §§ 5.61.020, 5.61.030, 6.46.090) violates "the Eighth Amendment prohibition against cruel and unusual punishment" and its "prohibition against excessive fines." Nonetheless, the court's final injunctive relief did not prohibit all enforcement of these provisions. Enforcement of § 5.61.020 (the anti-sleeping ordinance) was not enjoined at all. The City was enjoined from enforcing the anti-camping ordinances (GPMC §§ 5.61.030 and 6.46.090) "without first giving a person a warning of at least 24 hours before enforcement." It was further enjoined from enforcing those ordinances, and a related ordinance against criminal trespass on city property, in all but one City park during specified evening and overnight hours, which varied depending upon the time of year. Finally, the City was enjoined from enforcing the park-exclusion ordinance.[6]

---

[6] The district court's summary judgment order and judgment also declared that a separate ordinance (GPMC § 6.46.355), which addressed the procedures for appealing park-exclusion orders under § 6.46.350, failed to provide sufficient procedural due process. The parties dispute whether this claim was adequately raised and reached below, but as the majority notes, this claim for purely prospective relief has been mooted by the City's subsequent amendment of § 6.46.355 in a way that removes the features that had led to its invalidation. *See* Opin. at 55. Accordingly, this aspect of the district court's judgment should be vacated and remanded with instructions to dismiss as moot Plaintiffs' challenge to § 6.46.355.

The City timely appealed from that judgment and from the district court's subsequent award of attorneys' fees.

## II

Before turning to the merits, I first address the question of our jurisdiction under Article III of the Constitution. *Plains Com. Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008) (holding that courts "bear an independent obligation to assure [them]selves that jurisdiction is proper before proceeding to the merits").

"In limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). "The doctrine of standing is one of several doctrines that reflect this fundamental limitation," and in the context of a request for prospective injunctive or declaratory relief, that doctrine requires a plaintiff to "show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Id*. at 493. The requirement to show an actual threat of *imminent* injury-in-fact in order to obtain prospective relief is a demanding one: the Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S 398, 409 (2013) (simplified).

As "an indispensable part of the plaintiff's case," each of these elements of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Because, as in *Lujan*, this case arises from a grant of summary judgment, the question is whether, in seeking summary judgment, Plaintiffs "'set forth' by affidavit or other evidence 'specific facts'" in support of each element of standing. *Id.* (citation omitted). Moreover, "standing is not dispensed in gross," and therefore "a plaintiff must demonstrate standing for *each* claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006) (emphasis added) (citation omitted).

Plaintiffs' operative complaint named three individual plaintiffs as class representatives (John Logan, Gloria Johnson, and Debra Blake), and we have jurisdiction to address the merits of a particular claim if any one of them sufficiently established Article III standing as to that claim. *See Secretary of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other [plaintiffs], whose position here is identical to the State's."); *see also Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) ("In a class action, standing is satisfied if at least one named plaintiff meets the requirements."). Accordingly, I address the showing made by each named Plaintiff in support of summary judgment.

In my view, Plaintiff John Logan failed to establish that he has standing to challenge any of the ordinances in question. In support of his motion for summary judgment, Logan submitted a half-page declaration stating, in

conclusory fashion, that he is "involuntarily homeless in Grants Pass," but that he is "sleeping in [his] truck at night at a rest stop North of Grants Pass."  He asserted that he "cannot sleep in the City of Grants Pass for fear that [he] will be awakened, ticketed, fined, moved along, trespassed[,] and charged with Criminal Trespass."  Logan also previously submitted two declarations in support of his class certification motion.  In them, Logan stated that he has been homeless in Grants Pass for nearly seven of the last 10 years; that there have been occasions in the past in which police in Grants Pass have awakened him in his car and instructed him to move on; and that he now generally sleeps in his truck outside of Grants Pass.  Logan has made no showing that, over the seven years that he has been homeless, he has ever been issued a citation for violating the challenged ordinances, nor has he provided any facts to establish either that the threat of such a citation is "certainly impending" or that "there is a substantial risk" that he may be issued a citation.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation and internal quotation marks omitted). At best, his declarations suggest that he would *prefer* to sleep in his truck within the City limits rather than outside them, and that he is subjectively deterred from doing so due to the City's ordinances.  But such "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).  Nor has Logan provided any facts that would show that he has any actual intention or plans to stay overnight in the City.  *See Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) ("[W]e have concluded that pre-enforcement plaintiffs who failed to allege a concrete intent to violate the challenged law could not establish a credible threat of enforcement.").  Even if his

declarations could be generously construed as asserting an intention to stay in the City at some future point, "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [the Court's] cases require." *Lujan*, 504 U.S. at 564; *cf. Driehaus*, 573 U.S. at 161 (permitting pre-enforcement challenge against ordinance regulating election-related speech where plaintiffs' allegations identified "specific statements they intend[ed] to make in future election cycles"). And, contrary to what the majority suggests, *see* Opin. at 30–31 n.16, Logan's vaguely described knowledge about what has happened to *other* people cannot establish his standing. Accordingly, Logan failed to carry his burden to establish standing for the prospective relief he seeks.

By contrast, Plaintiff Gloria Johnson made a sufficient showing that she has standing to challenge the general anti-camping ordinance, GPMC § 5.61.030, and the parks anti-camping ordinance, GPMC § 6.46.090. Although Johnson's earlier declaration in support of class certification stated that she "often" sleeps in her van outside the City limits, she also stated that she "*continue[s]* to live without shelter in Grants Pass" and that, consequently, "[a]t any time, I could be arrested, ticketed, fined, and prosecuted for sleeping outside in my van or for covering myself with a blanket to stay warm" (emphasis added). Her declaration also recounts "dozens of occasions" in which the anti-camping ordinances have been enforced against her, either by instructions to "move along" or, in one instance, by issuance of a citation for violating the parks anti-camping ordinance, GPMC § 6.46.090. Because Johnson presented facts showing that she continues to violate the anti-camping ordinances and

that, in light of past enforcement, she faces a credible threat of future enforcement, she has standing to challenge those ordinances. *Lujan*, 504 U.S. at 564. Johnson, however, presented no facts that would establish standing to challenge either the anti-sleeping ordinance (which, unlike the anti-camping ordinances, does not apply to sleeping in a vehicle), the park-exclusion ordinance, or the criminal trespass ordinance.[7]

Debra Blake sufficiently established her standing, both in connection with the class certification motion and the summary judgment motion. Although she was actually

---

[7] The majority concludes that Johnson's standing to challenge the anti-camping ordinances necessarily establishes her standing to challenge the park-exclusion and criminal-trespass ordinances. *See* Opin. at 30 n.15. But as the district court explained, the undisputed evidence concerning Grants Pass's enforcement policies established that "Grants Pass first issues fines for violations and *then* either issues a trespass order or excludes persons from all parks *before* a person is charged with misdemeanor criminal trespass" (emphasis added). Although Johnson's continued intention to sleep in her vehicle in Grants Pass gives her standing to challenge the anti-camping ordinances, Johnson has wholly failed to plead any facts to show, *inter alia*, that she intends to engage in the *further* conduct that might expose her to a "credible threat" of prosecution under the park-exclusion or criminal trespass ordinances. *Driehaus*, 573 U.S. at 159 (citation omitted). Johnson's declaration states that she has been homeless in Grants Pass for three years, but it does not contend that she has ever been issued, or threatened with issuance of, a trespass order, a park-exclusion order, or a criminal trespass charge or that she has "an intention to engage in a course of conduct" that would lead to such an order or charge. *Id.* (citation omitted). Because "standing is not dispensed in gross," *see DaimlerChrysler*, 547 U.S. at 353 (citation omitted), Johnson must separately establish her standing with respect to each ordinance, and she has failed to do so with respect to the park-exclusion and criminal-trespass ordinances.

living in temporary housing at the time she submitted her
declarations in support of class certification in March and
June 2019, she explained that that temporary housing would
soon expire; that she would become homeless in Grants Pass
again; and that she would therefore again be subject to being
"arrested, ticketed and prosecuted for sleeping outside or for
covering myself with a blanket to stay warm." And, as her
declaration at summary judgment showed, that is exactly
what happened: in September 2019, she was cited for
sleeping in the park in violation of GPMC § 6.46.090,
convicted, and fined. Her declarations also confirmed that
Blake's persistence in sleeping and camping in a variety of
places in Grants Pass had also resulted in a park-exclusion
order (which she successfully appealed), and in citations for
violation of the anti-sleeping ordinance, GPMC § 5.61.020
(for sleeping in an alley), and for criminal trespass on City
property. Based on this showing, I conclude that Blake
established standing to challenge each of the ordinances at
issue in the district court's judgment.

However, Blake subsequently passed away during this
litigation, as her counsel noted in a letter to this court
submitted under Federal Rule of Appellate Procedure 43(a).
Because the only relief she sought was prospective
declaratory and injunctive relief, Blake's death moots her
claims. *King v. County of Los Angeles*, 885 F.3d 548, 553,
559 (9th Cir. 2018). And because, as explained earlier,
Blake was the only named Plaintiff who established standing
with respect to the anti-sleeping, park-exclusion, and
criminal trespass ordinances that are the subject of the
district court's classwide judgment, her death raises the
question whether we consequently lack jurisdiction over
those additional claims. Under *Sosna v. Iowa*, 419 U.S. 393
(1975), the answer to that question would appear to be no.

Blake established her standing at the time that the class was certified and, as a result, "[w]hen the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by [Blake]." *Id*. at 399. "Although the controversy is no longer alive as to [Blake], it remains very much alive for the class of persons she [had] been certified to represent." *Id*. at 401; *see also Nielsen v. Preap*, 139 S. Ct. 954, 963 (2019) (finding no mootness where "there was at least one named plaintiff with a live claim when the class was certified"); *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 987–88 (9th Cir. 2007) (en banc).

There is, however, presently no class representative who meets the requirements for representing the certified class with respect to the anti-sleeping, park-exclusion, and criminal trespass ordinances.**⁸**     Although that would

---

⁸ Because—in contrast to the named representative in *Sosna*, who had Article III standing at the time of certification—Johnson and Logan *never* had standing to represent the class with respect to the anti-sleeping ordinance, they may not represent the class as to such claims. *See Sosna*, 419 U.S. at 403 (holding that a *previously proper* class representative whose claims had become moot on appeal could continue to represent the class for purposes of that appeal); *see also Bates*, 511 F.3d at 987 (emphasizing that the named plaintiff "had standing at the time of certification"); *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 966 (9th Cir. 2019) (stating that "class representatives must have Article III standing"); *cf. NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. SW., Inc.*, 926 F.3d 528, 533 (9th Cir. 2019) (holding that, where the named plaintiffs never had standing, the class "must be decertified"). The majority correctly concedes this point.     *See* Opin. at 32–33. Nonetheless, the majority wrongly allows Johnson and Logan to represent the class as to the park-exclusion and criminal-trespass

normally require a remand to permit the possible substitution of a new class member, *see Kuahulu v. Employers Ins. of Wausau*, 557 F.2d 1334, 1336–37 (9th Cir. 1977), I see no need to do so here, and that remains true even if one assumes that the failure to substitute a new class representative might otherwise present a potential jurisdictional defect. As noted earlier, we have jurisdiction to address all claims concerning the two anti-camping ordinances, as to which Johnson has sufficient standing to represent the certified class. And, as I shall explain, the class as to those claims should be decertified, and the reasons for that decertification rest on cross-cutting grounds that apply equally to all claims. As a result, I conclude that we have jurisdiction to order the complete decertification of the class as to all claims, without the need for a remand to substitute a new class representative as to the anti-sleeping, park-exclusion, and criminal trespass ordinances. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998) (holding that, where "a merits issue [is] dispositively resolved in a companion case," that merits ruling could be applied to the other companion case without the need for a remand to resolve a potential jurisdictional issue).

## III

I therefore turn to whether the district court properly certified the class under Rule 23 of the Federal Rules of Civil Procedure. In my view, the district court relied on erroneous legal premises in certifying the class, and it therefore abused its discretion in doing so. *B.K.*, 922 F.3d at 965.

---

ordinances, based on its erroneous conclusion that they established standing to challenge those ordinances. *See supra* at 69–72 & n.7.

**A**

"To obtain certification of a plaintiff class under Federal Rule of Civil Procedure 23, a plaintiff must satisfy both the four requirements of Rule 23(a)—'numerosity, commonality, typicality, and adequate representation'—and 'one of the three requirements listed in Rule 23(b).'" *A.B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 834 (9th Cir. 2022) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 349 (2011)). Commonality, which is contested here, requires a showing that the class members' claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. In finding that commonality was satisfied with respect to the Eighth Amendment claims, the district court relied solely on the premise that whether the City's conduct "violates the Eighth Amendment" was a common question that could be resolved on a classwide basis. And in finding that Rule 23(b) was satisfied here, the district court relied solely on Rule 23(b)(2), which provides that a "class action may be maintained" if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). That requirement was satisfied, the district court concluded, because (for reasons similar to those that underlay its commonality analysis) the City's challenged enforcement of the ordinances "applies equally to all class members." The district court's commonality and Rule 23(b)(2) analyses are both flawed because they are based on an incorrect understanding of our decision in *Martin*.

As the earlier discussion of *Martin* makes clear, the Eighth Amendment theory adopted in that case requires an individualized inquiry in order to assess whether any individuals to whom the challenged ordinances are being applied "*do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it." 920 F.3d at 617 n.8. *See supra* at 61–63. Only when persons "do not have a *single place* where they can lawfully be," can it be said that an ordinance against sleeping or camping in public, "*as applied to them*, effectively punish[es] them for something for which they may not be convicted under the Eighth Amendment." *Id*. at 617 (simplified) (emphasis added).

Of course, such an individualized inquiry is not required—and no Eighth Amendment violation occurs under *Martin*—when the defendant can show that there is adequate shelter space to house all homeless persons in the jurisdiction. *Id*. But the converse is not true—the mere fact that a city's shelters are full does *not* by itself establish, without more, that any particular person who is sleeping in public does "not have a single place where [he or she] can lawfully be." *Id*. The logic of *Martin*, and of the opinions in *Powell* on which it is based, requires an assessment of a person's individual situation before it can be said that the Eighth Amendment would be violated by applying a particular provision against that person. Indeed, the opinions in *Powell* on which *Martin* relied—Justice White's concurring opinion and the opinion of the dissenting Justices—all agreed that, at most, the Eighth Amendment provided a case-specific affirmative defense that would require the defendant to provide a "satisfactor[y] showing that it was not feasible for him to have made arrangements"

to avoid the conduct at issue. *Powell*, 392 U.S. at 552 (White, J., concurring); *id*. at 568 n.31 (Fortas, J., dissenting) (agreeing with Justice White that the issue is whether the defendant "on the occasion in question" had shown that avoiding the conduct was "impossible"); *see also supra* at 59–60.[9]

In light of this understanding of *Martin*, the district court clearly erred in finding that the requirement of commonality was met here. "What matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

---

[9] The majority incorrectly contends that the dissenters in *Powell* did not endorse Justice White's conclusion that the *defendant* bears the burden to establish that his or her conduct was involuntary. *See* Opin. at 48–51. On the contrary, the *Powell* dissenters' entire argument rested on the affirmative "constitutional defense" presented at the trial in that case and on the findings made by the trial court in connection with that defense. *See* 392 U.S. at 558 (Fortas, J., dissenting). The majority's suggestion that I have taken that explicit reference to Powell's defense "out of context," *see* Opin. at 49 n.29, is demonstrably wrong—the context of the case was precisely the extensive affirmative defense that Powell presented at trial, including the testimony of an expert. *See* 392 U.S. at 517–26 (plurality) (summarizing the testimony). And, of course, in *Martin*, the issue was raised in the context of a § 1983 action in which the plaintiffs challenging the laws bore the burden to prove the involuntariness of their relevant conduct. The majority points to nothing that would plausibly support the view that *Powell* and *Martin* might require the *government* to carry the burden to establish *voluntariness*. *See* Opin. at 50 n.31 (leaving this issue open). The majority claims that it can sidestep this issue here, but that is also wrong: the burden issue is critical both to the class-certification analysis and to the issue of summary judgment on the merits. *See infra* at 78–89.

*Wal-Mart*, 564 U.S. at 350 (simplified).  Under *Martin*, the answer to the question whether the City's enforcement of each of the anti-camping ordinances violates the Eighth Amendment turns on the individual circumstances of each person to whom the ordinance is being applied on a given occasion.  That question is simply not one that can be resolved, on a common basis, "in one stroke." *Id*.  That requires decertification.

