(Slip Opinion) OCTOBER TERM, 2023 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CITY OF GRANTS PASS, OREGON *v.* JOHNSON ET AL., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 23–175.   Argued April 22, 2024—Decided June 28, 2024

Grants Pass, Oregon, is home to roughly 38,000 people, about 600 of whom are estimated to experience homelessness on a given day. Like many local governments across the Nation, Grants Pass has public-camping laws that restrict encampments on public property. The Grants Pass Municipal Code prohibits activities such as camping on public property or parking overnight in the city's parks. See §§5.61.030, 6.46.090(A)–(B). Initial violations can trigger a fine, while multiple violations can result in imprisonment. In a prior decision, *Martin* v. *Boise*, the Ninth Circuit held that the Eighth Amendment's Cruel and Unusual Punishments Clause bars cities from enforcing public-camping ordinances like these against homeless individuals whenever the number of homeless individuals in a jurisdiction exceeds the number of "practically available" shelter beds. 920 F. 3d 584, 617. After *Martin*, suits against Western cities like Grants Pass proliferated.

Plaintiffs (respondents here) filed a putative class action on behalf of homeless people living in Grants Pass, claiming that the city's ordinances against public camping violated the Eighth Amendment. The district court certified the class and entered a *Martin* injunction prohibiting Grants Pass from enforcing its laws against homeless individuals in the city. App. to Pet. for Cert. 182a–183a. Applying *Martin's* reasoning, the district court found everyone without shelter in Grants Pass was "involuntarily homeless" because the city's total homeless population outnumbered its "practically available" shelter beds. App.

2 CITY OF GRANTS PASS v. JOHNSON

Syllabus

to Pet. for Cert. 179a, 216a. The beds at Grants Pass's charity-run shelter did not qualify as "available" in part because that shelter has rules requiring residents to abstain from smoking and to attend religious services. App. to Pet. for Cert. 179a–180a. A divided panel of the Ninth Circuit affirmed the district court's *Martin* injunction in relevant part. 72 F. 4th 868, 874–896. Grants Pass filed a petition for certiorari. Many States, cities, and counties from across the Ninth Circuit urged the Court to grant review to assess *Martin*.

*Held*: The enforcement of generally applicable laws regulating camping on public property does not constitute "cruel and unusual punishment" prohibited by the Eighth Amendment. Pp. 15–35.

(a) The Eighth Amendment's Cruel and Unusual Punishments Clause "has always been considered, and properly so, to be directed at the method or kind of punishment" a government may "impos[e] for the violation of criminal statutes." *Powell* v. *Texas*, 392 U. S. 514, 531–532 (plurality opinion). It was adopted to ensure that the new Nation would never resort to certain "formerly tolerated" punishments considered "cruel" because they were calculated to "'superad[d]'" "'terror, pain, or disgrace,'" and considered "unusual" because, by the time of the Amendment's adoption, they had "long fallen out of use." *Bucklew* v. *Precythe*, 587 U. S 119, 130. All that would seem to make the Eighth Amendment a poor foundation on which to rest the kind of decree the plaintiffs seek in this case and the Ninth Circuit has endorsed since *Martin*. The Cruel and Unusual Punishments Clause focuses on the question what "method or kind of punishment" a government may impose after a criminal conviction, not on the question whether a government may criminalize particular behavior in the first place. *Powell*, 392 U. S., at 531–532.

The Court cannot say that the punishments Grants Pass imposes here qualify as cruel and unusual. The city imposes only limited fines for first-time offenders, an order temporarily barring an individual from camping in a public park for repeat offenders, and a maximum sentence of 30 days in jail for those who later violate an order. See Ore. Rev. Stat. §§164.245, 161.615(3). Such punishments do not qualify as cruel because they are not designed to "superad[d]" "terror, pain, or disgrace." *Bucklew*, 587 U. S., at 130 (internal quotation marks omitted). Nor are they unusual, because similarly limited fines and jail terms have been and remain among "the usual mode[s]" for punishing criminal offenses throughout the country. *Pervear* v. *Commonwealth*, 5 Wall. 475, 480. Indeed, cities and States across the country have long employed similar punishments for similar offenses. Pp. 15–17.

(b) Plaintiffs do not meaningfully dispute that, on its face, the Cruel and Unusual Punishments Clause does not speak to questions like

Syllabus

what a State may criminalize or how it may go about securing a con-
viction. Like the Ninth Circuit in *Martin*, plaintiffs point to *Robinson*
v. *California*, 370 U. S. 660, as a notable exception. In *Robinson*, the
Court held that under the Cruel and Unusual Punishments Clause,
California could not enforce a law providing that "'[n]o person shall . . .
be addicted to the use of narcotics.'" *Id.*, at 660, n 1. While California
could not make "the 'status' of narcotic addiction a criminal offense,"
*id.*, at 666, the Court emphasized that it did not mean to cast doubt on
the States' "broad power" to prohibit behavior even by those, like the
defendant, who suffer from addiction. *Id.*, at 664, 667–668. The prob-
lem, as the Court saw it, was that California's law made the status of
being an addict a crime. *Id.,* at 666–667 The Court read the Cruel and
Unusual Punishments Clause (in a way unprecedented in 1962) to im-
pose a limit on what a State may criminalize. In dissent, Justice White
lamented that the majority had embraced an "application of 'cruel and
unusual punishment' so novel that" it could not possibly be "ascribe[d]
to the Framers of the Constitution." 370 U. S., at 689. The Court has
not applied *Robinson* in that way since.

Whatever its persuasive force as an interpretation of the Eighth
Amendment, *Robinson* cannot sustain the Ninth Circuit's *Martin* pro-
ject. *Robinson* expressly recognized the "broad power" States enjoy
over the substance of their criminal laws, stressing that they may
criminalize knowing or intentional drug use even by those suffering
from addiction. 370 U. S., at 664, 666. The Court held that California's
statute offended the Eighth Amendment only because it criminalized
addiction as a status. *Ibid.*

Grants Pass's public-camping ordinances do not criminalize status.
The public-camping laws prohibit actions undertaken by any person,
regardless of status. It makes no difference whether the charged de-
fendant is currently a person experiencing homelessness, a backpacker
on vacation, or a student who abandons his dorm room to camp out in
protest on the lawn of a municipal building. See Tr. of Oral Arg. 159.
Because the public-camping laws in this case do not criminalize status,
*Robinson* is not implicated. Pp. 17–21.

(c) Plaintiffs insist the Court should extend *Robinson* to prohibit the
enforcement of laws that proscribe certain acts that are in some sense
"involuntary," because some homeless individuals cannot help but do
what the law forbids. See Brief for Respondents 24–25, 29, 32. The
Ninth Circuit pursued this line of thinking below and in *Martin*, but
this Court already rejected it in *Powell* v. *Texas*, 392 U. S. 514. In
*Powell*, the Court confronted a defendant who had been convicted un-
der a Texas statute making it a crime to " 'get drunk or be found in a
state of intoxication in any public place.' " *Id.*, at 517 (plurality opin-
ion). Like the plaintiffs here, Powell argued that his drunkenness was

4                   CITY OF GRANTS PASS v. JOHNSON

Syllabus

an "'involuntary'" byproduct of his status as an alcoholic. *Id.*, at 533. The Court did not agree that Texas's law effectively criminalized Powell's status as an alcoholic. Writing for a plurality, Justice Marshall observed that *Robinson*'s "very small" intrusion "into the substantive criminal law" prevents States only from enforcing laws that criminalize "a mere status." *Id.*, at 532–533. It does nothing to curtail a State's authority to secure a conviction when "the accused has committed some act . . . society has an interest in preventing." *Id.*, at 533. That remains true, Justice Marshall continued, even if the defendant's conduct might, "in some sense" be described as " 'involuntary' or 'occasioned by'" a particular status. *Ibid.*

This case is no different. Just as in *Powell*, plaintiffs here seek to extend *Robinson*'s rule beyond laws addressing "mere status" to laws addressing actions that, even if undertaken with the requisite *mens rea*, might "in some sense" qualify as " 'involuntary.' " And as in *Powell*, the Court can find nothing in the Eighth Amendment permitting that course. Instead, a variety of other legal doctrines and constitutional provisions work to protect those in the criminal justice system from a conviction. Pp. 21–24.

(d) *Powell* not only declined to extend *Robinson* to "involuntary" acts but also stressed the dangers of doing so. Extending *Robinson* to cover involuntary acts would, Justice Marshall observed, effectively "impe[l]" this Court "into defining" something akin to a new "insanity test in constitutional terms." *Powell*, 392 U. S., at 536. That is because an individual like the defendant in *Powell* does not dispute that he has committed an otherwise criminal act with the requisite *mens rea*, yet he seeks to be excused from "moral accountability" because of his "'condition.' " *Id.*, at 535–536. Instead, Justice Marshall reasoned, such matters should be left for resolution through the democratic process, and not by "freez[ing]" any particular, judicially preferred approach "into a rigid constitutional mold." *Id.*, at 537. The Court echoed that last point in *Kahler* v. *Kansas*, 589 U. S. 271, in which the Court stressed that questions about whether an individual who committed a proscribed act with the requisite mental state should be "reliev[ed of] responsibility," *id.*, at 283, due to a lack of "moral culpability," *id.*, at 286, are generally best resolved by the people and their elected representatives.

Though doubtless well intended, the Ninth Circuit's *Martin* experiment defied these lessons. Answers to questions such as what constitutes "involuntarily" homelessness or when a shelter is "practically available" cannot be found in the Cruel and Unusual Punishments Clause. Nor do federal judges enjoy any special competence to provide them. Cities across the West report that the Ninth Circuit's involun-

Syllabus

tariness test has created intolerable uncertainty for them. By extending *Robinson* beyond the narrow class of pure status crimes, the Ninth Circuit has created a right that has proven "impossible" for judges to delineate except "by fiat." *Powell*, 392 U. S., at 534. As Justice Marshall anticipated in *Powell*, the Ninth Circuit's rules have produced confusion and they have interfered with "essential considerations of federalism," by taking from the people and their elected leaders difficult questions traditionally "thought to be the[ir] province." *Id.*, at 535–536. Pp. 24–34.

(e) Homelessness is complex. Its causes are many. So may be the public policy responses required to address it. The question this case presents is whether the Eighth Amendment grants federal judges primary responsibility for assessing those causes and devising those responses. A handful of federal judges cannot begin to "match" the collective wisdom the American people possess in deciding "how best to handle" a pressing social question like homelessness. *Robinson*, 370 U. S., at 689 (White, J., dissenting). The Constitution's Eighth Amendment serves many important functions, but it does not authorize federal judges to wrest those rights and responsibilities from the American people and in their place dictate this Nation's homelessness policy. Pp. 34–35.

72 F. 4th 868, reversed and remanded.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, KAVANAUGH, and BARRETT, JJ., joined. THOMAS, J., filed a concurring opinion. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined.

Cite as: 603 U. S. ____ (2024)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 23–175

CITY OF GRANTS PASS, OREGON, PETITIONER *v.*
GLORIA JOHNSON, ET AL., ON BEHALF
OF THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 28, 2024]

JUSTICE GORSUCH delivered the opinion of the Court.

Many cities across the American West face a homelessness crisis. The causes are varied and complex, the appropriate public policy responses perhaps no less so. Like many local governments, the city of Grants Pass, Oregon, has pursued a multifaceted approach. Recently, it adopted various policies aimed at "protecting the rights, dignity[,] and private property of the homeless." App. 152. It appointed a "homeless community liaison" officer charged with ensuring the homeless receive information about "assistance programs and other resources" available to them through the city and its local shelter. *Id.*, at 152–153; Brief for Grants Pass Gospel Rescue Mission as *Amicus Curiae* 2–3. And it adopted certain restrictions against encampments on public property. App. 155–156. The Ninth Circuit, however, held that the Eighth Amendment's Cruel and Unusual Punishments Clause barred that last measure. With support from States and cities across the country, Grants Pass urged this Court to review the Ninth Circuit's decision. We take up that task now.

Opinion of the Court

# I
## A

Some suggest that homelessness may be the "defining public health and safety crisis in the western United States" today. 72 F. 4th 868, 934 (CA9 2023) (Smith, J., dissenting from denial of rehearing en banc). According to the federal government, homelessness in this country has reached its highest levels since the government began reporting data on the subject in 2007. Dept. of Housing and Urban Development, Office of Community Planning & Development, T. de Sousa et al., The 2023 Annual Homeless Assessment Report (AHAR) to Congress 2–3 (2023). California alone is home to around half of those in this Nation living without shelter on a given night. *Id.*, at 30. And each of the five States with the highest rates of unsheltered homelessness in the country—California, Oregon, Hawaii, Arizona, and Nevada—lies in the American West. *Id.*, at 17.

Those experiencing homelessness may be as diverse as the Nation itself—they are young and old and belong to all races and creeds. People become homeless for a variety of reasons, too, many beyond their control. Some have been affected by economic conditions, rising housing costs, or natural disasters. *Id.*, at 37; see Brief for United States as *Amicus Curiae* 2–3. Some have been forced from their homes to escape domestic violence and other forms of exploitation. *Ibid.* And still others struggle with drug addiction and mental illness. By one estimate, perhaps 78 percent of the unsheltered suffer from mental-health issues, while 75 percent struggle with substance abuse. See J. Rountree, N. Hess, & A. Lyke, Health Conditions Among Unsheltered Adults in the U. S., Calif. Policy Lab, Policy Brief 5 (2019).

Those living without shelter often live together. L. Dunton et al., Dept. of Housing and Urban Development,

Opinion of the Court

Office of Policy Development & Research, Exploring Homelessness Among People Living in Encampments and Associated Cost 1 (2020) (2020 HUD Report). As the number of homeless individuals has grown, the number of homeless encampments across the country has increased as well, "in numbers not seen in almost a century." *Ibid.* The unsheltered may coalesce in these encampments for a range of reasons. Some value the "freedom" encampment living provides compared with submitting to the rules shelters impose. Dept. of Housing and Urban Development, Office of Policy Development and Research, R. Cohen, W. Yetvin, & J. Khadduri, Understanding Encampments of People Experiencing Homelessness and Community Responses 5 (2019). Others report that encampments offer a "sense of community." *Id.*, at 7. And still others may seek them out for "dependable access to illegal drugs." *Ibid.* In brief, the reasons why someone will go without shelter on a given night vary widely by the person and by the day. See *ibid.*

As the number and size of these encampments have grown, so have the challenges they can pose for the homeless and others. We are told, for example, that the "exponential increase in . . . encampments in recent years has resulted in an increase in crimes both against the homeless and by the homeless." Brief for California State Sheriffs' Associations et al. as *Amici Curiae* 21 (California Sheriffs Brief ). California's Governor reports that encampment inhabitants face heightened risks of "sexual assault" and "subjugation to sex work." Brief for California Governor G. Newsom as *Amicus Curiae* 11 (California Governor Brief ). And by one estimate, more than 40 percent of the shootings in Seattle in early 2022 were linked to homeless encampments. Brief for Washington State Association of Sheriffs and Police Chiefs as *Amicus Curiae* on Pet. for Cert. 10 (Washington Sheriffs Brief ).

Other challenges have arisen as well. Some city officials indicate that encampments facilitate the distribution of

drugs like heroin and fentanyl, which have claimed the lives of so many Americans in recent years. Brief for Office of the San Diego County District Attorney as *Amicus Curiae* 17–19. Without running water or proper sanitation facilities, too, diseases can sometimes spread in encampments and beyond them. Various States say that they have seen typhus, shigella, trench fever, and other diseases reemerge on their city streets. California Governor Brief 12; Brief for Idaho et al. as *Amici Curiae* 7 (States Brief).