For similar reasons, the district court also erred in concluding that the requirements of Rule 23(b)(2) were met.  By its terms, Rule 23(b)(2) is satisfied only if (1) the defendant has acted (or refused to act) on grounds that are generally applicable to the class as whole and (2) as a result, final classwide or injunctive relief is appropriate.  As the Supreme Court has observed, "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart*, 564 U.S. at 360.  It follows that, when the *wrongfulness* of the challenged conduct with respect to any particular class member depends critically upon the individual circumstances of that class member, a class action under Rule 23(b)(2) is not appropriate.  In such a case, in which (for example) the challenged enforcement of a particular law may be lawful as to some persons and not as to others, depending upon their individual circumstances, the all-or-nothing determination of wrongfulness that is the foundation of a (b)(2) class is absent: in such a case, it is simply not true that the defendant's "conduct is such that it can be enjoined or declared unlawful *only* as to *all* of the class members or as to *none* of them.'" *Id*. (emphasis added).

Because *Martin* requires an assessment of each person's individual circumstances in order to determine whether application of the challenged ordinances violates the Eighth Amendment, these standards for the application of Rule 23(b)(2) were plainly not met in this case. That is, because the applicable law governing Plaintiffs' claims would entail "a process through which highly individualized determinations of liability and remedy are made," certification of a class under Rule 23(b)(2) is improper. *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th Cir. 2012). Moreover, the mere fact that the district court's final judgment imposes sweeping across-the-board injunctive relief that disregards individual differences in determining the defendant's liability does *not* mean that Rule 23(b)(2) has been satisfied. The rule requires that any such classwide relief be rooted in a determination of *classwide liability*—the defendant must have acted, or be acting, unlawfully "on grounds that apply generally to the class, *so that* final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2) (emphasis added). That requirement was not established here, and the class must be decertified. **10**

---

[10] The majority wrongly concludes that the City has forfeited any argument concerning Rule 23(b)(2) because it did not specifically mention that subdivision of the rule in its opening brief. Opin. at 41. This "Simon Says" approach to reading briefs is wrong. The *substance* of the argument is contained in the opening brief, in which the City explicitly contended that *Martin* requires "a more individualized analysis" than the district court applied and that, as a result, "neither FED. R. CIV. P. 23 nor *Martin* provide plaintiffs the ability to establish the type of sweeping class-wide claims advanced in this case." Indeed, Plaintiffs themselves responded to this argument, in their answering brief, by

**B**

The majority provides two responses to this analysis, but both of them are wrong.

First, the majority contends that *Martin* established a bright-line rule that the government cannot prosecute "involuntarily homeless persons for sleeping in public"—or, presumably, for camping—"if there are no other public areas or appropriate shelters where those individuals can sleep." *See* Opin. at 19. As the majority makes clear, that latter inquiry into available shelter space turns on whether "the number of homeless persons outnumber the available shelter beds," except that, "[w]hen assessing the number of shelter spaces," shelters that have a "mandatory religious focus" are not to be counted. *See* Opin. at 13, 19 (citation omitted). Moreover, although the majority's phrasing pays lip service to the fact that the persons at issue must be "involuntarily homeless," the majority also explicitly rejects the City's contention that "the holding of *Martin* can only be applied after an individualized inquiry of each alleged involuntarily homeless person's access to shelter." *See* Opin. at 35. The net result, for class certification purposes, is that any issue of individualized involuntariness is set aside and *Martin* is thereby reduced to a simplistic formula—to be resolved on a classwide basis—into whether the number of homeless persons in the jurisdiction exceeds the number of available shelter beds. *See* Opin. at 34–35, 38.

The majority's analysis fails, because *Martin* does *not* allow the individualized inquiry into involuntariness to be set aside in this way. *Martin* states that, if there are

---

explaining why they believe that the requirements of Rule 23(b)(2) were met.

insufficient available beds at shelters, then a jurisdiction "cannot prosecute homeless individuals for '*involuntarily* sitting, lying, and sleeping in public.'"   920 F.3d at 617 (emphasis added).   The lack of adequate shelter beds thus merely eliminates a *safe-harbor* that might otherwise have allowed a jurisdiction to prosecute violations of such ordinances *without* regard to individual circumstances, with the result that the jurisdiction's enforcement power will instead depend upon whether the conduct of the individual on a particular occasion was "involuntar[y]."  *Id*.  *Martin* confirms that the resulting inquiry turns on whether the persons in question have access to "a *single place* where they can lawfully be," *id*. at 617 (emphasis added) (citation omitted), and not just on whether they have access to "appropriate shelters" or "other public areas."   And the majority's misreading of *Martin* completely disregards the *Powell* opinions on which *Martin* relied, which make unmistakably clear that an individualized showing of involuntariness is required.

Second, and relatedly, the majority states that, to the extent that *Martin* requires such an individualized showing to establish an Eighth Amendment violation, any such individualized issue here has been eliminated by the fact that "[p]ursuant to the *class definition*, the class includes only *involuntarily* homeless persons."  *See* Opin. at 38–40 (first emphasis added).  As the majority acknowledges, "[p]ersons are involuntarily homeless" under *Martin* only "if they do not 'have access to adequate temporary shelter,'" such as, for example, when they lack "'the means to pay for it'" and it is otherwise not "'realistically available to them for free.'" Opin. at 14 n.2 (quoting *Martin*, 920 F.3d at 617 n.8). Because that individualized issue has been shifted into the class definition, the majority holds, the City's enforcement

of the challenged ordinances against *that* class can in that sense be understood to present a "common question" that can be resolved in one stroke. According to the majority, because the class definition requires that, at the time the ordinances are applied against them, the class members must be "involuntarily homeless" in the sense that *Martin* requires, there is a common question as to whether "the City's enforcement of the anti-camping ordinances against all involuntarily homeless individuals violates the Eighth Amendment." *See* Opin. at 38–39 & n.22.

The majority cites no authority for this audacious bootstrap argument. If a person's individual circumstances are such that he or she has *no* "access to adequate temporary shelter"—which necessarily subsumes (among other things) the determination that there are no shelter beds available—then the *entire* (highly individualized) question of the City's liability to that person under *Martin*'s standards has been shifted into the class definition. That is wholly improper. *See Olean Wholesale Grocery Coop. v. Bumble Bee Foods*, 31 F.4th 651, 670 n.14 (9th Cir. 2022) (en banc) ("A court may not . . . create a 'fail safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct."); *see also Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 n.7 (9th Cir. 2016) (stating that it would be improper to define a class in such a way "as to preclude membership unless the liability of the defendant is established" (simplified)).

The majority nonetheless insists that "[m]embership in [the] class" here "has no connection to the success of the underlying claims." *See* Opin. at 39 n.23. That is obviously false. As I have explained, *Martin*'s understanding of when a person "involuntarily" lacks "access to adequate temporary shelter" or to "a single place where [he or she] can lawfully

be," *see* 920 F.3d at 617 & n.8 (citations omitted), requires an individualized inquiry into a given person's circumstances at a particular moment. By insisting that a common question exists here *because Martin*'s involuntariness standard has been folded into the class definition, the majority is unavoidably relying on a fail-safe class definition that improperly subsumes this crucial individualized merits issue into the class definition. The majority's artifice renders the limitations of Rule 23 largely illusory.[11]

To the extent that the majority instead suggests that the class definition requires only an involuntary lack of access to regular or permanent shelter to qualify as "involuntarily homeless," its argument collapses for a different reason. Because *Martin*'s Eighth Amendment holding applies only to those who involuntarily lack "access to adequate temporary shelter" on a given occasion, *see* 920 F.3d at 617 n.8, such an understanding of the class definition would *not*

---

[11] The majority contends that, despite the presence of a liability-determining individualized issue in the class definition, there is no fail-safe class here because one or more of the claims might still conceivably fail on the merits for *other* reasons. *See* Opin. at 39 n.23. But the majority does not identify any such other reasons and, of course, under the majority's view of the substantive law, there are none. But more importantly, the majority is simply wrong in positing that the *only* type of class that would qualify as an impermissible fail-safe class is one in which *every* conceivable merits issue in the litigation has been folded into the class definition. What matters is whether the class definition folds within it *any* bootstrapping merits issue (such as the "injur[y]" issue mentioned in *Olean*) as to which "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Olean*, 31 F.4th at 670 n.14 (citation omitted). To the extent that the central individualized merits issue in this case has been folded into the class definition, that defect is present here.

be sufficient to eliminate the highly individualized inquiry into whether a particular person lacked such access at a given moment, and the class would then have to be decertified for the reasons I have discussed earlier. *See supra* at 75–80. Put simply, the majority cannot have it both ways: either the class definition is co-extensive with *Martin*'s involuntariness concept (in which case the class is an improper fail-safe class) or the class definition differs from the *Martin* standard (in which case *Martin*'s individualized inquiry requires decertification).

## IV

Given these conclusions as to standing and class certification, all that remains are the individual claims of Johnson for prospective relief against enforcement of the two anti-camping ordinances. In my view, these claims fail as a matter of law.

Johnson's sole basis for challenging these ordinances is that they prohibit her from sleeping in her van within the City. In her declaration in support of class certification, however, Johnson specifically stated that she has "often" been able to sleep in her van by parking *outside* the City limits. In a supplemental declaration in support of summary judgment, she affirmed that these facts "remain true," but she added that there had also been occasions in which, outside the City limits, county officers had told her to "move on" when she "was parked on county roads" and that, when she parked "on BLM land"—*i.e.*, land managed by the federal Bureau of Land Management—she was told that she "could only stay on BLM for a few days."

As an initial matter, Johnson's declaration provides no non-conclusory basis for finding that she lacks *any* option other than sleeping in her van. Although her declaration

notes that she worked as a nurse "for decades" and that she now collects social security benefits, the declaration simply states, without saying anything further about her present economic situation, that she "cannot afford housing."  Her declaration also says nothing about where she lived before she began living "on the street" a few years ago, and it says nothing about whether she has any friends or family, in Grants Pass or elsewhere, who might be able to provide assistance.[12]  And even assuming that this factual showing would be sufficient to permit a trier of fact to find that Johnson lacks any realistic option other than sleeping in her van, we cannot affirm the district court's summary judgment in Johnson's favor without holding that her showing was so overwhelming that she should prevail as a matter of law. Because a reasonable trier of fact could find, in light of these evidentiary gaps, that Johnson failed to carry her burden of proof on this preliminary point, summary judgment in her favor was improper.[13]

---

[12] The majority dismisses these questions about the sufficiency of Johnson's evidentiary showing as "artificial limitations" on claims under *Martin*, *see* Opin. at 51, but the standard for establishing an Eighth Amendment violation under *Martin* and the *Powell* opinions on which it relies is a demanding and individualized one, and we are obligated to follow it.  Indeed, in upholding Powell's conviction for public drunkenness, the controlling opinion of Justice White probed the details of the record as to whether, in light of the fact that Powell "had a home and wife," he could have "made plans while sober to prevent ending up in a public place," and whether, despite his chronic alcoholism, he "retained the power to stay off or leave the streets, and simply preferred to be there rather than elsewhere."  392 U.S. at 553.

[13] The majority errs by instead counting all gaps in the evidentiary record against the City, faulting it for what the majority thinks the City has failed to "demonstrate[]," *See* Opin. at 52 & n.32.  That is contrary to well-settled law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

But even assuming that Johnson had established that she truly has no option other than sleeping in her van, her showing is still insufficient to establish an Eighth Amendment violation.  As noted, Johnson's *sole* complaint in this case is that, by enforcing the anti-camping ordinances, the City will not let her sleep in her van.  But the sparse facts she has presented fail to establish that she lacks any alternative place where she could park her van and sleep in it. On the contrary, her factual showing establishes that the BLM will let her do so on BLM land for a "few days" at a time and that she also has "often" been able to do so on county land.   Given that Johnson has failed to present sufficient evidence to show that she lacks alternatives that would allow her to avoid violating the City's anti-camping ordinances, she has not established that the conduct for which the City would punish her is involuntary such that, under *Martin* and the *Powell* opinions on which *Martin* relies, it would violate the Eighth Amendment to enforce that prohibition against her.

In nonetheless finding that the anti-camping ordinances' prohibition on sleeping in vehicles violates the Eighth Amendment, the majority apparently relies on the premise that the question of whether an individual has options for avoiding violations of the challenged law must be limited to alternatives that are *within the City limits*.  Under this view, if a large homeless shelter with 1,000 vacant beds were

---

(holding that a movant's summary judgment motion should be granted "against a [nonmovant] who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").  The majority's analysis also belies its implausible claim that it has not shifted the burden to the City to establish the *voluntariness* of the behavior targeted by the ordinances.  *See supra* at 78 n.9.

opened a block outside the City's limits, the City would *still* be required by the Eighth Amendment to allow hundreds of people to sleep in their vans in the City and, presumably, in the City's public parks as well. Nothing in law or logic supports such a conclusion. *Martin* says that anti-sleeping ordinances may be enforced, consistent with the Eighth Amendment, so long as there is a "*single place* where [the person] can lawfully be," 920 F.2d at 617 (emphasis added) (citation omitted), and Justice White's concurrence in *Powell* confirms that the Eighth Amendment does not bar enforcement of a law when the defendant has failed to show that avoiding the violative conduct is "*impossible*," 392 U.S. at 551 (emphasis added).[14] Nothing in the rationale of this Eighth Amendment theory suggests that the inquiry into whether it is "impossible" for the defendant to avoid violating the law must be artificially constrained to only those particular options that suit the defendant's geographic or other preferences. To be sure, Johnson states that having to drive outside the City limits costs her money for gas, but that does not provide any basis for concluding that the option is infeasible or that she has thereby suffered "cruel and unusual punishment."

Finally, because the district court's reliance on the Excessive Fines Clause was predicated on the comparable view that the challenged ordinances punish "status and not conduct" in violation of *Robinson*, that ruling was flawed for the same reasons. And because Johnson provides no other

---

[14] The majority complains that this standard is too high, *see* Opin. at 52, but it is the standard applied in *Martin* and in the *Powell* opinions on which *Martin* relied.

basis for finding an Excessive Fines violation here, her claims under that clause also fail as a matter of law.

**V**

Accordingly, I would remand this case with instructions (1) to dismiss as moot the claims of Debra Blake as well as Plaintiffs' claims with respect to GPMC § 6.46.355; (2) to dismiss the claims of John Logan for lack of Article III standing; (3) to dismiss the remaining claims of Gloria Johnson for lack of Article III standing, except to the extent that she challenges the two anti-camping ordinances (GPMC §§ 5.61.030, 6.46.090); (4) to decertify the class; and (5) to grant summary judgment to the City, and against Johnson, with respect to her challenges to the City's anti-camping ordinances under the Eighth Amendment's Cruel and Unusual Punishments Clause and Excessive Fines Clause. That disposes of all claims at issue, and I therefore need not reach any of the many additional issues discussed and decided by the majority's opinion or raised by the parties.[15]

---

[15] Two of the majority's expansions of *Martin* nonetheless warrant special mention. First, the majority's decision goes well beyond *Martin* by holding that the Eighth Amendment precludes enforcement of anti-camping ordinances against those who involuntarily lack access to temporary shelter, if those ordinances deny such persons the use of whatever materials they need "to keep themselves warm and dry." *See* Opin. at 46. It seems unavoidable that this newly declared right to the necessary "materials to keep warm and dry" while sleeping in public parks must include the right to use (at least) a tent; it is hard to see how else one would keep "warm and dry" in a downpour. And the majority also raises, and leaves open, the possibility that the City's prohibition on the use of other "items necessary to facilitate sleeping outdoors"—such as "stoves," "fires," and makeshift "structures"—"may or may not be permissible." *See* Opin. at 45–46, 53–54. Second, the majority indirectly extends *Martin*'s holding from the strictly criminal context at issue in that case to civil citations and fines. *See* Opin. at 41–45. As the

## VI

Up to this point, I have faithfully adhered to *Martin* and its understanding of *Powell*, as I am obligated to do. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc).  But given the importance of the issues at stake, and the gravity of *Martin*'s errors, I think it appropriate to conclude by noting my general agreement with many of the points made by my colleagues who dissented from our failure to rehear *Martin* en banc.