Nor do problems like these affect everyone equally. Often, encampments are found in a city's "poorest and most vulnerable neighborhoods." Brief for City and County of San Francisco et al. as *Amici Curiae* on Pet. for Cert. 5 (San Francisco Cert. Brief); see also 2020 HUD Report 9. With encampments dotting neighborhood sidewalks, adults and children in these communities are sometimes forced to navigate around used needles, human waste, and other hazards to make their way to school, the grocery store, or work. San Francisco Cert. Brief 5; States Brief 8; California Governor Brief 11–12. Those with physical disabilities report this can pose a special challenge for them, as they may lack the mobility to maneuver safely around the encampments. San Francisco Cert. Brief 5; see also Brief for Tiana Tozer et al. as *Amici Curiae* 1–6 (Tozer Brief).

Communities of all sizes are grappling with how best to address challenges like these. As they have throughout the Nation's history, charitable organizations "serve as the backbone of the emergency shelter system in this country," accounting for roughly 40 percent of the country's shelter beds for single adults on a given night. See National Alliance To End Homelessness, Faith-Based Organizations: Fundamental Partners in Ending Homelessness 1 (2017). Many private organizations, city officials, and States have worked, as well, to increase the availability of affordable housing in order to provide more permanent shelter for those in need. See Brief for Local Government Legal Center

Opinion of the Court

et al. as *Amici Curiae* 4, 32 (Cities Brief). But many, too, have come to the conclusion that, as they put it, "[j]ust building more shelter beds and public housing options is almost certainly not the answer by itself." *Id.*, at 11.

As many cities see it, even as they have expanded shelter capacity and other public services, their unsheltered populations have continued to grow. *Id.*, at 9–11. The city of Seattle, for example, reports that roughly 60 percent of its offers of shelter have been rejected in a recent year. See *id.*, at 28, and n. 26. Officials in Portland, Oregon, indicate that, between April 2022 and January 2024, over 70 percent of their approximately 3,500 offers of shelter beds to homeless individuals were declined. Brief for League of Oregon Cities et al. as *Amici Curiae* 5 (Oregon Cities Brief). Other cities tell us that "the vast majority of their homeless populations are not actively seeking shelter and refuse all services." Brief for Thirteen California Cities as *Amici Curiae* 3. Surveys cited by the Department of Justice suggest that only "25–41 percent" of "homeless encampment residents" "willingly" accept offers of shelter beds. See Dept. of Justice, Office of Community Oriented Policing Services, S. Chamard, Homeless Encampments 36 (2010).

The reasons why the unsheltered sometimes reject offers of assistance may themselves be many and complex. Some may reject shelter because accepting it would take them further from family and local ties. See Brief for 57 Social Scientists as *Amici Curiae* 20. Some may decline offers of assistance because of concerns for their safety or the rules some shelters impose regarding curfews, drug use, or religious practices. *Id.*, at 22; see Cities Brief 29. Other factors may also be at play. But whatever the causes, local governments say, this dynamic significantly complicates their efforts to address the challenges of homelessness. See *id.*, at 11.

Rather than focus on a single policy to meet the chal-

Opinion of the Court

lenges associated with homelessness, many States and cities have pursued a range of policies and programs. See 2020 HUD Report 14–20. Beyond expanding shelter and affordable housing opportunities, some have reinvested in mental-health and substance-abuse treatment programs. See Brief for California State Association of Counties et al. as *Amici Curiae* 20, 25; see also 2020 HUD Report 23. Some have trained their employees in outreach tactics designed to improve relations between governments and the homeless they serve. *Ibid.* And still others have chosen to pair these efforts with the enforcement of laws that restrict camping in public places, like parks, streets, and sidewalks. Cities Brief 11.

Laws like those are commonplace. By one count, "a majority of cities have laws restricting camping in public spaces," and nearly forty percent "have one or more laws prohibiting camping citywide." See Brief for Western Regional Advocacy Project as *Amicus Curiae* 7, n. 15 (emphasis deleted). Some have argued that the enforcement of these laws can create a "revolving door that circulates individuals experiencing homelessness from the street to the criminal justice system and back." U. S. Interagency Council on Homelessness, Searching Out Solutions 6 (2012). But many cities take a different view. According to the National League of Cities (a group that represents more than 19,000 American cities and towns), the National Association of Counties (which represents the Nation's 3,069 counties) and others across the American West, these public-camping regulations are not usually deployed as a front-line response "to criminalize homelessness." Cities Brief 11. Instead, they are used to provide city employees with the legal authority to address "encampments that pose significant health and safety risks" and to encourage their inhabitants to accept other alternatives like shelters, drug treatment programs, and mental-health facilities. *Ibid.*

Opinion of the Court

Cities are not alone in pursuing this approach. The federal government also restricts "the storage of . . . sleeping bags," as well as other "sleeping activities," on park lands. 36 CFR §§7.96(i), (j)(1) (2023). And it, too, has exercised that authority to clear certain "dangerous" encampments. National Park Service, Record of Determination for Clearing the Unsheltered Encampment at McPherson Square and Temporary Park Closure for Rehabilitation (Feb. 13, 2023).

Different governments may use these laws in different ways and to varying degrees. See Cities Brief 11. But many broadly agree that "policymakers need access to the full panoply of tools in the policy toolbox" to "tackle the complicated issues of housing and homelessness." California Governor Brief 16; accord, Cities Brief 11; Oregon Cities Brief 17.

### B

Five years ago, the U. S. Court of Appeals for the Ninth Circuit took one of those tools off the table. In *Martin* v. *Boise*, 920 F. 3d 584 (2019), that court considered a public-camping ordinance in Boise, Idaho, that made it a misdemeanor to use "streets, sidewalks, parks, or public places" for "camping." *Id.*, at 603 (internal quotation marks omitted). According to the Ninth Circuit, the Eighth Amendment's Cruel and Unusual Punishments Clause barred Boise from enforcing its public-camping ordinance against homeless individuals who lacked "access to alternative shelter." *Id.*, at 615. That "access" was lacking, the court said, whenever "'there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters.'" *Id.*, at 617 (alterations omitted). According to the Ninth Circuit, nearly three quarters of Boise's shelter beds were not "practically available" because the city's charitable shelters had a "religious atmosphere." *Id.*, at 609–610, 618. Boise was thus enjoined from enforcing

its camping laws against the plaintiffs. *Ibid.*

No other circuit has followed *Martin*'s lead with respect to public-camping laws. Nor did the decision go unremarked within the Ninth Circuit. When the full court denied rehearing en banc, several judges wrote separately to note their dissent. In one statement, Judge Bennett argued that *Martin* was inconsistent with the Cruel and Unusual Punishments Clause. That provision, Judge Bennett contended, prohibits certain methods of punishment a government may impose after a criminal conviction, but it does not "impose [any] substantive limits on what conduct a state may criminalize." 920 F. 3d, at 599–602. In another statement, Judge Smith lamented that *Martin* had "shackle[d] the hands of public officials trying to redress the serious societal concern of homelessness." *Id.*, at 590. He predicted the decision would "wrea[k] havoc on local governments, residents, and businesses" across the American West. *Ibid.*

After *Martin*, similar suits proliferated against Western cities within the Ninth Circuit. As Judge Smith put it, "[i]f one picks up a map of the western United States and points to a city that appears on it, there is a good chance that city has already faced" a judicial injunction based on *Martin* or the threat of one "in the few short years since [the Ninth Circuit] initiated its *Martin* experiment." 72 F. 4th, at 940; see, *e.g.*, *Boyd* v. *San Rafael*, 2023 WL 7283885, *1–*2 (ND Cal., Nov. 2, 2023); *Fund for Empowerment* v. *Phoenix*, 646 F. Supp. 3d 1117, 1132 (Ariz. 2022); *Warren* v. *Chico*, 2021 WL 2894648, *3 (ED Cal., July 8, 2021).

Consider San Francisco, where each night thousands sleep "in tents and other makeshift structures." Brief for City and County of San Francisco et al. as *Amici Curiae* 8 (San Francisco Brief). Applying *Martin*, a district court entered an injunction barring the city from enforcing "laws and ordinances to prohibit involuntarily homeless individuals from sitting, lying, or sleeping on public property." *Coalition on Homelessness* v. *San Francisco*, 647 F. Supp. 3d

Opinion of the Court

806, 841 (ND Cal. 2022). That "misapplication of this Court's Eighth Amendment precedents," the Mayor tells us, has "severely constrained San Francisco's ability to address the homelessness crisis." San Francisco Brief 7. The city "uses enforcement of its laws prohibiting camping" not to criminalize homelessness, but "as one important tool among others to encourage individuals experiencing homelessness to accept services and to help ensure safe and accessible sidewalks and public spaces." *Id.*, at 7–8. Judicial intervention restricting the use of that tool, the Mayor continues, "has led to painful results on the streets and in neighborhoods." *Id.*, at 8. "San Francisco has seen over half of its offers of shelter and services rejected by unhoused individuals, who often cite" the *Martin* order against the city "as their justification to permanently occupy and block public sidewalks." *Id.*, at 8–9.

An exceptionally large number of cities and States have filed briefs in this Court reporting experiences like San Francisco's. In the judgment of many of them, the Ninth Circuit has inappropriately "limit[ed] the tools available to local governments for tackling [what is a] complex and difficult human issue." Oregon Cities Brief 2. The threat of *Martin* injunctions, they say, has "paralyze[d]" even commonsense and good-faith efforts at addressing homelessness. Brief for City of Phoenix et al. as *Amici Curiae* 36 (Phoenix Brief). The Ninth Circuit's intervention, they insist, has prevented local governments from pursuing "effective solutions to this humanitarian crisis while simultaneously protecting the remaining community's right to safely enjoy public spaces." Brief for International Municipal Lawyers Association et al. as *Amici Curiae* on Pet. for Cert. 27 (Cities Cert. Brief); States Brief 11 ("State and local governments in the Ninth Circuit have attempted a variety of solutions to address the problems that public encampments inflict on their communities," only to have those "efforts . . . shut down by federal courts").

Opinion of the Court

Many cities further report that, rather than help alleviate the homelessness crisis, *Martin* injunctions have inadvertently contributed to it. The numbers of "[u]nsheltered homelessness," they represent, have "increased dramatically in the Ninth Circuit since *Martin*." Brief for League of Oregon Cities et al. as *Amici Curiae* on Pet. for Cert. 7 (boldface and capitalization deleted). And, they say, *Martin* injunctions have contributed to this trend by "weaken[ing]" the ability of public officials "to persuade persons experiencing homelessness to accept shelter beds and [other] services." Brief for Ten California Cities as *Amici Curiae* on Pet. for Cert. 2. In Portland, for example, residents report some unsheltered persons "often return within days" of an encampment's clearing, on the understanding that "*Martin* . . . and its progeny prohibit the [c]ity from implementing more efficacious strategies." Tozer Brief 5; Washington Sheriffs Brief 14 (*Martin* divests officers of the "ability to compel [unsheltered] persons to leave encampments and obtain necessary services"). In short, they say, *Martin* "make[s] solving this crisis harder." Cities Cert. Brief 3.

All acknowledge "[h]omelessness is a complex and serious social issue that cries out for effective . . . responses." *Ibid.* But many States and cities believe "it is crucial" for local governments to "have the latitude" to experiment and find effective responses. *Id.*, at 27; States Brief 13–17. "Injunctions and the threat of federal litigation," they insist, "impede this democratic process," undermine local governments, and do not well serve the homeless or others who live in the Ninth Circuit. Cities Cert. Brief 27–28.

C

The case before us arises from a *Martin* injunction issued against the city of Grants Pass. Located on the banks of the Rogue River in southwestern Oregon, the city is home to roughly 38,000 people. Among them are an estimated 600 individuals who experience homelessness on a given day.

Opinion of the Court

72 F. 4th, at 874; App. to Pet. for Cert. 167a–168a; 212a–213a.

Like many American cities, Grants Pass has laws restricting camping in public spaces. Three are relevant here. The first prohibits sleeping "on public sidewalks, streets, or alleyways." Grants Pass Municipal Code §5.61.020(A) (2023); App. to Pet. for Cert. 221a. The second prohibits "[c]amping" on public property. §5.61.030; App. to Pet. for Cert. 222a (boldface deleted). Camping is defined as "set[ting] up . . . or remain[ing] in or at a campsite," and a "[c]ampsite" is defined as "any place where bedding, sleeping bag[s], or other material used for bedding purposes, or any stove or fire is placed . . . for the purpose of maintaining a temporary place to live." §§5.61.010(A)–(B); App. to Pet. for Cert. 221a. The third prohibits "[c]amping" and "[o]vernight parking" in the city's parks. §§6.46.090(A)–(B); 72 F. 4th, at 876. Penalties for violating these ordinances escalate stepwise. An initial violation may trigger a fine. §§1.36.010(I)–(J). Those who receive multiple citations may be subject to an order barring them from city parks for 30 days. §6.46.350; App. to Pet. for Cert. 174a. And, in turn, violations of those orders can constitute criminal trespass, punishable by a maximum of 30 days in prison and a $1,250 fine. Ore. Rev. Stat. §§164.245, 161.615(3), 161.635(1)(c) (2023).

Neither of the named plaintiffs before us has been subjected to an order barring them from city property or to criminal trespass charges. Perhaps that is because the city has traditionally taken a light-touch approach to enforcement. The city's officers are directed "to provide law enforcement services to all members of the community while protecting the rights, dignity[,] and private property of the homeless." App. 152, Grants Pass Dept. of Public Safety Policy Manual ¶428.1.1 (Dec. 17, 2018). Officers are instructed that "[h]omelessness is not a crime." *Ibid.* And they are "encouraged" to render "aid" and "support" to the

homeless whenever possible. *Id.*, at 153, ¶428.3.[1]

Still, shortly after the panel decision in *Martin*, two homeless individuals, Gloria Johnson and John Logan, filed suit challenging the city's public-camping laws. App. 37, Third Amended Complaint ¶¶6–7. They claimed, among other things, that the city's ordinances violated the Eighth Amendment's Cruel and Unusual Punishments Clause. *Id.*, at 51, ¶66. And they sought to pursue their claim on behalf of a class encompassing "all involuntarily homeless people living in Grants Pass." *Id.*, at 48, ¶52.[2]

The district court certified the class action and enjoined the city from enforcing its public-camping laws against the homeless. While Ms. Johnson and Mr. Logan generally sleep in their vehicles, the court held, they could adequately represent the class, for sleeping in a vehicle can sometimes count as unlawful "'camping'" under the relevant ordinances. App. to Pet. for Cert. 219a (quoting Grants Pass Municipal Code §5.61.010). And, the court found, everyone

---

[1] The dissent cites minutes from a community roundtable meeting to suggest that officials in Grants Pass harbored only punitive motives when adopting their camping ban. *Post*, at 13–14 (opinion of SOTOMAYOR, J.). But the dissent tells at best half the story about that meeting. In his opening remarks, the Mayor stressed that the city's goal was to "find a balance between providing the help [homeless] people need and not enabling . . . aggressive negative behavior" some community members had experienced. App. 112. And, by all accounts, the "purpose" of the meeting was to "develo[p] strategies to . . . connect [homeless] people to services." *Ibid.* The city manager and others explained that the city was dealing with problems of "harassment" and "defecation in public places" by those who seemingly "do not want to receive services." *Id.*, at 113, 118–120. At the same time, they celebrated "the strong commitment" from "faith-based entities" and a "huge number of people" in the city, who have "come together for projects" to support the homeless, including by securing "funding for a sobering center." *Id.*, at 115, 123.

[2] Another named plaintiff, Debra Blake, passed away while this case was pending in the Ninth Circuit, and her claims are not before us. 72 F. 4th 868, 880, n. 12 (2023). Before us, the city does not dispute that the remaining named plaintiffs face a credible threat of sanctions under its ordinances.