In particular, I agree that, by combining *dicta* in a concurring opinion with a *dissent*, the panel in *Martin* plainly misapplied *Marks*' rule that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken *by those Members who concurred in the judgments* on the narrowest grounds.'"   430 U.S. at 193 (emphasis added) (citation omitted).  Under a correct application of *Marks*, the holding of *Powell* is that there is no constitutional obstacle to punishing conduct that has *not* been shown to be involuntary, and the converse question of what rule applies when the

---

district court noted below, the parties vigorously debated the extent to which a "violation" qualifies as a crime under Oregon law. The majority, however, sidesteps that issue by instead treating it as irrelevant. The majority's theory is that, even assuming *arguendo* that violations of the anti-camping ordinances are only civil in nature, they are covered by *Martin* because such violations *later* could lead (after more conduct by the defendant) to criminal fines, *see* Opin. at 44–45. But the majority does not follow the logic of its own theory, because it has not limited its holding or remedy to the enforcement of the ultimate criminal provisions; on the contrary, the majority has enjoined *any* relevant enforcement of the underlying ordinances that contravenes the majority's understanding of *Martin*.  *See* Opin. at 55.

conduct *has* been shown to be involuntary was left open.  *See Martin*, 920 F.3d at 590–93 (M. Smith, J., dissenting from denial of rehearing en banc) (explaining that, under a proper application of *Marks*, "'there is definitely no Supreme Court holding' prohibiting the criminalization of involuntary conduct" (citation omitted)).

Moreover, the correct answer to the question left open in *Powell* was the one provided in Justice Marshall's plurality opinion in that case: there is no federal "constitutional doctrine of criminal responsibility."  392 U.S. at 534.  In light of the "centuries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds," including the "doctrines of *actus reus*, *mens rea*, insanity, mistake, justification, and duress," the "process of adjustment" of "the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man" is a matter that the Constitution leaves within "the province of the States" or of Congress.  *Id*. at 535–36.  "There is simply no indication in the history of the Eighth Amendment that the Cruel and Unusual Punishments Clause was intended to reach the substantive authority of Congress to criminalize acts or status, and certainly not before conviction," and the later incorporation of that clause's protections vis-à-vis the States in the Fourteenth Amendment "worked no change in its meaning."  *Martin*, 920 F.3d at 602 (Bennett, J., dissenting from denial of rehearing en banc); *see also id*. at 599 (explaining that *Martin*'s novel holding was inconsistent with the "text, tradition, and original public meaning[] [of] the Cruel and Unusual Punishments Clause of the Eighth Amendment").  Consequently, so long as "the accused has committed some

act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*," the Eighth Amendment principles applied in *Robinson* have been satisfied. *Powell*, 392 U.S. at 533 (plurality). The Eighth Amendment does not preclude punishing such an act merely "because it is, in some sense, 'involuntary' or 'occasioned by a compulsion.'" *Id*.; *see also Martin*, 920 F.3d at 592 n.3 (M. Smith, J., dissenting from denial of rehearing en banc) ("*Powell* does not prohibit the criminalization of involuntary conduct.").

Further, it is hard to deny that *Martin* has "generate[d] dire practical consequences for the hundreds of local governments within our jurisdiction, and for the millions of people that reside therein." *Id*. at 594 (M. Smith, J., dissenting from denial of rehearing en banc). Those harms, of course, will be greatly magnified by the egregiously flawed reconceptualization and extension of *Martin*'s holding in today's decision, and by the majority's equally troubling reworking of settled class-action principles. With no sense of irony, the majority declares that no such harms are demonstrated by the record in this case, even as the majority largely endorses an injunction effectively requiring Grants Pass to allow the use of its public parks as homeless encampments. Other cities in this circuit can be expected to suffer a similar fate.

In view of all of the foregoing, both *Martin* and today's decision should be overturned or overruled at the earliest opportunity, either by this court sitting en banc or by the U.S. Supreme Court.

\*     \*     \*

I respectfully but emphatically dissent.

Silver, District Judge, and Gould, Circuit Judge, joint statement regarding denial of rehearing:

The differences of opinion in this case are hard and there is basis for good-faith disagreements which are reflected in the filings from a variety of judges. The robust defense of the panel majority opinion we offer here should not be read as any comment on the sincerity of our colleagues' quarrels with our position.

The statement regarding the denial of rehearing from Judge O'Scannlain and the dissent from Judge M. Smith significantly exaggerate the holding in *Johnson v. Grants Pass*, 50 F.4th 787 (9th Cir. 2022). *Grants Pass*, relying on *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), holds only that governments cannot criminalize the act of sleeping with the use of rudimentary protections, such as bedding, from the elements in some public places when a person has nowhere else to sleep. It does not establish an unrestrained right for involuntarily homeless persons to sleep anywhere they choose. Nor does it require jurisdictions to cede all public spaces to involuntarily homeless persons. The argued notion that *Martin* and *Grants Pass* work together to guarantee a "federal constitutional 'right' . . . to camp or to sleep on sidewalks and in parks, playgrounds, and other public places" is completely absent from the opinion. The denial of en banc rehearing should not be criticized based on rhetorical exaggerations.

Beyond misdescribing the holding of *Grants Pass*, Judge O'Scannlain extrapolates and proposes that the Ninth Circuit ignore 65 years of Supreme Court precedent in favor of his preferred approach of looking exclusively to what he declares is the "text, history, and tradition" of the Eighth Amendment. But inferior courts are not free to embark on

such freewheeling adventures when the Supreme Court has provided the applicable guidance. Judge M. Smith does not join the portion of Judge O'Scannlain's statement discussing this point, but Judge M. Smith engages in a puzzling error by attributing in part the homelessness problem throughout the Ninth Circuit to *Martin* and now *Grants Pass*. The homelessness problem predates *Martin*, and cities outside the Ninth Circuit, and outside the United States, are experiencing crisis-levels of homelessness. It is implausible to argue the crisis would abate if jurisdictions in the Ninth Circuit regained the authority to punish involuntarily homeless persons for sleeping in public with blankets.

### I.  Limited Holding of *Grants Pass*

Judge O'Scannlain and Judge M. Smith aim most of their fire at the portion of *Grants Pass* addressing the two overlapping "anti-camping" ordinances. *Grants Pass* holds the anti-camping ordinances enacted by the City of Grants Pass violate the Eighth Amendment but only to the extent they criminalize sleeping with rudimentary forms of protection from the elements (*i.e.*, bedding or sleeping bags) by those persons without access to any other shelter (*i.e.*, persons who are "involuntarily homeless"). *Grants Pass* does not expressly preface every reference to "homeless persons" with the adjective "involuntarily." However, in clear reliance on *Martin*, the opinion is strictly limited to enforcement of the ordinances against "involuntarily" homeless persons. Like *Martin*, *Grants Pass* holds only that "it is 'unconstitutional to [punish] simply sleeping *somewhere* in public if one has nowhere else to do so.'" *Id.* (quoting *Martin*, 920 F.3d at 590 (Berzon, J., concurring in denial of rehearing en banc)).

The holding in *Grants Pass* is *not* that involuntarily

homeless persons in the City of Grants Pass and elsewhere
in the Ninth Circuit are allowed to sleep wherever and
whenever they wish. When there is space available in
shelters, jurisdictions are free to enforce prohibitions on
sleeping *anywhere* in public. And emphatically, when an
involuntarily homeless person refuses a specific offer of
shelter elsewhere, that individual may be punished for
sleeping in public. When there is no shelter space,
jurisdictions may still enforce limitations on sleeping at
certain locations. The assertion that jurisdictions must now
allow involuntarily homeless persons to camp or sleep on
every sidewalk and in every playground is plainly wrong.
Jurisdictions remain free to address the complex policy
issues regarding homelessness in the way those jurisdictions
deem fit, subject to the single restriction that involuntarily
homeless persons must have "*somewhere*" to sleep and take
rudimentary precautions (bedding) against the elements. *Id.*
(quoting *Martin*, 920 F.3d at 590 (Berzon, J., concurring in
denial of rehearing en banc)).

Judge M. Smith misinterpreted a statement in the
original majority opinion that he believed mandated "a crude
*jurisdiction-wide* inquiry" dictating a local "government
cannot prosecute homeless people for sleeping in public if
there is a greater number of homeless individuals in a
jurisdiction than the number of available shelter spaces."
Judge M. Smith's understanding of the original statement
was incorrect. To avoid any possibility of confusion, the
majority has now removed the statement Judge M. Smith
found confounding. But Judge M. Smith is still not satisfied.
He complains the change did not result in any "downstream
changes" to the majority's analysis. But Judge M. Smith
fails to acknowledge the undisputed facts established that in
the City of Grants Pass, there were zero shelter beds

available on almost every night of the year.  Given that, there was no need to change the remaining analysis.

As clearly explained in the majority opinion, the only secular shelter beds in the City of Grants Pass (other than beds for intoxicated adults) were located at a "warming center" that operated on especially cold nights.  The warming center could hold 40 individuals and was open 16 nights during the winter of 2020 and zero nights during the winter of 2021.  Thus, on 95% of the nights in 2020 and 100% of the nights in 2021, the City of Grants Pass had zero secular shelter beds for non-intoxicated adults.  Given that reality, there was no need to make "downstream changes" to the analysis based on the availability of shelter beds in the City of Grants Pass.  When a jurisdiction has zero shelter beds even theoretically available, it does not require significant analysis to conclude the jurisdiction is barred from prosecuting the involuntarily homeless persons in that jurisdiction.

Judge M. Smith's refusal to acknowledge the lack of shelter space in the City of Grants Pass reveals his actual complaint in this area is the perceived failure to strictly police who will qualify as involuntarily homeless. According to Judge M. Smith, it was inappropriate to find that zero shelter beds, combined with "conclusory allegations of involuntariness," were enough to conclude there were involuntarily homeless persons in the jurisdiction.  The "conclusory allegations" Judge M. Smith faults are expressly found in a declaration submitted by Gloria Johnson where she stated, in relevant part, "I have no choice but to live outside and have no place else to go," and "I continue to live without shelter in Grants Pass."  It bears repeating this case was resolved on summary judgment.  The City of Grants Pass did not present any evidence to the

district court, nor did it argue on appeal, that Gloria Johnson's declaration was inaccurate.   In fact, it is undisputed there are at least fifty involuntarily homeless persons in the City of Grants Pass, as stated in the testimony of a City of Grants Pass police officer.   Describing unequivocal and undisputed statements submitted at the summary judgment stage as mere "conclusory allegations" is incorrect.

Judge M. Smith worries the amended opinion might still prohibit any enforcement actions against individuals with access to shelter.   But the opinion repeatedly notes it only addresses enforcement attempts against "involuntarily homeless persons."   *Grants Pass* goes to great lengths to make this clear.   *Grants Pass* states individuals qualify as "involuntarily homeless" only if they "do not have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free."   *Id.* at 793 n.2 (internal quotation marks and citation omitted).   To remove any doubt, *Grants Pass* stresses "[i]ndividuals who have shelter or the means to acquire their own shelter simply are never class members," meaning such individuals are not "involuntarily homeless." *Id.* at 805.  And to further illuminate the point, *Grants Pass* states "To be clear: A person with access to temporary shelter is not involuntarily homeless unless and until they no longer have access to shelter."   *Id.* at 805 n.24.  Judge M. Smith's assertion that *Grants Pass* might prohibit enforcement against persons "no matter their personal situations" is wrong.

When an individual has access to a shelter, such as through a "city's offer of temporary housing," that person is not "involuntarily homeless" and anti-camping ordinances may be enforced against that person.   Similarly, if a

jurisdiction always has shelter beds or other locations available, that jurisdiction is free to enforce its anti-camping ordinances on all other public areas.

Judge M. Smith also claims that after *Grants Pass* local authorities are "powerless to cite" individuals "even for public defecation."[1]   Neither *Martin* nor *Grants Pass* involved particular ordinances precluding public urination and defecation and the assertion that *Martin* and *Grants Pass* resolved the constitutionality of ordinances addressing public urination and defecation is mistaken.[2]

---

[1] Judge M. Smith's sole support for this interpretation is an unpublished decision by the Eastern District of California. *Mahoney v. City of Sacramento*, No. 2:20-cv-00258-KJM, 2020 WL 616302 (E.D. Cal. Feb. 10, 2020).  That case involved the removal of portable toilets from public property that had been placed there by private citizens for homeless individuals to use.  The plaintiffs alleged many different constitutional claims, including that the removal of the toilets would violate their Eighth Amendment rights.  On that point, the City of Sacramento stated "neither the benefactors of the toilets nor the users of the toilets have, or will be, criminally prosecuted."  In denying a request for a temporary restraining order, the court stated "Extending *Martin* to these facts, the City may not prosecute or otherwise penalize the plaintiffs . . . for eliminating in public if there is no alternative to doing so."  *Id.*  The court continued, arguably based on the city's representations regarding non-prosecution, that "no irreparable injury to plaintiffs' Eighth Amendment rights is likely."  *Id.*  Because the plaintiffs voluntarily dismissed their claim nine days after the court's order, the court did not provide a more complete Eighth Amendment analysis based on *Martin*.   A brief statement made in the context of resolving an emergency motion is not a solid foundation for Judge M. Smith's assertion that after *Grants Pass* local authorities are now "powerless to cite" individuals for public defecation.

[2] The focus of *Martin* and *Grants Pass* was sleep.  Sleep is not a voluntary act but an "identifiable human need[]."  *Rico v. Ducart*, 980 F.3d 1292, 1298 (9th Cir. 2020).  "[S]leep is critical to human existence."

As another panel recently noted, it is unwise "to adjudicate slippery-slope hypotheticals." *Mayes v. Biden*, No. 22-15518, 2023 WL 2997037, at \*17 (9th Cir. Apr. 19, 2023). And Judge O'Scannlain noted almost twenty years ago, "[i]n our system of government, courts base decisions not on dramatic Hollywood fantasies . . . but on concretely particularized facts developed in the cauldron of the adversary process and reduced to an assessable record." *United States v. Kincade*, 379 F.3d 813, 838 (9th Cir. 2004) (en banc). Because there was no challenge to any public urination or defecation ordinances in *Grants Pass*, the parties did not develop a record regarding those issues such that neither the district court nor Ninth Circuit had a basis to address them. Judge M. Smith's assertion that *Grants Pass* prohibits citations "even for public defecation" is wrong.

## II. Class Certification was Proper

Connected to the purported "jurisdiction-wide analysis," Judge M. Smith argues, as did the dissent by Judge Collins, that *Grants Pass* erred in affirming certification of the class.

---

*Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013). *See also* Wilkins Kaplan & Sadock's Comprehensive Textbook of Psychiatry, 10th Ed. CH23 ("Sleep is a process required for proper brain function. Failure to sleep impairs thought processes, mood regulation, and a host of normal physiological functions."). The lack of sleep may play a role in the development of dementia. *See* Nedergaard and Goldman, *Glymphatic failure as a final common pathway to dementia*, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8186542/. And long-term sleep deprivation has been shown to be lethal in some animals. *See Why Severe Sleep Deprivation Can be Lethal*, *available at* https://brain.harvard.edu/hbi_news/why-severe-sleep-deprivation-can-be-lethal/#:~:text=We%20found%20high%20levels%20of,can%20eventually%20trigger%20cell%20death.

According to Judge M. Smith, the opinion "wholly collaps[es] the merits into the class definition" which resulted in an "impermissible fail safe class." The *Grants Pass* opinion explains why that conclusion is wrong. 50 F.4th at 805 n.23. In brief, the population of the class of "involuntarily homeless" individuals does not change based on whether the class wins or loses. There has never been a possibility that a "class member either wins or, by virtue of losing, is defined out of the class." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (quotation marks and citation omitted).

Judge M. Smith, as did Judge Collins, also believes the class should not have been certified due to a "lack of commonality." Judge M. Smith's view is that "commonality" was lacking because determining class membership requires an individualized assessment of each potential class member's access to shelter. This is an incorrect understanding of Federal Rule of Civil Procedure 23's "commonality" requirement.

To satisfy Rule 23's "commonality" requirement there must be a "common contention" such "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In *Grants Pass*, the "common contention" was the assertion that the City's anti-camping ordinances violated the Eighth Amendment as applied to the class. That contention could be resolved in "one stroke," meaning the "commonality" requirement was met. *Dukes*, 564 U.S. at 350.

While not entirely clear, Judge M. Smith might be arguing "commonality" does not exist when a court is unable

to immediately and easily identify each and every class member. But there has never been such a requirement. *See In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1115 (9th Cir. 2021) (affirming class settlement despite it being "not feasible" to identify class members). Alternatively, Judge M. Smith might be arguing "commonality" does not exist when some effort will be required to identify class members. But it is entirely routine for class actions to require individualized determinations to identify class members.

For example, a recent Ninth Circuit opinion involved a class defined as "All individuals who have worked as California-based flight attendants of Virgin America, Inc. while residing in California at any time during the Class Period." *Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127, 1134 (9th Cir. 2021). Identifying members of that class necessarily required individualized determinations to identify whether an individual had worked as a flight attendant for Virgin America and where the individual had lived throughout the multi-year class period. Judge M. Smith's view that "commonality" is not present whenever class members can only be identified after an individualized inquiry would preclude certification of most classes.