Opinion of the Court

without shelter in Grants Pass was "involuntarily home-less" because the city's total homeless population outnum-bered its "'practically available'" shelter beds. App. to Pet. for Cert. 179a, 216a. In fact, the court ruled, none of the beds at Grants Pass's charity-run shelter qualified as "available." They did not, the court said, both because that shelter offers something closer to transitional housing than "temporary emergency shelter," and because the shelter has rules requiring residents to abstain from smoking and attend religious services. *Id.*, at 179a–180a. The Eighth Amendment, the district court thus concluded, prohibited Grants Pass from enforcing its laws against homeless indi-viduals in the city. *Id.*, at 182a–183a.

A divided panel of the Ninth Circuit affirmed in relevant part. 72 F. 4th, at 874–896. The majority agreed with the district court that all unsheltered individuals in Grants Pass qualify as "involuntarily homeless" because the city's homeless population exceeds "available" shelter beds. *Id.*, at 894. And the majority further agreed that, under *Mar-tin*, the homeless there cannot be punished for camping with "rudimentary forms of protection from the elements." 72 F. 4th, at 896. In dissent, Judge Collins questioned *Mar-tin*'s consistency with the Eighth Amendment and la-mented its "dire practical consequences" for the city and others like it. 72 F. 4th, at 914 (internal quotation marks omitted).

The city sought rehearing en banc, which the court de-nied over the objection of 17 judges who joined five separate opinions. *Id.*, at 869, 924–945. Judge O'Scannlain, joined by 14 judges, criticized *Martin*'s "jurisprudential experi-ment" as "egregiously flawed and deeply damaging—at war with the constitutional text, history, and tradition." 72 F. 4th, at 925, 926, n. 2. Judge Bress, joined by 11 judges, contended that *Martin* has "add[ed] enormous and unjusti-fied complication to an already extremely complicated set of circumstances." 72 F. 4th, at 945. And Judge Smith,

14          CITY OF GRANTS PASS *v.* JOHNSON

Opinion of the Court

joined by several others, described in painstaking detail the
ways in which, in his view, *Martin* had thwarted good-faith
attempts by cities across the West, from Phoenix to Sacra-
mento, to address homelessness.  72 F. 4th, at 934, 940–
943.

Grants Pass filed a petition for certiorari.  A large num-
ber of States, cities, and counties from across the Ninth Cir-
cuit and the country joined Grants Pass in urging the Court
to grant review to assess the *Martin* experiment.  See Part
I–B, *supra.*  We agreed to do so.  601 U. S. ___ (2024).[3]

_____

[3] Supporters of Grants Pass's petition for certiorari included:  The cities
of Albuquerque, Anchorage, Chico, Chino, Colorado Springs, Fillmore,
Garden Grove, Glendora, Henderson, Honolulu, Huntington Beach, Las
Vegas, Los Angeles, Milwaukee, Murrieta, Newport Beach, Orange,
Phoenix, Placentia, Portland, Providence, Redondo Beach, Roseville,
Saint Paul, San Clemente, San Diego, San Francisco, San Juan Ca-
pistrano, Seattle, Spokane, Tacoma, and Westminster; the National
League of Cities, representing more than 19,000 American cities and
towns; the League of California Cities, representing 477 California cities;
the League of Oregon Cities, representing Oregon's 241 cities; the Asso-
ciation of Idaho Cities, representing Idaho's 199 cities; the League of Ar-
izona Cities and Towns, representing all 91 incorporated Arizona munic-
ipalities; the North Dakota League of Cities, comprising 355 cities; the
Counties of Honolulu, San Bernardino, San Francisco, and Orange; the
National Association of Counties, which represents the Nation's 3,069
counties; the California State Association of Counties, representing Cal-
ifornia's 58 counties; the Special Districts Association of Oregon, repre-
senting all of Oregon's special districts; the Washington State Associa-
tion of Municipal Attorneys, a nonprofit corporation comprising
attorneys representing Washington's 281 cities and towns; the Interna-
tional Municipal Lawyers Association, the largest association of attor-
neys representing municipalities, counties, and special districts across
the country; the District Attorneys of Sacramento and San Diego Coun-
ties, the California State Sheriffs' Association, the California Police
Chiefs Association, and the Washington State Association of Sheriffs and
Police Chiefs; California Governor Gavin Newsom and San Francisco
Mayor London Breed; and a group of 20 States:  Alabama, Alaska, Ar-
kansas, Florida, Idaho, Indiana, Kansas, Louisiana, Mississippi, Mis-
souri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina,
South Dakota, Texas, Utah, Virginia, and West Virginia.

Opinion of the Court

## II
## A

The Constitution and its Amendments impose a number of limits on what governments in this country may declare to be criminal behavior and how they may go about enforcing their criminal laws. Familiarly, the First Amendment prohibits governments from using their criminal laws to abridge the rights to speak, worship, assemble, petition, and exercise the freedom of the press. The Equal Protection Clause of the Fourteenth Amendment prevents governments from adopting laws that invidiously discriminate between persons. The Due Process Clauses of the Fifth and Fourteenth Amendments ensure that officials may not displace certain rules associated with criminal liability that are "so old and venerable," "'so rooted in the traditions and conscience of our people[,] as to be ranked as fundamental.'" *Kahler* v. *Kansas*, 589 U. S. 271, 279 (2020) (quoting *Leland* v. *Oregon*, 343 U. S. 790, 798 (1952)). The Fifth and Sixth Amendments require prosecutors and courts to observe various procedures before denying any person of his liberty, promising for example that every person enjoys the right to confront his accusers and have serious criminal charges resolved by a jury of his peers. One could go on.

But if many other constitutional provisions address what a government may criminalize and how it may go about securing a conviction, the Eighth Amendment's prohibition against "cruel and unusual punishments" focuses on what happens next. That Clause "has always been considered, and properly so, to be directed at the method or kind of punishment" a government may "impos[e] for the violation of criminal statutes." *Powell* v. *Texas*, 392 U. S. 514, 531–532 (1968) (plurality opinion).

We have previously discussed the Clause's origins and meaning. In the 18th century, English law still "formally tolerated" certain barbaric punishments like "disemboweling, quartering, public dissection, and burning alive," even

though those practices had by then "fallen into disuse." *Bucklew* v. *Precythe*, 587 U. S. 119, 130 (2019) (citing 4 W. Blackstone, Commentaries on the Laws of England 370 (1769) (Blackstone)). The Cruel and Unusual Punishments Clause was adopted to ensure that the new Nation would never resort to any of those punishments or others like them. Punishments like those were "cruel" because they were calculated to "'superad[d]'" "'terror, pain, or disgrace.'" 587 U. S., at 130 (quoting 4 Blackstone 370). And they were "unusual" because, by the time of the Amendment's adoption, they had "long fallen out of use." 587 U. S., at 130. Perhaps some of those who framed our Constitution thought, as Justice Story did, that a guarantee against those kinds of "atrocious" punishments would prove "unnecessary" because no "free government" would ever employ anything like them. 3 J. Story, Commentaries on the Constitution of the United States §1896, p. 750 (1833). But in adopting the Eighth Amendment, the framers took no chances.

All that would seem to make the Eighth Amendment a poor foundation on which to rest the kind of decree the plaintiffs seek in this case and the Ninth Circuit has endorsed since *Martin*. The Cruel and Unusual Punishments Clause focuses on the question what "method or kind of punishment" a government may impose after a criminal conviction, not on the question whether a government may criminalize particular behavior in the first place or how it may go about securing a conviction for that offense. *Powell*, 392 U. S., at 531–532. To the extent the Constitution speaks to those other matters, it does so, as we have seen, in other provisions.

Nor, focusing on the criminal punishments Grant Pass imposes, can we say they qualify as cruel and unusual. Recall that, under the city's ordinances, an initial offense may trigger a civil fine. Repeat offenses may trigger an order temporarily barring an individual from camping in a public

Opinion of the Court

park.  Only those who later violate an order like that may
face a criminal punishment of up to 30 days in jail and a
larger fine.  See Part I–C, *supra*.  None of the city's sanc-
tions qualifies as cruel because none is designed to "su-
perad[d]" "terror, pain, or disgrace."  *Bucklew*, 587 U. S., at
130 (internal quotation marks omitted).  Nor are the city's
sanctions unusual, because similar punishments have been
and remain among "the usual mode[s]" for punishing of-
fenses throughout the country.  *Pervear* v. *Commonwealth*,
5 Wall. 475, 480 (1867); see 4 Blackstone 371–372; *Timbs* v.
*Indiana*, 586 U. S. 146, 165 (2019) (Thomas J., concurring
in judgment) (describing fines as "'the drudge-horse of
criminal justice, probably the most common form of punish-
ment'" (some internal quotation marks omitted)).  In fact,
large numbers of cities and States across the country have
long employed, and today employ, similar punishments for
similar offenses.  See Part I–A, *supra*; Brief for Professor
John F. Stinneford as *Amicus Curiae* 7–13 (collecting his-
torical and contemporary examples).  Notably, neither the
plaintiffs nor the dissent meaningfully contests any of this.
See Brief for Respondents 40.[4]

B

Instead, the plaintiffs and the dissent pursue an entirely
different theory.  They do not question that, by its terms,
the Cruel and Unusual Punishments Clause speaks to the
question what punishments may follow a criminal convic-
tion, not to antecedent questions like what a State may
criminalize or how it may go about securing a conviction.
Yet, echoing the Ninth Circuit in *Martin*, they insist one
notable exception exists.

───────────

[4]This Court has never held that the Cruel and Unusual Punishments
Clause extends beyond criminal punishments to civil fines and orders,
see *Ingraham* v. *Wright*, 430 U. S. 651, 666–668 (1977), nor does this case
present any occasion to do so for none of the city's sanctions defy the
Clause.

In *Robinson* v. *California*, 370 U. S. 660 (1962), the plaintiffs and the dissent observe, this Court addressed a challenge to a criminal conviction under a California statute providing that "'[n]o person shall . . . be addicted to the use of narcotics.'" *Ibid.*, n. 1. In response to that challenge, the Court invoked the Cruel and Unusual Punishments Clause to hold that California could not enforce its law making "the 'status' of narcotic addiction a criminal offense." *Id.*, at 666. The Court recognized that "imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual." *Id.*, at 667. But, the Court reasoned, when punishing "'status,'" "[e]ven one day in prison would be . . . cruel and unusual." *Id.*, at 666–667.

In doing so, the Court stressed the limits of its decision. It would have ruled differently, the Court said, if California had sought to convict the defendant for, say, the knowing or intentional "use of narcotics, for their purchase, sale, or possession, or for antisocial or disorderly behavior resulting from their administration." *Id.*, at 666. In fact, the Court took pains to emphasize that it did not mean to cast doubt on the States' "broad power" to prohibit behavior like that, even by those, like the defendant, who suffered from addiction. *Id.*, at 664, 667–668. The only problem, as the Court saw it, was that California's law did not operate that way. Instead, it made the mere status of being an addict a crime. *Id.*, at 666–667. And it was that feature of the law, the Court held, that went too far.

Reaching that conclusion under the banner of the Eighth Amendment may have come as a surprise to the litigants. Mr. Robinson challenged his conviction principally on the ground that it offended the Fourteenth Amendment's guarantee of due process of law. As he saw it, California's law violated due process because it purported to make unlawful a "status" rather than the commission of any "volitional act." See Brief for Appellant in *Robinson* v. *California*, O. T. 1961, No. 61–554, p. 13 (Robinson Brief).

Opinion of the Court

That framing may have made some sense. Our due process jurisprudence has long taken guidance from the "settled usage[s] . . . in England and in this country." *Hurtado* v. *California*, 110 U. S. 516, 528 (1884); see also *Kahler*, 589 U. S., at 279. And, historically, crimes in England and this country have usually required proof of some act (or *actus reus*) undertaken with some measure of volition (*mens rea*). At common law, "a complete crime" generally required "both a will and an act." 4 Blackstone 21. This view "took deep and early root in American soil" where, to this day, a crime ordinarily arises "only from concurrence of an evil-meaning mind with an evil-doing hand." *Morissette* v. *United States*, 342 U. S. 246, 251–252 (1952). Measured against these standards, California's law was an anomaly, as it required proof of neither of those things.

Mr. Robinson's resort to the Eighth Amendment was comparatively brief. He referenced it only in passing, and only for the proposition that forcing a drug addict like himself to go "'cold turkey'" in a jail cell after conviction entailed such "intense mental and physical torment" that it was akin to "the burning of witches at the stake." Robinson Brief 30. The State responded to that argument with barely a paragraph of analysis, Brief for Appellee in *Robinson* v. *California*, O. T. 1961, No. 61–554, pp. 22–23, and it received virtually no attention at oral argument. By almost every indication, then, *Robinson* was set to be a case about the scope of the Due Process Clause, or perhaps an Eighth Amendment case about whether forcing an addict to withdraw from drugs after conviction qualified as cruel and unusual punishment.

Of course, the case turned out differently. Bypassing Mr. Robinson's primary Due Process Clause argument, the Court charted its own course, reading the Cruel and Unusual Punishments Clause to impose a limit not just on what punishments may follow a criminal conviction but what a

Opinion of the Court

State may criminalize to begin with.  It was a view unprecedented in the history of the Court before 1962.  In dissent, Justice White lamented that the majority had embraced an "application of 'cruel and unusual punishment' so novel that" it could not possibly be "ascribe[d] to the Framers of the Constitution."  370 U. S., at 689.  Nor, in the 62 years since *Robinson*, has this Court once invoked it as authority to decline the enforcement of any criminal law, leaving the Eighth Amendment instead to perform its traditional function of addressing the punishments that follow a criminal conviction.

Still, no one has asked us to reconsider *Robinson*.  Nor do we see any need to do so today.  Whatever its persuasive force as an interpretation of the Eighth Amendment, it cannot sustain the Ninth Circuit's course since *Martin*.  In *Robinson*, the Court expressly recognized the "broad power" States enjoy over the substance of their criminal laws, stressing that they may criminalize knowing or intentional drug use even by those suffering from addiction.  370 U. S., at 664, 666.  The Court held only that a State may not criminalize the "'status'" of being an addict.  *Id*., at 666.  In criminalizing a mere status, *Robinson* stressed, California had taken a historically anomalous approach toward criminal liability.  One, in fact, this Court has not encountered since *Robinson* itself.

Public camping ordinances like those before us are nothing like the law at issue in *Robinson*.  Rather than criminalize mere status, Grants Pass forbids actions like "occupy[ing] a campsite" on public property "for the purpose of maintaining a temporary place to live."  Grants Pass Municipal Code §§5.61.030, 5.61.010; App. to Pet. for Cert. 221a–222a.  Under the city's laws, it makes no difference whether the charged defendant is homeless, a backpacker on vacation passing through town, or a student who abandons his dorm room to camp out in protest on the lawn of a municipal building.  See Part I–C, *supra*; *Blake* v. *Grants*

Opinion of the Court

*Pass*, No. 1:18–cv–01823 (D Ore.), ECF Doc. 63–4, pp. 2, 16; Tr. of Oral Arg. 159. In that respect, the city's laws parallel those found in countless jurisdictions across the country. See Part I–A, *supra*. And because laws like these do not criminalize mere status, *Robinson* is not implicated.[5]

### C

If *Robinson* does not control this case, the plaintiffs and the dissent argue, we should extend it so that it does. Perhaps a person does not violate ordinances like Grants Pass's simply by being homeless but only by engaging in certain acts (*actus rei*) with certain mental states (*mentes reae*). Still, the plaintiffs and the dissent insist, laws like these seek to regulate actions that are in some sense "involuntary," for some homeless persons cannot help but do what the law forbids. See Brief for Respondents 24–25, 29, 32; *post*, at 16–17 (opinion of SOTOMAYOR, J.). And, the plaintiffs and the dissent continue, we should extend *Robinson* to prohibit the enforcement of laws that operate this way— laws that don't proscribe status as such but that proscribe acts, even acts undertaken with some required mental state, the defendant cannot help but undertake. *Post*, at 16–17. To rule otherwise, the argument goes, would "'effectively'" allow cities to punish a person because of his status. *Post*, at 25. The Ninth Circuit pursued just this line of thinking below and in *Martin*.