### III. Eighth Amendment Doctrine

Judge O'Scannlain laments "*Grants Pass* never meaningfully engaged the text, history, and tradition of the Constitution." For the most part, that criticism is misplaced as the *Grants Pass* majority was bound to follow *Martin*. More importantly, however, the present record does not contain sufficient facts to conduct the analysis Judge O'Scannlain wishes to perform, presumably because the parties were aware Judge O'Scannlain's preferred method of

analysis is foreclosed by long established precedent.

The historical inquiry regarding the meaning of constitutional terms may require looking as far back as the 13th Century. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2249 (2022) (discussing cases from 13th century). The parties in *Grants Pass* did not gather and present evidence regarding centuries of history to illuminate the complete "text, history, and tradition" of the Eighth Amendment. If, as Judge O'Scannlain believes, courts must assess the Eighth Amendment exclusively under a "text, history, and tradition" approach, the parties must be given the opportunity to present relevant historical evidence. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (noting courts should follow "party presentation principle"). That may require the parties retain experts. *See, e.g., Miller v. Smith*, No. 22-1482, 2023 WL 334788, at \*1 (7th Cir. Jan. 20, 2023) (remanding for district court to solicit additional expert reports regarding "text, history, and tradition framework" in Second Amendment case).

Notably, Judge O'Scannlain is not arguing *Grants Pass* should be remanded for a proper inquiry under his proposed "text, history, and tradition" test. Rather, he professes he has conducted the relevant inquiry on his own and definitively established the correct interpretation of centuries of history. Our adversarial system takes a dim view of appellate courts embarking on their own fact-finding missions. *Alpha Distrib. Co. of California v. Jack Daniel Distillery*, 454 F.2d 442, 453 (9th Cir. 1972) ("The appellate court is not the trier of facts and does not ordinarily make findings of fact."). And that is especially true when the inquiry has not been briefed by the parties. *Sineneng-Smith*, 140 S. Ct. at 1579 (2020). Ultimately, however, Judge O'Scannlain's favored constitutional analysis is beside the point. The Supreme

Court has made clear "text, history, and tradition" is not the correct method when assessing Eighth Amendment claims.

According to the Supreme Court, the proper interpretation of the Eighth Amendment does not turn exclusively on standards from hundreds of years ago. In a plurality opinion in 1958, the Supreme Court explained the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion). More recently, the Supreme Court stated a proper Eighth Amendment analysis "is determined not by the standards that prevailed when the Eighth Amendment was adopted in 1791 but by the norms that 'currently prevail.'" *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (citation omitted). And "courts must look beyond historical conceptions" when assessing Eighth Amendment challenges. *Graham v. Florida.*, 560 U.S. 48, 58 (2010).

Given this guidance, lamenting *Grants Pass* did not delve into the Eighth Amendment's "text, history, and tradition" is a complaint that the majority in *Grants Pass* followed the Supreme Court's settled guidance. Contrary to Judge O'Scannlain, the majority in *Grants Pass* was not free to ignore the Supreme Court, embark on its own fact-finding mission, and conclude the correct interpretation of the Eighth Amendment is the one Judge O'Scannlain likes. Instead, the majority chose the more modest approach of applying existing Supreme Court and Ninth Circuit authority to the record presented by the parties.[3]

---

[3] Judge Graber agrees with the "underlying legal premise" that the Eighth Amendment prohibits criminal prosecution of involuntarily homeless persons. But she believes *Grants Pass* "unjustifiably expands the reach of the Eighth Amendment" by prohibiting "civil remedies that could, in

## IV. Application of *Marks* Doctrine

Both Judge O'Scannlain and Judge M. Smith take issue with the *Marks v. United States*, 430 U.S. 188 (1977), analysis in *Martin* and *Grants Pass*. According to them, the proper application of the *Marks* doctrine is obvious and should have prevented the result in *Martin* and *Grants Pass*. It is not clear if the *Marks* analyses conducted by Judge O'Scannlain and Judge M. Smith reach the same conclusion.[4]   Moreover, neither Judge O'Scannlain nor Judge M. Smith cite the en banc majority opinion from the Fourth Circuit that conducts the *Marks* analysis on the relevant Supreme Court authorities and reaches the "same conclusion" as that reached in *Martin*. *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 283 n.17 (4th Cir. 2019) (en banc). Thus, Judge O'Scannlain and Judge M. Smith show overconfidence that their application of the *Marks* doctrine is correct. In the end, however, an exhaustive

---

theory, lead to [criminal] prosecution." But all parties in *Grants Pass* agreed the civil violations were used as the first step in the eventual pursuit of criminal charges. This is not a case where the jurisdiction has disavowed pursuing criminal charges.

[4] Judge O'Scannlain describes Justice White's concurrence in *Powell v. Texas*, 392 U.S. 514 (1968), as "the dispositive fifth vote." But Judge O'Scannlain also relies heavily, without explanation, on statements made by the non-binding plurality in *Powell*. As for Judge M. Smith, he argues *Powell* produced "no single rationale and only its specific result is binding." But Judge M. Smith then faults the *Martin* and *Grants Pass* majorities for not addressing arguments made by the non-binding plurality in *Powell*. Judge M. Smith seems to believe proper application of the *Marks* doctrine means only the result in *Powell* is binding, but lower courts have an affirmative obligation to address points made by the *Powell* plurality. Judge M. Smith does not cite any authority for his idiosyncratic view of how the *Marks* doctrine operates.

*Marks* analysis is not necessary.

Everyone agrees *Robinson v. California*, 370 U.S. 660 (1962) is the binding Supreme Court precedent. It is vital that every justice in *Powell v. State of Texas*, 392 U.S. 514 (1968), fully embraced the holding in *Robinson* that a status cannot be prosecuted. In *Robinson*, the Supreme Court concluded it violated the Eighth Amendment for California to criminalize the status of being "addicted to the use of narcotics." In doing so, the Supreme Court also noted it would violate the Eighth Amendment for a state to make it a criminal offense to be "mentally ill, or a leper, or to be afflicted with a venereal disease." *Robinson*, 370 U.S. at 666. And "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.* at 667. Judge O'Scannlain and Judge M. Smith interpret *Robinson* as establishing a conclusive line between constitutionally barred "status crimes" and constitutionally permitted "conduct crimes." But such a definitive line requires *Robinson* be read rigidly, such that a jurisdiction could avoid *Robinson* by tying "statuses" to inescapable human activities.

For example, under a strict "status-conduct" distinction, the California statute at issue in *Robinson* could have been cured by tying the addiction status to sleeping. Under such logic, it would have been constitutional for California to make it a criminal offense for a person "addicted to the use of narcotics" to fall asleep. *Id.* at 660. Similarly, it now would be constitutional for a jurisdiction to criminalize falling asleep while being "mentally ill, or a leper, or []
afflicted with a venereal disease." *Id.* at 666. Reading

*Robinson* as allowing such simple evasion is absurd.[5]

Regardless of the *Marks* analysis, *Robinson* limits the reach of criminal law. Or, as the Supreme Court declared fifteen years after *Robinson*, the Eighth Amendment "imposes substantive limits on what can be made criminal and punished as such." *Ingraham v. Wright*, 430 U.S. 651, 667 (1977). *Martin* and *Grants Pass* recognize those substantive limits reach the exceptionally narrow situation of prohibiting punishment when involuntarily homeless persons engage in the life-sustaining act of sleeping in public. Criminalizing the act of sleeping in public when an individual has nowhere else to sleep is, in effect, criminalizing the underlying status of being homeless.

## V. Non-Existent Circuit Split

Judge O'Scannlain greatly overstates the extent to which *Martin* and *Grants Pass* fall on one side of an existing circuit split. According to Judge O'Scannlain, no "federal circuit or state supreme court . . . has ever embraced *Grants Pass*'s sweeping holding" regarding the Eighth Amendment. Judge O'Scannlain then cites opinions from the Eleventh and Fifth Circuits, but neither of those opinions hold what Judge O'Scannlain claims. In fact, no circuit court has reached the merits of a challenge to public camping or sleeping

---

[5] Even the dissent in the Fourth Circuit opinion Judge O'Scannlain cites with approval understood the logic of *Robinson* points away from a rigid interpretation. *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 290 (4th Cir. 2019) (Wilkinson, J., dissenting). That dissent noted "[i]n the rare case where the Eighth Amendment was found to invalidate a criminal law, the law in question sought to punish persons merely for their need to eat or sleep, which are essential bodily functions. This is simply a variation of *Robinson*'s command that the state identify conduct in crafting its laws, rather than punish a person's mere existence." *Id.*

restrictions when no shelter space was available and concluded such restrictions were lawful. Judge O'Scannlain also points to a state supreme court opinion but that opinion explicitly does not decide the question presented in *Martin* and *Grants Pass*.

First, in *Joel v. City of Orlando*, 232 F.3d 1353 (11th Cir. 2000), the Eleventh Circuit addressed a challenge to an anti-camping ordinance. The entire Eighth Amendment analysis in that case was premised on the fact the City of Orlando "presented unrefuted evidence that . . . a large homeless shelter . . . never reached its maximum capacity and that no individual has been turned away because there was no space available or for failure to pay the one dollar nightly fee." *Id.* at 1362. Thus, the Eleventh Circuit concluded the anti-sleeping ordinance did "not criminalize involuntary behavior" because the plaintiff could "comply with the [anti-sleeping] ordinance" by sleeping in the shelter. *Id.* There is no suggestion the result would have been the same if there were no shelter space available.

Judge O'Scannlain claims the availability of shelter space is not a "compelling response" in terms of distinguishing the result in *Joel* from that in *Martin* and *Grants Pass*. But the central holding in *Martin* and *Grants Pass* is that the Eighth Amendment analysis turns on whether there are shelter beds or other locations where an involuntarily homeless person can lawfully sleep. It would be hard to imagine a more "compelling" way to distinguish *Joel* than pointing out *Joel* did not involve involuntary conduct because shelter space was always available.

Judge O'Scannlain also cites *Johnson v. City of Dallas, Tex.*, 61 F.3d 442 (5th Cir. 1995), where the Fifth Circuit concluded the plaintiffs lacked standing to challenge an anti-

sleeping ordinance because they had not been prosecuted. The district court had conducted an extensive overview of the Supreme Court cases and concluded the challenged anti-sleeping ordinance impermissibly "punishe[d] the homeless for their status as homeless." *Johnson v. City of Dallas*, 860 F. Supp. 344, 350 (N.D. Tex. 1994). Instead of rejecting or even addressing such reasoning, the Fifth Circuit concluded no individual had standing to seek pre-enforcement review of a criminal statute. It is not clear whether Judge O'Scannlain agrees with this standing analysis and there is significant reason to doubt it is correct. *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15 (2010) (allowing "preenforcement review of a criminal statute"). But at the very least, it is misleading to describe the Fifth Circuit's rejection based on standing as establishing any position on the merits of the Eighth Amendment issue.**[6]**

---

[6] Judge O'Scannlain also professes to find conflicting decisions from the First and Seventh Circuits. In the First Circuit case, the defendant argued "because his drug addiction is a disease, sentencing him to a term of imprisonment for manifesting a condition of his disease constitutes cruel and unusual punishment in violation of the Eighth Amendment." *United States v. Sirois*, 898 F.3d 134, 135 (1st Cir. 2018). The First Circuit rejected this argument, primarily because the standard of review was "clear error" based on the defendant's failure to raise the argument in the district court. Thus, the First Circuit held only that existing caselaw did not make it "clear or obvious" that "the Eighth Amendment proscribes criminal punishment for conduct that results from narcotic addiction." *Id.* at 138. Concluding existing caselaw did not make the issue "clear or obvious" is not the same as reaching the merits of the issue. As for the Seventh Circuit opinion, it is unpublished and is based on an obvious error. The opinion discusses a defendant who, allegedly due to his alcoholism, "failed to attend treatment programs, used cocaine, and abused alcohol so excessively that it led to his arrest for public intoxication." *United States v. Stenson*, 475 Fed. App'x 630, 631 (7th Cir. 2012). The Seventh Circuit concluded the defendant could be

Judge O'Scannlain also cites *Tobe v. City of Santa Ana*, 892 P.2d 1145 (1995) from the California Supreme Court. That case involved a facial challenge to an anti-camping ordinance. *Id.* at 1154. The California Supreme Court explicitly noted, however, it was not resolving whether an "involuntarily homeless person who involuntarily camps on public property may be convicted or punished under the ordinance." *Id.* at 1166 n.19. Claiming *Tobe* is contrary to *Grants Pass* requires ignoring the language of *Tobe*.

Finally, Judge O'Scannlain does not disclose that reaching his preferred result would create a circuit split with the Fourth Circuit. In *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 268 (4th Cir. 2019) (en banc), the en banc Fourth Circuit addressed Virginia's statutory scheme that made it a criminal offense for individuals identified as "habitual drunkards" to possess or attempt to possess alcohol. The Fourth Circuit concluded this scheme might violate the Eighth Amendment's Cruel and Unusual Punishments clause because it targeted "conduct that is both *compelled by [the plaintiffs'] illness* and is *otherwise lawful* for all those of legal drinking age." *Id.* at 281. In reaching that conclusion, the Fourth Circuit unequivocally adopted the same view of the Supreme Court cases regarding status crimes as that adopted in *Martin*. 930 F.3d at 282 n.17.

Judge O'Scannlain acknowledges that *Manning* holds "involuntary conduct may be exempt" from prosecution.

---

punished for those acts because he was not being "punished for his status as an alcoholic but for his conduct." *Id.* However, as noted by the Fourth Circuit, the Seventh Circuit "erroneously treated the plurality opinion in *Powell* as the holding of the Court." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 283 n.17 (4th Cir. 2019). Therefore, *Stenson* is of little value.

But he argues *Manning* "limited its holding to laws that singled individuals out for special punishment for otherwise lawful conduct that is compelled by their illness." Judge O'Scannlain apparently believes the ordinances addressed in *Grants Pass* do not "single out" individuals in a similar manner. Judge O'Scannlain is wrong. The ordinances addressed in *Grants Pass* target the involuntarily homeless the same way the scheme in *Manning* targeted alcoholics.

Under the ordinances addressed in *Grants Pass*, it would be lawful for an individual with access to shelter to wrap himself in a blanket in a public park because the individual was not using the blanket "for the purpose of maintaining a temporary place to live." 50 F.4th at 793. However, the same conduct could lead to criminal prosecution of an involuntarily homeless person because, with no other place to live, the person would be using the blanket for purposes of maintaining a place to live. In brief, blanket use in a public park is criminal if you are homeless and "lawful conduct" if you are not. As with the ordinances in *Manning* regarding alcoholics, the ordinances addressed in *Grants Pass* single out the involuntarily homeless for criminalization of otherwise lawful conduct.

Judge O'Scannlain's purported "deep and varied intercircuit split over how to read the Eighth Amendment" is an illusion. The Ninth Circuit is the sole circuit to have addressed, on the merits, a challenge to the criminalization of sleeping in public by involuntarily homeless persons. The Ninth Circuit's current approach is faithful to Supreme Court precedent and consistent with the Fourth Circuit's approach to a similar issue. Thus, Judge O'Scannlain's desire to hear *Grants Pass* en banc is so that a circuit split with the Fourth Circuit can be created, not that an existing circuit split can be resolved.

## VI. Evidence Not in the Record

Judge M. Smith cites a wide variety of extra-record evidence establishing homelessness is a serious issue "caused by a complex mix of economic, mental-health, and substance-abuse factors." Everyone agrees. Judge M. Smith then states, "local governments have taken a variety of steps intended to ameliorate the crisis . . . but most of these attempts to mitigate the challenging issues of homelessness have been wholly or partially frustrated by an alleged constitutional right conjured by a panel of our court." This appears to say that, but for *Martin* and now *Grants Pass*, local governments would be able to pursue policies that would reduce the homeless population. In other words, Judge M. Smith believes *Martin* and *Grants Pass* are somewhat responsible for the size of the homeless population. That is not sensible.

Judge M. Smith points out the City of Los Angeles has roughly 70,000 homeless persons. Judge M. Smith seems to believe at least some of those 70,000 persons, and more throughout the Ninth Circuit, remain homeless because of the very limited protection offered by *Martin*. Thus, it follows that if *Martin* were overruled and criminal penalties were again possible, at least some of those 70,000 persons in Los Angeles would obtain housing. Judge M. Smith does not cite any authority that shows the possibility of criminal penalties would have this effect. Available evidence points away from such a conclusion. *See, e.g.*, Donald Saelinger, *Nowhere to Go: The Impacts of City Ordinances Criminalizing Homelessness*, 13 Geo. J. on Poverty L. & Pol'y 545, 559 (2006) ("[C]riminalization laws make it much more difficult for the homeless to gain social and economic mobility, and thus the laws have the result of extending the period of time that one is homeless.").