The problem is, this Court has already rejected that view.

––––––––––
[5]At times, the dissent seems to suggest, mistakenly, that laws like Grants Pass's apply only to the homeless. See *post*, at 13. That view finds no support in the laws before us. Perhaps the dissent means to suggest that some cities selectively "enforce" their public-camping laws only against homeless persons. See *post*, at 17–19. But if that's the dissent's theory, it is not one that arises under the Eighth Amendment's Cruel and Unusual Punishments Clause. Instead, if anything, it may implicate due process and our precedents regarding selective prosecution. See, *e.g., United States* v. *Armstrong,* 517 U. S. 456 (1996). No claim like that is before us in this case.

In *Powell* v. *Texas*, 392 U. S. 514 (1968), the Court confronted a defendant who had been convicted under a Texas statute making it a crime to "'get drunk or be found in a state of intoxication in any public place.'" *Id.*, at 517 (plurality opinion). Like the plaintiffs here, Mr. Powell argued that his drunkenness was an "'involuntary'" byproduct of his status as an alcoholic. *Id.*, at 533. Yes, the statute required proof of an act (becoming drunk or intoxicated and then proceeding into public), and perhaps some associated mental state (for presumably the defendant knew he was drinking and maybe even knew he made his way to a public place). Still, Mr. Powell contended, Texas's law effectively criminalized his status as an alcoholic because he could not help but doing as he did. *Ibid.* Justice Fortas embraced that view, but only in dissent: He would have extended *Robinson* to cover conduct that flows from any "condition [the defendant] is powerless to change." 392 U. S., at 567 (Fortas, J., dissenting).

The Court did not agree. Writing for a plurality, Justice Marshall observed that *Robinson* had authorized "a very small" intrusion by courts "into the substantive criminal law" "under the aegis of the Cruel and Unusual Punishment[s] Clause." 392 U. S., at 533. That small intrusion, Justice Marshall said, prevents States only from enforcing laws that criminalize "a mere status." *Id.*, at 532. It does nothing to curtail a State's authority to secure a conviction when "the accused has committed some act . . . society has an interest in preventing." *Id.*, at 533. That remains true, Justice Marshall continued, regardless whether the defendant's act "in some sense" might be described as "'*involuntary*' or '*occasioned by*'" a particular status. *Ibid.* (emphasis added). In this, Justice Marshall echoed *Robinson* itself, where the Court emphasized that California remained free to criminalize intentional or knowing drug use even by addicts whose conduct, too, in some sense could be considered involuntary. See *Robinson*, 370 U. S., at 664, 666. Based

Opinion of the Court

on all this, Justice Marshall concluded, because the defendant before the Court had not been convicted "for being" an "alcoholic, but for [engaging in the act of] being in public while drunk on a particular occasion," *Robinson* did not apply. *Powell*, 392 U. S., at 532.[6]

This case is no different from *Powell*. Just as there, the plaintiffs here seek to expand *Robinson*'s "small" intrusion "into the substantive criminal law." Just as there, the plaintiffs here seek to extend its rule beyond laws addressing "mere status" to laws addressing actions that, even if undertaken with the requisite *mens rea*, might "in some sense" qualify as "'involuntary.'" And just as *Powell* could find nothing in the Eighth Amendment permitting that course, neither can we. As we have seen, *Robinson* already sits uneasily with the Amendment's terms, original meaning, and our precedents. Its holding is restricted to laws that criminalize "mere status." Nothing in the decision called into question the "broad power" of States to regulate acts undertaken with some *mens rea*. And, just as in *Powell*, we discern nothing in the Eighth Amendment that might provide us with lawful authority to extend *Robinson* beyond its narrow holding.

---

[6] Justice White, who cast the fifth vote upholding the conviction, concurred in the result. Writing only for himself, Justice White expressed some sympathy for Justice Fortas's theory, but ultimately deemed that "novel construction" of the Eighth Amendment "unnecessary to pursue" because the defendant hadn't proven that his alcoholism made him "unable to stay off the streets on the night in question." 392 U. S., at 552, n. 4, 553–554 (White, J., concurring in result). In *Martin*, the Ninth Circuit suggested Justice White's solo concurrence somehow rendered the *Powell* dissent controlling and the plurality a dissent. See *Martin* v. *Boise*, 920 F. 3d 584, 616–617 (2019). Before us, neither the plaintiffs nor the dissent defend that theory, and for good reason: In the years since *Powell*, this Court has repeatedly relied on Justice Marshall's opinion, as we do today. See, *e.g.*, *Kahler* v. *Kansas*, 589 U. S. 271, 280 (2020); *Clark* v. *Arizona*, 548 U. S. 735, 768, n. 38 (2006); *Jones* v. *United States*, 463 U. S. 354, 365, n. 13 (1983).

Opinion of the Court

To be sure, and once more, a variety of other legal doctrines and constitutional provisions work to protect those in our criminal justice system from a conviction. Like some other jurisdictions, Oregon recognizes a "necessity" defense to certain criminal charges. It may be that defense extends to charges for illegal camping when it comes to those with nowhere else to go. See *State* v. *Barrett*, 302 Ore. App. 23, 28, 460 P. 3d 93, 96 (2020) (citing Ore. Rev. Stat. §161.200). Insanity, diminished-capacity, and duress defenses also may be available in many jurisdictions. See *Powell*, 392 U. S., at 536. States and cities are free as well to add additional substantive protections. Since this litigation began, for example, Oregon itself has adopted a law specifically addressing how far its municipalities may go in regulating public camping. See, *e.g.*, Ore. Rev. Stat. §195.530(2) (2023). For that matter, nothing in today's decision prevents States, cities, and counties from going a step further and declining to criminalize public camping altogether. For its part, the Constitution provides many additional limits on state prosecutorial power, promising fair notice of the laws and equal treatment under them, forbidding selective prosecutions, and much more besides. See Part II–A, *supra*; and n. 5, *supra*. All this represents only a small sample of the legion protections our society affords a presumptively free individual from a criminal conviction. But aside from *Robinson*, a case directed to a highly unusual law that condemned status alone, this Court has never invoked the Eighth Amendment's Cruel and Unusual Punishments Clause to perform that function.

D

Not only did *Powell* decline to extend *Robinson* to "involuntary" acts, it stressed the dangers that would likely attend any attempt to do so. Were the Court to pursue that path in the name of the Eighth Amendment, Justice Marshall warned, "it is difficult to see any limiting principle

Opinion of the Court

that would serve to prevent this Court from becoming . . . the ultimate arbiter of the standards of criminal responsibility, in diverse areas of the criminal law, throughout the country." *Powell*, 392 U. S., at 533. After all, nothing in the Amendment's text or history exists to "confine" or guide our review. *Id.*, at 534. Unaided by those sources, we would be left "to write into the Constitution" our own "formulas," many of which would likely prove unworkable in practice. *Id.*, at 537. Along the way, we would interfere with "essential considerations of federalism" that reserve to the States primary responsibility for drafting their own criminal laws. *Id.*, at 535.

In particular, Justice Marshall observed, extending *Robinson* to cover involuntary acts would effectively "impe[l]" this Court "into defining" something akin to a new "insanity test in constitutional terms." 392 U. S., at 536. It would because an individual like the defendant in *Powell* does not dispute that he has committed an otherwise criminal act with the requisite *mens rea*, yet he seeks to be excused from "moral accountability" because of his "'condition.'" *Id.*, at 535–536. And "[n]othing," Justice Marshall said, "could be less fruitful than for this Court" to try to resolve for the Nation profound questions like that under a provision of the Constitution that does not speak to them. *Id.*, at 536. Instead, Justice Marshall reasoned, such matters are generally left to be resolved through "productive" democratic "dialogue" and "experimentation," not by "freez[ing]" any particular, judicially preferred approach "into a rigid constitutional mold." *Id.*, at 537.

We recently reemphasized that last point in *Kahler* v. *Kansas* in the context of a Due Process Clause challenge. Drawing on Justice Marshall's opinion in *Powell*, we acknowledged that "a state rule about criminal liability" may violate due process if it departs from a rule "so rooted in the traditions" of this Nation that it might be said to

"ran[k] as fundamental." 589 U. S., at 279 (internal quotation marks omitted). But, we stressed, questions about whether an individual who has committed a proscribed act with the requisite mental state should be "reliev[ed of] responsibility," *id.*, at 283, due to a lack of "moral culpability," *id.*, at 286, are generally best resolved by the people and their elected representatives. Those are questions, we said, "of recurrent controversy" to which history supplies few "entrenched" answers, and on which the Constitution generally commands "no one view." *Id.*, at 296.

The Ninth Circuit's *Martin* experiment defied these lessons. Under *Martin*, judges take from elected representatives the questions whether and when someone who has committed a proscribed act with a requisite mental state should be "relieved of responsibility" for lack of "moral culpability." 598 U. S., at 283, 286. And *Martin* exemplifies much of what can go wrong when courts try to resolve matters like those unmoored from any secure guidance in the Constitution.

Start with this problem. Under *Martin*, cities must allow public camping by those who are "involuntarily" homeless. 72 F. 4th, at 877 (citing *Martin*, 920 F. 3d, at 617, n. 8). But how are city officials and law enforcement officers to know what it means to be "involuntarily" homeless, or whether any particular person meets that standard? Posing the questions may be easy; answering them is not. Is it enough that a homeless person has turned down an offer of shelter? Or does it matter why? Cities routinely confront individuals who decline offers of shelter for any number of reasons, ranging from safety concerns to individual preferences. See Part I–A, *supra*. How are cities and their law enforcement officers on the ground to know which of these reasons are sufficiently weighty to qualify a person as "involuntarily" homeless?

If there are answers to those questions, they cannot be found in the Cruel and Unusual Punishments Clause. Nor

Opinion of the Court

do federal judges enjoy any special competence to provide them. Cities across the West report that the Ninth Circuit's ill-defined involuntariness test has proven "unworkable." Oregon Cities Brief 3; see Phoenix Brief 11. The test, they say, has left them "with little or no direction as to the scope of their authority in th[eir] day-to-day policing contacts," California Sheriffs Brief 6, and under "threat of federal litigation . . . at all times and in all circumstances," Oregon Cities Brief 6–7.

To be sure, *Martin* attempted to head off these complexities through some back-of-the-envelope arithmetic. The Ninth Circuit said a city needs to consider individuals "involuntarily" homeless (and thus entitled to camp on public property) only when the overall homeless population exceeds the total number of "adequate" and "practically available" shelter beds. See 920 F. 3d, at 617–618, and n. 8. But as sometimes happens with abstract rules created by those far from the front lines, that test has proven all but impossible to administer in practice.

City officials report that it can be "monumentally difficult" to keep an accurate accounting of those experiencing homelessness on any given day. Los Angeles Cert. Brief 14. Often, a city's homeless population "fluctuate[s] dramatically," in part because homelessness is an inherently dynamic status. Brief for City of San Clemente as *Amicus Curiae* 16 (San Clemente Brief). While cities sometimes make rough estimates based on a single point-in-time count, they say it would be "impossibly expensive and difficult" to undertake that effort with any regularity. *Id.*, at 17. In Los Angeles, for example, it takes three days to count the homeless population block-by-block—even with the participation of thousands of volunteers. *Martin*, 920 F. 3d, at 595 (Smith, J., dissenting from denial of rehearing en banc).

Beyond these complexities, more await. Suppose even large cities could keep a running tally of their homeless citizens forevermore. And suppose further that they could

keep a live inventory of available shelter beds. Even so, cities face questions over which shelter beds count as "adequate" and "available" under *Martin*. *Id.*, at 617, and n. 8. Rather than resolve the challenges associated with defining who qualifies as "involuntarily" homeless, these standards more nearly return us to them. Is a bed "available" to a smoker if the shelter requires residents to abstain from nicotine, as the shelter in Grants Pass does? 72 F. 4th, at 896; App. 39, Third Amended Complaint ¶13. Is a bed "available" to an atheist if the shelter includes "religious" messaging? 72 F. 4th, at 877. And how is a city to know whether the accommodations it provides will prove "adequate" in later litigation? 920 F. 3d, at 617, n. 8. Once more, a large number of cities in the Ninth Circuit tell us they have no way to be sure. See, *e.g.*, Phoenix Brief 28; San Clemente Brief 8–12; Brief for City of Los Angeles as *Amicus Curiae* 22–23 ("What may be available, appropriate, or actually beneficial to one [homeless] person, might not be so to another").

Consider an example. The city of Chico, California, thought it was complying with *Martin* when it constructed an outdoor shelter facility at its municipal airport to accommodate its homeless population. *Warren* v. *Chico*, 2021 WL 2894648, *3 (ED Cal., July 8, 2021). That shelter, we are told, included "protective fencing, large water totes, hand-washing stations, portable toilets, [and] a large canopy for shade." Brief for City of Chico as *Amicus Curiae* on Pet. for Cert. 16. Still, a district court enjoined the city from enforcing its public-camping ordinance. Why? Because, in that court's view, "appropriate" shelter requires "'indoo[r],'" not outdoor, spaces. *Warren*, 2021 WL 2894648, *3 (quoting *Martin*, 920 F. 3d, at 617). One federal court in Los Angeles ruled, during the COVID pandemic, that "adequate" shelter must also include nursing staff, testing for communicable diseases, and on-site security, among other things. See *LA Alliance for Hum. Rights* v. *Los Angeles*, 2020 WL 2512811,

Opinion of the Court

*4 (CD Cal., May 15, 2020).  By imbuing the availability of shelter with constitutional significance in this way,  many cities tell us, *Martin* and its progeny have "paralyzed" communities and prevented them from implementing even policies designed to help the homeless while remaining sensitive to the limits of their resources and the needs of other citizens.  Cities Cert. Brief 4 (boldface and capitalization deleted).

There are more problems still.  The Ninth Circuit held that "involuntarily" homeless individuals cannot be punished for camping with materials "necessary to protect themselves from the elements."  72 F. 4th, at 896.  It suggested, too, that cities cannot proscribe "life-sustaining act[s]" that flow necessarily from homelessness.  72 F. 4th, at 921 (joint statement of Silver and Gould, JJ., regarding denial of rehearing).  But how far does that go?  The plaintiffs before us suggest a blanket is all that is required in Grants Pass.  Brief for Respondents 14.  But might a colder climate trigger a right to permanent tent encampments and fires for warmth?  Because the contours of this judicial right are so "uncertai[n]," cities across the West have been left to guess whether *Martin* forbids their officers from removing everything from tents to "portable heaters" on city sidewalks.  Brief for City of Phoenix et al. on Pet. for Cert. 19, 29 (Phoenix Cert. Brief ).  There is uncertainty, as well, over whether *Martin* requires cities to tolerate other acts no less "attendant [to] survival" than sleeping, such as starting fires to cook food and "public urination [and] defecation."  Phoenix Cert. Brief 29–30; see also *Mahoney* v. *Sacramento*, 2020 WL 616302, *3 (ED Cal., Feb. 10, 2020) (indicating that "the [c]ity may not prosecute or otherwise penalize the [homeless] for eliminating in public if there is no alternative to doing so").  By extending *Robinson* beyond the narrow class of status crimes, the Ninth Circuit has created a right that has proven "impossible" for judges to delineate except "by fiat."  *Powell*, 392 U. S., at 534.