Judge M. Smith's extra-record evidence is carefully limited to support his causal theory.  But if extra-record evidence should be considered, other jurisdictions show *Martin* is not the problem.  New York City is experiencing a crisis in the increase of the involuntarily homeless population.  As of February 2023, New York City had more than 77,000 homeless persons, "by far the most ever recorded and an increase of over 70 percent since May." Emma G. Fitzsimmons and Andy Newman, *New York City Commissioner Of Social Services Resigns*, The New York Times (Feb. 8, 2023).  New York City is not in the Ninth Circuit and it seems unlikely the holding in *Martin* is causing a surge in the homeless population across the country.  Thus, *Martin* is not, as alleged, the driver of the homelessness problem.

**VII. Conclusion**

The Eighth Amendment "imposes substantive limits on what can be made criminal and punished as such." *Ingraham v. Wright*, 430 U.S. 651, 667 (1977).  Those substantive limits are implicated only in rare circumstances. One such circumstance is when a jurisdiction attempts to punish as a criminal offense the life-sustaining act of sleeping in public with bedding when a person has nowhere else to go.  Because *Grants Pass* and *Martin* provide exceptionally limited protection, and are consistent with Supreme Court precedent, the decision not to rehear *Grants Pass* en banc is correct.[7]

---

[7] The city ordinances addressed in *Grants Pass* will be superseded, to some extent, on July 1, 2023, when a new Oregon state law takes effect. The new state law requires "[a]ny city or county law that regulates the acts of sitting, lying, sleeping or keeping warm and dry outdoors on public property that is open to the public must be objectively reasonable

O'SCANNLAIN, Circuit Judge,[1] with whom Judges WALLACE, CALLAHAN, BEA, IKUTA, BENNETT, R. NELSON, BADE, COLLINS, LEE, BRESS, FORREST, BUMATAY, and VANDYKE join, and with whom Judge M. SMITH joins as to all parts except Part II-A, respecting the denial of rehearing en banc:

With this decision, our Circuit's jurisprudence now effectively guarantees a personal federal constitutional 'right' for individuals to camp or to sleep on sidewalks and in parks, playgrounds, and other public places in defiance of traditional health, safety, and welfare laws—a dubious holding premised on a fanciful interpretation of the Eighth Amendment. We are the first and only federal circuit to have divined such a strange and sweeping mandate from the Cruel and Unusual Punishments Clause. Our jurisprudence in this case is egregiously flawed and deeply damaging—at war with constitutional text, history, and tradition, and Supreme Court precedent. And it conflicts with other circuits on a question of exceptional importance—paralyzing local

---

as to time, place and manner with regards to persons experiencing homelessness." Or. Rev. Stat. Ann. § 195.530(2). The statute specifies that "[k]eeping warm and dry means using measures necessary for an individual to survive outdoors given the environmental conditions" but it "does not include any measure that involves fire or flame." Or. Rev. Stat. Ann. § 195.530(1)(b)(B). This change in state law is yet another reason why it was wise to not rehear *Grants Pass*.

[1] As a judge of this court in senior status, I no longer have the power to vote on calls for rehearing cases en banc or formally to join a dissent from failure to rehear en banc. *See* 28 U.S.C. § 46(c); Fed. R. App. P. 35(a). Following our court's general orders, however, I may participate in discussions of en banc proceedings. *See* Ninth Circuit General Order 5.5(a).

communities from addressing the pressing issue of homelessness, and seizing policymaking authority that our federal system of government leaves to the democratic process. We should have reheard this case en banc to reconsider our unfortunate constitutional mistake.

I

Instead of respecting constitutional "text, history, and precedent," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2271 (2022), our Eighth Amendment jurisprudence here has disrupted the "paramount role of the States in setting 'standards of criminal responsibility,'" *Kahler v. Kansas*, 140 S. Ct. 1021, 1028 (2020) (quoting *Powell v. Texas*, 392 U.S. 514, 533 (1968) (plurality)). In my view, our cases do not inspire confidence that we have faithfully followed the Cruel and Unusual Punishments Clause—and it is worth explaining how we got here before considering why we should have reheard *Grants Pass* en banc to fix our constitutional mistakes. *See Martin v. City of Boise*, 920 F.3d 584, 603 (9th Cir. 2019) (inventing the doctrine); *Johnson v. City of Grants Pass*, 50 F.4th 787 (9th Cir. 2022) (expanding the doctrine).

A

Our untenable jurisprudence here started in *Boise*— where a three-judge panel first invented a federal constitutional 'right' (rooted in the Eighth Amendment, of all places!) to sleep on public property. In *Boise*, six homeless individuals alleged that the City of Boise, Idaho, had violated their constitutional rights by enforcing municipal ordinances that prohibited unauthorized sleeping on sidewalks and in parks, plazas, and other public places. Even though the Eighth Amendment, on its own terms, only prohibits "cruel and unusual punishments," U.S. Const.

amend. VIII, the *Boise* panel went where no federal circuit had gone before—holding that the Eighth Amendment prohibited a local government from "prosecuting people criminally" for the "involuntary act" of "sleeping outside on public property [including sidewalks] when those people have no home or other shelter to go to." *Boise*, 920 F.3d at 603, 613, 616 (cleaned up).

In doing so, the *Boise* panel made no effort to ground its decision in the text, history, or tradition of the Eighth Amendment. Instead—after failing to identify a single Supreme Court precedent blessing its approach—the *Boise* panel attempted to fashion its preferred constitutional rule by stitching together *dicta* in a lone concurrence with a *dissent*. *Id.* at 616 (holding that these separate, unprevailing writings in *Powell* "compel[led]" *Boise*'s result). While we declined to rehear *Boise* en banc, *see id.* at 590-99 (M. Smith, J., dissental) (explaining *Boise*'s misconstruction of Supreme Court precedent); *id.* at 599-603 (Bennett, J., dissental) (articulating *Boise*'s inconsistency with the Eighth Amendment), our mistake in *Boise* has (fortunately) not been replicated in other circuits—and, as I have already stated, we remain the only federal court of appeals to have recognized an individual constitutional 'right' to sleep or to camp on sidewalks and other public property.

B

Unfortunately, the problems created by *Boise* have now been visited upon the City of Grants Pass by the panel majority here, which has expanded *Boise*'s faulty holding to affirm an injunction effectively requiring the City to resign all but one of its public parks to be used as homeless

encampments.  *See Grants Pass*, 50 F.4th at 792-93, 813.**²**
In this case, several individuals sought to represent a putative
class of all involuntarily homeless people living in Grants
Pass, seeking a permanent injunction barring the
enforcement of municipal ordinances that prohibited
unauthorized sleeping or camping in public spaces.  *Id.* at
792-94 (explaining that violating the challenged public-
sleeping, public-camping, and park-exclusion ordinances
could result in civil citations and fines, that repeat violators
could be excluded from specified City property, and that
violating an exclusion order could subject a violator to
criminal trespass prosecution).  The district court sided with
the challengers—and it certified a class consisting of "[a]ll
involuntarily homeless individuals living in Grants Pass,"
and held that the City's enforcement of the public-sleeping
and public-camping ordinances violated the Eighth
Amendment.  *Id.* at 795-97.

1

A divided panel of our Court affirmed in all "material

---

² The cities of Boise and Grants Pass are, regrettably, not the only victims
of our Eighth Amendment jurisprudence here—a point that is not to be
celebrated.  *See, e.g.*, *Fund for Empowerment v. City of Phoenix*, No.
CV-22-02041-PHX-GMS, 2022 WL 18213522 (D. Ariz. Dec. 16, 2022)
(applying *Boise*); *Coal. on Homelessness v. City & Cnty. of San
Francisco*, No. 22-CV-05502-DMR, 2022 WL 17905114 (N.D. Cal.
Dec. 23, 2022) (applying *Grants Pass*).  While our mistaken
jurisprudence in this area has some limits, *see Grants Pass*, 50 F.4th at
812 n.33, we should not pretend that the jurisprudential experiment
started by *Boise* and expanded by *Grants Pass*—which "effectively
strikes down the anti-camping and anti-sleeping [o]rdinances … of
countless, if not all, cities within our jurisdiction," *Boise*, 920 F.3d at 599
(M. Smith, J., dissental)—is "narrow," *contra id.* at 617 (majority
opinion); *Grants Pass*, 50 F.4th at 813.

aspects of this case." *Id.* at 793. After concluding that class certification was proper, the panel majority held, following *Boise*, that the City could not enforce the public-camping and park-exclusion ordinances against "involuntarily homeless persons" for the "mere act of sleeping" or camping in public spaces when "there is no other place in the City for them to go." *Id.* at 798 & n.12, 813 (remanding, *inter alia*, on the public-sleeping ordinance because the relevant plaintiff had died). It also expanded *Boise* by holding that the City could not deprive persons of whatever materials they needed "to keep … warm and dry," and by extending *Boise* from the purely criminal arena to civil fines and citations. *Id.* at 806-09. In doing so, the panel majority— content to rest on *Boise*'s tortured reading of Supreme Court precedent, *see id.* at 808-11—declined to devote any serious attention to the text, history, or tradition of the Eighth Amendment.

2

Judge Collins dissented. *Id.* at 814-31. He explained, *inter alia*, that the case should be reheard en banc because the panel majority decision combined a "gross misreading of [*Boise*] with a flagrant disregard of settled class-certification principles," and because "the foundation on which [the panel majority decision] is built is deeply flawed: [*Boise*] seriously misconstrued the Eighth Amendment and the Supreme Court's caselaw construing it." *Id.* at 814, n.1. In his view, *Boise* has "'generate[d] dire practical consequences for the hundreds of local governments within our jurisdiction,'" and those harms will be "greatly magnified by the egregiously flawed reconceptualization and extension of [*Boise*'s] holding." *Id.* at 831 (quoting *Boise*, 920 F.3d at 594 (M. Smith, J., dissental)).

## II

There is a simple reason why we should have reheard *Grants Pass* en banc: it entrenches a deeply damaging and egregiously wrong construction of the Eighth Amendment in our Circuit's precedent. An "erroneous interpretation" of the Constitution is "always important." *Dobbs*, 142 S. Ct. at 2265. But some judicial mistakes are "more damaging" than others—and "more than just wrong." *Id.* at 2265-66. The novel and expansive jurisprudence entrenched by *Grants Pass*—which thumbs its nose at the "standard grounds for constitutional decisionmaking[:] text, history, and precedent"—stands on "exceptionally weak grounds" and "should be overruled." *Id.* at 2264, 2266, 2271.

## A

The first flaw in *Grants Pass*'s jurisprudence is that it conflicts with the text, history, and tradition of the Eighth Amendment—which demonstrate that the Cruel and Unusual Punishments Clause does not establish a federal constitutional "doctrine[] of criminal responsibility." *Kahler*, 140 S. Ct. at 1028 (cleaned up). Constitutional text, history, and tradition make plain that the Clause was directed to *modes of punishment*—and that it was never intended to arrogate the substantive authority of legislatures to prohibit "acts" like those at issue here, and "certainly not before conviction." *Boise*, 920 F.3d at 602 (Bennett, J., dissental). Indeed, one might question whether the Cruel and Unusual Punishments Clause has anything to do with the jurisprudence embraced by *Grants Pass*—which authorizes a plaintiff who has never been assigned a "punishment," let alone one that is "cruel and unusual," to challenge traditional anti-vagrancy regulations under the Clause. It is regrettable that *Grants Pass* never meaningfully engaged the text,

history, and tradition of the Constitution—which are the "standard grounds for constitutional decisionmaking." *Dobbs*, 142 S. Ct. at 2271 ("text, history, and precedent"); *see, e.g.*, *Ingraham v. Wright*, 430 U.S. 651, 664 (1977) ("history" and precedent); *Kennedy v. Louisiana*, 554 U.S. 407, 421 (2008) ("text, history, meaning, and purpose"); *see also, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022) ("historical practices and understandings" (cleaned up)); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128-29 (2022) ("text and history"); *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) ("history and tradition" (cleaned up)).

1

The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor *cruel and unusual punishments inflicted*." U.S. Const. amend. VIII (emphasis added). The Amendment's bar on excessive "bail," excessive "fines," and the infliction of cruel and unusual "punishments" indicates the Amendment's punitive focus. And the text of the Cruel and Unusual Punishments Clause itself provides no substantive limit on what conduct may be punished. Instead, it only prohibits "punishments" (i.e., pain or suffering inflicted for a crime or offense) that are "cruel" (i.e., marked by savagery and barbarity) and "unusual" (i.e., not in common use), reflecting a constitutional prohibition originally and traditionally understood to forbid the government from "authorizing particular forms or 'modes' of punishment—specifically, cruel methods of punishment that are not regularly or customarily employed." *Harmelin v. Michigan*, 501 U.S. 957, 976 (1991) (opinion of Scalia, J.); *id.* at 979 ("[b]reaking on the wheel," "flaying alive," and "maiming, mutilating, and scourging to death" (cleaned up)).

Constitutional text, history, and tradition make clear—
contrary to *Grants Pass*'s holding—that the Clause was not
originally understood to displace the authority of legislatures
to prohibit historically proscribable acts (and certainly not
before any punishment was imposed), *see Boise*, 920 F.3d at
599-603 (Bennett, J., dissental), and that the Clause was not
traditionally taken to enshrine a constitutional "doctrine[] of
criminal responsibility," *Kahler*, 140 S. Ct. at 1028 (cleaned
up).

2

Ultimately, the text, history, and tradition of the Eighth
Amendment teach a simple truth: the Cruel and Unusual
Punishments Clause—a constitutional prohibition
fundamentally centered on *modes of punishment*—is not a
boundless remedy for all social and policy ills, including
homelessness. It does not empower us to displace state and
local decisionmakers with our own enlightened view of how
to address a public crisis over which we can claim neither
expertise nor authority, and it certainly does not authorize us
to dictate municipal policy here. Given the "centuries-long
evolution of the collection of interlocking and overlapping
concepts which the common law has utilized to assess the
moral accountability of an individual for his antisocial
deeds," including the "doctrines of actus reus, mens rea,
insanity, mistake, justification, and duress," the "process of
adjustment" of the "tension between the evolving aims of the
criminal law and changing religious, moral, philosophical,
and medical views of the nature of man" has primarily "been
thought to be the province of the States." *Powell*, 392 U.S.
at 535-36 (plurality). So long as "the accused has committed
some act, has engaged in some behavior, which society has
an interest in preventing, or perhaps in historical common
law terms, has committed some *actus reus*," the Eighth

Amendment does not prohibit punishing such an act merely "because it is, in some sense, 'involuntary' or 'occasioned by a compulsion.'" *Id.* at 533. It is troubling that our Circuit—in inventing a new individual 'right' unmoored from text, history, or tradition—has twisted the Eighth Amendment to displace the substantive authority of local officials to prohibit a species of antisocial conduct that was neither originally nor traditionally thought to warrant the protection of the Constitution, let alone immunity under the Cruel and Unusual Punishments Clause.

B

The second flaw in *Grants Pass*'s jurisprudence is that it lacks any foundation in the Eighth Amendment doctrine handed down to us by the Supreme Court—which, to be clear, has *never* accepted *Grants Pass*'s theory that the Cruel and Unusual Punishments Clause establishes a federal constitutional prohibition on the criminalization of purportedly nonvolitional conduct. While *Grants Pass* purports faithfully to follow the Supreme Court's decisions in *Robinson v. California*, 370 U.S. 660 (1962), and *Powell v. Texas*, 392 U.S. 514 (1968), it actually rests on a plain misreading of the Supreme Court's instructions because it does little more than combine dicta in a solo concurrence with a dissent. In doing so, *Grants Pass* has clearly erred—embracing a startling misapplication of the *Marks* doctrine to venture far astray from Supreme Court precedent, *see Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (cleaned up)).

1

The Supreme Court has never blessed our Circuit's sweeping approach to the Eighth Amendment here—and neither *Robinson* nor *Powell* provide any support for *Grants Pass*'s adventurous holding.  In *Robinson*, the Supreme Court first articulated the status-act distinction that should have made this a simple case—holding only that the Eighth Amendment prohibited states from making it a crime "to be addicted to the use of narcotics." *Robinson*, 370 U.S. at 662 (cleaned up).  Unlike laws "punish[ing] a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration," the California law invalidated by *Robinson* punished the mere "status" of narcotics addiction, unmoored from any particular conduct. *Id.* at 662, 666.  The holding of *Robinson* is simple: the criminal law cannot punish status (e.g., "be[ing] addicted to the use of narcotics"); it can only punish conduct (e.g., "the use of narcotics"). *Id.* at 662-67 (cleaned up); *see Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 288 (4th Cir. 2019) (en banc) (Wilkinson, J., dissenting).