Opinion of the Court

Doubtless, the Ninth Circuit's intervention in *Martin* was well-intended. But since the trial court entered its injunction against Grants Pass, the city shelter reports that utilization of its resources has fallen by roughly 40 percent. See Brief for Grants Pass Gospel Rescue Mission as *Amicus Curiae* 4–5. Many other cities offer similar accounts about their experiences after *Martin*, telling us the decision has made it more difficult, not less, to help the homeless accept shelter off city streets. See Part I–B, *supra* (recounting examples). Even when "policymakers would prefer to invest in more permanent" programs and policies designed to benefit homeless and other citizens, *Martin* has forced these "overwhelmed jurisdictions to concentrate public resources on temporary shelter beds." Cities Brief 25; see Oregon Cities Brief 17–20; States Brief 16–17. As a result, cities report, *Martin* has undermined their efforts to balance conflicting public needs and mired them in litigation at a time when the homelessness crisis calls for action. See States Brief 16–17.

All told, the *Martin* experiment is perhaps just what Justice Marshall anticipated ones like it would be. The Eighth Amendment provides no guidance to "confine" judges in deciding what conduct a State or city may or may not proscribe. *Powell*, 392 U. S., at 534. Instead of encouraging "productive dialogue" and "experimentation" through our democratic institutions, courts have frozen in place their own "formulas" by "fiat." *Id.*, at 534, 537. Issued by federal courts removed from realities on the ground, those rules have produced confusion. And they have interfered with "essential considerations of federalism," taking from the people and their elected leaders difficult questions traditionally "thought to be the[ir] province." *Id.*, at 535–536.[7]

––––––––––

[7]The dissent suggests we cite selectively to the *amici* and "see only what [we] wan[t]" in their briefs. *Post*, at 24. In fact, all the States, cities, and counties listed above (n. 3, *supra*) asked us to review this case. Among them all, the dissent purports to identify just two public officials

Opinion of the Court

### E

Rather than address what we have actually said, the dissent accuses us of extending to local governments an "unfettered freedom to punish," *post*, at 25, and stripping away any protections "the Constitution" has against "criminalizing sleeping," *post*, at 5. "Either stay awake," the dissent warns, "or be arrested." *Post*, at 2. That is gravely mistaken. We hold nothing of the sort. As we have stressed, cities and States are not bound to adopt public-camping laws. They may also choose to narrow such laws (as Oregon itself has recently). Beyond all that, many substantive legal protections and provisions of the Constitution may have important roles to play when States and cities seek to enforce their laws against the homeless. See Parts II–A, II–C, *supra*. The only question we face is whether one specific provision of the Constitution—the Cruel and Unusual Punishments Clause of the Eighth Amendment—prohibits the enforcement of public-camping laws.

Nor does the dissent meaningfully engage with the reasons we have offered for our conclusion on that question. It claims that we "gratuitously" treat *Robinson* "as an outlier." *Post*, at 12, and n. 2. But the dissent does not dispute that

_____

and two cities that, according to the dissent, support its view. *Post*, at 24–25. But even among that select group, the dissent overlooks the fact that each expresses strong dissatisfaction with how *Martin* has been applied in practice. See San Francisco Brief 15, 26 ("[T]he Ninth Circuit and its lower courts have repeatedly misapplied and overextended the Eighth Amendment" and "hamstrung San Francisco's balanced approach to addressing the homelessness crisis"); Brief for City of Los Angeles as *Amicus Curiae* 6 ("[T]he sweeping rationale in *Martin* . . . calls into question whether cities can enforce public health and safety laws"); California Governor Brief 3 ("In the wake of *Martin*, lower courts have blocked efforts to clear encampments while micromanaging what qualifies as a suitable offer of shelter"). And for all the reasons we have explored and so many other cities have suggested, we see no principled basis under the Eighth Amendment for federal judges to administer anything like *Martin*.

the law *Robinson* faced was an anomaly, punishing mere status. The dissent does not dispute that *Robinson*'s decision to address that law under the rubric of the Eighth Amendment is itself hard to square with the Amendment's text and this Court's other precedents interpreting it. And the dissent all but ignores *Robinson*'s own insistence that a different result would have obtained in that case if the law there had proscribed an act rather than status alone.

Tellingly, too, the dissent barely mentions Justice Marshall's opinion in *Powell*. There, reasoning exactly as we do today, Justice Marshall refused to extend *Robinson* to actions undertaken, "in some sense, 'involuntar[ily].'" 392 U. S., at 533. Rather than confront any of this, the dissent brusquely calls *Powell* a "strawman" and seeks to distinguish it on the inscrutable ground that Grants Pass penalizes "status[-defining]" (rather than "involuntary") conduct. *Post*, at 23. But whatever that might mean, it is no answer to the reasoning Justice Marshall offered, to its obvious relevance here, or to the fact this Court has since endorsed Justice Marshall's reasoning as correct in cases like *Kahler* and *Jones*, cases that go undiscussed in the dissent. See n. 6, *supra*. The only extraordinary result we might reach in this case is one that would defy *Powell*, ignore the historical reach of the Eighth Amendment, and transform *Robinson*'s narrow holding addressing a peculiar law punishing status alone into a new rule that would bar the enforcement of laws that are, as the dissent puts it, "'pervasive'" throughout the country. *Post*, at 15; Part I–A, *supra*.

To be sure, the dissent seeks to portray the new rule it advocates as a modest, "limited," and "narrow" one addressing only those who wish to fulfill a "biological necessity" and "keep warm outside with a blanket" when they have no other "adequate" place "to go." *Post*, at 1, 5, 10, 21, 24. But that reply blinks the difficult questions that necessarily follow and the Ninth Circuit has been forced to confront: What does it mean to be "involuntarily" homeless with "no

Opinion of the Court

place to go"?  What kind of "adequate" shelter must a city provide to avoid being forced to allow people to camp in its parks and on its sidewalks?  And what are people entitled to do and use in public spaces to "keep warm" and fulfill other "biological necessities"?[8]

Those unavoidable questions have plunged courts and cities across the Ninth Circuit into waves of litigation.  And without anything in the Eighth Amendment to guide them, any answers federal judges can offer (and have offered) come, as Justice Marshall foresaw, only by way of "fiat." *Powell*, 392 U. S., at 534.  The dissent cannot escape that hard truth.  Nor can it escape the fact that, far from narrowing *Martin*, it would expand its experiment from one circuit to the entire country—a development without any precedent in this Court's history.  One that would authorize

——————

[8]The dissent brushes aside these questions, declaring that "available answers" exist in the decisions below. *Post*, at 22.  But the dissent misses the point.  The problem, as Justice Marshall discussed, is not that it is impossible for someone to dictate answers to these questions.  The problem is that nothing in the Eighth Amendment gives federal judges the authority or guidance they need to answer them in a principled way.  Take just two examples.  First, the dissent says, a city seeking to ban camping must provide "adequate" shelter for those with "no place to go." *Post*, at 21–22.  But it never says what qualifies as "adequate" shelter. *Ibid.*  And, as we have seen, cities and courts across the Ninth Circuit have struggled mightily with that question, all with nothing in the Eighth Amendment to guide their work.  Second, the dissent seems to think that, if a city lacks enough "adequate" shelter, it must permit "'bedding'" in public spaces, but not campfires, tents, or "'public urination or defecation.'" *Post*, at 15, 21–22, 24.  But where does that rule come from, the federal register?  See *post*, at 22.  After *Martin*, again as we have seen, many courts have taken a very different view.  The dissent never explains why it disagrees with those courts.  Instead, it merely quotes the district court's opinion in this case that announced a rule it seems the dissent happens to prefer.  By elevating *Martin* over our own precedents and the Constitution's original public meaning, the dissent faces difficult choices that cannot be swept under the rug—ones that it can resolve not by anything found in the Eighth Amendment, only by fiat.

Opinion of the Court

federal judges to freeze into place their own rules on matters long "thought to be the province" of state and local leaders, *id.*, at 536, and one that would deny communities the "wide latitude" and "flexibility" even the dissent acknowledges they need to address the homelessness crisis, *post*, at 2, 5.

### III

Homelessness is complex. Its causes are many. So may be the public policy responses required to address it. At bottom, the question this case presents is whether the Eighth Amendment grants federal judges primary responsibility for assessing those causes and devising those responses. It does not. Almost 200 years ago, a visitor to this country remarked upon the "extreme skill with which the inhabitants of the United States succeed in proposing a common object to the exertions of a great many men, and in getting them voluntarily to pursue it." 2 A. de Tocqueville, Democracy in America 129 (H. Reeve transl. 1961). If the multitude of *amicus* briefs before us proves one thing, it is that the American people are still at it. Through their voluntary associations and charities, their elected representatives and appointed officials, their police officers and mental health professionals, they display that same energy and skill today in their efforts to address the complexities of the homelessness challenge facing the most vulnerable among us.

Yes, people will disagree over which policy responses are best; they may experiment with one set of approaches only to find later another set works better; they may find certain responses more appropriate for some communities than others. But in our democracy, that is their right. Nor can a handful of federal judges begin to "match" the collective wisdom the American people possess in deciding "how best to handle" a pressing social question like homelessness. *Robinson*, 370 U. S., at 689 (White, J., dissenting). The

Opinion of the Court

Constitution's Eighth Amendment serves many important functions, but it does not authorize federal judges to wrest those rights and responsibilities from the American people and in their place dictate this Nation's homelessness policy. The judgment below is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 603 U. S. ____ (2024)          1

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–175

_____

CITY OF GRANTS PASS, OREGON, PETITIONER *v.*
GLORIA JOHNSON, ET AL., ON BEHALF
OF THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 28, 2024]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full because it correctly rejects the respondents' claims under the Cruel and Unusual Punishments Clause. As the Court observes, that Clause "focuses on the question what method or kind of punishment a government may impose after a criminal conviction." *Ante,* at 16 (internal quotation marks omitted). The respondents, by contrast, ask whether Grants Pass "may criminalize particular behavior in the first place." *Ibid.* I write separately to make two additional observations about the respondents' claims.

First, the precedent that the respondents primarily rely upon, *Robinson* v. *California*, 370 U. S. 660 (1962), was wrongly decided. In *Robinson*, the Court held that the Cruel and Unusual Punishments Clause prohibits the enforcement of laws criminalizing a person's status. *Id.*, at 666. That holding conflicts with the plain text and history of the Cruel and Unusual Punishments Clause. See *ante,* at 15–16. That fact is unsurprising given that the *Robinson* Court made no attempt to analyze the Eighth Amendment's text or discern its original meaning. Instead, *Robinson*'s holding rested almost entirely on the Court's understanding of public opinion: The *Robinson* Court observed that "in

Case 1:23-cv-01826-CJN Document 68-19 Filed 06/28/24 Page 42 of 74

the light of contemporary human knowledge, a law which made a criminal offense of . . . a disease [such as narcotics addiction] would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 370 U. S., at 666. Modern public opinion is not an appropriate metric for interpreting the Cruel and Unusual Punishments Clause— or any provision of the Constitution for that matter.

Much of the Court's other Eighth Amendment precedents make the same mistake. Rather than interpret our written Constitution, the Court has at times "proclaim[ed] itself sole arbiter of our Nation's moral standards," *Roper* v. *Simmons*, 543 U. S. 551, 608 (2005) (Scalia, J., dissenting), and has set out to enforce "evolving standards of decency," *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion). "In a system based upon constitutional and statutory text democratically adopted, the concept of 'law' ordinarily signifies that particular words have a fixed meaning." *Roper*, 543 U. S., at 629 (opinion of Scalia, J.). I continue to believe that we should adhere to the Cruel and Unusual Punishments Clause's fixed meaning in resolving any challenge brought under it.

To be sure, we need not reconsider *Robinson* to resolve this case. As the Court explains, the challenged ordinances regulate conduct, not status, and thus do not implicate *Robinson. Ante,* at 20–21. Moreover, it is unclear what, if any, weight *Robinson* carries. The Court has not once applied *Robinson*'s interpretation of the Cruel and Unusual Punishments Clause. And, today the Court rightly questions the decision's "persuasive force." *Ante,* at 20. Still, rather than let *Robinson*'s erroneous holding linger in the background of our Eighth Amendment jurisprudence, we should dispose of it once and for all. In an appropriate case, the Court should certainly correct this error.

Second, the respondents have not established that their claims implicate the Cruel and Unusual Punishments

THOMAS, J., concurring

Clause in the first place. The challenged ordinances are enforced through the imposition of civil fines and civil park exclusion orders, as well as through criminal trespass charges. But, "[a]t the time the Eighth Amendment was ratified, the word 'punishment' referred to the penalty imposed for the commission of a crime." *Helling* v. *McKinney*, 509 U. S. 25, 38 (1993) (THOMAS, J., dissenting); see *ante,* at 15–16. The respondents have yet to explain how the civil fines and park exclusion orders constitute a "penalty imposed for the commission of a crime." *Helling*, 509 U. S., at 38.

For its part, the Court of Appeals concluded that the Cruel and Unusual Punishments Clause governs these civil penalties because they can "later . . . become criminal offenses." 72 F. 4th 868, 890 (CA9 2023). But, that theory rests on layer upon layer of speculation. It requires reasoning that because violating one of the ordinances "*could* result in civil citations and fines, [and] repeat violators *could* be excluded from specified City property, and . . . violating an exclusion order *could* subject a violator to criminal trespass prosecution," civil fines and park exclusion orders therefore must be governed by the Cruel and Unusual Punishments Clause. *Id*., at 926 (O'Scannlain, J., statement respecting denial of rehearing en banc) (emphasis added). And, if this case is any indication, the possibility that a civil fine turns into a criminal trespass charge is a remote one. The respondents assert that they have been involuntarily homeless in Grants Pass for years, yet they have never received a park exclusion order, much less a criminal trespass charge. See *ante,* at 11.

Because the respondents' claims fail either way, the Court does not address the merits of the Court of Appeals' theory. See *ante,* at 16–17, and n. 4. Suffice it to say, we have never endorsed such a broad view of the Cruel and Unusual Punishments Clause. Both this Court and lower courts should be wary of expanding the Clause beyond its

4                CITY OF GRANTS PASS *v.* JOHNSON

THOMAS, J., concurring

text and original meaning.

Cite as: 603 U. S. \_\_\_\_ (2024)           1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

——————

No. 23–175

——————

## CITY OF GRANTS PASS, OREGON, PETITIONER *v.* GLORIA JOHNSON, ET AL., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 28, 2024]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

Sleep is a biological necessity, not a crime. For some people, sleeping outside is their only option. The City of Grants Pass jails and fines those people for sleeping anywhere in public at any time, including in their cars, if they use as little as a blanket to keep warm or a rolled-up shirt as a pillow. For people with no access to shelter, that punishes them for being homeless. That is unconscionable and unconstitutional. Punishing people for their status is "cruel and unusual" under the Eighth Amendment. See *Robinson* v. *California*, 370 U. S. 660 (1962).

Homelessness is a reality for too many Americans. On any given night, over half a million people across the country lack a fixed, regular, and adequate nighttime residence. Many do not have access to shelters and are left to sleep in cars, sidewalks, parks, and other public places. They experience homelessness due to complex and interconnected issues, including crippling debt and stagnant wages; domestic and sexual abuse; physical and psychiatric disabilities; and rising housing costs coupled with declining affordable housing options.

2            CITY OF GRANTS PASS *v.* JOHNSON

SOTOMAYOR, J., dissenting

At the same time, States and cities face immense challenges in responding to homelessness. To address these challenges and provide for public health and safety, local governments need wide latitude, including to regulate when, where, and how homeless people sleep in public. The decision below did, in fact, leave cities free to punish "littering, public urination or defecation, obstruction of roadways, possession or distribution of illicit substances, harassment, or violence." App. to Pet. for Cert. 200a. The only question for the Court today is whether the Constitution permits punishing homeless people with no access to shelter for sleeping in public with as little as a blanket to keep warm.