The Supreme Court has not wavered from the status-act distinction articulated by *Robinson*—and *Powell* is certainly no exception.  In *Powell*, decided soon after *Robinson*, a fractured Supreme Court upheld a Texas law prohibiting public drunkenness against an Eighth Amendment challenge alleging that the alcoholic's status compelled him to drink in public. *Powell*, 392 U.S. 514.  No controlling majority rejected the status-act line drawn by *Robinson*: (1) Justice Marshall's four-justice plurality upheld the statute based on *Robinson*'s status-act distinction, *id.* at 516-37 (plurality); (2) Justice White's lone concurrence (the dispositive fifth vote) upheld the statute because it involved a volitional act,

and he declined to determine whether a non-volitional act could be criminalized, *id.* at 548-54 (White, J., concurring); and (3) Justice Fortas's four-justice dissent rejected *Robinson*'s status-act distinction and deemed the statute's enforcement unconstitutional, *id.* at 554-70 (Fortas, J., dissenting). Because Justice White did not "reach[] the broader question of compulsion, the judgment in *Powell* neither extended [n]or contracted *Robinson*, which was left undisturbed." *Manning*, 930 F.3d at 289 (Wilkinson, J., dissenting). And the Supreme Court has certainly never understood *Powell* to have such broad effect: it has neither "walked away from *Robinson*" nor "embraced [*Boise*'s] whole notion of nonvolitional conduct." *Id.*

2

Nevertheless, *Grants Pass*—turning to *Powell*'s fractured decision, *see Grants Pass*, 50 F.4th at 809-11 (contorting *Powell* and *Marks*)—attempts to "tease [its] preferred reading from the dicta of a single justice," *Manning*, 930 F.3d at 290 (Wilkinson, J., dissenting). *Grants Pass*'s distortion of *Powell* clearly violates *Marks*— which, as explained, instructs that the Court's holding is "that position taken by those Members who concurred in the judgment[] on the narrowest grounds." *Marks*, 430 U.S. at 193 (cleaned up). Because no victorious majority in *Powell* disrupted *Robinson*'s "status-act" distinction or blessed *Grants Pass*'s "involuntary conduct" theory, we are left with nothing more than *Grants Pass*'s attempt to craft its preferred rule by combining dicta in a concurrence with a dissent—which means that *Grants Pass* is ultimately predicated on a plain *Marks* violation. Such a fundamental mistake, which directly implicates the limits on an inferior court's authority to circumvent the limits of such controlling precedents, should not remain the law of our Circuit.

## III

The fundamental flaws in *Grants Pass* are sufficient reason to reject its deeply damaging and egregiously wrong interpretation of the Eighth Amendment.  But even apart from the constitutional errors entrenched by *Grants Pass*, there are additional, compelling reasons why this case warranted rehearing en banc.  Perhaps most importantly, our expansive interpretation of the Cruel and Unusual Punishments Clause diverges from other courts on an issue of exceptional importance—and it is telling that we remain the only circuit bold enough to embrace an Eighth Amendment doctrine that effectively requires local communities to surrender their sidewalks and other public places to homeless encampments.

### A

The Eighth Amendment jurisprudence undergirding *Grants Pass* squarely conflicts with decisions from other circuits and other courts.  We should not pretend that our Circuit's divination of a personal constitutional 'right' to encamp on public property (including sidewalks) is anything but the inventive, judge-made novelty that we all know it to be.

#### 1

The first set of conflicts—which centers on *Grants Pass*'s result—is plain.  No federal circuit or state supreme court (not one!) has ever embraced *Grants Pass*'s sweeping holding that the Eighth Amendment prohibits the enforcement of public-camping restrictions (including before any punishment is imposed).  Other circuits to consider the issue have uniformly upheld such laws against Eighth Amendment challenges.  *See Joel v. City of Orlando*,

232 F.3d 1353, 1356, 1361-62 (11th Cir. 2000) (upholding public-camping proscription because "[a] distinction exists between applying criminal laws to punish conduct, which is constitutionally permissible, and applying them to punish status, which is not"); *see also Johnson v. City of Dallas*, 61 F.3d 442, 443-45, n.5 (5th Cir. 1995) (rejecting challenge to public-camping proscription because the prohibition on cruel and unusual punishments is applicable only after prosecution and conviction, and none of the challengers had been "*convicted* of violating the sleeping in public ordinance" (relying on *Ingraham*, 430 U.S. at 664)). And no state supreme court has reached the same result as our aberrant decision here. *See Tobe v. City of Santa Ana*, 892 P.2d 1145, 1166 (Cal. 1995) (upholding public-camping regulation because the "ordinance permits punishment for proscribed conduct, not punishment for status"); *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 60 (2015) (upholding public-camping bar because "the Eighth Amendment does not prohibit the punishment of acts," and the "ordinance punishes the act[] of [illegal] camping, … not homelessness"). No defender of *Grants Pass*'s jurisprudence has provided a compelling response to these decisions, *see Boise*, 920 F.3d at 617 n.9 (attempting to reconcile *Boise* with *Joel*'s alternative rationale, but declining to do much else); *Grants Pass*, 50 F.4th 787 (not even attempting this much)—let alone a federal appellate or state supreme court case that has ever reached *Grants Pass*'s result. While *Grants Pass* has not been replicated elsewhere, aside from a smattering of trial-level dispositions, a decision that stands so far out of step with so many other courts is one that cries out for correction.

2

The second set of conflicts—which relates to *Grants*

*Pass*'s rationale—is similarly troublesome.  Our approach to the Eighth Amendment in this area conflicts with decisions from the First Circuit, Fourth Circuit, and Seventh Circuit, which embrace several competing tests for determining whether the Eighth Amendment immunizes involuntary conduct.  At least two other circuits—the First Circuit and the Seventh Circuit—have flatly rejected the *Grants Pass* principle that purportedly "involuntary" conduct is exempt from criminal liability under the Eighth Amendment, or that Justice White's lone concurrence in *Powell* provides the binding opinion that compels such exemptions.  *See, e.g.*, *United States v. Sirois*, 898 F.3d 134, 137-38 (1st Cir. 2018); *United States v. Stenson*, 475 F. App'x 630, 631 (7th Cir. 2012) (citing *United States v. Black*, 116 F.3d 198, 200-01 (7th Cir. 1997)); *see also supra* (collecting cases rejecting *Grants Pass*'s reading of *Robinson*, *Powell*, and *Ingraham*). And the Fourth Circuit—the only circuit that embraces anything like *Grants Pass*'s approach—provides, at best, only mixed support because even though it held that involuntary conduct may be exempt based on dicta in Justice White's lone concurrence, it limited its holding to laws that "singled" individuals "out for special punishment for otherwise lawful conduct that is compelled by their illness." *Manning*, 930 F.3d at 281 n.14.  Our Circuit is, therefore, locked in a deep and varied intercircuit split over how to read the Eighth Amendment in light of *Robinson* and *Powell*— and, as explained, we are the only federal court of appeals to have discovered a personal constitutional 'right' for individuals to encamp on public property (including sidewalks) in violation of traditional health, safety, and welfare laws, a result that no other federal circuit or state supreme court in the country has been bold enough to replicate.

B

*Grants Pass* also presents a question of exceptional practical and institutional importance.   The immodest approach to the Eighth Amendment that it embraces is both troubling and dangerous.   It undermines the power of state and local governments to address the homelessness crisis. And it arrogates to federal judges authority that the Constitution reserves elsewhere.   We should have granted rehearing en banc to stop the damage already being worked by *Boise* and to stave off the mischiefs that *Grants Pass* is sure to worsen.   It is regrettable that our Circuit has declined to grapple with the consequences of our mistakes.

1

The practical consequences should have been reason enough to reconsider our jurisprudential experiment before it did any more harm to our communities—and before its dangers were exacerbated by *Grants Pass*.   No one reasonably doubts that our existing precedent in *Boise* has created grave and troubling consequences for the state and local communities within our jurisdiction.   And no one meaningfully contests that these harms will be greatly worsened by the doctrinal innovations introduced by *Grants Pass*.   One need only walk through our neighborhoods— through the Tenderloin (San Francisco) or Skid Row (Los Angeles)—to know that our communities are fast coming undone.   Tents crowding out sidewalks, needles flooding parks, and rubbish (and worse) marring public squares reflect a threat to the public welfare that should not be taken lightly.   Nor do such troubling blights mark an area where we should be eager to throw caution to the wind and to embrace judicial adventurism so far removed from the guardrails set by the Constitution's text and the Supreme

Court's precedents.

Unfortunately, the "Hobson's choice" imposed by our Circuit effectively requires state and local officials to "abandon enforcement of a host of laws regulating public health and safety," *Boise*, 920 F.3d at 594 (M. Smith, J., dissental)—and, if today's decision is any guide, our precedents will readily be wielded effectively to require jurisdictions throughout our Circuit to surrender the use of many of their public spaces (including sidewalks) to homeless encampments. It is easy enough for us, behind marble walls and sealed doors, to dismiss the consequences of our decisions. But for those who call these communities home—who must live by the criminal violence, narcotics activity, and dangerous diseases that plague the homeless encampments buttressed by our decisions—the consequences of our judicial arrogation are harder to accept.

2

In addition to the practical harms that our jurisprudence creates for our communities, we also should have ended the jurisprudential mistake embraced by *Grants Pass* as quickly as possible because it "visit[s] structural and institutional damage in so many respects." *Manning*, 930 F.3d at 305 (Wilkinson, J., dissenting). In particular, the doctrine embraced by *Grants Pass* puts "judges in policymaking roles reserved largely for legislatures and states." *Id.* at 297. It erodes "the states' role as separate sovereigns entrusted to define the criminal law within their own borders," and "pushes the Eighth Amendment as a catch-all corrective" for social ills identified by inexpert and unelected judicial officers. *Id.* Under our federal system, state and local leaders—not distant federal judges—are primarily entrusted with the power and duty to protect the common welfare of

our towns, cities, and neighborhoods, and to ensure that our streets, squares, and sidewalks remain clean and safe. *See United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995). The reason for such "legislative responsibility over criminal law is fundamental: the criminal law exists to protect the safety of citizens, and ensuring the safety of the people is one of those things that popular government exists to do." *Manning*, 930 F.3d at 297 (Wilkinson, J., dissenting). Unfortunately, this has not swayed our Court—with consequences that will sweep well past the troubles visited upon the City of Boise and the City of Grants Pass.

IV

*Grants Pass* is a regrettable mistake that entrenches and expands upon previous deeply damaging jurisprudence. While I do not doubt the good faith of my colleagues, it is hard to imagine a jurisprudence that combines so little regard for the sacred words of the Constitution, with so much disregard for the state and local authorities that our constitutional system entrusts as the primary protectors of the health, safety, and welfare of our communities. Our jurisprudence here is flawed—in conflict with the text, history, and tradition of the Eighth Amendment, and the precedents of the Supreme Court. And it splits from other circuits on a question of exceptional importance, working great violence to our constitutional structure and threatening dire consequences for communities within our jurisdiction. It is most regrettable that our Court has failed to rehear this case en banc.

GRABER, Senior Circuit Judge, respecting the denial of rehearing en banc:

The constitutional limits on a municipality's ability to address the issue of homelessness present an exceptionally important and complex topic.   I appreciate the many thoughtful views expressed by my colleagues.   I write separately to offer a middle ground.

Whether or not the result is dictated by Powell v. Texas, 392 U.S. 514 (1968), the Eighth Amendment almost certainly prohibits criminal punishment of persons who engage in truly involuntary actions such as sleeping.  I thus agree with the underlying legal premise of the decisions in Johnson v. City of Grants Pass, 50 F.4th 787 (9th Cir. 2022), and Martin v. City of Boise, 920 F.3d 584 (9th Cir. 2019). Eighth Amendment protection also extends to individualized injunctive relief, such as precluding a municipality from enforcing a particular criminal provision against a specific person, if past actions by the municipality warrant such equitable relief.     Our opinion in Martin, though controversial, reached a reasonable result, particularly because Martin emphasized the "narrow" nature of its holding.  920 F.3d at 617.  I did not join, and did not agree with, the dissents from denial of rehearing en banc in Martin.

In my view, though, the extension of Martin to classwide relief, enjoining civil statutes that may eventually lead to criminal violations but have never resulted in criminal convictions for any named plaintiff, is a step too far from the individualized inquiries inherent both in the Eighth Amendment context and in the context of injunctive relief. A key part of Johnson's reasoning begins with the observation that civil citations could lead to a civil park-exclusion order which, in turn, could lead to a prosecution

for criminal trespass (but which never has for the named plaintiffs).[1] Johnson, 50 F.4th at 807–08. The opinion then concludes that, because the Eighth Amendment would prohibit that ultimate prosecution, it also must prohibit the civil citations. Id. I disagree with that double leap in logic. Even assuming that classwide injunctive relief were available against a prosecution for criminal trespass, the Eighth Amendment does not prohibit all civil remedies that could, in theory, lead to such a prosecution. In this way, Johnson unjustifiably expands the reach of the Eighth Amendment.

The challenges faced by individuals experiencing homelessness are severe. And the challenges that face municipalities are daunting. When called upon, we have an obligation to ensure that a municipality's efforts to provide for the common health and safety do not violate the Constitution. I agree with the basic legal premise that the Eighth Amendment protects against criminal prosecution of the involuntary act of sleeping, but the injunctive relief in this case goes too far. Moreover, given the widespread nature of the homelessness crisis in our jurisdiction, it is

---

[1] The amended opinion refers to Debra Blake as "a named plaintiff," and the amended opinion states that she was convicted of "Criminal Trespass on City Property." Amended Op. at 28 n.13. Blake unfortunately died. As the opinion elsewhere recognizes, Johnson, 50 F.4th at 800–02, she is no longer a named plaintiff. Moreover, Blake's "conviction" is doubly inapt here. First, despite the name of the citation, the conviction was for a violation, not a crime. Second, Blake was cited for being in a closed park, not for violating any of the civil statutes challenged here. The crux of the opinion's analysis is that a civil citation could lead to a criminal misdemeanor conviction under Oregon Revised Statute section 164.245. Johnson, 50 F.4th at 807. No evidence in the record suggests that the civil statutes relevant here have caused Blake or any named plaintiff to be convicted of that crime.

crucial that we get it right.  Our court should have reheard this case en banc.

___

M. SMITH, Circuit Judge, with whom Judges BENNETT, BUMATAY, and VANDYKE join, and with whom Judges IKUTA, R. NELSON, BADE, COLLINS, and BRESS join as to Parts I and II, dissenting from the denial of rehearing en banc:

Homelessness is presently the defining public health and safety crisis in the western United States.  California, for example, is home to half of the individuals in the entire country who are without shelter on a given night.[1]  In the City of Los Angeles alone, there are roughly 70,000 homeless persons.[2]  There are stretches of the city where one cannot help but think the government has shirked its most basic responsibilities under the social contract: providing public safety and ensuring that public spaces remain open to all.  One-time public spaces like parks—many of which provide scarce outdoor space in dense, working-class neighborhoods—are filled with thousands of tents and makeshift structures, and are no longer welcoming to the

___

[1] HUD, *The 2022 Annual Homelessness Assessment Report (AHAR) to Congress*                16                2022), https://www.huduser.gov/portal/sites/default/files/pdf/2022-AHAR-Part-1.pdf.

[2] Doug Smith, *Rand Survey Finds Homelessness Up 18% in L.A. Hot Spots Where the Official Count Recorded Decreases*, L.A. Times (Jan. 26, 2023), https://www.latimes.com/california/story/2023-01-26/rand-survey-finds-homelessness-up-18-in-l-a-hot-spots-where-the-official-count-recorded-decreases.

broader community.**3**

It is a status quo that fails both those in the homeless encampments and those near them. The homeless disproportionately risk being the victims of violence, sexual assault, and drug-related death,**4** and encampments' unsanitary conditions have caused resurgences of plagues such as typhus, tuberculosis, and hepatitis-A.**5** For those who live, work, and attend school near these encampments, they have become a source of fear and frustration. A plurality of California residents rate homelessness and the closely related issue of a lack of affordable housing as the

---

3 *See generally* Luis Sinco, *Photos: An Unflinching Look at Homelessness During the Pandemic* (Mar. 8, 2021), https://www.latimes.com/california/story/2021-03-08/homelessness-and-the-pandemic (depicting homeless encampments); L.A. Homeless Servs. Auth., *Car, Van, RV/Camper, Tent, and Makeshift Shelter (CVRTM)* (2022), https://www.lahsa.org/documents?id=6533-cvrtm-summary-by-geography (estimating the total number of tents and makeshift structures across the City of Los Angeles).