It is possible to acknowledge and balance the issues facing local governments, the humanity and dignity of homeless people, and our constitutional principles. Instead, the majority focuses almost exclusively on the needs of local governments and leaves the most vulnerable in our society with an impossible choice: Either stay awake or be arrested. The Constitution provides a baseline of rights for all Americans rich and poor, housed and unhoused. This Court must safeguard those rights even when, and perhaps especially when, doing so is uncomfortable or unpopular. Otherwise, "the words of the Constitution become little more than good advice." *Trop* v. *Dulles*, 356 U. S. 86, 104 (1958) (plurality opinion).

I

The causes, consequences, and experiences of homelessness are complex and interconnected. The majority paints a picture of "cities across the American West" in "crisis" that are using criminalization as a last resort. *Ante*, at 1. That narrative then animates the majority's reasoning. This account, however, fails to engage seriously with the precipitating causes of homelessness, the damaging effects of criminalization, and the myriad legitimate reasons people may lack or decline shelter.

SOTOMAYOR, J., dissenting

### A

Over 600,000 people experience homelessness in America on any given night, meaning that they lack "a fixed, regular, and adequate nighttime residence." Dept. of Housing and Urban Development, T. de Sousa et al., The 2023 Annual Homeless Assessment Report to Congress 4 (2023 AHAR). These people experience homelessness in different ways. Although 6 in 10 are able to secure shelter beds, the remaining 4 in 10 are unsheltered, sleeping "in places not meant for human habitation," such as sidewalks, abandoned buildings, bus or train stations, camping grounds, and parked vehicles. See *id.*, at 2. "Some sleep alone in public places, without any physical structures (like tents or shacks) or connection to services. Others stay in encampments, which generally refer to groups of people living semipermanently in tents or other temporary structures in a public space." Brief for California as *Amicus Curiae* 6 (California Brief ) (citation omitted). This is in part because there has been a national "shortage of 188,000 shelter beds for individual adults." Brief for Service Providers as *Amici Curiae* 8 (Service Providers Brief ).

People become homeless for many reasons, including some beyond their control. "[S]tagnant wages and the lack of affordable housing" can mean some people are one unexpected medical bill away from being unable to pay rent. Brief for Public Health Professionals and Organizations as *Amici Curiae* 3. Every "$100 increase in median rental price" is "associated with about a 9 percent increase in the estimated homelessness rate." GAO, A. Cackley, Homelessness: Better HUD Oversight of Data Collection Could Improve Estimates of Homeless Populations 30 (GAO–20–433, 2020). Individuals with disabilities, immigrants, and veterans face policies that increase housing instability. See California Brief 7. Natural disasters also play a role, including in Oregon, where increasing numbers of people

"have lost housing because of climate events such as extreme wildfires across the state, floods in the coastal areas, [and] heavy snowstorms." 2023 AHAR 52. Further, "mental and physical health challenges," and family and domestic "violence and abuse" can be precipitating causes of homelessness. California Brief 7.

People experiencing homelessness are young and old, live in families and as individuals, and belong to all races, cultures, and creeds. Given the complex web of causes, it is unsurprising that the burdens of homelessness fall disproportionately on the most vulnerable in our society. People already in precarious positions with mental and physical health, trauma, or abuse may have nowhere else to go if forced to leave their homes. Veterans, victims of domestic violence, teenagers, and people with disabilities are all at an increased risk of homelessness. For veterans, "those with a history of mental health conditions, including post-traumatic stress disorder (PTSD) . . . are at greater risk of homelessness." Brief for American Psychiatric Association et al. as *Amici Curiae* 6. For women, almost 60% of those experiencing homelessness report that fleeing domestic violence was the "immediate cause." Brief for Advocates for Survivors of Gender-Based Violence as *Amici Curiae* 9. For young people, "family dysfunction and rejection, sexual abuse, juvenile legal system involvement, 'aging out' of the foster care system, and economic hardship" make them particularly vulnerable to homelessness. Brief for Juvenile Law Center et al. as *Amici Curiae* 2. For American Indians, "policies of removal and resettlement in tribal lands" have caused displacement, resulting in "a disproportionately high rate of housing insecurity and unsheltered homelessness." Brief for StrongHearts Native Helpline et al. as *Amici Curiae* 10, 24. For people with disabilities, "[l]ess than 5% of housing in the United States is accessible for moderate mobility disabilities, and less than 1% is accessi-

SOTOMAYOR, J., dissenting

ble for wheelchair use." Brief for Disability Rights Education and Defense Fund et al. as *Amici Curiae* 2 (Disability Rights Brief).

B

States and cities responding to the homelessness crisis face the difficult task of addressing the underlying causes of homelessness while also providing for public health and safety. This includes, for example, dealing with the hazards posed by encampments, such as "a heightened risk of disease associated with living outside without bathrooms or wash basins," "deadly fires" from efforts to "prepare food and create heat sources," violent crime, and drug distribution and abuse. California Brief 12.

Local governments need flexibility in responding to homelessness with effective and thoughtful solutions. See *infra*, at 19–21. Almost all of these policy solutions are beyond the scope of this case. The only question here is whether the Constitution permits criminalizing sleeping outside when there is nowhere else to go. That question is increasingly relevant because many local governments have made criminalization a frontline response to homelessness. "[L]ocal measures to criminalize 'acts of living'" by "prohibit[ing] sleeping, eating, sitting, or panhandling in public spaces" have recently proliferated. U. S. Interagency Council on Homelessness, Searching Out Solutions 1 (2012).

Criminalizing homelessness can cause a destabilizing cascade of harm. "Rather than helping people to regain housing, obtain employment, or access needed treatment and services, criminalization creates a costly revolving door that circulates individuals experiencing homelessness from the street to the criminal justice system and back." *Id.*, at 6. When a homeless person is arrested or separated from their property, for example, "items frequently destroyed in-

SOTOMAYOR, J., dissenting

clude personal documents needed for accessing jobs, housing, and services such as IDs, driver's licenses, financial documents, birth certificates, and benefits cards; items required for work such as clothing and uniforms, bicycles, tools, and computers; and irreplaceable mementos." Brief for 57 Social Scientists as *Amici Curiae* 17–18 (Social Scientists Brief). Consider Erin Spencer, a disabled Marine Corps veteran who stores items he uses to make a living, such as tools and bike parts, in a cart. He was arrested repeatedly for illegal lodging. Each time, his cart and belongings were gone once he returned to the sidewalk. "[T]he massive number of times the City or State has taken all I possess leaves me in a vacuous déjà vu." Brief for National Coalition for Homeless Veterans et al. as *Amici Curiae* 28.

Incarceration and warrants from unpaid fines can also result in the loss of employment, benefits, and housing options. See Social Scientists Brief 13, 17 (incarceration and warrants can lead to "termination of federal health benefits such as Social Security, Medicare, or Medicaid," the "loss of a shelter bed," or disqualification from "public housing and Section 8 vouchers"). Finally, criminalization can lead homeless people to "avoid calling the police in the face of abuse or theft for fear of eviction from public space." *Id.*, at 27. Consider the tragic story of a homeless woman "who was raped almost immediately following a police move-along order that pushed her into an unfamiliar area in the dead of night." *Id.,* at 26. She described her hesitation in calling for help: "What's the point? If I called them, they would have made all of us move [again]." *Ibid.*

For people with nowhere else to go, fines and jail time do not deter behavior, reduce homelessness, or increase public safety. In one study, 91% of homeless people who were surveyed "reported remaining outdoors, most often just moving two to three blocks away" when they received a move-along order. *Id.*, at 23. Police officers in these cities recognize as much: "'Look we're not really solving anybody's problem.

SOTOMAYOR, J., dissenting

This is a big game of whack-a-mole.'" *Id.*, at 24. Consider Jerry Lee, a Grants Pass resident who sleeps in a van. Over the course of three days, he was woken up and cited six times for "camping in the city limits" just because he was sleeping in the van. App. 99 (capitalization omitted). Lee left the van each time only to return later to sleep. Police reports eventually noted that he "continues to disregard the city ordinance and returns to the van to sleep as soon as police leave the area. Dayshift needs to check on the van this morning and . . . follow up for tow." *Ibid.* (same).

Shelter beds that are available in theory may be practically unavailable because of "restrictions based on gender, age, income, sexuality, religious practice, curfews that conflict with employment obligations, and time limits on stays." Social Scientists Brief 22. Studies have shown, however, that the "vast majority of those who are unsheltered would move inside if safe and affordable options were available." Service Providers Brief 8 (collecting studies). Consider CarrieLynn Hill. She cannot stay at Gospel Rescue Mission, the only entity in Grants Pass offering temporary beds, because "she would have to check her nebulizer in as medical equipment and, though she must use it at least once every four hours, would not be able to use it in her room." Disability Rights Brief 18. Similarly, Debra Blake's "disabilities prevent her from working, which means she cannot comply with the Gospel Rescue Mission's requirement that its residents work 40-hour work weeks." *Ibid.*

Before I move on, consider one last example of a Nashville man who experienced homelessness for nearly 20 years. When an outreach worker tried to help him secure housing, the worker had difficulty finding him for his appointments because he was frequently arrested for being homeless. He was arrested 198 times and had over 250 charged citations, all for petty offenses. The outreach worker made him a t-shirt that read "Please do not arrest me, my outreach

SOTOMAYOR, J., dissenting

worker is working on my housing." Service Providers Brief 16. Once the worker was able to secure him stable housing, he "had no further encounters with the police, no citations, and no arrests." *Ibid.*

These and countless other stories reflect the reality of criminalizing sleeping outside when people have no other choice.

## II

Grants Pass, a city of 38,000 people in southern Oregon, adopted three ordinances (Ordinances) that effectively make it unlawful to sleep anywhere in public, including in your car, at any time, with as little as a blanket or a rolled-up shirt as a pillow. The Ordinances prohibit "[c]amping" on "any sidewalk, street, alley, lane, public right of way, park, bench, or any other publicly-owned property or under any bridge or viaduct." Grants Pass, Ore. Municipal Code §5.61.030 (2024). A "[c]ampsite" is defined as "any place where bedding, sleeping bag, or other material used for bedding purposes, or any stove or fire is placed, established, or maintained for the purposes of maintaining a temporary place to live." §5.61.010(B). Relevant here, the definition of "campsite" includes sleeping in "any vehicle." *Ibid.* The Ordinances also prohibit camping in public parks, including the "[o]vernight parking" of any vehicle. §6.46.090(B).[1]

The City enforces these Ordinances with fines starting at $295 and increasing to $537.60 if unpaid. Once a person is cited twice for violating park regulations within a 1-year period, city officers can issue an exclusion order barring that person from the park for 30 days. See §6.46.350. A

---

[1] The City's "sleeping" ordinance prohibits sleeping "on public sidewalks, streets, or alleyways at any time as a matter of individual and public safety." §5.61.020(A). That ordinance is not before the Court today because, after the only class representative with standing to challenge this ordinance died, the Ninth Circuit remanded to the District Court "to determine whether a substitute representative is available as to that challenge alone." 72 F. 4th 868, 884 (2023).

SOTOMAYOR, J., dissenting

person who camps in a park after receiving that order commits criminal trespass, which is punishable by a maximum of 30 days in jail and a $1,250 fine.  Ore. Rev. Stat. §164.245 (2023); see §§161.615(3), 161.635(1)(c).

In 2019, the Ninth Circuit held that "'the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter.'"  *Martin* v. *Boise*, 920 F. 3d 584, 616, cert. denied, 589 U. S. ___ (2019). Considering an ordinance from Boise, Idaho, that made it a misdemeanor to use "streets, sidewalks, parks, or public places" for "camping," 920 F. 3d, at 603, the court concluded that "as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property," *id.*, at 617.

Respondents here, two longtime residents of Grants Pass who are homeless and sleep in their cars, sued on behalf of themselves and all other involuntarily homeless people in the City, seeking to enjoin enforcement of the Ordinances. The District Court eventually certified a class and granted summary judgment to respondents.  "As was the case in *Martin*, Grants Pass has far more homeless people than 'practically available' shelter beds."  App. to Pet. for Cert. 179a.  The City had "zero emergency shelter beds," and even counting the beds at the Gospel Rescue Mission (GRM), which is "the only entity in Grants Pass that offers any sort of temporary program for some class members," "GRM's 138 beds would not be nearly enough to accommodate the at least 602 homeless individuals in Grants Pass."  *Id.*, at 179a–180a.  Thus, "the only way for homeless people to legally sleep on public property within the City is if they lay on the ground with only the clothing on their backs and without their items near them."  *Id.*, at 178a.

The District Court entered a narrow injunction.  It concluded that Grants Pass could "implement time and place restrictions for when homeless individuals may use their

belongings to keep warm and dry and when they must have their belonging[s] packed up." *Id.*, at 199a. The City could also "ban the use of tents in public parks," as long as it did not "ban people from using any bedding type materials to keep warm and dry while they sleep." *Id.*, at 199a–200a. Further, Grants Pass could continue to "enforce laws that actually further public health and safety, such as laws restricting littering, public urination or defecation, obstruction of roadways, possession or distribution of illicit substances, harassment, or violence." *Id.,* at 200a.

The Ninth Circuit largely agreed that the Ordinances violated the Eighth Amendment because they punished people who lacked "some place, such as [a] shelter, they can lawfully sleep." 72 F. 4th 868, 894 (2023). It further narrowed the District Court's already-limited injunction. The Ninth Circuit noted that, beyond prohibiting bedding, "the ordinances also prohibit the use of stoves or fires, as well as the erection of any structures." *Id.*, at 895. Because the record did not "establis[h that] the fire, stove, and structure prohibitions deprive homeless persons of sleep or 'the most rudimentary precautions' against the elements," the court remanded for the District Court "to craft a narrower injunction recognizing Plaintiffs' limited right to protection against the elements, as well as limitations when a shelter bed is available." *Ibid.*

### III

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." Amdt. 8 (Punishments Clause). This prohibition, which is not limited to medieval tortures, places "'limitations' on 'the power of those entrusted with the criminal-law function of government.'" *Timbs* v. *Indiana*, 586 U. S. 146, 151 (2019). The Punishments Clause "circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes

SOTOMAYOR, J., dissenting

punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such." *Ingraham* v. *Wright*, 430 U. S. 651, 667 (1977) (citations omitted).

In *Robinson* v. *California*, this Court detailed one substantive limitation on criminal punishment. Lawrence Robinson was convicted under a California statute for "'be[ing] addicted to the use of narcotics'" and faced a mandatory 90-day jail sentence. 370 U. S., at 660. The California statute did not "punis[h] a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration." *Id*., at 666. Instead, it made "the 'status' of narcotic addiction a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.'" *Ibid*.

The Court held that, because it criminalized the "'status' of narcotic addiction," *ibid*., the California law "inflict[ed] a cruel and unusual punishment in violation" of the Punishments Clause, *id*., at 667. Importantly, the Court did not limit that holding to the status of narcotic addiction alone. It began by reasoning that the criminalization of the "mentally ill, or a leper, or [those] afflicted with a venereal disease" "would doubtless be universally thought to be an infliction of cruel and unusual punishment." *Id*., at 666. It extended that same reasoning to the status of being an addict, because "narcotic addiction is an illness" "which may be contracted innocently or involuntarily." *Id*., at 667.

Unlike the majority, see *ante,* at 15–17, the *Robinson* Court did not rely on the harshness of the criminal penalty itself. It understood that "imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual." 370 U. S., at 667. Instead, it reasoned that, when imposed because of a person's status, "[e]ven one day in prison would be a cruel and unusual punishment." *Ibid*.