4 *See* Gale Holland, *Attacked, Abused and Often Forgotten: Women Now Make Up 1 in 3 Homeless People in L.A. County*, L.A. Times (Oct. 28, 2016), https://www.latimes.com/projects/la-me-homeless-women/; Christian Martinez & Rong-Gong Lin II, *L.A. County Homeless Deaths Surged 56% in Pandemic's First Year. Overdoses Are Largely to Blame*, L.A. Times (Apr. 22, 2022), https://www.latimes.com/california/story/2022-04-22/la-county-homeless-deaths-surge-pandemic-overdoses.

5 Soumya Karlamangla, *L.A. Typhus Outbreak Adds Fuel to Debates Over Homelessness and Housing*, L.A. Times (Oct. 11, 2018), https://www.latimes.com/local/california/la-me-ln-typhus-outbreak-20181011-story.html; Anna Gorman & Kaiser Health News, *Medieval Diseases Are Infecting California's Homeless*, Atlantic, https://www.theatlantic.com/health/archive/2019/03/typhus-tuberculosis-medieval-diseases-spreading-homeless/584380/ (last updated Mar. 11, 2019).

state's two most pressing issues.[6]   In the City of Los
Angeles, a startling 95% of residents view homelessness as
a serious or very serious problem, while roughly 40% of
residents report that pervasive homelessness makes them no
longer feel safe in their own neighborhoods.[7]

Homelessness is caused by a complex mix of economic,
mental-health, and substance-abuse factors, and appears to
resist any easy solution.  In recent years, state and local
governments have taken a variety of steps intended to
ameliorate the crisis: adopting zoning reforms to increase the
supply of housing, declaring public emergencies to bypass
red tape and more quickly build new public housing,
increasing spending on mental-health services, and
contracting with hotels and motels to offer temporary
housing to those living on the street.  Some local
governments have also reasonably chosen to couple these
longer-term measures with attempts to enforce public-
camping bans and other public health measures—but most
of these attempts to mitigate the challenging issues of
homelessness have been wholly or partially frustrated by an

---

[6] Mark Murray, California Poll: *Homelessness Is Most Urgent Issue in
the State*, NBC News (Mar. 1, 2023), https://www.nbcnews.com/meet-
the-press/meetthepressblog/california-poll-homelessness-urgent-issue-
state-rcna72972.

[7] Benjamin Oreskes, Doug Smith & David Lauter, *95% of Voters Say
Homelessness is L.A.'s Biggest Problem, Times Poll finds. 'You Can't
Escape It.'*, L.A. Times (Nov. 14, 2019),
https://www.latimes.com/california/story/2019-11-14/homeless-
housing-poll-opinion; Benjamin Oreskes & David Lauter, *L.A. Voters
Angry, Frustrated Over Homeless Crisis, Demand Faster Action, Poll
Finds*, L.A. Times (Dec. 1, 2021), https://www.latimes.com/homeless-
housing/story/2021-12-01/la-voters-are-frustrated-impatient-over-
persistent-homelessness-crisis.

alleged constitutional right conjured by a panel of our court that finds no support in United States Supreme Court jurisprudence.

Assume, for example, that you are a police officer and you encounter a homeless person in some public space—say, San Francisco's Civic Center near the James R. Browning Building where our court sits.  Assume further that the person has set up a tent and "engage[d] in other life-sustaining activities" like defecation and urination on the sidewalk nearby. *Martin v. City of Boise*, 920 F.3d 584, 617 (9th Cir. 2019) (citation omitted).  You also know that, pursuant to the city's good-faith efforts to comply with the dictates of *Martin*, government workers have conducted outreach and offered temporary housing to the homeless persons in this area.  Nonetheless, under the majority's reasoning, you are powerless to cite this person even for public defecation because San Francisco has fewer shelter beds than total homeless persons.  It is irrelevant that the city already offered this specific person shelter because "the number of homeless persons outnumber the available shelter beds." *Johnson v. City of Grants Pass*, 50 F.4th 787, 792 (9th Cir. 2022) (cleaned up).[8]  In a democracy, voters and government officials should be able to debate the efficacy and desirability of these types of enforcement actions. Regrettably, our court has short-circuited the political process and declared a reasonable policy response to be off-limits and flatly unconstitutional.

Contrary to Judges Gould and Silver's assertion, neither

---

[8] This hypothetical is based on two district-court applications of *Martin* and *Grants Pass*.  *See infra* section III (San Francisco and Sacramento examples).

my description of the West's homelessness crisis nor my offering of the above hypothetical is meant to "argue the crisis would abate" if *Martin* and *Grants Pass* were overruled.  Though these decisions certainly add obstacles to local governments' already difficult path to solving the homelessness crisis, I have never and do not here contend that our precedent is an on/off-switch entirely responsible for the crisis.

I describe the scope of the West's homelessness crisis to instead make a point about our proper role, as well as our institutional competence and accountability.  Unlike the officials tasked with addressing homelessness, the members of our court are neither elected nor policy experts. Of course, the political process must yield to the fundamental rights protected by the Constitution, and some of federal courts' finest moments have come in enforcing the rights of politically marginal groups against the majority.  But when asked to inject ourselves into a vexing and politically charged crisis, we should tread carefully and take pains to ensure that any rule we impose is truly required by the Constitution—not just what our unelected members think is good public policy.  Unfortunately, the careful constitutional analysis that the West's homelessness crisis calls for is absent from both *Martin*, 920 F.3d 584, and the majority opinion here, *Grants Pass*, 50 F.4th 787.

*Martin* misread Supreme Court precedent, yet we failed to give that case the en banc reconsideration it deserved. *Grants Pass* now doubles down on *Martin*—crystallizing *Martin* into a crude population-level inquiry, greenlighting what should be (at most) an individualized inquiry for class-wide litigation, and leaving local governments without a clue of how to regulate homeless encampments without risking legal liability.  *Martin* handcuffed local jurisdictions as they

tried to respond to the homelessness crisis; *Grants Pass* now places them in a straitjacket. If this case does not "involve[] a question of exceptional importance," I cannot imagine one that does. Fed. R. App. P. 35(a)(2). We should have taken this second chance to revisit our flawed precedent en banc, and I respectfully dissent from our decision not to do so.

**I.**

As Judge O'Scannlain explains in his Statement, *Martin* cannot be squared with the Supreme Court's Eighth Amendment precedent. What is more, as Judge O'Scannlain also explains, *Martin* violates Supreme Court precedent regarding what constitutes binding precedent. The *Marks* rule instructs in no uncertain terms that, "[w]hen a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who *concurred in the judgments* on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (cleaned up) (emphasis added). Yet *Martin* counted to five votes for its understanding of the Eighth Amendment by including the four votes of the *Powell* dissenters. *Martin*, 920 F.3d at 616 ("The four dissenting Justices adopted a position consistent with that taken by Justice White [in his concurrence] . . . ."). When the *Marks* rule is properly applied to *Powell v. Texas*, 392 U.S. 514 (1968), it produces the holding that Powell's "conviction was constitutional because it involved the commission of an act. Nothing more, nothing less." *Martin*, 920 F.3d at 591 (M. Smith, J., dissenting from denial of rehearing en banc); *see also Grants Pass*, 50 F.4th at 830 (Collins, J., dissenting) ("Under a correct application of *Marks*, the holding of *Powell* is that there is no constitutional obstacle to punishing conduct that has *not* been shown to be

involuntary, and the converse question of what rule applies when the conduct has been shown to be involuntary was left open."). Put differently: When the *Marks* rule is properly applied, *Martin* cannot hide behind *Powell* and insist that Supreme Court precedent "compels the conclusion" it reached. *Martin*, 920 F.3d at 616.

*Martin* therefore had the burden to affirmatively justify its rule—that a "state may not criminalize conduct that is an unavoidable consequence" of a person's status—as consistent with the Eighth Amendment. *Id.* at 617 (cleaned up). But neither *Martin* nor the majority in this case even attempts to make that showing, including rebutting the number of reasons Justice Thurgood Marshall and the other Justices in the *Powell* plurality thought an unavoidable-consequence-of-status rule would be both improper and unworkable. We are left completely in the dark as to why, for example, the *Martin* panel and *Grants Pass* majority apparently thought:

- The *Powell* plurality was wrong to interpret *Robinson v. California*, 370 U.S. 660 (1962) as a ban on "punish[ing] a mere status" and nothing more. *Powell*, 392 U.S. at 532 (plurality) (Marshall, J.).

- The *Powell* plurality was wrong to be concerned that an unavoidable-consequence-of-status rule would lack "any limiting principle." *Id.* at 533.

- The *Powell* plurality was wrong to think that a constitutionalized unavoidable-consequence rule would improperly override the ability of states to develop "[t]he doctrines of actus reus, mens rea, insanity, mistake, justification, and duress" to resolve as they think best "the tension between the evolving

aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man." *Id.* at 535–36.

- The *Powell* plurality incorrectly characterized an unavoidable-consequence rule as conferring upon unelected federal judges the impossible task of being "the ultimate arbiter[s] of the standards of criminal responsibility, in diverse areas of the criminal law, throughout the country." *Id.* at 533.

- The punishment flowing from a public-camping prosecution (or even just a civil citation) constitutes the "exceedingly rare" instance—outside the context of capital punishment and juvenile life without parole—where a particular sentence may violate the Eighth Amendment. *Rummel v. Estelle*, 445 U.S. 263, 272 (1980); *see Miller v. Alabama*, 567 U.S. 460, 469–70 (2012) (summarizing proportionality case law).

Judges Gould and Silver are correct to note that the *Powell* plurality is, after all, just a plurality. But these questions, and others, still warranted a response—one would hope that a lower court, when fashioning a novel constitutional rule, would at least grapple with the reasons four Supreme Court Justices expressly chose to reject the very same rule. The district courts tasked with applying *Martin*/*Grants Pass*, the local governments placed in a straitjacket by these decisions, and the residents of our circuit who now must live with the consequences all deserved better than the half-reasoned decisions they received from our court.

## II.

Moreover, even if one assumes *arguendo* that the Eighth

Amendment supports an unavoidable-consequence-of-status principle, *Grants Pass*'s homelessness-specific analysis has nothing to do with that principle. One would reasonably assume that *Grants Pass* implemented *Martin*'s general Eighth Amendment principle by mandating that courts conduct an *individualized* inquiry: whether public camping by the individual plaintiffs before the court is an "unavoidable consequence" of their status as homeless persons—inquiring, for example, into whether the plaintiffs declined offers of temporary housing.[9] But one would be mistaken in that assumption. Instead of calling for an individualized inquiry, the original *Grants Pass* majority opinion candidly set forth a crude *jurisdiction-wide* inquiry: "The formula established in *Martin* is that the government cannot prosecute homeless people for sleeping in public if there is a greater number of homeless individuals in a jurisdiction than the number of available shelter spaces." *Grants Pass*, 50 F.4th at 795 (cleaned up); *see id.* at. 823–28 (Collins, J., dissenting) (arguing that *Martin* provides at most a "case-specific," as-applied claim). The original

---

[9] One short-term housing site in Los Angeles sits nearly empty despite proximity to a large homeless camp, and one of the new Los Angeles mayor's marquee offers of short-term housing had a below-50% acceptance rate. *See* Helen Li, *The Times Podcast: Why Hotel Rooms for L.A.'s Homeless Sit Empty* (Feb. 15, 2023), https://www.latimes.com/podcasts/story/2023-02-15/the-times-podcast-cecil-hotel-los-angeles; Benjamin Oreskes, *Bass Wants to Bring Homeless People Indoors. Can She Secure Enough Beds?*, L.A. Times (Dec. 22, 2022), https://www.latimes.com/california/story/2022-12-22/karen-bass-homelessness-directive-inside-safe; *see also* David Zahniser, *In Downtown L.A., Bass' Plan to Clear Encampments Faces Crime, Addiction and Resistance* (May 30, 2023), L.A. Times, https://www.latimes.com/california/story/2023-05-30/la-me-mayor-bass-homeless-encampment-resistance.

majority opinion made clear that the beds-versus-population "formula" is all that matters: Because the plaintiffs in this case established a shelter-beds deficit, they are deemed—no matter their personal situations—involuntarily homeless, and the city effectively cannot enforce its ordinances against *any* homeless person.

The majority has now amended its opinion to remove this "formula" language, and the opinion's body now quotes *Martin*'s statement that individuals are outside the purview of its holding if they "have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but [they] choose not to use it." *Martin*, 920 F.3d at 617 n.8. But I fear that this amendment, in reality, does little to change the substance of *Grants Pass* and instead simply obscures what *Grants Pass* holds.

Notably, the amendment is not accompanied by any downstream changes to the majority's application of its rule to the facts or its ultimate conclusion. So, the "formula" language may be gone, but the approach that language forthrightly described remains embedded in the opinion. *Grants Pass* still holds that "[t]here, of course, exists no law or rule requiring a homeless person" to "provide the court an accounting of her finances and employment history" before being deemed "involuntarily homeless." 50 F.4th at 811. It still equates a shelter-beds deficit with jurisdiction-wide involuntariness: "[T]he number of homeless persons outnumber the available beds. In other words, homeless persons have nowhere to shelter and sleep in the City . . . ." *Id.* at 792; *see also id.* at 797 (describing the district court decision, which it largely affirms, as holding "that, based on the unavailability of shelter beds, the City's enforcement of its anti-camping and anti-sleeping ordinances violated the

Cruel and Unusual Punishment Clause"). And it still treats a shelter-beds deficit, when combined with conclusory allegations of involuntariness, as sufficient for an individual to show that he or she is involuntarily homeless: "Gloria Johnson has adequately demonstrated that there is no available shelter in Grants Pass and that she is involuntarily homeless." *Id.* at 811.

The amendment thus places district courts in an impossible position. They will not be able to reconcile *Grants Pass*'s disparate strands—because they cannot be reconciled. District courts will have to choose between following what *Grants Pass* now says in one place (there must be a meaningful voluntariness inquiry) and what *Grants Pass* says and does in another place (a shelter-beds deficit and conclusory allegations are all one needs).

Indeed, *Grants Pass*'s class-certification analysis confirms that its nod to the *unavoidable*-consequence or *involuntarily*-homeless limitation is just window dressing— and that the amendment to the opinion is one of form, not substance. As Judge Collins explained, if *Martin*'s public-camping ban is truly limited to those who are involuntarily homeless, then *Martin*-type cases cannot possibly be litigated on a class-wide basis. *Grants Pass*, 50 F.4th at 823–28 (Collins, J., dissenting). To be certified, a putative class must satisfy Federal Rule of Civil Procedure 23's commonality requirement, among others. "What matters" for purposes of that requirement "is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (cleaned up). A court must be able to "resolve an issue that is central to the validity of each one of the [class members']

claims in one stroke." *Id.* Whether a public-camping ban is unconstitutional as applied to a homeless plaintiff depends (it would seem) on whether that plaintiff is "involuntarily homeless," which in turn depends on a host of individualized factors: Did they decline the city's offer of temporary housing? Do they otherwise "have the means to pay" for temporary housing? Were there areas of the city where they could publicly camp without citation in light of the city's enforcement policies? It blinks reality to say that the district court could, "in one stroke," resolve the constitutionality of the public-camping ban as applied to each of the "at least around 50" class members here. *Grants Pass*, 50 F.4th at 811.

The majority, for what it is worth, tries to backdoor involuntariness into its Rule 23 analysis. But its argument is one that Philosophy 101 professors should consider using as their go-to example of circular reasoning: The class satisfies Rule 23's commonality requirement because the class members' claims all present the question of whether enforcement of public-camping ordinances against "involuntarily homeless individuals violates the Eighth Amendment." *Id.* at 804–05 n.22. Answering that question resolves the claims of each class member "in one stroke" because "[p]ursuant to the class definition, the class includes only involuntarily homeless persons." *Id.* at 804–05 (citation omitted). The basis for that premise? "[T]he record establishes" it. *Id.* at 804–05 n.22. As Judge Collins explained, there is "no authority for this audacious bootstrap argument." *Id.* at 827 (Collins, J., dissenting). By wholly collapsing the merits into the class definition, the majority opinion certified an impermissible "fail safe" class. *Id.* (quoting *Olean Wholesale Grocery Coop. v. Bumble Bee Foods*, 31 F.4th 651, 670 n.14 (9th Cir. 2022) (en banc)).