*Robinson* did not prevent States from using a variety of tools, including criminal law, to address harmful conduct

related to a particular status.  The Court candidly recognized the "vicious evils of the narcotics traffic" and acknowledged the "countless fronts on which those evils may be legitimately attacked."  *Id.*, at 667–668.  It left untouched the "broad power of a State to regulate the narcotic drugs traffic within its borders," including the power to "impose criminal sanctions . . . against the unauthorized manufacture, prescription, sale, purchase, or possession of narcotics," and the power to establish "a program of compulsory treatment for those addicted to narcotics."  *Id.*, at 664–665.

This Court has repeatedly cited *Robinson* for the proposition that the "Eighth Amendment . . . imposes a substantive limit on what can be made criminal and punished as such." *Rhodes* v. *Chapman*, 452 U. S. 337, 346, n. 12 (1981); see also *Gregg* v. *Georgia*, 428 U. S. 153, 172 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) ("The substantive limits imposed by the Eighth Amendment on what can be made criminal and punished were discussed in *Robinson*"). Though it casts aspersions on *Robinson* and mistakenly treats it as an outlier, the majority does not overrule or reconsider that decision.[2]  Nor does the majority cast doubt on this Court's firmly rooted principle that inflicting "unnecessary suffering" that is "grossly disproportionate to the severity of the crime" or that serves no "penological purpose" violates the Punishments Clause.  *Estelle* v. *Gamble*, 429 U. S. 97, 103, and n. 7 (1976).  Instead, the majority sees this case as requiring an application or extension of *Robinson*.  The majority's understanding of *Robinson*, however, is plainly wrong.

_____

[2] See *ante*, at 20 ("[N]o one has asked us to reconsider *Robinson*.  Nor do we see any need to do so today"); but see *ante,* at 23 (gratuitously noting that *Robinson* "sits uneasily with the Amendment's terms, original meaning, and our precedents").  The most important takeaway from these unnecessary swipes at *Robinson* is just that.  They are unnecessary.  *Robinson* remains binding precedent, no matter how incorrectly the majority applies it to these facts.

SOTOMAYOR, J., dissenting

## IV

Grants Pass's Ordinances criminalize being homeless. The status of being homeless (lacking available shelter) is defined by the very behavior singled out for punishment (sleeping outside). The majority protests that the Ordinances "do not criminalize mere status." *Ante,* at 21. Saying so does not make it so. Every shred of evidence points the other way. The Ordinances' purpose, text, and enforcement confirm that they target status, not conduct. For someone with no available shelter, the only way to comply with the Ordinances is to leave Grants Pass altogether.

## A

Start with their purpose. The Ordinances, as enforced, are intended to criminalize being homeless. The Grants Pass City Council held a public meeting in 2013 to "'identify solutions to current vagrancy problems.'" App. to Pet. for Cert. 168a. The council discussed the City's previous efforts to banish homeless people by "buying the person a bus ticket to a specific destination," or transporting them to a different jurisdiction and "leaving them there." App. 113–114. That was unsuccessful, so the council discussed other ideas, including a "'do not serve'" list or "a 'most unwanted list' made by taking pictures of the offenders . . . and then disseminating it to all the service agencies." *Id.,* at 121. The council even contemplated denying basic services such as "food, clothing, bedding, hygiene, and those types of things." *Ibid.*

The idea was deterrence, not altruism. "[U]ntil the pain of staying the same outweighs the pain of changing, people will not change; and some people need an external source to motivate that needed change." *Id.,* at 119. One councilmember opined that "[m]aybe they aren't hungry enough or cold enough . . . to make a change in their behavior." *Id.,* at 122. The council president summed up the goal succinctly: "'[T]he point is to make it uncomfortable enough for

[homeless people] in our city so they will want to move on down the road.'" *Id.*, at 114.[3]

One action item from this meeting was the "'targeted enforcement of illegal camping'" against homeless people. App. to Pet. for Cert. 169a. "The year following the [public meeting] saw a significant increase in enforcement of the City's anti-sleeping and anti-camping ordinances. From 2013 through 2018, the City issued a steady stream of tickets under the ordinances." 72 F. 4th, at 876–877.

### B

Next consider the text. The Ordinances by their terms single out homeless people. They define "campsite" as "any place where bedding, sleeping bag, or other material used for bedding purposes" is placed "for the purpose of maintaining a temporary place to live." §5.61.010. The majority claims that it "makes no difference whether the charged defendant is homeless." *Ante,* at 20. Yet the Ordinances do not apply unless bedding is placed to maintain a temporary place to live. Thus, "what separates prohibited conduct from permissible conduct is a person's intent to 'live' in public spaces. Infants napping in strollers, Sunday afternoon picnickers, and nighttime stargazers may all engage in the same conduct of bringing blankets to public spaces [and sleeping], but they are exempt from punishment because they have a separate 'place to live' to which they presuma-

––––––––––

[3]The majority does not contest that the Ordinances, as enforced, are intended to target homeless people. The majority observes, however, that the council also discussed other ways to handle homelessness in Grants Pass. See *ante,* at 12, n. 1. That is true. Targeted enforcement of the Ordinances to criminalize homelessness was only one solution discussed at the meeting. See App. 131–132 (listing "[a]ctions to move forward," including increasing police presence, exclusion zones, "zero tolerance" signs, "do not serve" or "most unwanted" lists, trespassing letters, and building a sobering center or youth center (internal quotation marks omitted)).

SOTOMAYOR, J., dissenting

bly intend to return." Brief for Criminal Law and Punishment Scholars as *Amici Curiae* 12.

Put another way, the Ordinances single out for punishment the activities that define the status of being homeless. By most definitions, homeless individuals are those that lack "a fixed, regular, and adequate nighttime residence." 42 U. S. C. §11434a(2)(A); 24 CFR §§582.5, 578.3 (2023). Permitting Grants Pass to criminalize sleeping outside with as little as a blanket permits Grants Pass to criminalize homelessness. "There is no . . . separation between being without available indoor shelter and sleeping in public—they are opposite sides of the same coin." Brief for United States as *Amicus Curiae* 25. The Ordinances use the definition of "campsite" as a proxy for homelessness because those lacking "a fixed, regular, and adequate nighttime residence" are those who need to sleep in public to "maintai[n] a temporary place to live."

Take the respondents here, two longtime homeless residents of Grants Pass who sleep in their cars. The Ordinances define "campsite" to include "any vehicle." §5.61.010(B). For respondents, the Ordinances as applied do not criminalize any behavior or conduct related to encampments (such as fires or tents). Instead, the Ordinances target respondents' status as people without any other form of shelter. Under the majority's logic, cities cannot criminalize the status of being homeless, but they can criminalize the conduct that defines that status. The Constitution cannot be evaded by such formalistic distinctions.

The Ordinances' definition of "campsite" creates a situation where homeless people necessarily break the law just by existing. "[U]nsheltered people have no private place to survive, so they are virtually guaranteed to violate these pervasive laws." S. Rankin, Hiding Homelessness: The Transcarceration of Homelessness, 109 Cal. L. Rev. 559, 561 (2021); see also Disability Rights Brief 2 ("[T]he members of Grants Pass's homeless community do not choose to

be homeless. Instead, in a city with no public shelters, they have no alternative but to sleep in parks or on the street"). Every human needs to sleep at some point. Even if homeless people with no available shelter options can exist for a few days in Grants Pass without sleeping, they eventually must leave or be criminally punished.

The majority resists this understanding, arguing that the Ordinances criminalize the conduct of being homeless in Grants Pass while sleeping with as little as a blanket. Therefore, the argument goes, "[r]ather than criminalize mere status, Grants Pass forbids actions." *Ante,* at 20. With no discussion about what it means to criminalize "status" or "conduct," the majority's analysis consists of a few sentences repeating its conclusion again and again in hopes that it will become true. See *ante,* at 20–21 (proclaiming that the Ordinances "forbi[d] actions" "[r]ather than criminalize mere status"; and that they "do not criminalize mere status"). The best the majority can muster is the following tautology: The Ordinances criminalize conduct, not pure status, because they apply to conduct, not status.

The flaw in this conclusion is evident. The majority countenances the criminalization of status as long as the City tacks on an essential bodily function—blinking, sleeping, eating, or breathing. That is just another way to ban the person. By this logic, the majority would conclude that the ordinance deemed unconstitutional in *Robinson* criminalizing "being an addict" would be constitutional if it criminalized "being an addict and breathing." Or take the example in *Robinson*: "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." 370 U. S., at 667. According to the majority, although it is cruel and unusual to punish someone for having a common cold, it is not cruel and unusual to punish them for sniffling or coughing because of that cold. See *Manning* v. *Caldwell*, 930 F. 3d 264, 290 (CA4 2019) (Wilkinson, J., dissenting) ("In the rare case where the Eighth Amendment

SOTOMAYOR, J., dissenting

was found to invalidate a criminal law, the law in question sought to punish persons merely for their need to eat or sleep, which are essential bodily functions. This is simply a variation of *Robinson*'s command that the state identify conduct in crafting its laws, rather than punish a person's mere existence" (citation omitted)).

## C

The Ordinances are enforced exactly as intended: to criminalize the status of being homeless. City officials sought to use the Ordinances to drive homeless people out of town. See *supra*, at 13–14. The message to homeless residents is clear. As Debra Blake, a named plaintiff who passed away while this case was pending, see n. 1, *supra*, shared:

> "I have been repeatedly told by Grants Pass police that I must 'move along' and that there is nowhere in Grants Pass that I can legally sit or rest. I have been repeatedly awakened by Grants Pass police while sleeping and told that I need to get up and move. I have been told by Grants Pass police that I should leave town.
>
> Because I have no choice but to live outside and have no place else to go, I have gotten tickets, fines and have been criminally prosecuted for being homeless." App. 180–181.

Debra Blake's heartbreaking message captures the cruelty of criminalizing someone for their status: "I am afraid at all times in Grants Pass that I could be arrested, ticketed and prosecuted for sleeping outside or for covering myself with a blanket to stay warm." *Id.*, at 182. So, at times, when she could, Blake "slept outside of the city." *Ibid.* Blake, who was disabled, unemployed, and elderly, "owe[d] the City of Grants Pass more than $5000 in fines for crimes and violations related directly to [her] involuntary homelessness and the fact that there is no affordable housing or emergency

shelters in Grants Pass where [she could] stay." *Ibid.*

Another homeless individual was found outside a non-profit "in severe distress outside in the frigid air." *Id.*, at 109. "[H]e could not breathe and he was experiencing acute pain," and he "disclosed fear that he would be arrested and trespassed again for being outside." *Ibid.* Another, Carrie-Lynn Hill, whose story you read earlier, see *supra*, at 7, was ticketed for "lying down on a friend's mat" and "lying down under a tarp to stay warm." App. 134. She was "constantly afraid" of being "cited and arrested for being outside in Grants Pass." *Ibid.* She is unable to stay at the only shelter in the City because she cannot keep her nebulizer, which she needs throughout the night, in her room. So she does "not know of anywhere in the city of Grants Pass where [she] can safely sleep or rest without being arrested, trespassed, or moved along." *Id.*, at 135. As she put it: "The only way I have figured out how to get by is try to stay out of sight and out of mind." *Ibid.* Stories like these fill the record and confirm the City's success in targeting the status of being homeless.

The majority proclaims, with no citation, that "it makes no difference whether the charged defendant is homeless, a backpacker on vacation passing through town, or a student who abandons his dorm room to camp out in protest." *Ante,* at 20. That describes a fantasy. In reality, the deputy chief of police operations acknowledged that he was not aware of "any non-homeless person ever getting a ticket for illegal camping in Grants Pass." Tr. of Jim Hamilton in *Blake* v. *Grants Pass*, No. 1:18–cr–01823 (D Ore., Oct. 16, 2019), ECF Doc. 63–4, p. 16. Officers testified that "laying on a blanket enjoying the park" would not violate the ordinances, ECF Doc. 63–7, at 2; and that bringing a sleeping bag to "look at stars" would not be punished, ECF Doc. 63–5, at 5. Instead, someone violates the Ordinance only if he or she does not "have another home to go to." *Id.,* at 6. That is the definition of being homeless. The majority does not

SOTOMAYOR, J., dissenting

contest any of this.  So much for the Ordinances applying to
backpackers and students.

## V

*Robinson* should squarely resolve this case.  Indeed, the
majority seems to agree that an ordinance that fined and
jailed "homeless" people would be unconstitutional.  See
*ante,* at 21 (disclaiming that the Ordinances "criminalize
mere status").  The majority resists a straightforward ap-
plication of *Robinson* by speculating about policy consider-
ations and fixating on extensions of the Ninth Circuit's nar-
row rule in *Martin.*

The majority is wrong on all accounts.  First, no one con-
tests the power of local governments to address homeless-
ness.  Second, the majority overstates the line-drawing
problems that this case presents.  Third, a straightforward
application of *Robinson* does not conflict with *Powell* v.
*Texas*, 392 U. S. 514 (1968).  Finally, the majority draws the
wrong message from the various *amici* requesting this
Court's guidance.

## A

No one contests that local governments can regulate the
time, place, and manner of public sleeping pursuant to their
power to "enact regulations in the interest of the public
safety, health, welfare or convenience."  *Schneider* v. *State
(Town of Irvington)*, 308 U. S. 147, 160 (1939).  This power
includes controlling "the use of public streets and side-
walks, over which a municipality must rightfully exercise a
great deal of control in the interest of traffic regulation and
public safety."  *Shuttlesworth* v. *Birmingham*, 394 U. S.
147, 152 (1969).  When exercising that power, however, reg-
ulations still "may not abridge the individual liberties se-
cured by the Constitution."  *Schneider*, 308 U. S., at 160.
The Ninth Circuit in *Martin* provided that "an ordinance

violates the Eighth Amendment insofar as it imposes crim-
inal sanctions against homeless individuals for sleeping
outdoors, on public property, when no alternative shelter is
available to them." 920 F. 3d, at 604. *Martin* was narrow.[4]
Consider these qualifications:

> "[O]ur holding does not cover individuals who *do* have
> access to adequate temporary shelter, whether because
> they have the means to pay for it or because it is real-
> istically available to them for free, but who choose not
> to use it. Nor do we suggest that a jurisdiction with
> insufficient shelter can *never* criminalize the act of
> sleeping outside. Even where shelter is unavailable, an
> ordinance prohibiting sitting, lying, or sleeping outside
> at particular times or in particular locations might well
> be constitutionally permissible. So, too, might an ordi-
> nance barring the obstruction of public rights of way or
> the erection of certain structures." *Id.*, at 617, n. 8 (ci-
> tation omitted).

Upholding *Martin* does not call into question all the other
tools that a city has to deal with homelessness. "Some cities
have established approved encampments on public prop-
erty with security, services, and other resources; others
have sought to impose geographic and time-limited bans on
public sleeping; and others have worked to clear and clean
particularly dangerous encampments after providing notice
and reminders to those who lived there." California Brief
14. Others might "limit the use of fires, whether for cooking
or other purposes" or "ban (or enforce already-existing bans
on) particular conduct that negatively affects other people,
including harassment of passersby, illegal drug use, and lit-
tering." Brief for Maryland et al. as *Amici Curiae* 12. All

---

[4]Some district courts have since interpreted *Martin* broadly, relying
on it to enjoin time, place, and manner restrictions on camping outside.
See *ante*, at 7–10, 28–29. This Court is not asked today to consider any
of these interpretations or extensions of *Martin*.

SOTOMAYOR, J., dissenting

of these tools remain available to localities seeking to address homelessness within constitutional bounds.