In response to this criticism, Judges Gould and Silver suggest that *Grants Pass*'s class-certification analysis is run of the mill—analogizing it to our court's recent approval of a district court's certification of a class of California residents who worked for a certain employer. *See Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127, 1134 (9th Cir. 2021). It is telling that Judges Gould and Silver think involuntary homelessness is as easily determined as residency and employment history—another piece of evidence that *Martin*'s involuntariness component has faded away or been collapsed into the shelter-beds inquiry. More fundamentally, their analogy overlooks that the *Bernstein* class definition did not swallow the merits inquiry in the manner that the class definition does here. Separate from class membership (based on residency and employment), the *Bernstein* plaintiffs still had to make a merits showing that the defendant violated California labor laws by, among other things, failing to pay a minimum wage and to pay for all hours worked. *See id.* at 1133. Here, by contrast, the game is essentially over as soon as the class is certified. The class (purportedly) consists only of involuntarily homeless people, and application of the challenged ordinances to the class members is unconstitutional (under our flawed precedent) *because* the class members are involuntarily homeless.

Viewing the majority's class-certification analysis, there are only two possible conclusions: *Either* (1) the majority erred in certifying the class despite a lack of commonality; *or* (2) the majority read "involuntarily" out of *Martin*'s purported involuntarily-homeless rule. Either conclusion points to profound error that we should have used the en banc process to correct.

## III.

Judges Gould and Silver insist that *Martin* and *Grants Pass* apply only in "exceptionally narrow situation[s]" and that critics of these decisions have resorted to "rhetorical exaggerations." But whose word should one take: that of a panel majority defending its own work or that of several district court judges who have no dog in this fight and are simply trying to understand and apply the law as we have handed it down to them? Several district court decisions have understood *Martin* and now *Grants Pass* to run roughshod over normal procedural rules and past any substantive limiting principles. As a result, local governments are hard-pressed to find any way to regulate the adverse health and safety effects of homeless encampments without running afoul of our court's case law—or, at a minimum, being saddled with litigation costs. If one picks up a map of the western United States and points to a city that appears on it, there is a good chance that city has already faced a lawsuit in the few short years since our court initiated its *Martin* experiment. Without expressing any view on how other district courts or panels of our court should decide these or similar cases pursuant to our existing precedent, I offer a few examples of the judicial adventurism our case law has already produced:

**1.** *San Francisco* responded conscientiously to *Martin*. The police department promulgated an enforcement bulletin intended to comply with that case's dictates while retaining flexibility to clear some of the city's worst encampments. *See Coal. on Homelessness v. City & Cnty. of San Francisco*, No. 22-cv-05502-DMR, 2022 WL 17905114, at \*3–7 (N.D. Cal. Dec. 23, 2022). Pursuant to the bulletin, an officer cannot arrest a homeless person for a set of enumerated offenses unless SFPD first "secure[s] appropriate shelter."

*Id.* at \*4 (emphasis omitted).   SFPD policy requires officers
to work with other city agencies to implement a multi-step
process: The city posts a notice that an encampment clearing
will occur on a particular date; city workers perform
outreach at the encampment the weekend before the
clearing; and city workers follow up at the encampment 24
to 72 hours before the clearing.  *Id.* at \*5–7.  Only then can
an encampment clearing take place.  To be sure, the record
on SFPD's compliance with this policy was mixed.  The
defendants asserted that they *always* comply with the
policy—"conduct[ing] regular training[s]" on it, setting
aside beds based on an estimated acceptance rate, and
providing officers with the means to check shelter-bed
availabilities.  *Id.* at \*13–15, \*23.  Some plaintiffs asserted
that they *never* received advance notice of encampment
clearings or offers of housing.  *Id.* at \*8–9.  Other plaintiffs
asserted that SFPD *sometimes* complied with the policy and
"acknowledge[d] receiving and/or accepting shelter offers at
. . . encampment closures."  *Id.* at \*22; *see also id.* at \*10–
12.  The plaintiffs' expert opined that San Francisco had a
shelter-beds deficit but conceded that a "clear way to access
shelter is via an encampment [closure] while under threat
from law enforcement."  *Id.* at \*14.

Nonetheless, the court found the mixed record before it
sufficient to issue a sweeping preliminary injunction.  The
district court repeatedly returned not to the facts of specific
plaintiffs in specific encampment clearings but to the
consideration at the center of *Grants Pass*: whether there is
a shelter-beds deficit.  *See id.* at \*21 ("insufficient stock of
shelter beds"); *id.* \*22 ("long-standing shelter bed
shortfalls"); *id.* at \*23 ("there are thousands more homeless
individuals . . . than there are available shelter beds"); *id.* at
\*27 ("shortfall of shelter beds").  The court determined that

it "need not decide" how offers of housing, when actually made, would impact the constitutionality of arrests or alter the scope of an injunction. *See id.* at \*23–24. The court instead issued a broad, if ambiguous, injunction that appears to effectively prevent SFPD from enforcing five separate prohibitions against homeless persons in San Francisco "as long as there are more homeless individuals . . . than there are shelter beds available." *Id.* at \*28.

**2.** *Phoenix* suffered a similar fate. Like San Francisco, it adopted a policy that police "officers must make individualized assessments" before issuing citations against homeless persons for certain offenses. *Fund for Empowerment v. City of Phoenix*, No. CV-22-02041-PHX-GMS, 2022 WL 18213522, at \*3 (D. Ariz. Dec. 16, 2022). Unlike the San Francisco case, the district court cited no evidence in the record showing that Phoenix breached its policy. Still, the district court issued a sweeping injunction after conducting a merits inquiry that focused almost exclusively on the *Grants Pass* beds-versus-population inquiry. The district court noted that it was "not contested that there are more unsheltered individuals than shelter beds in Phoenix" and then concluded that Phoenix's policy "present[s] likely unconstitutional applications especially when the unsheltered in the city outnumber the available bed spaces." *Id.* The city's enforcement policy—as a mere "statement of administrative policy"—was insufficient to "forestall the Plaintiffs' ultimate likelihood of success on the merits." *Id.* (quoting *Martin*, 920 F.3d at 607).

**3.** *Santa Barbara* adopted a half-measure: a geographically- and time-limited ban against public sleeping that applied only in the city's downtown area. *Boring v. Murillo*, No. CV-21-07305, 2022 WL 14740244, at \*1 (C.D. Cal. Aug. 11, 2022). Despite the ordinance's modest scope,

the district court still held that the plaintiffs stated a plausible claim to relief pursuant to *Martin* and denied the city's motion to dismiss. *See id.* at \*5–6.

**4.** *Sacramento* found itself subject to a lawsuit after taking the innocuous step of removing a portable toilet from city-owned property. *Mahoney v. City of Sacramento*, No. 2:20-cv-00258-KJM, 2020 WL 616302, at \*1 (E.D. Cal. Feb. 10, 2020). Though the court ultimately declined to issue a temporary restraining order because the plaintiffs' claims failed on factual grounds, it still interpreted *Martin* to cover public urination and defecation prosecutions and stated that "the City may not prosecute or otherwise penalize the plaintiffs . . . for eliminating in public if there is no alternative to doing so." *Id.* at \*3.

Judges Gould and Silver argue this "brief statement made in the context of resolving an emergency motion is not a solid foundation" on which to suggest that the enforcement of public defecation and urination laws may well be suspect pursuant to our court's precedent. In their view, that is because *Martin* and *Grants Pass* did not involve a "challenge to any public urination or defecation ordinances." But our decisions are not good-for-one-ride-only tickets forever bound to their specific facts; they serve as precedent to which parties analogize in related situations. *Martin* attempted to limit its reach by explaining that sleep is a "life-sustaining activit[y]." *Martin*, 920 F.3d at 617. In their concurrence, Judges Gould and Silver offer a slightly different version of that limiting principle—that sleep is an "identifiable human need[]." But "[w]hat else is [an identifiable human need]? Surely bodily functions." *Martin*, 920 F.3d at 596 (M. Smith, J., dissenting from denial of rehearing en banc). It is not a slippery-slope fallacy to note a realistic consequence that flows directly from *Martin*

and *Grants Pass*'s reasoning.  Moreover, Judges Gould and Silver fail to recognize that something is fundamentally amiss with our precedent if a city, even if it ultimately prevails, must first go to court before it can remove a toilet from property it owns.

**5.**  *Chico* "constructed an outdoor temporary shelter facility at the Chico Municipal Airport that accommodate[d] all 571 of the City's homeless persons." *Warren v. City of Chico*, No. 2:21-CV-00640-MCE, 2021 WL 2894648, at *3 (E.D. Cal. July 8, 2021).  But the district court cited stray lines in *Martin* in addition to *Merriam-Webster*'s definition of "shelter," conducted a single paragraph of analysis, concluded that the airport shelter was not *Martin*-type shelter, and subsequently enjoined Chico from enforcing its anti-camping laws  against "homeless persons in violation." *Id.* at *3–4.

As the district court itself recognized, this decision (as well as the others above) shows that, while the *Martin* analysis may be "straight-forward . . . [as] to the facts of [a] case," the "practical ramifications for the community are much more complex" and the "concerns raised in the dissent from the denial of rehearing en banc appear to have come to fruition." *Id.* at *4 n.4 (citation omitted).  As I feared, our case law has "prohibit[ed] local governments from fulfilling their duty to enforce an array of public health and safety laws," and the "[h]alting [of] enforcement of such laws" has "wreak[ed] havoc on our communities." *Martin*, 920 F.3d at 594 (M. Smith, J., dissenting from denial of rehearing en banc).

\* \* \*

I respect the good intentions of my colleagues on the *Martin* panel and in the *Grants Pass* majority.  But *Martin*,

particularly now that it has been supercharged by *Grants Pass*, has proven to be a runaway train that has derailed and done substantial collateral damage to the governmental units in which it has been applied and those living therein. These cases use a misreading of Supreme Court precedent to require unelected federal judges—often on the basis of sloppy, mixed preliminary-injunction records—to act more like homelessness policy czars than as Article III judges applying a discernible rule of law. I respectfully dissent from our court's decision not to rehear *Grants Pass* en banc.

---

COLLINS, Circuit Judge, dissenting from the denial of rehearing en banc:

In my dissent as a member of the panel in this case, I explained that:

- *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), is a "deeply flawed" decision that "seriously misconstrued the Eighth Amendment and the Supreme Court's caselaw construing it";

- Even if *Martin* were correct in its Eighth Amendment holding, the panel majority's decision in *Johnson* "greatly expands *Martin*'s holding" in a way that is "egregiously wrong"; and

- The panel majority's decision "make[s] things worse" by "combin[ing] its gross misreading of

> *Martin* with a flagrant disregard of settled class-
> certification principles."

*See Johnson v. City of Grants Pass*, 50 F.4th 787, 814 & n.1
(9th Cir. 2022) (Collins, J., dissenting).   In its "joint
statement regarding denial of rehearing," the panel majority
today recycles many of the flawed arguments in its opinion.
I have already explained in my dissent why those arguments
are wrong.   *See id*. at 823–31.   The statement of Judge
O'Scannlain respecting the denial of rehearing en banc and
Parts I and II of Judge M. Smith's dissent from the denial of
rehearing en banc—which I join—further cogently explain
the multiple serious errors in the panel majority's opinion. I
will not repeat all of what has already been said, but I think
that two points are worth underscoring in response to the
panel majority's statement regarding the denial of rehearing.

First, the panel majority's statement confirms and
illustrates the layers of self-contradiction that underlie its
opinion in this case.

The panel majority continues implausibly to insist that
its opinion is "strictly limited to enforcement of the
ordinances against 'involuntarily' homeless persons," which
would   suggest—as   *Martin*   itself   suggested—an
individualized case-specific inquiry.   *See* Panel Majority
Statement at 94.   But the panel majority also continues to
insist that the class was properly certified *because* any
individualized issues concerning involuntariness were
moved into the class definition.   *See* Panel Majority
Statement at 99–101.   As I have explained, that "artifice"
ignores the requirements of Federal Rule of Civil Procedure
23, because it "rel[ies] on a fail-safe class definition that
improperly subsumes this crucial individualized merits issue
into the class definition."   50 F.4th at 827 (Collins, J.,

dissenting). The panel majority tries to wave away the problem as merely one of "individualized determinations to *identify* class members," arguing that what it did in this case is no different than asking whether, for example, a given class member resides in a particular State or performs a given job for a company. *See* Panel Majority Statement at 101 (emphasis added). But in sharp contrast to the simple factual inquiries in the panel majority's examples, its standard for "identifying" class members here—*i.e.*, whether a given plaintiff's homelessness is involuntary under all of the circumstances—is the *central merits issue* in the case under a correct reading of *Martin*. Thus, under the faulty class action upheld by the panel majority, if a particular person's individual circumstances confirm that his homelessness is not "involuntary" in the sense that *Martin* requires, then his Eighth Amendment claim under *Martin* fails on the merits—and he is then defined out of the class. But if his homelessness is involuntary under *Martin*'s standards, then (under that decision's reading of the Eighth Amendment) his *Martin* claim is a winner—and he remains in the class. The result is a classic fail-safe class: each "class member either wins or, by virtue of losing, is defined out of the class." *Olean Wholesale Grocery Coop. v. Bumble Bee Foods*, 31 F.4th 651, 669–70 n.14 (9th Cir. 2022) (en banc) (citation omitted).

Underlying all of this is a fundamental inconsistency between the various propositions endorsed by the panel majority's opinion. As I stated in my panel dissent, "the majority cannot have it both ways: either the class definition is co-extensive with *Martin*'s involuntariness concept (in which case the class is an improper fail-safe class) or the class definition differs from the *Martin* standard (in which case *Martin*'s individualized inquiry requires

decertification)." 50 F.4th at 827–28 (Collins, J., dissenting). Nothing in the panel majority's statement resolves these internal contradictions, which plague its deeply flawed opinion.

Second, I cannot let pass without comment the panel majority's contention that a newly enacted Oregon statute regulating the application of local ordinances to homeless individuals provides "yet another reason why it was wise to not rehear" this case en banc. *See* Panel Majority Statement at 112–13 n.7. Even assuming that this statute will require that city laws such as those challenged here must be "objectively reasonable as to time, place and manner with regards to persons experiencing homelessness," under "the totality of the circumstances," *see* Or. Rev. Stat. § 195.530(2), (5), the removal of the objectively *un*reasonable constitutional straitjacket wrongly imposed by *Martin* and *Johnson* would continue to alter the outcome of this case and would also greatly improve the cogency, coherence, and correctness of Eighth Amendment jurisprudence in this circuit. The panel majority is quite wrong in suggesting that this statute provides any grounds for looking the other way and allowing *Martin*'s cancer on our jurisprudence to continue to metastasize.

I reiterate what I said in the conclusion of my panel dissent, which is that both *Martin* and *Johnson* "should be overturned or overruled at the earliest opportunity, either by this court sitting en banc or by the U.S. Supreme Court." 50 F.4th at 831 (Collins, J., dissenting). By denying rehearing en banc today, we have regrettably failed to overrule *Martin* and *Johnson*. I again emphatically dissent.

BRESS, Circuit Judge, joined by CALLAHAN, M. SMITH, IKUTA, BENNETT, R. NELSON, MILLER, BADE, LEE, FORREST, BUMATAY, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

Looking out the windows of the Ninth Circuit's courthouse in San Francisco, one sees the most difficult problems plaguing big-city America on display. Homelessness, drug addiction, barely concealed narcotics dealing, severe mental health impairment, the post-COVID hollowing out of our business districts. These problems of disrespect for the law, human suffering, and urban decline would seem connected, the result of a complex interaction of forces that defies any easy solution.

But on top of everything that our localities must now contend with, our court has injected itself into the mix by deploying the Eighth Amendment to impose sharp limits on what local governments can do about the pressing problem of homelessness—a problem now so often related to every other in our great cities. With no mooring in the text of the Constitution, our history and traditions, or the precedent of the Supreme Court, we have taken our national founding document and used it to enact judge-made rules governing who can sit and sleep where, rules whose ill effects are felt not merely by the States, and not merely by our cities, but block by block, building by building, doorway by doorway.

The antecedent question we must always ask when interpreting the Constitution is whether a matter has been entrusted, in the first instance, to the courts or to the people. The answer to that question here is clear: we must allow local leaders—and the people who elect them—the latitude to address on the ground the distinctly local features of the present crisis of homelessness and lack of affordable

housing. And we must preserve for our localities the ability to make tough policy choices unobstructed by court-created mandates that lack any sound basis in law. The expanding constitutional common law our court is fashioning in this area adds enormous and unjustified complication to an already extremely complicated set of circumstances.

Not every challenge we face is constitutional in character. Not every problem in our country has a legal answer that judges can provide. This is one of those situations. The decision in *Johnson v. City of Grants Pass*, 50 F.4th 787 (9th Cir. 2022), and our decision in *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), on which *Johnson* is premised, are clearly wrong and should have been overruled. I respectfully dissent from the denial of rehearing en banc.