## B

The scope of this dispute is narrow. Respondents do not challenge the City's "restrictions on the use of tents or other camping gear," "encampment clearances," "time and place restrictions on sleeping outside," or "the imposition of fines or jail time on homeless people who decline accessible shelter options." Brief for Respondents 18.

That means the majority does not need to answer most of the hypotheticals it poses. The City's hypotheticals, echoed throughout the majority opinion, concern "violent crime, drug overdoses, disease, fires, and hazardous waste." Brief for Petitioner 47. For the most part, these concerns are not implicated in this case. The District Court's injunction, for example, permits the City to prohibit "littering, public urination or defecation, obstruction of roadways, possession or distribution of illicit substances, harassment, or violence." App. to Pet. for Cert. 200a. The majority's framing of the problem as one involving drugs, diseases, and fires instead of one involving people trying to keep warm outside with a blanket just provides the Court with cover to permit the criminalization of homeless people.

The majority also overstates the line-drawing problems that a baseline Eighth Amendment standard presents. Consider the "unavoidable" "difficult questions" that discombobulate the majority. *Ante,* at 32–33. Courts answer such factual questions every day. For example, the majority asks: "What does it mean to be 'involuntarily' homeless with 'no place to go'?" *Ibid. Martin*'s answer was clear: It is when "'there is a greater number of homeless individuals in [a city] than the number of available beds [in shelters,]'" not including "individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them

for free." 920 F. 3d, at 617, and n. 8. The District Court here found that Grants Pass had "zero emergency shelter beds" and that Gospel Rescue Mission's "138 beds would not be nearly enough to accommodate the at least 602 homeless individuals in Grants Pass." App. to Pet. for Cert. 179a–180a. The majority also asks: "[W]hat are people entitled to do and use in public spaces to 'keep warm'"? *Ante,* at 33. The District Court's opinion also provided a clear answer: They are permitted "bedding type materials to keep warm and dry," but cities can still "implement time and place restrictions for when homeless individuals . . . must have their belonging[s] packed up." App. to Pet. for Cert. 199a. Ultimately, these are not metaphysical questions but factual ones. See, *e.g.,* 42 U. S. C. §11302 (defining "homeless," "homeless individual," and "homeless person"); 24 CFR §582.5 (defining "[a]n individual or family who lacks a fixed, regular, and adequate nighttime residence").

Just because the majority can list difficult questions that require answers, see *ante,* at 33, n. 8, does not absolve federal judges of the responsibility to interpret and enforce the substantive bounds of the Constitution. The majority proclaims that this dissent "blinks the difficult questions." *Ante,* at 32. The majority should open its eyes to available answers instead of throwing up its hands in defeat.

### C

The majority next spars with a strawman in its discussion of *Powell* v. *Texas.* The Court in *Powell* considered the distinction between status and conduct but could not agree on a controlling rationale. Four Justices concluded that *Robinson* covered any "condition [the defendant] is powerless to change," 392 U. S., at 567 (Fortas, J., dissenting), and four Justices rejected that view. Justice White, casting the decisive fifth vote, left the question open because the defendant had "made no showing that he was unable to stay off the streets on the night in question." *Id.,* at 554 (opinion

SOTOMAYOR, J., dissenting

concurring in judgment). So, in his view, it was "unnecessary to pursue at this point the further definition of the circumstances or the state of intoxication which might bar conviction of a chronic alcoholic for being drunk in a public place." *Id.*, at 553.

This case similarly called for a straightforward application of *Robinson*. The majority finds it telling that this dissent "barely mentions" Justice Marshall's opinion in *Powell*. *Ante,* at 32.[5] The majority completely misses the point. Even Justice Marshall's plurality opinion in *Powell* agreed that *Robinson* prohibited enforcing laws criminalizing "a mere status." 392 U. S., at 532. The *Powell* Court considered a statute that criminalized voluntary conduct (getting drunk) that could be rendered involuntary by a status (alcoholism); here, the Ordinances criminalize conduct (sleeping outside) that defines a particular status (homelessness). So unlike the debate in *Powell*, this case does not turn on whether the criminalized actions are "'involuntary' or 'occasioned by'" a particular status. *Id.*, at 533 (Marshall, J., dissenting). For all the reasons discussed above, see *supra,* at 13–19, these Ordinances criminalize status and are thus unconstitutional under any of the opinions in *Powell*.

### D

The majority does not let the reader forget that "a large number of States, cities, and counties" all "urg[ed] the Court to grant review." *Ante*, at 14; see also *ante*, at 9 ("An exceptionally large number of cities and States have filed briefs in this Court"); *ante,* at 34 (noting the "multitude of

_____

[5] The majority claims that this dissent does not dispute that *Robinson* is "hard to square" with the Eighth Amendment's "text and this Court's other precedents." *Ante*, at 32. That is wrong. See *supra*, at 12 (recognizing *Robinson*'s well-established rule). The majority also claims that this dissent "ignores *Robinson*'s own insistence that a different result would have obtained in that case if the law there had proscribed an act rather than status alone." *Ante*, at 32. That too is wrong. See *supra*, at 11–12 (discussing *Robinson*'s distinction between status and conduct).

*amicus* briefs before us"); *ante,* at 14, n. 3 (listing certiorari-stage *amici*). No one contests that States, cities, and counties could benefit from this Court's guidance. Yet the majority relies on these *amici* to shift the goalposts and focus on policy questions beyond the scope of this case. It first declares that "[t]he only question we face is whether one specific provision of the Constitution . . . prohibits the enforcement of public-camping laws." *Ante,* at 31. Yet it quickly shifts gears and claims that "the question this case presents is whether the Eighth Amendment grants federal judges primary responsibility for assessing those causes [of homelessness] and devising those responses." *Ante,* at 34. This sleight of hand allows the majority to abdicate its responsibility to answer the first (legal) question by declining to answer the second (policy) one.

The majority cites various *amicus* briefs to amplify Grants Pass's belief that its homelessness crisis is intractable absent the ability to criminalize homelessness. In so doing, the majority chooses to see only what it wants. Many of those stakeholders support the narrow rule in *Martin.* See, *e.g.,* Brief for City and County of San Francisco et al. as *Amici Curiae* 4 ("[U]nder the Eighth Amendment . . . a local municipality may not prohibit sleeping—a biological necessity—in all public spaces at all times and under all conditions, if there is no alternative space available in the jurisdiction for unhoused people to sleep"); Brief for City of Los Angeles as *Amicus Curiae* 1 ("The City agrees with the broad premise underlying the *Martin* and *Johnson* decisions: when a person has no other place to sleep, sleeping at night in a public space should not be a crime leading to an arrest, criminal conviction, or jail"); California Brief 2–3 ("[T]he Constitution does not allow the government to punish people for the status of being homeless. Nor should it allow the government to effectively punish the status of being homeless by making it a crime in all events for someone with no other options to sleep outside on public property at

SOTOMAYOR, J., dissenting

night").

Even the Federal Government, which restricts some sleeping activities on park lands, see *ante,* at 7, has for nearly three decades "taken the position that laws prohibiting sleeping in public at all times and in all places violate the *Robinson* principle as applied to individuals who have no access to shelter." Brief for United States as *Amicus Curiae* 14. The same is true of States across the Nation. See Brief for Maryland et al. as *Amici Curiae* 3–4 ("Taking these policies [criminalizing homelessness] off the table does not interfere with our ability to address homelessness (including the effects of homelessness on surrounding communities) using other policy tools, nor does it amount to an undue intrusion on state sovereignty").

Nothing in today's decision prevents these States, cities, and counties from declining to criminalize people for sleeping in public when they have no available shelter. Indeed, although the majority describes *Martin* as adopting an unworkable rule, the elected representatives in Oregon codified that very rule. See *infra,* at 26. The majority does these localities a disservice by ascribing to them a demand for unfettered freedom to punish that many do not seek.

## VI

The Court wrongly concludes that the Eighth Amendment permits Ordinances that effectively criminalize being homeless. Grants Pass's Ordinances may still raise a host of other legal issues. Perhaps recognizing the untenable position it adopts, the majority stresses that "many substantive legal protections and provisions of the Constitution may have important roles to play when States and cities seek to enforce their laws against the homeless." *Ante,* at 31. That is true. Although I do not prejudge the merits of these other issues, I detail some here so that people experiencing homelessness and their advocates do not take the

SOTOMAYOR, J., dissenting

Court's decision today as closing the door on such claims.[6]

A

The Court today does not decide whether the Ordinances are valid under a new Oregon law that codifies *Martin*. In 2021, Oregon passed a law that constrains the ability of municipalities to punish homeless residents for public sleeping. "Any city or county law that regulates the acts of sitting, lying, sleeping or keeping warm and dry outdoors on public property that is open to the public must be objectively reasonable as to time, place and manner with regards to persons experiencing homelessness." Ore. Rev. Stat. §195.530(2). The law also grants persons "experiencing homelessness" a cause of action to "bring suit for injunctive or declaratory relief to challenge the objective reasonableness" of an ordinance. §195.530(4). This law was meant to "'ensure that individuals experiencing homelessness are protected from fines or arrest for sleeping or camping on public property when there are no other options.'" Brief in Opposition 35 (quoting Speaker T. Kotek, Hearing on H. B. 3115 before the House Committee on the Judiciary, 2021 Reg. Sess. (Ore., Mar. 9, 2021)). The panel below already concluded that "[t]he city ordinances addressed in *Grants Pass* will be superseded, to some extent," by this new law. 72 F. 4th, at 924, n. 7. Courts may need to determine whether and how the new law limits the City's enforcement of its Ordinances.

B

The Court today also does not decide whether the Ordinances violate the Eighth Amendment's Excessive Fines Clause. That Clause separately "limits the government's

_____

[6]The majority does not address whether the Eighth Amendment requires a more particularized inquiry into the circumstances of the individuals subject to the City's ordinances. See Brief for United States as *Amicus Curiae* 27. I therefore do not discuss that issue here.

SOTOMAYOR, J., dissenting

power to extract payments, whether in cash or in kind, as punishment for some offense." *United States* v. *Bajakajian*, 524 U. S. 321, 328 (1998) (internal quotation marks omitted). "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.*, at 334.

The District Court in this case concluded that the fines here serve "no remedial purpose" but rather are "intended to deter homeless individuals from residing in Grants Pass." App. to Pet. for Cert. 189a. Because it concluded that the fines are punitive, it went on to determine that the fines are "'grossly disproportionate to the gravity of the offense'" and thus excessive. *Ibid.* The Ninth Circuit declined to consider this holding because the City presented "no meaningful argument on appeal regarding the excessive fines issue." 72 F. 4th, at 895. On remand, the Ninth Circuit is free to consider whether the City forfeited its appeal on this ground and, if not, whether this issue has merit.

### C

Finally, the Court does not decide whether the Ordinances violate the Due Process Clause. "The Due Process Clauses of the Fifth and Fourteenth Amendments ensure that officials may not displace certain rules associated with criminal liability that are 'so old and venerable,' '"so rooted in the traditions and conscience of our people[,] as to be ranked as fundamental."'" *Ante,* at 15 (quoting *Kahler* v. *Kansas*, 589 U. S. 271, 279 (2020)). The majority notes that due process arguments in *Robinson* "may have made some sense." *Ante,* at 19. On that score, I agree. "[H]istorically, crimes in England and this country have usually required proof of some act (or *actus reus*) undertaken with some measure of volition (*mens rea*)." *Ibid.* "This view 'took deep

and early root in American soil' where, to this day, a crime ordinarily arises 'only from concurrence of an evil-meaning mind with an evil-doing hand.' *Morissette* v. *United States*, 342 U. S. 246, 251–252 (1952)." *Ibid*. Yet the law at issue in *Robinson* "was an anomaly, as it required proof of neither of those things." *Ante,* at 19.

Relatedly, this Court has concluded that some vagrancy laws are unconstitutionally vague. See, *e.g.*, *Kolender* v. *Lawson*, 461 U. S. 352, 361–362 (1983) (invalidating California law that required people who loiter or wander on the street to provide identification and account for their presence); *Papachristou* v. *Jacksonville*, 405 U. S. 156, 161–162 (1972) (concluding that vagrancy law employing "'archaic language'" in its definition was "void for vagueness"); accord, *Desertrain* v. *Los Angeles*, 754 F. 3d 1147, 1155–1157 (CA9 2014) (holding that an ordinance prohibiting the use of a vehicle as "'living quarters'" was void for vagueness because the ordinance did not define "living quarters"). Other potentially relevant due process precedents abound. See, *e.g.*, *Winters* v. *New York*, 333 U. S. 507, 520 (1948) ("Where a statute is so vague as to make criminal an innocent act, a conviction under it cannot be sustained"); *Chicago* v. *Morales*, 527 U. S. 41, 57 (1999) (opinion of Stevens, J.) (invalidating ordinance that failed "to distinguish between innocent conduct and conduct threatening harm").

The Due Process Clause may well place constitutional limits on anti-homelessness ordinances. See, *e.g.*, *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250, 263–264 (1974) (considering statute that denied people medical care depending on duration of residency and concluding that "to the extent the purpose of the [statute] is to inhibit the immigration of indigents generally, that goal is constitutionally impermissible"); *Pottinger* v. *Miami*, 810 F. Supp. 1551, 1580 (SD Fla. 1992) (concluding that "enforcement of laws that prevent homeless individuals who have no place to go from sleeping" might also unconstitutionally "burde[n]

SOTOMAYOR, J., dissenting

their right to travel"); see also *ante,* at 21, n. 5 (noting that these Ordinances "may implicate due process and our precedents regarding selective prosecution").

## D

The Ordinances might also implicate other legal issues. See, *e.g.*, *Trop*, 356 U. S., at 101 (plurality opinion) (concluding that a law that banishes people threatens "the total destruction of the individual's status in organized society"); Brief for United States as *Amicus Curiae* 21 (describing the Ordinances here as "akin to a form of banishment, a measure that is now generally recognized as contrary to our Nation's legal tradition"); *Lavan* v. *Los Angeles*, 693 F. 3d 1022, 1029 (CA9 2012) (holding that a city violated homeless plaintiffs' Fourth Amendment rights by seizing and destroying property in an encampment, because "[v]iolation of a City ordinance does not vitiate the Fourth Amendment's protection of one's property").

The Court's misstep today is confined to its application of *Robinson*. It is quite possible, indeed likely, that these and similar ordinances will face more days in court.

\*     \*     \*

Homelessness in America is a complex and heartbreaking crisis. People experiencing homelessness face immense challenges, as do local and state governments. Especially in the face of these challenges, this Court has an obligation to apply the Constitution faithfully and evenhandedly.

The Eighth Amendment prohibits punishing homelessness by criminalizing sleeping outside when an individual has nowhere else to go. It is cruel and unusual to apply any penalty "selectively to minorities whose numbers are few, who are outcasts of society, and who are unpopular, but whom society is willing to see suffer though it would not countenance general application of the same penalty across the board." *Furman* v. *Georgia*, 408 U. S. 238, 245 (1972)

(Douglas, J., concurring).

I remain hopeful that our society will come together "to address the complexities of the homelessness challenge facing the most vulnerable among us." *Ante,* at 34. That responsibility is shared by those vulnerable populations, the States and cities in which they reside, and each and every one of us. "It is only after we begin to see a street as *our* street, a public park as *our* park, a school as *our* school, that we can become engaged citizens, dedicating our time and resources for worthwhile causes." M. Desmond, Evicted: Property and Profit in the American City 294 (2016).

This Court, too, has a role to play in faithfully enforcing the Constitution to prohibit punishing the very existence of those without shelter. I remain hopeful that someday in the near future, this Court will play its role in safeguarding constitutional liberties for the most vulnerable among us. Because the Court today abdicates that role, I respectfully dissent.